IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OTO ANALYTICS, INC. D/B/A WOMPLY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-cv-2636 |
| | § | |
| CAPITAL PLUS FINANCIAL, LLC, | § | |
| CROSSROADS SYSTEMS, INC. AND | § | |
| ERIC DONNELLY, | § | |
| | § | |
| Defendants. | § | |

## **DEFENDANTS' NOTICE OF REMOVAL**

Defendants Capital Plus Financial, LLC, Crossroads Systems, Inc. ("Crossroads"), and Eric Donnelly (collectively "Capital Plus"), with a full reservation of rights, defenses, objections, and exceptions, hereby remove the above-captioned action from the 95th Judicial District, Dallas County, Texas, to the United States District Court for the Northern District of Texas. In support of removal, defendants state:

1.  On September 9, 2021, Plaintiff Oto Analytics, Inc. d/b/a Womply ("Womply") filed the state court action captioned *Oto Analytics, Inc. d/b/a Womply v. Capital Plus Financial, LLC et al.*, Cause No. DC-21-13097, in the District Court of Dallas County, Texas, 95th Judicial District. Ex. B-1.

2.  Removal is timely. Capital Plus Financial, LLC was served with a copy of Womply's Original Petition on September 23, 2021. *See* Ex. B-7. Other defendants were served after that date. This notice is therefore timely filed because defendants are filing this notice of removal within the 30-day period required by 28 U.S.C. § 1446(b)(1). *See* Fed. R. Civ. P. 6(a)(1)(C).

3. Venue is proper. The United States District Court of the Northern District of Texas, Dallas Division, is the district court "embracing the place where [this] action is pending." 28 U.S.C. § 1441(a).

4. Removal is proper pursuant to both federal-question jurisdiction and the federal officer removal statute. Although plaintiff asserts only state common law claims, the viability of each claim depends on interpretation of federal law—both statutory and regulatory—governing the Paycheck Protection Program ("PPP"). Congress expressly prohibited plaintiffs like Womply from attempting to hold defendants like Capital Plus "responsible" for fees in the absence of a direct contractual relationship, which Womply admits does not exist. 15 U.S.C. § 636(a)(36)(P)(ii). Moreover, the governing statute and corresponding regulations both render illegal the contract plaintiff seeks to rely upon and strictly caps the fees payable to an entity like Womply—the validity of this underlying contract is an essential element of plaintiff's fraud and tortious interference claims. Finally, the lawsuit challenges the conduct of Capital Plus while it was acting under the "delegated" authority of SBA. As a result, plaintiff's claims—albeit facially raising only state law claims—implicate significant federal issues justifying removal under *Grable & Sons Metal Products, Inc. v. Darue Engineering & Manufacturing*, 545 U.S. 308, 312 (2005), and the federal officer removal statute.

## BACKGROUND

5. This is a business dispute arising out of PPP.

6. In 2020, the United States Congress authorized the Small Business Administration ("SBA") to administer PPP to support small businesses during the COVID-19 pandemic. Under PPP, private lenders make loans that are guaranteed by SBA. To the extent the borrower uses the proceeds as required by the statutory and regulatory requirements, repayment of that portion of the

loan may be "forgiven," triggering SBA's guarantee—effectively meaning the federal government paid off that portion of the loan for the borrower. SBA promulgates regulations and guidance for PPP and ensures compliance with PPP. But many tasks related to the loans—finding borrowers, vetting borrowers, and making the loans—fall to the financial institutions that act as lenders.

7.     In 2020 and 2021, Capital Plus underwrote loans to borrowers under PPP. Capital Plus is a Community Development Financial Institution ("CDFI"), which means it is dedicated to serving underserved markets and disinvested communities. To facilitate its loan operation, in late 2020, Capital Plus signed a Lender Service Provider Agreement (LSPA) with a company called Blueacorn, who agreed to handle some of the underwriting and processing associated with certain PPP loans.

8.     Womply alleges that it is a California-based technology company that developed a platform allowing: (a) potential borrowers to apply for loans under PPP; (b) Womply to refer those potential borrowers to its partner lenders; and (c) those lenders to manage and track PPP loans they funded. Pet. ¶ 26 (Ex. B-1).

9.     In early 2021, the expiration date for PPP was extended from March 31, 2021 to June 30, 2021. The extension, however, was designed to get money to a narrower group of borrowers, namely those in underserved communities. As a result, the extension allowed only CDFIs like Capital Plus and Minority Depository Institutions to make the loans.

10.    Upon information and belief, as the CDFI requirement became effective, Womply faced an issue: it had compiled applications for approximately 140,000 potential borrowers but had not yet referred these borrowers to a lender. Womply approached Blueacorn in May 2021 with the possibility of referring the borrowers to Capital Plus—a qualifying CDFI lender.

11. Womply claims that Blueacorn proposed a business relationship where Womply would refer loans to Capital Plus but would have no contractual relationship with Capital Plus. Pet. ¶ 27 (Ex. B-1). Instead, Blueacorn would act as some sort of middleman and agree to pay Womply a portion of the fees that Blueacorn would receive from Capital Plus. *Id.* Capital Plus was not involved in these discussions.

12. Womply claims that it was hesitant to enter into the agreement with Blueacorn without certain assurances from Capital Plus that Blueacorn would receive the fees to pay Womply. Pet. ¶ 28 (Ex. B-1). Womply claims that in response to Womply's concerns, Capital Plus represented any fees paid by SBA would be deposited into an account owned jointly by Capital Plus and Blueacorn. *Id.* ¶ 29. In other words, Womply claims that Capital Plus represented SBA would simultaneously pay Blueacorn and Capital Plus. This representation mattered—according to Womply—because a few days later Womply signed contracts with Blueacorn that conditioned Blueacorn's payment obligations to Womply on Blueacorn's actual receipt of fees from Capital Plus. *Id.* ¶ 32.

13. Womply signed two contracts with Blueacorn. Pet. ¶ 30 (Ex. B-1). The contracts, which Womply incorporated by reference into its Petition, *e.g.*, *id.* ¶ 31, are attached as **Exhibit E**. Although purportedly two contracts—a "Referral Agreement" and an "Order Form"—the contracts substantively comprise a single agreement. Both contracts require Womply to perform the same contractual obligations. Referral Agreement § 1.2 (Ex. E at 2) (requiring Womply to conduct a review process in completing applications of prospective borrowers described in Exhibit A to the Referral Agreement); Order Form Description of "Service" (Ex. E at 10) (listing the same items covered by Exhibit A to the Referral Agreement); Order Form Add'l Terms & Conditions § 2.1 (Ex. E at 11) ("Section 1.2 of the Referral Agreement is hereby incorporated by reference.").

The actual service that Womply was providing was preparing and reviewing applications by potential borrowers for referral. *See, e.g.*, Referral Agreement Ex. A (Ex. E at 6) (describing the steps that Womply was required to perform to prepare and review an application before sending to Blueacorn).

14. While both contracts purportedly require payment of two distinct fees—a "Referral Fee" and a so-called "Technology Fee"—this is just a façade. The calculation for the Technology Fee eliminates the Referral Fee, so that Blueacorn really owes Womply the Technology Fee amount. Order Form Add'l Terms & Conditions § 3.4 (Ex. E at 12). In effect, the contracts purport to entitle Womply to at least 40% of lender fees paid by SBA on a particular loan. *Id.*[1]

15. Finally, each contract expressly says that it is "subject to All Applicable Laws, including SBA Regulations," which in turn is defined to include all federal statutes and SBA Regulations governing PPP. Referral Agreement § 9 (Ex. E at 4); Order Form Add'l Terms & Conditions § 9 (Ex. E at 14).

16. Because Capital Plus has not paid Blueacorn the fees that Womply claims are due under these contracts, Womply sued Capital Plus for (1) fraudulent inducement of Womply to enter into the Blueacorn contracts, (2) tortious interference with the Blueacorn contracts, (3) conversion, and (4) unjust enrichment.

---

[1] The Technology Fee consists of $250 per loan plus one-third of all fees (minus the $250) paid by SBA on a particular loan, which for the loans in question was $2500 or less. The Referral Fee was netted out, so it did not change this preceding math. As a result, on a loan with a $2,500 fee, the Technology Fee would equal $999.99 or 40% of the fees paid by SBA to Capital Plus. For those loans with fees less than $2,500, the Technology Fee would exceed 40% of the fees paid by SBA to Capital Plus.

## REMOVAL IS PROPER UNDER FEDERAL QUESTION JURISDICTION

17. Removal is proper because Womply's suit involves a federal question. 28 U.S.C. §§ 1331, 1441(a).

18. "[I]n certain cases federal-question jurisdiction will lie over state-law claims that implicate significant federal issues," even where only state-law claims are cited in a complaint. *Grable*, 545 U.S. at 312. "[F]ederal jurisdiction over a state law claim will lie if a federal issue is: (1) necessarily raised, (2) actually disputed, (3) substantial, and (4) capable of resolution in federal court without disrupting the federal-state balance approved by Congress." *Gunn v. Minton*, 568 U.S. 251, 258 (2013).

19. Here, all four requirements are satisfied, and the Court has federal-question jurisdiction over all Womply's claims because they seek to hold Capital Plus "responsible" for Womply's fees in violation of a clear federal statute, and over Womply's fraud and tortious interference claims because to establish key elements of each, Womply must show its contract with Blueacorn complied with federal law.

20. To the extent any of Womply's claims do not involve a federal question, this Court has supplemental jurisdiction over those claims under 28 U.S.C. § 1367.[2]

### Womply's Claims Arise Under Federal Law.

21. All four factors of the *Grable* inquiry are satisfied by Womply's claims.

#### A. *Womply's Claims Necessarily Raise Federal Issues.*

22. The entire point of Womply's lawsuit is to hold Capital Plus liable for fees under PPP. On December 27, 2020, Congress passed the Economic Aid Act which extended PPP.

---

[2] The claims are thus all removable. But even if any of Womply's claims were nonremovable, so long as Womply's suit involves at least one federal-question claim, the entire action could be removed. *See* 28 U.S.C. § 1441(c)(1). Then, after removal, the Court would sever the nonremovable claim and remand it to state court. *See* 28 U.S.C. § 1441(c)(2).

6

Among other things, the statute also addressed payments to "agents" in connection with PPP; "agents" is a broad term under the relevant implementing regulations that essentially covers anyone acting in any sort of representative capacity. 13 C.F.R. § 103.1(a) ("Agent means an authorized representative, including . . . any other person representing an Applicant or Participant by conducting business with SBA.") & *id.* § 103.1(b) ("The term *conduct business with SBA* means: (1) Preparing or submitting on behalf of an applicant an application for financial assistance of any kind . . . ; (2) Preparing or processing on behalf of a lender or a participant in any of SBA's programs an application for federal financial assistance . . . ."). Here, Womply helped all the borrowers complete their applications, including collecting supporting information, and then referred the loans to Capital Plus. Womply was, therefore, categorically acting as an "agent" for purposes of PPP.

23. With regard to agent fees, the statute prohibits "agent[s] that assist[] an eligible recipient to prepare an application for a covered loan" from collecting a fee in excess of limits set by SBA. 15 U.S.C. § 636(a)(36)(P)(iii). The statute also provides that a lender like Capital Plus shall not be "responsible" for paying fees to an agent, like Womply, with whom it does not directly contract: "A lender ***shall only be responsible*** for paying fees to an agent for services for which the lender ***directly contracts*** with the agent." *Id.* (emphases added). During 2020, many purported agents attempted to recover against lenders for payment fees on various legal theories even though the purported agents had no contract with the respective lenders. *See, e.g.*, *Juan Antonio Sanchez, PC v. Bank of South Texas*, 494 F. Supp. 3d 421 (S.D. Tex. 2020). These claims were universally rejected, *e.g.*, *id.* at 434, and in an amendment to the statute in late 2020, Congress added the "directly contracts" language, presumably to foreclose such suits. Consol. Appropriations Act, 2021, Pub. L. No. 116-260, § 340, 134 Stat. 1182, 2050.

24.     It is undisputed that Capital Plus did not contract directly with Womply for any services. Womply's lawsuit unambiguously alleges that was precisely what Womply wanted to achieve: Womply alleges that from the outset, the idea was that "Womply would contract only with Blueacorn" and that "Capital Plus would have no contractual obligation to pay Womply for the referral and technology services it provided." Pet. ¶¶ 27 & 28 (Ex. B-1). Yet now Womply seeks to hold Capital Plus "responsible" for agent fees. Each of Womply's claims seeks as relief that Capital Plus be held responsible for $76 million of such fees in direct contravention of federal law. *Id.* ¶¶ 72, 78, 81, 87 & Prayer for Relief.

25.     As outlined below, it is no accident that Womply did not ask Capital Plus for a direct contractual relationship; Womply was trying to evade caps on fees collected from lenders like Capital Plus by not contracting with Capital Plus. Womply's scheme was too cute because it overlooked the statutory protection afforded lenders against claims like Womply's.

26.     In addition to the above federal question, both Womply's tortious interference and fraudulent inducement claims share a necessary element: a valid underlying contract—*i.e.*, that Womply's contracts with Blueacorn are legal under federal law. "To establish a claim for tortious interference with a contract, a plaintiff must establish: (1) the existence of a valid contract subject to interference; (2) that the defendant willfully and intentionally interfered with the contract; (3) that the interference proximately caused the plaintiff's injury; and (4) that the plaintiff incurred actual damage or loss." *Cmty. Health Sys. Prof'l Servs. Corp. v. Hansen*, 525 S.W.3d 671, 689 (Tex. 2017). To prove "existence of a valid contract" (element one), Womply would have to show the Blueacorn contracts are legally valid and enforceable. To satisfy proximate causation and actual loss (the third and fourth elements), Womply would have to show that Blueacorn could perform the contracts and breached. *Amigo Broad. LP v. Spanish Broad. Sys., Inc.*, 521 F.3d 472,

8

493 (5th Cir. 2008) ("To establish proximate cause, a party must show that 'the defendant took an active part in persuading a party to a contract to breach it.'").

27.     To prevail on a fraud claim, "a plaintiff must show that: (1) the defendant made a false, material representation; (2) the defendant knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; (3) the defendant intended to induce the plaintiff to act upon the representation; and (4) the plaintiff justifiably relied on the representation, which caused the plaintiff injury." *Barrow-Shaver Res. Co. v. Carrizo Oil & Gas, Inc.*, 590 S.W.3d 471, 496 (Tex. 2019), reh'g denied (Jan. 17, 2020) (internal quotation marks and citations omitted).  Because Womply's claimed injury is loss of fees under the Blueacorn contract, Womply must show that it could have been paid those fees without violating federal law. *Villanueva v. Gonzalez,* 123 S.W.3d 461, 468 (Tex. App.—San Antonio 2003, no pet.) ("Gonzalez moved for judgment notwithstanding the verdict, in part, on the basis that Villanueva could not recover lost profits on his fraud or fraudulent inducement claim because he did not have an otherwise enforceable contract on which to predicate such an award. . . . Here, the contract claimed by Villanueva is unenforceable because it is illegal.  Therefore, his fraud claim to recover the benefit of an unenforceable bargain cannot stand.").  As well, Womply cannot establish the element of reasonable reliance; Womply claims it relied on alleged statements that if actually made (Defendants deny this) would be manifestly false because the governing SBA rules clearly prohibit what Womply claims was represented, and Womply is presumed to know the law.

28.     As explained below, the Womply–Blueacorn contracts as written violate federal law because the provided fee structure would exceed a clear regulatory cap.  Alternatively, the contracts, which say they are subject to SBA regulations, must be construed not to require Blueacorn to violate these regulations by making the payments Womply seeks; as a result,

9

Blueacorn did not breach the contracts by failing to pay Womply, so there was no injury attributable to an alleged interference or fraud by Capital Plus. If correct as a matter of federal law, Womply cannot satisfy its affirmative burden on either the tortious interference or fraudulent inducement claims.

29. Given the clear statutory command making lenders responsible for fees only if a direct contract exists as outlined above, one might wonder why Womply would not have sought to contract directly with Capital Plus? The answer is that Womply sought to evade limits on the size of the fees it could collect. The Blueacorn contracts clearly call for payment of fees in violation of the relevant SBA regulations.

30. To implement the Economic Aid Act, SBA issued regulations setting limits on the fees that agents acting in the capacity Womply was acting could collect. On January 14, 2021, SBA issued an Interim Final Rule governing the Paycheck Protection Program as Amended by the Economic Aid Act. 86 Fed. Reg. 3692 (Jan. 14, 2021). With regard to agent fees, the regulation provides:

> A lender is only responsible for paying fees to an agent for services for which the lender directly contracts with the agent. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:
> a. One (1) percent for loans of not more than $350,000;
> b. 0.50 percent for loans of more than $350,000 and less than $2 million; and
> c. 0.25 percent for loans of at least $2 million.

*Id.* at 3709. All the loans at issue were relatively small loans—almost all well under $25,000. As a result, an agent could not collect more than $250 as the capped fee amount of 1% of the amount of the loan. SBA, however, generally paid the lender $2,500 in fees for such loans—unless the loan was for less than $5,000, in which case the fee was 50% of the loan amount. *Id.* at 3708. As result, the cap meant that for loans of less than $25,000, an agent could receive no more than 10%

of the SBA fee ($250 out of $2,500) and even less for smaller loans. As noted above, Womply's contracts with Blueacorn purport to give Womply a minimum of 40% of the SBA fees.

31. Apparently, Womply believed that by contracting with Blueacorn instead of Capital Plus, Womply could circumvent the SBA fee caps. Womply apparently contends that SBA only set caps on fees paid by "lenders" and Blueacorn is not a lender. This ignores the regulatory language. The regulation governs "the total amount that an agent may *collect* from the lender . . . ." 86 Fed. Reg. 3709. Under the Blueacorn contract, Blueacorn's payment obligation to Womply is expressly dependent on payment of fees from Capital Plus; thus, the express source of the fees Womply would "collect" is Capital Plus, the lender. Referral Agreement § 2.3 (Ex. E at 2) ("Within five (5) days after Blueacorn receives its fees from the lender . . . Blueacorn will pay Womply . . . ."); Order Form Add'l Terms & Conditions § 3.5 (Ex. E at 12) (same). Womply's position that the fees were not collected from a lender is made even worse if one credits Womply's claim that the fees were supposed to come directly from an account jointly owned by Capital Plus—the lender. Even if the language did not foreclose Womply's effort at evasion, it would make no sense to construe the regulation to cap fees if the payment was made via a check from the lender to the agent but not to cap the fees if the lender first gave the money to a third-party that in turn paid the agent.

32. Womply may also attempt to claim that the cap does not apply because it was doing more than referring loans to Capital Plus; it was providing a "platform." Pet. ¶ 26 (Ex. B-1). But this position would ignore both the language of the regulation and the language of Womply's contracts. The cap applies to any fees collected by an agent from a lender "for assistance in preparing an application for a PPP loan (including referral to the lender)." 86 Fed. Reg. 3709. Despite Womply's effort to dress up its fees under the label "Technology Fees," the actual

contractual performance required by the contracts—and for which Womply alleges it is entitled to compensation—consists of completing and reviewing borrower applications and referring the loans to Capital Plus. *See supra* paras. 13, 14. Moreover, any additional services Womply provided would constitute "assistance in preparing an application for a PPP loan (including referral to the lender)." Given the stage in the process when Womply contracted with Blueacorn (Womply apparently had received information from 140,000 potential borrowers) and given that Womply is not a lender, the only service Womply could offer was assistance in completing the applications and referring them to Capital Plus.

33. Additionally, Womply cannot establish the element of reasonable reliance necessary to sustain a fraud claim because as a matter of law Womply is charged with knowing federal law which directly prohibits the payment set-up Womply claimed it reasonably believed existed. Specifically, Womply claims that Capital Plus represented that Blueacorn and Capital Plus held a "joint account" in which all fees received from SBA "were deposited directly." Pet. ¶ 29 (Ex. B-1). Womply claims that this representation allayed its concern that "Blueacorn may default on its contractual obligations if Capital Plus chose not to compensate Blueacorn." *Id.* ¶ 28. In other words, if SBA deposited the fees into an account owned in part by Blueacorn, Capital Plus (with which Womply had no contractual relationship) would not have unilateral control over the fees, so Blueacorn could pay Womply under their contracts. Womply claims that it was in reliance on this representation that Womply entered into the Blueacorn contracts that made payment to Womply contingent on Blueacorn's receipt of fees from Capital Plus.

34. Under Texas law, a party is presumed to know the law. *Steward v. Tex. Lottery Comm'n*, 975 S.W.2d 732 (Tex. App.—Corpus Christi 1998, no pet.). The fact allegedly represented by Capital Plus—that SBA paid fees into an account owned in part by Blueacorn—

runs directly counter to federal law. SBA has instructed lenders that the account into which loan fees will be deposited must be "owned **by the Lender**" and that SBA will not pay third-parties acting on behalf of lenders, such as Lender Service Providers. *See* SBA, SBA Procedural Notice Control No. 5000-20091, Second Updated Paycheck Protection Program Lender Processing Fee Payment & 1502 Reporting Process (Feb. 8, 2021) (emphasis added) ("SBA will not make any payments to LSPs [Lender Service Providers]"). Given the legal presumption that Womply knew about this regulation, Womply cannot establish justifiable reliance to recover for fraud. *Barrow-Shaver Res. Co.*, 590 S.W.3d at 497.

### B. The Federal Issues Raised by Womply's Tortious Interference and Fraud Claims Are Actually Disputed.

35. The first *Grable* element—that the federal issues are actually disputed—is easily satisfied. Womply's lawsuit makes no sense whatsoever unless Womply has some different understanding of the meaning or application of the federal laws and statutes cited above.

### C. The Federal Issues Raised by Womply's Claims Are Substantial.

36. "The substantiality inquiry under *Grable* looks [] to the importance of the issue to the federal system as a whole." *Gunn*, 568 U.S. at 260. "The Supreme Court has suggested that an issue can be important for many reasons: because state adjudication would undermine the development of a uniform body of federal law; because the case presents a nearly pure issue of law that would have applications to other federal cases; or because resolution of the issue has broad significance for the federal government." *Bd. of Comm'rs of Se. La. Flood Prot. Auth.-E. v. Tenn. Gas Pipeline Co., L.L.C.*, 850 F.3d 714, 724 (5th Cir. 2017) (internal quotation marks and notes omitted) (collecting cases).

37. PPP is a nationwide, federal program established under statute, implemented by regulations promulgated by SBA, funded by banks throughout the United States, and guaranteed

by SBA.  The Federal Government has invested almost one trillion dollars in PPP.  Under the authority given it by Congress, SBA has promulgated rules, regulations, and guidance intended to reduce the likelihood of fraud and maximize the achievement of PPP's goals.  SBA has issued strict rules and regulations regarding the payment of fees to LSPs and agents who assist the bank making loans to borrowers.  For example, pursuant to Congressional command, SBA has placed limits on the "total amount that an agent may collect from the lender."  86 Fed. Reg. 3709.  The Federal Government has a keen interest in making sure that PPP is carried out as required by the governing statutes and regulations.

38. This issue has resounding effects for PPP.  First, Womply is currently engaged in litigation with various lenders over fees.  Although at least some of these cases are in confidential arbitrations, the issues in each are presumably similar.  According to published reports, Womply has received hundreds of millions in fees from PPP.  *E.g.*, Stacy Cowley & Ella Koeze, *How Two Start-Ups Reaped Billions in Fees on Small Business Relief Loans*, Oct. 11, 2021, https://www.nytimes.com/2021/06/27/business/ppp-relief-loans-blueacorn-womply.html.
Second, the claims at issue here involve PPP loans to almost 90,000 borrowers.  While these loans have been funded, not all the loans have been forgiven or repaid.  Capital Plus's ability to service the loans and complete the PPP process could be impacted by how much of the loan fees (which along with minimal interest constitute the only compensation earned by a lender on these loans) it must pay to Womply.  Third, this case represents an attack on the supremacy of federal law; Womply is trying to use state common law to reach a result—holding Capital Plus responsible for fees in the absence of a direct contractual relationship—that Congress has prohibited.

### D. *The Federal Issues Raised by Womply's Claims Are Capable of Resolution in Federal Court Without Disrupting the Federal-State Balance Approved by Congress.*

39. This case is suited for federal court. Not only is there an "actually disputed and substantial" federal issue, but that issue has national effect.

40. The meaning of PPP and the effects of SBA's promulgated rules, regulations, and guidance are federal issues. Leaving this case in state court could result in disparate interpretations of the meaning and effect of SBA's pronouncements. Further, given the scope and importance of PPP in the federal scheme to address the continuing COVID-19 pandemic, disparate interpretations of SBA's guidelines could undermine PPP's enforcement mechanisms.

41. The federal government has a strong interest in the enforcement of its laws. And this suit by Womply seeking to undermine SBA's published rules, regulations, and guidance would undermine enforcement of the laws. Therefore, this is a case warranting federal jurisdiction and that would not disrupt the federal-state balance approved by Congress.

## REMOVAL IS PROPER UNDER FEDERAL OFFICER REMOVAL STATUTE

42. Removal is also proper under the federal officer removal statute, which provides for removal of any suit brought against "[t]he United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, in an official or individual capacity, for or relating to any act under color of such office . . . ." 28 U.S.C. § 1442(a)(1). "[S]ection 1442(a) permits an officer to remove a case even if no federal question is raised in the well-pleaded complaint, so long as the officer asserts a federal defense in the response." *Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 290 (5th Cir. 2020).

43. "[T]o remove under section 1442(a), a defendant must show (1) it has asserted a colorable federal defense, (2) it is a 'person' within the meaning of the statute, (3) that has acted pursuant to a federal officer's directions, and (4) the charged conduct is connected or associated

with an act pursuant to a federal officer's directions." *Id.* at 296. "The Court has consistently urged courts to avoid 'a narrow, grudging interpretation of § 1442(a)(1).'" *Id.* at 290 (quoting *Willingham v. Morgan*, 395 U.S. 402, 405 (1969)). Here, all four elements are met.

44. First, Capital Plus is asserting a colorable federal defense. In addition to the deficiencies in ***Womply's affirmative case*** described above, Capital Plus has also invoked illegality and public policy as ***affirmative defenses*** to the petition, in part because Womply cannot seek by litigation to compel Capital Plus to pay an amount in violation of SBA regulations. *See generally* Answer ¶¶ 3–12 (Ex. B-14). The underlying contract that plaintiff claims was fraudulently induced and/or tortiously interfered with is illegal under federal law, which caps the fees payable to an entity like Womply. The second and third elements are met because SBA has "delegated authority" to Capital Plus for the purpose of making PPP loans. 15 U.S.C. § 636(a)(36)(F)(ii)(I) ("For purposes of making covered loans . . . a lender approved to make loans under this subsection shall be deemed to have been delegated authority by [SBA]."); *see Bell v. Thornburg*, 743 F.3d 84, 89 (5th Cir. 2014) (private citizens qualify for removal where they "receive delegated authority [and] do not merely comply with the law"). Fourth, Womply's claims are "connected or associated with" Capital Plus's acts under color of federal office because Womply is seeking a share of fees from the loans Capital Plus has made under PPP.

45. Therefore, this Court also has jurisdiction for this removed case under the federal officer removal statute.

### CONSENT OF ALL PROPERLY SERVED DEFENDANTS

46. Under 28 U.S.C. § 1446(b)(2)(A), all defendants who are properly joined and served must join in or consent to removal if removal is based solely on § 1441(a). Defendants Capital Plus Financial LLC, Crossroads, and Donnelly all join in and consent to removal.

## JURY DEMAND

47. Womply demanded a jury in the state-court suit.

## LOCAL RULE 81.1

48. Copies of all pleadings, process, orders, and other filings in the state-court suit are attached to this notice as required by 28 U.S.C. § 1446(a).

49. Pursuant to Northern District of Texas Local Rule 81.1, defendants are attaching as Exhibits A–D the following:

   A. an index of all documents that clearly identifies each document and indicates the date the document was filed in state court;

   B. a copy of the docket sheet in the state court action;

   C. each document filed in the state court action; and

   D. a separately signed certificate of interested persons for each of the defendants.

50. Further, defendants are submitting a cover sheet and supplemental cover sheet as required by this Court's local rules.

51. In addition, defendants will promptly file a copy of this notice of removal with the clerk of the Dallas County court where the suit has been pending.

## CONCLUSION

52. Removal is timely and proper pursuant to federal-question jurisdiction and the federal officer removal statute, and defendants have satisfied all procedural requirements for removal.

53. For these reasons, defendants ask the Court to remove the suit to the United States District Court for the Northern District of Texas.

Respectfully submitted,

*/s/ Terrell W. Oxford*
Terrell W. Oxford
   State Bar No. 15390500
Harry P. Susman (Attorney-in-Charge)
   (pro hac vice application pending)
   State Bar No. 24008875
Megan Elise Griffith
   (application pending)
   State Bar No. 24122748
SUSMAN GODFREY L.L.P.
1000 Louisiana Street, Suite 5100
Houston, Texas 77002-5096
Telephone: (713) 651-9366
Fax: (713) 654-6666
toxford@susmangodfrey.com
hsusman@susmangodfrey.com
mgriffith@susmangodfrey.com

**Attorneys for Defendants Capital Plus Financial, LLC, Crossroads Systems, Inc., and Eric Donnelly**

## CERTIFICATE OF SERVICE

This is to certify that a true and correct copy of the foregoing instrument has been served on the following counsel of record, this 25th day of October 2021, by using the electronic case filing system of the United States District Court for the District of Texas and by email on the following counsel:

Alistair Dawson, adawson@beckredden.com
Alexander L. Cheney, acheney@willkie.com
Jennifer S. Maybee, jmaybee@willkie.com
Casie M. Orellana, corellana@willkie.com

*/s/ Megan E. Griffith*
Megan E. Griffith