IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OTO ANALYTICS, INC. d/b/a WOMPLY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2636-B |
| | § | |
| CAPITAL PLUS FINANCIAL, LLC, | § | |
| CROSSROADS SYSTEMS, INC., ERIC | § | |
| DONNELLY, BA FIN ORION, LLC d/b/a | § | |
| BLUEACORN, and BARRY CALHOUN | § | |
| | § | |
| Defendants. | § | |

**PLAINTIFF'S FIRST AMENDED COMPLAINT**

Pursuant to Federal Rule of Civil Procedure 15(a)(2), Plaintiff Oto Analytics, Inc. d/b/a

Womply ("Womply"), by and through its undersigned counsel, files its First Amended Complaint

against Defendants Capital Plus Financial, LLC ("Capital Plus"), Crossroads Systems, Inc.

("Crossroads"), and Eric Donnelly ("Donnelly;" together with Capital Plus and Crossroads, the

"Capital Plus Defendants"), and Defendants BA Fin Orion, LLC d/b/a/ Blueacorn ("Blueacorn")[1]

and Barry Calhoun ("Calhoun;" together with Blueacorn and the Capital Plus Defendants,

"Defendants") and alleges as follows:

**INTRODUCTION**

1.      This case concerns fees Womply earned by creating and providing a technology

infrastructure crucial to the success of the federal Paycheck Protection Program ("PPP").  Congress

enacted the PPP to authorize banks and other lenders to make federally guaranteed and (if statutory

conditions are met) forgivable loans to businesses that sought to continue to cover payroll and

---

[1]   BA Fin Orion, LLC has since been restructured and is owned by Blueacorn PPP, LLC.

other basic expenses during the height of the COVID-19 pandemic.  Congress tasked the United States Small Business Administration ("SBA") with implementing the PPP's ambitious objectives, which proved no small feat.  The program required connecting millions of potential borrowers with thousands of lenders, which were required to organize and review applications for compliance with the PPP's criteria and, if the loan was approved, track and service the loan in accordance with still further requirements.  All told, more than 10 million borrowers obtained PPP loans from approximately 5,500 national and local lenders.

2.      Many of the PPP loans were of modest size, and much smaller than most lenders were accustomed to making.  Moreover, the vast majority of the 5,500 lenders did not have experience funding and managing a large volume of loans before the PPP's enactment.  As a result, many of those lenders lacked the personnel and technological infrastructure to receive thousands upon thousands of loan applications, conduct the review and approval process, and maintain the records required for servicing and tracking so many loans.  And all of this needed to be done expeditiously enough to provide urgently needed economic relief to the borrowers.

3.      Womply is a technology company that filled a crucial role in solving those challenges.  As relevant here, Womply performed two primary functions: (i) Womply developed and maintained an internet portal through which borrowers searching for PPP assistance could be connected with and submit an application to PPP lenders; and (ii) Womply provided lenders and their partners (such as loan-servicing companies) with a technology platform necessary to manage the enormous logistical difficulties inherent in reviewing, approving, and servicing thousands— and, in some cases, hundreds of thousands—of small-dollar PPP loans.  Womply partnered with more than a dozen lenders that provided more than 1.4 million PPP loans totaling more than $20 billion in principal amount to small businesses across the country

4.      In addition to interest and a federal guarantee, the PPP provided lenders with "processing fees" that were generous relative to the size of the loans.  For example, lenders would receive the lesser of a 50% fee for any loan of up to $5,000 and a flat $2,500 fee for loans between $5,000 and $50,000.  Recognizing the difficulty of connecting borrowers with lenders across such a scale (but with small amounts involved in most transactions), SBA rules authorized lenders to pay up to 1% of the loan amount to a third-party "Agent" that helped a borrower prepare and submit its application to a lender.  The SBA noted that this modest fee was reasonable in light of the limited time and effort required to fill out a PPP loan application.  SBA rules did not cap other costs, such as technology services fees, that lenders might pay to manage thousands of small-dollar PPP loans; lenders were free to contract for those services as their particular needs required and in light of the generous processing fees the government paid to PPP lenders.

5.      This lawsuit arose because lender Capital Plus and its lender service provider Blueacorn have refused to pay Womply for its provision of referral services *and* technology services.  They refuse even though Womply's services enabled them to earn massive fees under the PPP.  Before the PPP, Capital Plus was a small regional lender with less than $40 million in annual revenue.   Capital Plus nonetheless originated more than 470,000 risk-free PPP loans through its partnership with Blueacorn, and received more than *$1 billion* in fees from the SBA, plus millions more in interest.  Just the loans Capital Plus originated and managed with Womply's technology platform generated fees of more than $187 million for Capital Plus.

6.      There is no dispute that Womply is owed more than $76 million (plus interest) under its referral contract (which accounts for approximately $9 million) and its technology contract (which accounts for approximately $67 million).  Blueacorn has refused to pay Womply, however, asserting that Blueacorn is, in turn, waiting for payment from Capital Plus. For its part,

Capital Plus does not deny that it has already received its $187 million in fees from the federal government, that Capital Plus is contractually obligated to pay Blueacorn, and that the terms of Womply's contracts entitle Womply to the claimed amounts.

7.      Womply filed its initial lawsuit in Texas state court seeking to require Capital Plus to honor its obligations.  Capital Plus then saw an opportunity to reap a massive windfall for itself, claiming for the first time that Capital Plus was **_prohibited_** by SBA rules from paying Blueacorn, despite the absence of any authority supporting Capital Plus's newfound reading of the rules and the fact that Capital Plus had paid Blueacorn such fees in the past.  Lest there be any doubt as to Capital Plus's true motives, Capital Plus has refused to pay even the portion of the fees it says **_are_** allowed by the SBA's rules (*i.e.*, the $9 million due under the referral contract), and Capital Plus proposes to keep for itself the fees it received from the federal government but is supposedly forbidden from paying for Womply's technology services.  This is a money grab, plain and simple.

8.      One might expect Blueacorn to share Womply's outrage, but recent events have revealed that Blueacorn is engaged in a coordinated scheme with Capital Plus. Their strategy started with Blueacorn and Capital Plus representing to Womply that fees Capital Plus would receive from the federal government would go directly into an account jointly held by Blueacorn and Capital Plus—thus eliminating Blueacorn's ability to claim it could not pay Womply until Capital Plus paid Blueacorn.  That was a lie.  If such a joint account ever existed at all, the fees did not go there; rather, they went to an account controlled solely by Capital Plus, and Capital Plus is using that control as leverage to deny Womply what it is owed.

9.      What is more, Blueacorn hopes to facilitate the windfall to Capital Plus without risking a penny of Blueacorn's own money.  Blueacorn has not sought to compel payment from Capital Plus because Blueacorn—which did not even exist as a company before April 2020—is

beholden to Capital Plus, which is one of just *two* Blueacorn lender counterparties.  Moreover, on information and belief, Capital Plus has paid Blueacorn more than $500 million in fees from non-Womply loan transactions under the PPP.

10.     Womply now commences this lawsuit to obtain, among other things, (i) a declaratory judgment that SBA rules capping fees for PPP loan application preparation and referral services do not apply to fees for technology services, including the technology fees charged by Womply; (ii) money damages, including contractual fees and punitive damages; (iii) equitable relief, including disgorgement and/or constructive trust; and (iv) reasonable attorneys' fees and costs.

## PARTIES

11.     Plaintiff Womply is a Delaware corporation.

12.     Defendant Capital Plus is a Texas limited liability company with its principal place of business located in Bedford, Texas.

13.     Defendant Crossroads is a Delaware corporation with its principal place of business located in Dallas, Texas.  Capital Plus is a wholly owned subsidiary of Crossroads.

14.     Defendant Donnelly is an individual who, on information and belief, resides in Denver, Colorado.  Donnelly is the CEO and a member of the Board of Directors of Crossroads.  Until August 30, 2021, Donnelly was also the CEO of Capital Plus.  Donnelly is Capital Plus's registered agent for service of process, which may be served at 2247 Central Drive, Bedford, Texas 76021.

15.     Defendant BA Fin Orion, LLC d/b/a Blueacorn is a Wyoming limited liability company with its principal place of business in Wyoming.  On information and belief, BA Fin Orion, LLC d/b/a Blueacorn has been restructured and is now owned by Blueacorn PPP, LLC, which is an Arizona limited liability company with its principal place of business in Arizona.

16.     Defendant Calhoun is an individual who, on information and belief, resides in Scottsdale, Arizona.  Calhoun is the CEO of Blueacorn.

## JURISDICTION AND VENUE

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. § 1367.  Womply's claims necessarily depend on the resolution of substantial and disputed issues of federal law regarding SBA rules and regulations.

18.     This Court has subject-matter jurisdiction over Womply's claims against Blueacorn because the arbitration provision in the agreements between Womply and Blueacorn was procured through fraud and therefore is unenforceable.

19.     This Court has personal jurisdiction over Defendant Capital Plus because Capital Plus is a Texas limited liability company with its principal place of business located in this District.

20.     This Court has personal jurisdiction over Defendant Crossroads because Crossroads has its principal place of business located in this District.

21.     This Court has personal jurisdiction over Defendant Donnelly because he has continuous and systematic contacts with Texas by virtue of his active role as an officer and director of Crossroads and as a former officer of Capital Plus.  This Court also has personal jurisdiction over Donnelly because he has purposefully conducted activities in Texas on behalf of Crossroads and Capital Plus, the causes of action herein arise from or relate to those purposeful contacts with Texas, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

22.     This Court has personal jurisdiction over Defendant Blueacorn because Blueacorn has purposefully conducted activities in Texas, including through its business relationship with Capital Plus, the causes of action herein arise from or relate to those purposeful contacts with

Texas, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

23.     This Court has personal jurisdiction over Defendant Calhoun because he has purposefully conducted activities in Texas on behalf of Blueacorn, including through his active role as an officer of Blueacorn and his business relationship with Capital Plus, the causes of action herein arise from or relate to those purposeful contacts with Texas, and the exercise of personal jurisdiction does not offend traditional notions of fair play and substantial justice.

24.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c), because a substantial part of the events or omissions giving rise to the claims alleged herein occurred in this District.

25.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding the disputed SBA rules and regulations at issue in this action.

## FACTS

**A.     The SBA's Paycheck Protection Program and Applicable Rules Regarding Fees for Lenders, Lender Agents, and Technology Service Providers**

26.     In response to the COVID-19 pandemic, Congress, among other things, passed the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) which temporarily authorized the SBA to guarantee loans made under Section 7(a) of the Small Business Act as part of a new program called the Paycheck Protection Program. The PPP allowed qualifying small businesses to apply for low-interest private loans that cover, for example, payroll costs, rent, interest, and utilities.  The loans were guaranteed by the SBA and could be partially or fully forgiven if a borrowing business spent the loan money in accordance with the program requirements.  As a result, lenders that funded PPP loans had no financial risk if

borrowers failed to repay their loans.  The President signed the CARES Act into law on March 27, 2020.

27.     Lenders providing SBA-guaranteed PPP loans received interest on the loans and Lender Processing Fees from the SBA pursuant to applicable SBA rules.  The SBA issued an interim final rule on April 15, 2020 (the "April 2020 Final Rule") providing, among other things, that for funding a PPP loan of $350,000 or less, the SBA would pay a lender a Lender Processing Fee equal to 5% of the PPP loan amount.

28.     In the April 2020 Final Rule, the SBA recognized that lenders may choose to contract with "agents" who provide loan application preparation and referral services, and it issued rules concerning the fees lenders could pay agents for such services.  The April 2020 Final Rule provides, in relevant part, that "[a]gent fees may not be paid out of the proceeds of a PPP loan," and that, for PPP loans of $350,000 or less, "[t]he total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender)" may not exceed 1% of the PPP loan amount (the "SBA Agent Fee Cap").

29.     The SBA defines "agent" as "an authorized representative, including an attorney, accountant, consultant, packager, lender service provider, or any other person representing an Applicant or Participant by conducting business with the SBA."  13 C.F.R. § 103.1(a).

30.     The SBA defines "conduct business" with the SBA to mean:

(1)     Preparing or submitting on behalf of an applicant an application for financial assistance of any kind, assistance from the Investment Division of SBA, or assistance in procurement and technical matters;

(2)     Preparing or processing on behalf of a lender or a participant in any of SBA's programs an application for federal financial assistance;

  (3)  Participating with or communicating in any way with officers or employees of SBA on an applicant's, participant's, or lender's behalf;

  (4)  Acting as a lender service provider; and

  (5)  Such other activity as SBA reasonably shall determine.

13 C.F.R. § 103.1(b).

  31.  The SBA has also recognized that lenders may choose to contract with technology service providers. The SBA treats lenders' relationships with technology service providers differently from lenders' relationships with "agents" that provide loan application preparation and referral services.

  32.  The SBA Standard Operating Procedure (SOP) 50 10 6, effective October 1, 2020 (the "SBA SOP"), states that "***SBA does not consider entities providing technology services that do not include underwriting to be Agents.***" SBA SOP at 179, 185, 194 (emphasis added). It also states that "[f]ees associated with technology services (whether developed internally or purchased from a third party) . . . may not be passed on to the Borrower or paid for out of SBA-guaranteed loan proceeds." *Id.* at 179. Unlike the fees lenders pay to agents for limited application preparation and referral services, the fees lenders pay to technology service providers are not capped by SBA rules or any other applicable regulation, rule, or law.

  33.  The SBA defines "technology services fees" to include, for example, "[t]he costs or fees for ***software or technology*** used in connection with preparing SBA loan documents . . . or closing the SBA-guaranteed loan," "[a]cquisition costs or fees for licensing ***software or software platforms*** to 7(a) Lenders solely for the purpose of performing administrative functions (not including underwriting functions), such as generating SBA-required forms," and "[f]ees associated with entities that develop systems or ***lending platforms to automate the 7(a) Lender's internal loan decision making process***." *Id.* (emphasis added).

B.    **In Order to Incentivize Lenders to Fund Smaller PPP Loans for Small Businesses, Congress Increases Lender Compensation but Leaves Lender Agent Fee Rules and Technology Services Fee Rules Unchanged.**

34.    Under the CARES Act, many relatively small businesses initially struggled to obtain PPP loans. Reviewing and processing PPP loan applications and managing and tracking a PPP loan portfolio requires substantial resources and involves a tremendous amount of paperwork, and many lenders were not able or willing to devote such resources to funding smaller PPP loans when they stood to recover a Lender Processing Fee of just 5% of the PPP loan amount under the April 2020 Final Rule.

35.    In an attempt to incentivize lenders to fund smaller PPP loans for small businesses, Congress passed the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1181 (2020), which included the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act, opened a new period for first draw PPP loans, and extended and authorized a second draw of PPP loans (the "December 2020 Act"). In the legislation, which became law on December 27, 2020, Congress authorized an increase in lender compensation for processing second draw loans of $50,000 or less. For these relatively small loans, the Lender Processing Fee increased from 5% of a PPP loan to the lesser of 50% of a PPP loan or $2,500.

36.    While the Lender Processing Fee for these smaller PPP loans increased, the SBA did not change the rules for agent fees or the separate rules for technology services fees. On January 14, 2021, the SBA published an interim final rule (the "January 2021 Final Rule") that incorporated the December 2020 amendments to the PPP and consolidated the interim final rules governing borrower eligibility, lender eligibility, and PPP application and origination requirements for PPP loans. The January 2021 Final Rule left the fees that "agents" could collect for providing lenders with "assistance in preparing an application for a PPP loan (including referral to the

lender)" unchanged at 1%.  It also did not change the SBA rules regarding "technology services fees," which remained uncapped.

37.     On August 16, 2021, certain PPP lenders sent a letter (attached as Exhibit 1 hereto) to the SBA claiming, without reference to the January 2021 Final Rule, that the SBA had not "issued regulations . . . regarding the maximum loan agent fees that lenders could pay for referrals" of PPP loans after passage of the December 2020 Act.  These lenders proposed that the SBA address this purported "oversight" by issuing "a short regulation . . . indicating that no lender may pay more than 50% of their earned processing fees made on these smaller ($50,000 and under) PPP loans to any loan agent."

38.     The SBA rejected the lenders' proposal.  On September 14, 2021, the SBA sent a letter to the lenders (attached as Exhibit 2 hereto) directing them to the January 2021 Final Rule, which is identical to the earlier April 2020 Final Rule.

### C.     Womply Develops a Technology Platform that Integrates Critical Technology Services Allowing Lenders Like Capital Plus to Easily Manage Their PPP Loan Portfolios.

39.     Following the passage of the December 2020 Act, Womply—a technology company with a successful track record of developing technologies that connect businesses to their customers—created a website through which potential borrowers could apply for PPP loans. Womply invested heavily in marketing its website to small businesses.  Womply referred applicants applying through its website to Womply's lender partners, and the lenders were responsible not only for deciding whether to fund the loans, but also for all other tasks associated with processing, managing, and tracking the PPP loans, including verifying borrower identity and auditing borrower information.  Many lenders had limited technological capabilities and personnel, and they were unable to handle the workload associated with processing, managing, and tracking a large volume of PPP loans.  As a result, lenders focused primarily on funding larger PPP loans

to large businesses to maximize the interest the lenders received on the loans and the Lender Processing Fees the lenders received from the SBA.  This left millions of eligible small businesses without access to PPP loans.

40.     In February 2021, Womply released a technology platform that made it substantially easier and more cost-effective for lenders to process, manage, and track their PPP loans, particularly the smaller PPP loans to the smallest businesses (the "Technology Platform"). The Technology Platform provided lenders with similar PPP loan application collection and referral services that Womply provided before, but through a borrower-facing internet portal called "PPP Fast Lane."

41.     The Technology Platform also provided a new lender-facing portal with numerous integrated technology services, which Womply developed in conjunction with Teslar Software ("Teslar") and other third parties (the "Teslar Portal").  Those technology services helped lenders collect, verify, and understand the documentation and information provided by applicants, and the services included, among other things, multilingual translations, bank data collection and analysis, tax document collection and analysis, identity verification, bank account analysis, borrower status updates, borrower support, bank account and deposit management, cybersecurity protection, and logging, reporting, and capacity management tools.   The Technology Platform also allowed lenders to review, manage, and submit PPP loan applications to the SBA, track the status of the applications, resubmit applications if necessary, fund PPP loans, and track all funding activities.

42.     Womply did not provide underwriting services, submit loan applications to the SBA, or otherwise communicate with the SBA on behalf of a lender or borrower.  Womply was not responsible for determining whether applicants qualified for PPP loans or whether the information applicants provided was accurate.    Womply's lender partners retained all

responsibility for ensuring that applicants qualified for PPP loans, underwriting PPP loans, submitting them to the SBA for approval, communicating with the SBA, and funding the loans.

43.     Without the Technology Platform and its Teslar Portal and integrated services, Womply's lender partners would have needed to either hire a large staff to perform all of those services in-house, which was not economical or logistically feasible for many lenders, or contract with a separate technology service provider for such services.   With Womply's Technology Platform, lenders received in one web-based platform both (i) PPP loan application collection and referral services, and (ii) Womply's loan portfolio management services and a wide range of other integrated, highly valuable technology services.   As a result, Womply's lender partners had to do little more than make underwriting decisions, determine whether to send loan applications to the SBA, and fund the loans that the SBA approved.   Womply managed nearly everything else related to the lenders' PPP loan portfolios.

**D.     Capital Plus Is One of the Largest Lenders of PPP Loans in Part Because of Its Partnership with Blueacorn.**

44.     Capital Plus is a Certified Community Development Institution specializing in residential mortgage lending in the Dallas/Fort Worth, Houston, and San Antonio areas.   Capital Plus is a wholly owned subsidiary of Crossroads, a public holding company.

45.     Before becoming a PPP lender, Capital Plus was a small, regional lender whose total revenue from operations for the fiscal year ending October 31, 2020 was $36.6 million.

46.     On January 11, 2021, Capital Plus issued a press release announcing that it was "partnering with Blueacorn to provide a simple and efficient platform for small businesses across the country to apply for first and second draw [PPP] loans via the [SBA]."   On its website, Blueacorn describes itself as a Lender Service Provider that helps "compile loan application paperwork for the PPP" and partners with banks "to apply for and secure" loans.

47.     According to *The New York Times*, "Blueacorn will take in at least $1 billion this year on the loans it processed" for the PPP, including at least $314 million in fees from Capital Plus in the quarter ending on April 30, 2021.[2]

48.     On June 14, 2021, Crossroads released its consolidated financial results for the second quarter of 2021, ending April 30, 2021. Crossroads disclosed that its "[g]ross origination fees associated with PPP loans totaled $464.1 million for the quarter," and that Crossroads "[e]xpects to accrue a total of $1.1 billion in deferred gross origination fees from the [PPP]." It also disclosed that as of April 30, 2021, Crossroads "held a cash balance of $213.1 million compared to $2.6 million as of October 31, 2020."

49.     The June 14, 2021 financial release also includes statements from Defendant Donnelly describing how lucrative participating in the PPP had been for Crossroads and Capital Plus:

> "In the last several months, Capital Plus has transformed from a regional single-family mortgage-based lending institution into ***one of the country's largest providers of small business loans***," said Eric A. Donnelly, Chief Executive Officer of Crossroads Systems. When the SBA announced its reopening of the program in January, we immediately identified strong synergies between the program's focus on small businesses and Capital Plus' core mission as a CDFI. Together with our loan service providers, we established early incumbency as the go-to institution for small business owners, independent contractors, and sole proprietors. Financially, our success in the program has put us into the ***best position we have ever been in, netting us more than $150 million in operating income for the quarter***. ***At a record cash position***, we are well-capitalized to support the future growth initiatives that will drive our double-bottom line. We will provide a more detailed review of the quarter

---

[2]     *See* Stacy Cowley & Ella Koeze, *How Two Start-Ups Reaped Billions in Fees on Small Business Relief Loans*, N.Y. Times (June 27, 2021), *available at* https://www.nytimes.com/2021/06/27/business/ppp-relief-loans-blueacorn-womply.html.

and these growth initiatives in the near future upon the completion
of PPP.

(emphasis added).

50.     In a later July 8, 2021 letter to Crossroads' shareholders, Donnelly again touted the

success of its partnership with Blueacorn:

> *With the help of loan service providers like Blueacorn* . . ., we were
> able to issue and approve loan applications at an unprecedentedly
> rapid pace.  Within just five months, *we have approved 472,036
> loans* at an average amount of $16,062.  In total, this amounts to
> *$7.6 billion in funding* . . . .  As a result of our early dominance in
> PPP lending, *Capital Plus was ranked the fourth largest PPP
> lender by net dollar amount and the second largest by the number
> of loans approved*.  Blueacorn's early traction amongst sole
> proprietors and independent contractors was critical to scaling the
> operation and enabling us to compete with the country's largest
> financial institutions.

(emphasis added).

51.     In the same letter, Donnelly described Crossroads and Capital Plus's success in

connection with the PPP as a "windfall."  He told shareholders that the "[t]he program will result

in Capital Plus holding the $7.6 billion in loans on its balance sheet until they are forgiven," and

that Capital Plus "anticipate[s] full forgiveness."  He further disclosed that Capital Plus "issue[s]

PPP loans at a rate of 1%," and that "[w]ith a 35-bps cost of capital through the SBA's credit

facility, [Capital Plus] recognize[s] a 65-bps spread, which nets out as interest income."

52.     Capital Plus's PPP lending program was so successful that Crossroads determined

it was "overcapitalized."  In the July 8 letter, Donnelly disclosed to shareholders that Crossroads

"intend[ed] to pay out a special dividend of $40 per share on July 26, 2021," but that it would "still

retain $120 million of liquidity . . . ."  Consistent with this disclosure to investors, Capital Plus

paid the special dividend on July 26, 2021, totaling approximately $238.9 million.

53.     On September 14, 2021, Crossroads released its consolidated financial results for the third quarter of 2021, ending July 31, 2021.  Crossroads disclosed that its "[t]otal revenue from operations for the nine months ended July 31, 2021, was $970.5 million compared to $27.5 million for the same period of 2020.  The increase in revenue was the result of the Company participating in the Payment Protection Program," and "[t]he Company earned fees from the program totaling approximately $930.0 million.  The Company has taken the full amount of fees earned during the period from the program into income."

54.     On December 14, 2021, Crossroads reported its financial results for its fiscal fourth quarter and year ended October 31, 2021.  Crossroads disclosed that, for fiscal year 2021, "[t]otal revenues increased 2,446% to $932.7 million, up from $36.6 million in the comparative 2020 period," "[t]otal interest income increased 220% to $40.5 million, up from $12.6 million in 2020," and "[o]perating income increased 4,127% to $243.4 million, up from $5.8 million in 2020." Crossroads disclosed that "[t]he substantial increase in operating income was primarily due to origination fees associated with the Company's participation in the PPP loan program."

**E.     Defendants Donnelly and Calhoun Make Material Representations to Womply to Convince Womply to Refer PPP Loans and Provide Technology Services to Capital Plus Through Blueacorn.**

55.     In early May 2021, in order to increase the volume of PPP loans Capital Plus could originate—and therefore the fees from the SBA and interest that Capital Plus (and in turn Blueacorn) would receive—Blueacorn approached Womply with a proposal.  Under the proposal, Womply would refer PPP applicants to Capital Plus through Blueacorn as the intermediary, and would provide access to the Womply Technology Platform directly to Capital Plus.  Womply would contract only with Blueacorn, and in return for its referral and technology services, Womply would receive certain fees from Blueacorn for each Womply-referred PPP loan that Capital Plus funded and managed through the Technology Platform.

56.     Womply was initially hesitant to enter into such an arrangement.  It was particularly concerned that Capital Plus would have no contractual obligation to pay Womply for the referral and technology services it provided, and that Blueacorn may default on its contractual obligations if Capital Plus chose not to compensate Blueacorn.

57.     Womply communicated these concerns to Capital Plus and Blueacorn.  For example, on May 9, 2021, Womply's CEO emailed Defendant Calhoun that "we'd like to get some confirmation from Cap[ital] Plus that they're aware of the terms and our involvement," and "that we would have visibility into [the] FBO account with Evolve."

58.     In an effort to dispel Womply's concerns, Defendants Donnelly and Calhoun each made critical and material representations to Womply's CEO.  On May 11, 2021, Donnelly and Calhoun each represented to Womply's CEO during a phone call (the "May 11 Call"), in sum and substance, that  (i)  Blueacorn would pass all Womply-referred PPP loans to Capital Plus for origination, (ii) Blueacorn and Capital Plus held a joint account at Evolve Bank & Trust (the "Joint Account") into which all fees received from the SBA for PPP loans funded by Capital Plus were deposited directly, (iii) the SBA fees for all Womply-referred PPP loans funded by Capital Plus would be deposited directly into the Joint Account, and (iv) Blueacorn and Capital Plus would provide Womply with visibility into the Joint Account so that Womply could verify when Blueacorn and Capital Plus received funds from the SBA.  As discussed below, those representations were false.

59.     On May 19, 2021, in reliance on Donnelly's and Calhoun's representations during the May 11 Call, Womply executed two contracts with Blueacorn.

F.      **Womply's Agreements with Blueacorn Comply with All Applicable SBA Rules, Regulations, and Guidance.**

60.     As discussed above, the SBA promulgated different sets of rules governing fees PPP lenders paid to "agents" for loan referral and preparation services, which are subject to the SBA Agent Fee Cap, and fees lenders paid to technology service providers, which are not.  Under the SBA Agent Fee Cap, the "total amount that an agent may collect from the lender *for assistance in preparing an application for a PPP loan (including referral to the lender)* may not exceed . . . [o]ne (1) percent for loans of not more than $350,000" (emphasis added).  Fees paid by lenders for technology services, by contrast, are not capped.

61.     Womply entered into two separate agreements with Blueacorn: (i) a PPP Loan Referral Agreement, dated May 10, 2021 (the "Referral Agreement"), which is appended as Exhibit 3 hereto, and (ii) the Womply Developer Order Form, dated May 10, 2021 (the "Order Form," and together with the Referral Agreement, the "Agreements"), which is appended as Exhibit 4 hereto.  Each Agreement governs the provision of different services with separate fee structures.

62.     Under the Referral Agreement, "Womply provides referrals to Blueacorn in connection with potential loan applicants seeking loans under the PPP from third-party lenders," and "Blueacorn desires to engage in the marketing, initial underwriting, and submission to third-party lenders of loans funded and created under the [PPP]."  (Referral Agreement at 1; *see id.* § 1.1 ("Womply may, from time to time, refer to Blueacorn such PPP loan applicants Womply shall, in its sole and absolute discretion, deem appropriate."); *id.* § 8.)

63.     "In consideration of Womply providing Blueacorn with Referrals, Blueacorn shall pay to Womply" a referral fee (the "Referral Fee") of 1% of the outstanding balance of each Womply-referred PPP loan at the time of loan disbursement.  (*Id.* § 2.2.)  Consistent with the April

2020 and January 2021 Final Rules, Section 2.2 of the Referral Agreement tracks the requirements

of the SBA Agent Fee Cap, and Section 9 incorporates by reference "SBA Regulations," which

"control" "[i]n the event of any conflict between the governing law and the SBA Regulations."[3]

64.     Blueacorn separately contracted with Womply for access to Womply's Technology

Platform and integrated technology services listed on an accompanying order form.   These

technology services include "Tax Documents," "Bank Data," "Identity," "Account Verification,"

and "PPP Portfolio Management System."   (Order Form at 1.)   The Technology Platform also

"includes integrations with and/or links to certain third-party service providers (including, without

limitation, Plaid, Docusign, LexisNexis, Teslar, Inscribe, Ocrolus, AWS Mechanical Turk,

Mindee, Persona, Twilio, Sendgrid, etc.)."   (*Id.* § 2.2.)

65.     In consideration for providing these technology services, Blueacorn agreed to pay

a technology fee (the "Technology Fee") equal to "the first $250 from any Lender Processing Fee,

plus 1/3 of the remaining Lender Processing Fee after the $250 is subtracted."   (*Id.* § 3.3.)

66.     The Technology Fees do not compensate Womply for providing loan application

collection or referral services.   The Technology Fees compensate Womply for, among other things,

the development of and access to the Technology Platform, the development of and access to the

Teslar Portal, and the extensive, wide-ranging, and highly valuable technology services integrated

---

[3]     The Referral Agreement defines "SBA Regulations" to "mean[] all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 20811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time."   (Referral Agreement § 9.)

into the Technology Platform.  Womply spent more than $268 million creating the Technology Platform.

67.     The technology services Womply provided to Blueacorn and Capital Plus through the Technology Platform include:

a.  Integrated Know Your Customer ("KYC") information verification and management services, including verification of an applicant's personal identification information against authoritative databases, verification of driver's licenses with departments of motor vehicles, verification of additional government identification, biometric scan verification, and manual verification of information where appropriate;

b.  Bank data and tax data analysis and validation to automatically validate bank data, OCR data extraction from manually uploaded documents, in-business verification based on bank transaction history, and manual checks to ensure data accuracy where appropriate;

c.  The lender-facing portal that allows lenders to receive referrals from Womply, and review, process, manage, and track all PPP loan applications and loans;

d.  The dashboard on the lender-facing portal through which the lenders could sign PPP loan applications, submit loan applications directly to the SBA, resubmit loan applications to the SBA with corrected information, approve loans, reject loans, send adverse action notices for declined loans, monitor the status of a loan application at the SBA, and fund approved loans;

e.  Reports to lenders regarding KYC information, funding instructions, loan eligibility reports, and tax data reports;

     f.   Application Programming Interfaces allowing lenders to send information to and receive information from the SBA; and

     g.   Integrated services provided by numerous third parties, including Twilio, Kickbox, Custmer.io, Salesforce, WordPress, Simple Texting, Drift, Teslar Software, Plaid, Amazon Web Services, Guideline, FreshAddress, Inscribe, Slack, Mindee, Ocrolus, DocuSign, and LexisNexis.

68.    The SBA Agent Fee Cap does not apply to the Technology Fees for at least four reasons:

     a.   *First*, neither Blueacorn nor Womply is an SBA-regulated lender, so the SBA Agent Fee Cap does not apply to the Agreements between Blueacorn and Womply.

     b.   *Second*, the plain language of the SBA Agent Fee Cap states that it applies only to fees received for "assistance in preparing an application for a PPP loan (including referral to the lender)," and the only fee that Womply earned for loan preparation and referral services is the Referral Fee pursuant to the Referral Agreement.  Even if the SBA Agent Fee Cap applies to the Referral Agreement (it does not), the Referral Fee is within the SBA Agent Fee Cap.

     c.   *Third*, Womply earned separate Technology Fees under the Order Form for providing access to its Technology Platform, the Teslar Portal, and integrated technology services that go well beyond providing loan application preparation and referral services.  Moreover, SBA regulations provide that the SBA Agent Fee Cap is "reasonable based upon the ***application requirements*** and the fees that lenders receive for making PPP loans" (emphasis added), which indicates that the SBA Agent Fee Cap applies only to fees paid for limited application preparation and

referral services, and not to fees for extensive technology services that allow lenders to process, track, and manage their PPP loan portfolios.

d.  *Fourth*, the SBA Agent Fee Cap applies only to "agents," and Womply was not Capital Plus's "agent," as that term is defined by the SBA, when it provided access to its Technology Platform, the Teslar Portal, and technology services.  Womply is not an "authorized representative" of an "Applicant or Participant."  Nor did Womply "conduct business with SBA," "[p]articipat[e] with or communicat[e] in any way with officers or employees of SBA on an applicant's, participant's, or lender's behalf," "act[] as a lender service provider," or "prepar[e] . . . on behalf of an applicant an application for financial assistance."  Moreover, the SBA SOP states that "SBA does not consider entities providing technology services that do not include underwriting to be Agents."  Womply did not provide underwriting services to Capital Plus and is therefore not an "agent" with respect to its provision of technology services.

69.     The Agreements include strict deadlines for the payment of these fees to Womply. Section 2.3 of the Referral Agreement states that, "[w]ithin five (5) days after Blueacorn receives its fees from the lender that submitted the Referred Loan to the SBA [*i.e.*, Capital Plus], Blueacorn will pay Womply all associated Referral Fees for such applicable Referred Loan."  Similarly, Section 3.5 of the Order Form states that, "[w]ithin five (5) days after Blueacorn receives its fees from [Capital Plus], [Blueacorn] will pay Womply all associated Technology Fees for each applicable Referred Loan."

70.    The Agreements provide that if the Referral Fees and Technology Fees are not paid on time, they will incur a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower.  (Referral Agreement § 2.4; Order Form § 3.7.)

71.    The Agreements also provide that "[t]he prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees."  (Referral Agreement § 10; Order Form § 10.)

G.    **Capital Plus Funds and Manages More Than 86,000 PPP Loans Referred by Womply Using the Technology Platform, for Which Womply Is Entitled to More Than $76 Million in Fees and Finance Charges.**

72.    By July 12, 2021, Capital Plus had funded most of the 86,521 PPP loans referred by Womply pursuant to the Agreements, which total more than $950 million.  Capital Plus had funded the remainder of those PPP loans by the end of August 2021.

73.    However, despite Donnelly's representations to Womply on the May 11 Call, Capital Plus never gave Womply visibility into the Joint Account, so Womply cannot verify when Capital Plus received fees from the SBA for the Womply-referred PPP loans or whether Capital Plus deposited those funds directly into the Joint Account.

74.    On information and belief, lenders of PPP loans typically are paid a Lender Processing Fee from the SBA within approximately two to three weeks following the funding of a PPP loan.

75.    In addition, the last day the SBA accepted PPP applications was May 31, 2021, and the program ended on June 30, 2021.  On information and belief, by the end of July 2021, the SBA had paid all or substantially all Lender Processing Fees due to lenders under the PPP.

76.    On information and belief, Capital Plus has received Lender Processing Fees totaling $186,882,948 from the SBA for all Womply-referred PPP loans.

77.     On July 21, 2021, Womply sent an invoice to Blueacorn indicating that more than $76 million was due to Womply in outstanding Technology Fees and Referral Fees, not including the finance charge applicable to late fees.

78.     On August 4, 2021, Womply sent a second invoice to Blueacorn indicating that more than $76 million was due to Womply in outstanding Technology Fees and Referral Fees, not including the finance charge applicable to late fees.

79.     Womply now is owed more than $9 million in Referral Fees and more than $67 million in Technology Fees, plus finance charges on the delinquent fees.

**H.     Defendants Improperly and Unjustifiably Withhold Payment from Blueacorn to Extract Concessions from Womply.**

80.     On or around June 7, 2021, Capital Plus received a subpoena seeking documents related to certain Womply-referred PPP loans.

81.     The subpoena was not issued to Womply, and Womply had no obligation to provide Blueacorn, Capital Plus, or the government with any documents or information as a result of the subpoena.  Nevertheless, in good faith, Womply provided Capital Plus with documents sought in the subpoena.

82.     In late July 2021, Blueacorn's counsel approached Womply's outside counsel and asked if Womply would consider putting in place a process for providing documents and information to Blueacorn and Capital Plus in response to future government inquiries and subpoenas.  Womply agreed to discuss putting in place such a process in good faith.

83.     Blueacorn's proposed process, initially premised on obtaining cooperation for government inquiries and subpoenas, grew into a demand that Womply agree to provide Blueacorn and Capital Plus with virtually any document in its possession on demand for virtually any reason.

84.     Blueacorn also informed Womply that Capital Plus was withholding payment from Blueacorn in connection with Womply-referred PPP loans, thus preventing Womply from receiving the more than $76 million in fees it was owed under the Agreements from Blueacorn, as leverage over Womply.

85.     For example, on August 9, 2021, in response to Womply expressing its expectation that it would be paid its fees under the Agreements promptly, Blueacorn's counsel sent an email to Womply's outside counsel stating:

> We're working on making payment happen as soon as possible, because obviously Blueacorn wants to be paid too. If it happens today, that will be great, but Womply should not "expect" it, in particular because the contract only calls for Womply to be paid within "five (5) days after Blueacorn receives its fees from the lender that submitted the Referred Loan to the SBA." **_Blueacorn has not received its fees from Capital Plus_**, so Womply's expectation is premature.
>
> This issue of having confidence that government requests for information will be promptly and fully responded to is important to Capital Plus and Blueacorn. To the extent Womply is intending something precipitous before that confidence can be obtained, the obvious solution is for Blueacorn to terminate the contract and, per the contract, require Womply to gather up and provide to Blueacorn 100% of all loan-file records for all applicants from all sources. That would give Blueacorn and Capital Plus the assurance they need. You had suggested that wasn't Womply's first choice, and it seems unlikely to speed the payment process while we waited for Womply to comply. So probably the better option is for us to take the little time needed to give Capital Plus the confidence we've been discussing about the procedures for responding to government requests for information. To that end, attached is a memo outlining what we think those procedures should be. If you tell us Womply agrees that these are the appropriate procedures it will follow, we'll take it to Capital Plus and find out whether this resolves the issue.

(emphasis added).

86.     Blueacorn's counsel's statements are inconsistent with Defendants Donnelly's and Calhoun's representations during the May 11 Call that Capital Plus would deposit SBA fees for all Womply-referred PPP loans directly into the Joint Account with Blueacorn.

87.     Adding further confusion to the matter, on August 13, 2021, Defendant Calhoun confirmed that Blueacorn and Capital Plus have a Joint Account into which SBA fees are deposited.  Specifically, Womply's CEO sent a text message to Calhoun stating:  "You and Eric [Donnelly] said you had an FBO account where all funds were deposited directly from the govt. Did that change?"  Calhoun responded simply:  "No."

88.     On August 30, 2021, Womply sent a letter to Blueacorn's counsel demanding that, by September 3, 2021, Blueacorn (i) pay Womply all Referral Fees and Technology Fees for all Womply-referred PPP loans, which total $76,714,482.67, and (ii) provide Womply with a full accounting of when the SBA paid fees to Capital Plus for the Womply-referred PPP loans so that Womply could calculate the appropriate finance charge to apply to the delinquent fees.

89.     Womply further demanded that if Blueacorn continued to insist that it had not received any fees from Capital Plus for Womply-referred PPP loans, Blueacorn produce all correspondence between Blueacorn and Capital Plus concerning fees related to the Womply-referred PPP loans.

90.     Blueacorn did not substantively respond to Womply's August 30 letter.

91.     On September 6, 2021, Womply sent a letter to Capital Plus demanding that, by September 8, 2021, Capital Plus:  (i) confirm whether or not SBA fees for Womply-referred PPP loans were deposited into the Joint Account, as promised by Donnelly; (ii) confirm whether or not Capital Plus was withholding SBA fees for Womply-referred PPP loans from Blueacorn and, if so, why; (iii) release all funds owed to Blueacorn in connection with the Womply-referred loans,

and (iv) provide Womply with a full accounting of when Capital Plus received SBA fees for Womply-referred loans.  Womply's letter further stated that if Capital Plus did not respond, Womply would have to assume that Capital Plus was withholding SBA fees for Womply-referred PPP loans from Blueacorn in order to compel Womply to agree to produce certain documents and information to Capital Plus.

92.     Capital Plus did not respond to Womply's September 6 letter.

93.     As a result of Donnelly's and Capital Plus's fraudulent misrepresentations and wrongful retention of payment to Blueacorn for all Womply-referred PPP loans in an effort to compel Womply to produce documents and information to which Capital Plus is not entitled, Womply has suffered extensive damages, including the loss of more than $76 million in fees and finance charges due under the Agreements.

## I.      Blueacorn Conspires with Capital Plus to Avoid Paying Womply.

94.     Blueacorn claims that it is not required to pay Womply under the Agreements because it has not received payment from Capital Plus for the Womply-referred PPP loans.

95.     Blueacorn's position is wrong.  Under Section 3.3 of the Order Form, Blueacorn "***shall pay*** Womply the technology fees" for each PPP loan it refers to a lender that is funded (emphasis added).  Thus, Blueacorn's obligation to pay Womply the Technology Fees is not contingent on receiving payment from Capital Plus.  Payment by Capital Plus affects only the timing of Blueacorn's payment to Womply, which must be paid "[w]ithin five (5) days after Blueacorn receives its fees from the [] lender" (Order Form § 3.5), not Blueacorn's obligation to pay Womply.

96.     Blueacorn is acting in concert with Capital Plus to deprive Womply of more than $76 million owed under the Agreements.  Blueacorn refuses to pay Womply under the Agreements

and has asked repeatedly that Womply drop its lawsuit against Capital Plus for no consideration in return.

97.     Despite claiming that it has not received payments from Capital Plus, Blueacorn refuses to initiate any action against Capital Plus.

98.     Blueacorn's representation is false.  Blueacorn is a Lender Service Provider for PPP loans.   According to Blueacorn's own website, its only business is "to streamline the PPP application process," "compile loan application paperwork for the PPP," and "get the PPP paperwork done correctly."   The SBA stopped accepting PPP applications as of May 31, 2021, and the program ended on June 30, 2021, so Blueacorn no longer has a meaningful commercial relationship with Capital Plus.

99.     Blueacorn is not initiating any action against Capital Plus to help it obtain payment from Capital Plus.   Instead, Blueacorn is hoping that Capital Plus prevails in this action and the Agreements are invalidated, and then Capital plus will pay Blueacorn and Blueacorn will not have to pay Womply.

100.     Blueacorn is seeking to obtain payment from Capital Plus at Womply's expense. Blueacorn is also prioritizing its relationship with Capital Plus over its contractual obligations to Womply to avoid paying Womply under the Agreements.

101.     The Agreements contain the following arbitration provision (the "Arbitration Provision"):

> Without limiting a party's right to seek injunctive or other equitable relief in court, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court.

(Referral Agreement § 10; Order Form § 10.)

-28-

102.    Womply entered into the Arbitration Provision in reliance on Defendants Donnelly's and Calhoun's representations during the May 11 Call.

103.    Before entering into the Agreements, Womply was concerned that by contracting with Blueacorn as an intermediary, Capital Plus would have no contractual obligation to pay Womply for the services it provided, and that Blueacorn may default on its payment obligations if Capital Plus chose not to compensate Blueacorn for Womply-referred PPP loans.  While Womply had previously entered into agreements to arbitrate disputes with lenders, arbitration against Blueacorn alone potentially would be fruitless if Blueacorn never received money from Capital Plus.  Womply agreed to arbitrate disputes with Blueacorn based on Defendants Donnelly's and Calhoun's representations that, among other things, fees Capital Plus received from the SBA for all Womply-referred PPP loans would be deposited directly into the Joint Account and Womply would receive visibility into the Joint Account.

104.    As discussed above, Defendants Donnelly's and Calhoun's representations during the May 11 Call were false.

105.    Although the Arbitration Provision was procured by fraud and is therefore unenforceable, Womply nevertheless requested repeatedly that Blueacorn waive the Arbitration Provision to participate in this action, including by letter dated December 13, 2021.  Blueacorn refused to do so.

**J.    Crossroads Is the Alter Ego of Capital Plus.**

106.    Crossroads is a holding company and, on information and belief, Capital Plus is Crossroads' only operating subsidiary.

107.    The websites for each of Crossroads and Capital Plus promote the business of the other entity and include links to presentations to both companies in the "About" sections of their respective websites.

108.    The Crossroads Investor Presentation, available on Crossroads' website, is focused almost entirely on the business of Capital Plus.

109.    According to the Crossroads Investor Presentation, 66% of Crossroads' stock is owned by Crossroads' directors and executives, including Defendant Donnelly.

110.    Crossroads and Capital Plus have overlapping executives.  Until August 30, 2021, Donnelly was the CEO of both Capital Plus and Crossroads, and he remains the CEO of Crossroads today.  Both Capital Plus and Crossroads share the same Chief Financial Officer.

111.    At all relevant times, Donnelly was acting on behalf of Crossroads and Capital Plus.

112.    As the CEO of both Crossroads and Capital Plus, Donnelly perpetrated a fraud on Womply as alleged herein.

113.    Crossroads and its shareholders—including Donnelly himself—have received a substantial benefit from Donnelly's fraud, including through the distribution of a dividend to Crossroads' shareholders on July 26, 2021, totaling nearly $240 million, which, on information and belief, includes fees and interest that Capital Plus received in connection with the Womply-referred PPP loans.

114.    Womply respectfully requests that Crossroads' corporate fiction be disregarded, and that Crossroads be held liable for the acts of Donnelly and Capital Plus and be ordered to pay all actual and consequential damages resulting from Donnelly's and Capital Plus's wrongful conduct.

115.    Womply reserves the right to add as defendants in this litigation additional executives, directors, and/or shareholders of Crossroads and Capital Plus based on information obtained through discovery.

## COUNT 1 — DECLARATORY JUDGMENT

### (Against Capital Plus Defendants)

116.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–115 above as if fully set forth herein.

117.    There is an actual, ongoing, and justiciable controversy between Womply and Capital Plus regarding whether the SBA Agent Fee Cap applies to fees charged for technology services, such as those Womply provided to Capital Plus and Blueacorn.

118.    This dispute is immediate and real because Capital Plus is withholding payment from Blueacorn for Womply-referred PPP loans, and Blueacorn has not paid Womply any fees under the Agreements, based on Capital Plus's interpretation of the SBA Agent Fee Cap.  *See* Notice ¶ 16.

119.    A judicial resolution of this dispute will resolve the considerable uncertainty and controversy that currently exists between the parties with respect to whether Capital Plus and Blueacorn are required to pay Technology Fees under the SBA, or whether they may avoid such fees based on the SBA Agent Fee Cap.

120.    Accordingly, pursuant to 28 U.S.C. § 2201, Womply requests a declaration from this Court that the SBA Agent Fee Cap does not apply to fees for technology services, including for Technology Fees Blueacorn agreed to pay Womply for access to the Technology Platform.

## COUNT 2 — TORTIOUS INTERFERENCE WITH CONTRACTS

### (Against Capital Plus Defendants)

121.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–120 above as if fully set forth herein.

122.    The Agreements by and between Womply and Blueacorn are valid and binding contracts.

123.     Under the Agreements, for each Womply-referred PPP loan funded by Capital Plus, Womply is entitled to receive all associated Referral Fees and Technology Fees within five days of Blueacorn receiving payment from Capital Plus.

124.     The Referral Fees are consistent with, and incorporate by reference, applicable SBA rules, regulations, and guidance.

125.     The Capital Plus Defendants are aware that the Referral Fees are consistent with, and incorporate by reference, applicable SBA rules, regulations, and guidance. *See* Notice ¶¶ 15, 30.

126.     The Capital Plus Defendants do not challenge the validity of the Referral Fees. *See id*. ¶¶ 29–32.

127.     The Technology Fees are not subject to the SBA Agent Fee Cap.

128.     Capital Plus is withholding payment from Blueacorn for Womply-referred PPP loans, and Blueacorn has not paid Womply any fees under the Agreements. *See id*. ¶ 16.

129.     On information and belief, the Capital Plus Defendants are willfully and intentionally interfering with the Agreements by withholding payment from Blueacorn for Womply-referred PPP loans in an attempt to compel Womply to produce certain documents and information to Capital Plus to which Capital Plus is not entitled.

130.     The Capital Plus Defendants' improper interference with the Agreements has caused Womply substantial damages, including the loss of more than $76 million in fees plus finance charges due under the Agreements.

## COUNT 3 — FRAUD

### (Against all Defendants)

131.     Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–130 above as if fully set forth herein.

132.    On the May 11 Call, Defendant Donnelly, on behalf of Defendants Crossroads and Capital Plus, and Defendant Calhoun, on behalf of Defendant Blueacorn, made several misrepresentations to Womply's CEO, including that:

   a.   Blueacorn and Capital Plus held a Joint Account at Evolve Bank & Trust into which all fees received from the SBA for PPP loans funded by Capital Plus were deposited directly;

   b.   the SBA fees for all Womply-referred PPP loans funded by Capital Plus would be deposited directly into the Joint Account; and

   c.   Blueacorn and Capital Plus would provide Womply with visibility into the Joint Account so that Womply could verify when Blueacorn and Capital Plus received funds from the SBA.

133.    Some or all of the foregoing representations were false when made.

134.    On information and belief, Defendants did not intend to give Womply visibility into the Joint Account when the foregoing representations were made.

135.    Defendants did not in fact give Womply visibility into the Joint Account.

136.    On information and belief, Defendants did not intend to directly deposit into the Joint Account the SBA fees that Capital Plus received for Womply-referred PPP loans.

137.    Defendants did not in fact deposit into the Joint Account the SBA fees that Capital Plus received for Womply-referred PPP loans.

138.    On information and belief, Defendants Donnelly and Calhoun made the foregoing misrepresentations to Womply with the intent that Womply would rely on the misrepresentations, and Womply justifiably relied on Donnelly's and Calhoun's representations when it agreed to enter into the Agreements with Blueacorn and provided referral and technology services to Capital Plus.

139.    Womply's reliance on Defendants Donnelly's and Calhoun's misrepresentations has caused Womply substantial damages, including the loss of more than $76 million in fees and finance charges due under the Agreements.

## COUNT 4 — NEGLIGENT MISREPRESENTATION

### (Against all Defendants)

140.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–139 above as if fully set forth herein.

141.    On the May 11 Call, Defendant Donnelly, on behalf of Defendants Crossroads and Capital Plus, and Defendant Calhoun, on behalf of Defendant Blueacorn, made several misrepresentations to Womply's CEO, including that:

    a.    Blueacorn and Capital Plus held a Joint Account at Evolve Bank & Trust into which all fees received from the SBA for PPP loans funded by Capital Plus were deposited directly;

    b.    the SBA fees for all Womply-referred PPP loans funded by Capital Plus would be deposited directly into the Joint Account; and

    c.    Blueacorn and Capital Plus would provide Womply with visibility into the Joint Account so that Womply could verify when Blueacorn and Capital Plus received funds from the SBA.

142.    Some or all of the foregoing representations were false when made.

143.    Each of Defendants' misrepresentations was made in the course of Defendants' business and in relation to PPP lending transactions in which Defendants had a pecuniary interest.

144.    On information and belief, Defendants did not exercise reasonable care in obtaining or communicating the foregoing false information to Womply because Defendants did not intend to give Womply visibility into the Joint Account when the foregoing representations were made.

145.    Defendants did not in fact give Womply visibility into the Joint Account.

146.    On information and belief, Defendants did not exercise reasonable care in obtaining or communicating the foregoing false information to Womply because Defendants did not intend to directly deposit into the Joint Account the SBA fees that Capital Plus received for Womply-referred PPP loans.

147.    Defendants did not in fact deposit into the Joint Account the SBA fees that Capital Plus received for Womply-referred PPP loans.

148.    Womply suffered substantial damages resulting from Defendants Donnelly's and Calhoun's misrepresentations, including the loss of more than $76 million in fees and finance charges due under the Agreements.

## COUNT 5 — PROMISSORY ESTOPPEL

### (Against Capital Plus Defendants)

149.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–148 above as if fully set forth herein.

150.    Defendant Donnelly, on behalf of Defendants Crossroads and Capital Plus, promised to pay Technology Fees in excess of 1% of the PPP loan amount for Womply-referred PPP loans for the services and benefits it received through the use of Womply's Technology Platform by depositing the fees into a Joint Account of Capital Plus and Blueacorn.

151.    On information and belief, Capital Plus pays technology fees in excess of 1% of the PPP loan to other service providers for assistance with funding PPP loans.

152.    Womply relied on Capital Plus's promise to pay Technology Fees as evidenced by Donnelly's communications and Capital Plus's payment of technology fees greater than 1% of the PPP loan amount to other service providers.

153.    Defendants knew and could reasonably foresee that Womply would not have provided referral and technology services to Capital Plus without the promise made that Capital Plus would pay Womply, through Blueacorn as an intermediary, Technology Fees in excess of 1% of the PPP loan amount.

154.    Capital Plus has benefitted from Womply's services by using Womply's Technology Platform to fund thousands of PPP loans and collect more than $187 million in SBA processing fees.

155.    Womply's reliance on Capital Plus's promises has caused Womply substantial damages, including the loss of more than $76 million in fees and finance charges due under the Agreements with Blueacorn.

156.    In the event there is not a valid contract between Womply and Capital Plus, as an alternative, Capital Plus must pay Womply the Technology Fees owed based on its promises.

## COUNT 6 — UNJUST ENRICHMENT

### (Against Capital Plus Defendants)

157.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–156 above as if fully set forth herein.

158.    Defendants Capital Plus and Crossroads received benefits from Womply in the form of: (i) referrals of PPP loans from Womply, (ii) access to and use of Womply's Technology Platform that allowed Defendants to manage and track Womply-referred PPP loans, (iii) SBA fees for Womply-referred PPP loans, and (iv) interest on Womply-referred PPP loans.

159.    On information and belief, Defendant Donnelly received a benefit from Womply in the form of a dividend Crossroads paid to its shareholders, including Defendant Donnelly, from SBA fees for and interest on Womply-referred PPP loans.

160.    The Capital Plus Defendants received these benefits based on Defendant Donnelly's fraudulent misrepresentations to Womply, which he made in his capacity as CEO of Crossroads and Capital Plus.

161.    The Capital Plus Defendants are willfully and intentionally withholding from Blueacorn and Womply the Technology Fees and Referral Fees for all Womply-referred PPP loans funded by Capital Plus.

162.    It would be unjust to allow the Capital Plus Defendants to retain these benefits without releasing the Technology Fees and Referral Fees to Womply.

163.    Womply seeks restitution or, alternatively, the imposition of a constructive trust over all SBA fees and interest Capital Plus has received for the Womply-referred PPP loans.

## COUNT 7 — BREACH OF CONTRACT

### (Against Capital Plus and Blueacorn)

164.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–163 above as if fully set forth herein.

165.    On May 11, 2021, Defendant Donnelly, in his capacity as CEO of Capital Plus and Crossroads, and Defendant Calhoun, in his capacity as CEO of Blueacorn, promised Womply's CEO during a telephone call that (i) the SBA fees for all Womply-referred PPP loans funded by Capital Plus would be deposited directly into the Joint Account, and (ii) Capital Plus and Blueacorn would provide Womply with visibility into the Joint Account so that Womply could verify when Blueacorn and Capital Plus received funds from the SBA.

166.    On May 19, 2021, Womply executed the Agreements.  Under the Agreements, Womply referred 86,521 PPP loans to Capital Plus through Blueacorn and provided valuable technology services to Capital Plus and Blueacorn.

167.     Capital Plus, Blueacorn, and Womply entered into a valid and enforceable oral contract.

168.     All conditions precedent were performed, fulfilled, or waived, including demand and presentment.

169.     Womply performed all applicable duties under the contract and tendered performance under the contract, including by referring PPP loans to Capital Plus through Blueacorn and providing technology services to Capital Plus and Blueacorn.

170.     Capital Plus and Blueacorn breached the contract by, among other things, failing to give Womply visibility into the Joint Account.

171.     Womply suffered substantial damages resulting from Defendants' breach, including the loss of more than $76 million in fees and finance charges due under the Agreements. In addition to its damages, Womply is entitled to recover its attorneys' fees and litigation costs pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

## COUNT 8 — QUANTUM MERUIT

### (Against Capital Plus Defendants)

172.     Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–171 above as if fully set forth herein.

173.     Womply provided valuable services to Capital Plus, including referral of 86,521 PPP loans and additional technology services that enabled Capital Plus to process, track, and service these loans.

174.     Capital Plus accepted Womply's services.  Capital Plus funded the PPP loans Womply referred and earned fees and interest on those loans.  Capital Plus also used Womply's Technology Platform and services to, among other things, process, track, and service these loans.

175.    Capital Plus had reasonable notice of Womply's expected compensation for its services.  During the May 11 Call, Womply notified Capital Plus of the fees it expected to receive for referring PPP loans and providing technology services.  Capital Plus agreed to deposit the fees it received from the SBA for these loans into the Joint Account that it held with Blueacorn and to provide Womply with visibility into the Joint Account.

176.    Capital Plus never compensated Womply for referring 86,521 PPP loans or providing valuable technology services.  Capital Plus also did not provide Womply with visibility into the Joint Account.

177.    Womply suffered substantial damages resulting from the Capital Plus Defendants' conduct, including the loss of more than $76 million in fees and finance charges due under the Agreements.  In addition to its damages, Womply is entitled to recover its attorneys' fees and litigation costs pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code.

## COUNT 9 — BREACH OF CONTRACT

### (Against Blueacorn)

178.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–177 above as if fully set forth herein.

179.    The Agreements between Womply and Blueacorn "shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof."  (Referral Agreement § 9; Order Form § 9.)

180.    Blueacorn claims that it is not required to pay Womply under the Agreements because it has not received payment from Capital Plus.

181.    Blueacorn is coordinating with Capital Plus to avoid paying Womply under the Agreements.

182.    In breach of the implied covenant of good faith and fair dealing, Blueacorn refuses to initiate any action against Capital Plus to obtain payment.

183.    Blueacorn is acting in bad faith by prioritizing its commercial relationship with Capital Plus over its contractual obligations to Womply.

184.    Blueacorn is also acting in bad faith by waiting to see whether Capital Plus succeeds in invalidating the Agreements between Blueacorn and Womply, which would enable Blueacorn to avoid paying Womply.

185.    Womply suffered substantial damages resulting from Blueacorn's conduct, including the loss of more than $76 million in fees and finance charges due under the Agreements.

### COUNT 10 — CIVIL CONSPIRACY

### (Against all Defendants)

186.    Plaintiff Womply re-alleges and incorporates by reference paragraphs 1–185 above as if fully set forth herein.

187.    At all relevant times, Defendants Capital Plus, Crossroads, and Donnelly were jointly engaged in the commission of the tortious and unlawful actions alleged herein.  Capital Plus, Crossroads, and Donnelly each acted intentionally, and their actions caused injury to Womply.

188.    At all relevant times, Defendants Blueacorn and Calhoun were jointly engaged in the commission of the tortious and unlawful actions alleged herein.  Blueacorn and Calhoun each acted intentionally, and their actions caused injury to Womply.

189.    At all relevant times, Defendants Capital Plus, Crossroads, Donnelly, Blueacorn, and Calhoun conspired together, acted in concert, and came to a mutual understanding to commit the tortious and unlawful actions alleged herein.  Defendants Capital Plus, Crossroads, Donnelly,

Blueacorn, and Calhoun committed overt acts in furtherance of this conspiracy that caused injury to Womply.

190.    Womply suffered substantial damages resulting from the Defendants' conspiracy, including the loss of more than $76 million in fees and finance charges due under the Agreements.

## JURY DEMAND

191.    Womply hereby requests a trial by jury on all issues so triable by right.

## PRAYER FOR RELIEF

192.    WHEREFORE, Womply respectfully requests that the Court enter judgment in Womply's favor and grant the following relief:

   a.   A declaration that the SBA Agent Fee Cap does not apply to technology services, including for Technology Fees Blueacorn agreed to pay Womply for access to the Technology Platform;

   b.   Actual damages to be determined at trial, but not less than $76,714,482.67 plus applicable financing fees;

   c.   Punitive or exemplary damages;

   d.   Restitution and/or a constructive trust;

   e.   Costs and disbursements assessed by Womply in connection with this action, including reasonable attorneys' fees pursuant to Section 38.001 of the Texas Civil Practice and Remedies Code;

   f.   Pre-judgment and post-judgment interest at the maximum applicable rate; and

   g.   Such further and other relief as this Court may deem proper and just.

Respectfully submitted,

*Of Counsel:*

Willkie Farr & Gallagher LLP

Alexander L. Cheney (admitted *pro hac vice*)
One Front Street
San Francisco, CA 94111
(415) 858-7400
acheney@willkie.com

Mark T. Stancil (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
1875 K Street, N.W.
Washington, D.C. 20006
(202) 303-1000
mstancil@willkie.com
jlevy@willkie.com

By:___/s/ Jason P. Bloom___
    Jason P. Bloom
    Texas Bar No. 24045511
    Nina Cortell
    Texas Bar No. 04844500
Haynes and Boone, LLP
2323 Victory Avenue, Suite 700
Dallas, TX 75219
(214) 651-5000
jason.bloom@haynesboone.com
nina.cortell@haynesboone.com

*Attorneys for Plaintiff Oto Analytics, Inc. d/b/a Womply*

# EXHIBIT 1

 **FOUNTAINHEAD**

August 16, 2021

The Honorable Isabella Casillas Guzman
Administrator of the U.S. Small Business Administration
409 3rd Street SW
Washington, D.C.  20416

**Re:  The Absence of PPP loan agent fee regulations for 2021 PPP loans**

Dear Administrator Guzman:

We write to you regarding an apparent oversight by SBA in NOT issuing regulations concerning loan agent fees paid on Paycheck Protection Program (PPP) loans made during calendar year 2021.  While this oversight has caused some problems for various lenders due to the absence of this guidance, this issue can be easily rectified if SBA takes quick action.

Our three Florida-based small business lending firms (Fountainhead, Benworth and SEDCO) made 627,566 PPP loans in 2021 (for approximately $8.7bn) which represents 9.39% of all PPP loans made this year (and approximately 3.14% of the dollar amount of PPP loans made in 2021). While none of our lending firms are household names, we all pivoted our businesses to respond to the dire needs of small businesses and contributed significantly to the government's economic recovery efforts.  Out of 5,242 participating PPP lenders in 2021, our three firms helped save an estimated 690,000 American jobs.

In early April 2020 with the launch of the first round of PPP loans, Treasury issued regulations regarding the maximum fee a participating PPP lender could pay a "loan agent" for their PPP loan referrals.  These maximum loan agent fees ranged from between 16.67% and 25% of the lenders' processing fees (no more than 1% of the loan amount could be paid on PPP loans up to $350,000; no more than 0.5% of the loan amount could be paid on PPP loans between $350,000 and $2,000,000; and no more than 0.25% of the loan amount could be paid on PPP loans above $2,000,000).

Unfortunately, with the passage of round three of PPP loans in late December 2020 (which enabled 2021 PPP loans to be made), neither Treasury nor SBA issued regulations (or updates to existing regulations) regarding the maximum loan agent fees that lenders could pay for referrals.  Especially problematic was that the lender processing fees earned on the smallest PPP loans (those of $50,000 or less) were dramatically changed from 2020 PPP loans to incentivize lenders to make these smaller loans to underserved small business owners.  However, no regulation has been issued regarding the maximum fee a lender can pay a loan agent for these particular 2021 PPP loan referrals.  The absence of this guidance has caused considerable ambiguity and unnecessary disputes between lenders and loan agents.

800-770-1504 

www.fountainheadcc.com 

3216 W. Lake Mary Blvd. 
Lake Mary, FL 32746

 **FOUNTAINHEAD**

We believe this oversight can be rectified quickly and easily with the issuance of a regulation about these smaller 2021 PPP loans regarding the maximum amount a lender may pay a loan agent on each referred PPP loan made in 2021.  Our suggestion would be that SBA issue a short regulation (in the Federal Register and/or in your PPP FAQ's) indicating that no lender may pay more than 50% of their earned processing fees made on these smaller ($50,000 and under) PPP loans to any loan agent.

**We urge you to make this simple fix and end this ambiguity so we may refocus our efforts on continuing to support small businesses with other SBA loan programs.**

Thank you for your consideration.

Sincerely,

Chris Hurn,
Founder/CEO
Fountainhead SBF

Bernie Navarro,
Founder/CEO
Benworth Capital Partners

Brooke Mirenda,
President & CEO
Sunshine State Economic Development Company (SEDCO)

800-770-1504 

www.fountainheadcc.com

3216 W. Lake Mary Blvd. 

Lake Mary, FL 32746

# EXHIBIT 2

**U.S. SMALL BUSINESS ADMINISTRATION**
**WASHINGTON, D.C. 20416**

Sent Via Email:  Chris@fountainheadcc.com; BNavarro@BenworthCapital.com; BMirenda@sedco504.com

September 14, 2021

Mr. Chris Hurn
Founder/CEO
Fountainhead SBF

Mr. Bernie Navarro
Founder/CEO
Benworth Capital Partners

Ms. Brooke Mirenda
President/CEO
Sunshine State Economic Development Company (SEDCO)

**Re: August 16, 2021 Letter to the Administrator**

Dear Messrs. Hurn and Navarro and Ms. Mirenda:

Thank you for your letter to Administrator Guzman dated August 16, 2021, expressing your concern that the Small Business Administration (SBA) has not issued guidance regarding the maximum loan agent fees that lenders could pay for referrals of Paycheck Protection Program (PPP) loans. The Administrator has asked me to respond on her behalf.

The Coronavirus Aid, Relief, and Economic Security Act (CARES Act) (Pub. L. 116-136) stated the fees that SBA would pay to lenders for processing PPP loans and provided SBA with the authority to set limits on agent fees.

On January 14, 2021, SBA published an interim final rule implementing updates to the PPP as a result of the enactment of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act (Pub. L. 116-260). That interim final rule included the following guidance regarding fees paid to an agent who provides assistance in connection with a PPP loan, including referral of the loan to the lender:

> "Agent fees may not be paid out of the proceeds of a PPP loan. If a borrower has knowingly retained an agent, such fees will be paid by the borrower. A lender is only responsible for paying fees to an agent for services for which the lender directly contracts with the agent. The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed:
>
> > a. One (1) percent for loans of not more than $350,000;
> > b. 0.50 percent for loans of more than $350,000 and less than $2 million; and
> > c. 0.25 percent for loans of at least $2 million.

The Act authorizes the Administrator to establish limits on agent fees. The Administrator, in consultation with the Secretary, determined that the agent fee limits set forth above are reasonable based upon the application requirements and the fees that lenders receive for making PPP loans."

We hope that this information is helpful and thank you for your commitment to the nation's small businesses.

Very truly yours,

SUSAN
STREICH
Susan E. Streich
Director - Office of Credit Risk Management

Digitally signed by SUSAN
STREICH
Date: 2021.09.14 14:29:48
-04'00'

Cc:      Isabella Guzman, Administrator – Small Business Administration
         Patrick Kelley, Associate Administrator – Office of Capital Access
         John Miller, Deputy Associate Administrator – Office of Capital Access
         Dianna Seaborn, Director, Office of Financial Assistance

# EXHIBIT 3

## womply

**1.PPP Loan Referral Agreement**

This PPP Loan Referral Agreement (the "**Agreement**") is made and entered into on May 10th, 2021 (the "**Effective Date**") by and between Oto Analytics, Inc. d/b/a Womply ("**Womply**") and BA Fin Orion, LLC ("**Blueacorn**"). In consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, Womply and Blueacorn hereby agree as follows:

**WHEREAS,** Blueacorn desires to engage in the marketing, initial underwriting, and submission to third-party lenders of loans funded and created under the U.S. Small Business Administration ("**SBA**") Paycheck Protection Program (the "**PPP**");

**WHEREAS**, Blueacorn and Womply desire to establish an independent contractor relationship whereby Womply provides referrals to Blueacorn in connection with potential loan applicants seeking loans under the PPP from third-party lenders; and

**WHEREAS**, Blueacorn and Womply specifically acknowledge that any third-party lender retains ultimate responsibility for all loan decisions, including approvals, underwriting, closings, disbursements, due diligence, and loan servicing actions (including those relating to loan deferments, loan forgiveness, and loan guarantees), as required by the SBA, and Womply will exercise all best efforts to comply with all regulatory requirements of the PPP.

**NOW THEREFORE**, in consideration of the mutual covenants, promises, and undertakings contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.   **Referrals**.

1.1.   Womply may, from time to time, refer to Blueacorn such PPP loan applicants as Womply shall, in its sole and absolute discretion, deem appropriate (each such applicant a "**Referral**"). Womply acknowledges that sometimes the same borrower is submitted to Blueacorn by multiple referring parties. Womply will be the party paid if they were the first to submit a complete package to Blueacorn for the requested loan.

1.2.   WOMPLY SHALL EXERCISE COMMERCIALLY REASONABLE EFFORTS TO (I) COMPLY WITH THE APPLICATION REVIEW PROCESS SET FORTH ON EXHIBIT A, AND (II) WOMPLY REPRESENTS AND WARRANTS, TO ITS KNOWLEDGE AS OF THE EFFECTIVE DATE, THAT THE INFORMATION ACCOMPANYING ANY REFERRAL COMPLIES WITH THE REGULATORY GUIDANCE FROM THE SBA. NOTWITHSTANDING THE FOREGOING WOMPLY MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT, AND HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF ANY AND ALL APPLICATION INFORMATION PROVIDED BY AN APPLICANT THAT IS DEEMD A REFERRAL HEREUNDER. WOMPLY ACKNOWLEDGES AND AGREES THAT BLUEACORN WILL NOT CONDUCT AN INDEPENDENT REVIEW OF THE REFERRED LOANS (AS DEFINED BELOW) PRIOR TO SUBMISSION TO A THIRD PARTY LENDER.

1.3.   Neither Blueacorn nor Womply is a lender or lender service provider as defined by the SBA.

2.   **Compensation**.

2.1.   The Referral Fees described in this Section 2 will be paid out of the fees actually received by Blueacorn in respect of Referred Loans (defined below) (the "**Loan Fees**").

2.2.   In consideration of Womply providing Blueacorn with Referrals, Blueacorn shall pay to Womply the referral fee set forth in the table below, which is expressed as a percentage of the outstanding balance of the Referred Loan at the time of loan disbursement (such fees, the "**Referral Fees**"), for each loan originated by Blueacorn under the PPP resulting from a Referral (such loan a "**Referred Loan**"). Blueacorn retains the right, in its sole and absolute discretion, to refuse to submit any Referred Loan to a third party lender for any reason.

| Referral Fee Amount | 1.00% for each Referred Loan |
|---|---|

2.3.   Within five (5) days after Blueacorn receives its fees from the lender that submitted the Referred Loan to the the SBA, Blueacorn will pay Womply all associated Referral Fees for such applicable Referred Loan. Womply shall return any Referral Fees paid in the event that the SBA or other governmental agency requires Blueacorn to return the Blueacorn Fee. Additionally, Womply shall return any portion of Referral Fees paid that the SBA or other

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

womply

governmental agency determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements. Such return of fees will occur within fifteen (15) days of Womply receiving notice of such return of fees from Blueacorn.

2.4.   Each party shall be responsible for and pay any and all applicable taxes, customs, withholding taxes, duties, assessments and other governmental impositions resulting from its own activities under this Agreement. Referral Fee payments not made in accordance with the foregoing schedule are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all costs of collection. Except as expressly set forth above, all Referral Fees paid are non-refundable, non-cancellable, and not subject to set-off. All payments described in this Section 2 must be made by wire transfer.

3.   **Representations and Warranties**. Each party represents, warrants, and covenants that: (a) it has the full right, power and authority to execute this Agreement and perform its obligations hereunder; (b) its performance hereunder will not conflict with any obligation it has to any third party; and (c) it has and will maintain such comprehensive general liability and other insurance as is necessary to cover any claims and losses associated with any of its obligations under this Agreement.

4.   **Term; Termination**.

4.1.   The term of this Agreement shall be one (1) year from the Effective Date (the "**Term**"), and thereafter upon the mutual written consent of both parties shall renew for successive one (1) year terms unless earlier terminated, if Notice of Termination is timely provided, in accordance with this Section 4.

4.2.   Notwithstanding Section 4.1 above, either party may terminate this Agreement at its option by providing no less than thirty (30) days' written notice ("**Notice of Termination**") to the other party. Either party may also terminate this Agreement immediately upon delivery of a Notice of Termination if the other party is in material breach of any warranty, representation, covenant or obligation under this Agreement or the Womply Developer Order Form and is not able to cure such breach within seven (7) calendar days of receiving the Notice of Termination.

4.3.   Upon Blueacorn's receipt of a Notice of Termination, Blueacorn may request from Womply, and Womply shall reasonably provide to Blueacorn, a plan for transmitting to Blueacorn electronic copies of loan files in its possession that relate to the Referred Loans, to the extent not otherwise in the possession of Blueacorn. Womply will not unreasonably withhold its cooperation in such selection and transmission. Both parties shall agree upon a data format and method of transmission. Womply shall reasonably provide such requested information to Blueacorn no later than thirty (30) days following the termination of this Agreement.

4.4.   The following Sections shall survive termination or expiration of this Agreement: 1.2, 2 (to the extent Referral Fees remain outstanding), 3, 4.3, 4.4, 4.5, and 5 through 17.

4.5.   Womply shall be entitled to all Referral Fees accrued in connection with Referred Loans pursuant to the terms and provisions of Section 2 above, including services provided after termination of this Agreement pursuant to Blueacorn's request.

5.   **Confidential Information**.

5.1.   During the course of performing this Agreement, each party may have access to confidential or proprietary information of the other party, as well as confidential customer information that accompanies each Referral ("**Confidential Information**"). The protection of confidential customer information is required at all times and Blueacorn and Womply shall at all times comply with relevant state and federal regulations regarding disclosure of such Confidential Information, including if applicable the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801-6809) and the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.).

5.2   A party's Confidential Information shall not include any information which (i) becomes part of the public domain through no act or omission of the other party; (ii) is lawfully acquired by the other party on a non-confidential basis from a third party without any breach of a confidentiality obligation; (iii) is disclosed by such party to a third party without any obligation of confidentiality; or (iv) was independently developed by the other party without reference to such party's Confidential Information. Each party agrees to use the other party's Confidential Information only as necessary to perform its obligations under this Agreement or to address any issues related to fraud or investigations into fraud related to the Referred Loans and to maintain the confidentiality of the other party's Confidential Information using at least the same degree of care in safeguarding the other's Confidential Information as it uses in safeguarding its own Confidential Information, subject to a minimum standard of reasonable diligence and protection to prevent any unauthorized copying, use, distribution, installation or transfer of possession of such

**w‑ompIy**

information. If required by law, the receiving party may disclose Confidential Information of the disclosing party, provided the receiving party gives adequate prior notice of such disclosure to the disclosing party to permit the disclosing party to intervene and to request protective orders or other confidential treatment therefor. Notwithstanding the foregoing, the confidentiality protections set forth in this Section 5 does not apply to the use of the Confidential Information by any third-party lenders to which the Referrred Loans are sent for processing.

**6.    Indemnification.**

6.1.    Subject to Section 6.2, each party ("**Indemnifying Party**") shall indemnify, defend, and hold the other party, its officers, directors, employees, representatives and agents ("**Indemnified Parties**"), harmless from and against any Claim (defined below) to the extent resulting from (i) infringement, conflict with, or violation by the Indemnifying Party of any intellectual property rights, contracts rights, or tort rights (including the right of publicity or right of privacy) of any third party or (ii) a breach by the Indemnifying Part of Section 1.2(l). Indemnifying Party agrees to promptly pay and fully satisfy any and all Losses (defined below), including, without limitation, reasonable attorneys' fees, actually incurred, or sustained, as a result of any Claims. "**Claim**" means any third-party claim, legal or equitable, cause of action, suit, litigation, proceeding (including a regulatory or administrative proceeding), complaint, demand, charge, investigation, audit, arbitration, mediation, or other process for settling disputes or disagreements, including, without limitation, any of the foregoing processes or procedures in which injunctive or equitable relief is sought. "**Losses**" mean and include any loss, assessment, fine, penalty, deficiency, interest, payment, expense, cost, debt, indebtedness, liability, lien, judgment, or damage, which is both (a) sustained, incurred, or accrued and (b) paid to an unaffiliated third party.

6.2.    The Indemnified Party shall: (i) promptly notify the Indemnifying Party in writing of any Losses for which the Indemnified Party seeks indemnification; (ii) provide reasonable cooperation to the Indemnifying Party and its legal representatives in the investigation of any matter which is the subject of indemnification; and (iii) permit the Indemnifying Party to have full control over the defense and settlement of any matter subject to indemnification. The Indemnified Party shall have the right to participate in the defense at its own expense.

7.    **Limitation of Liability**. EXCEPT WITH RESPECT TO A BREACH OF SECTION 5 AND EACH PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, (I) NEITHER PARTY WILL BE LIABLE OR OBLIGATED WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR UNDER ANY CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, RELIANCE OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA OR USE, AND (II) NEITHER PARTY'S LIABILITY SHALL EXCEED THE AMOUNTS PAID AND PAYABLE (IN THE CASE OF BLUEACORN'S BREACH ONLY) TO WOMPLY DURING THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY.

8.    **Recitals**. The recitals set forth above are hereby incorporated into this Agreement.

9.    **Choice of Law**.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof. Notwithstanding the foregoing or any provision of this Agreement to the contrary, this Agreement is subject to all Applicable Laws, including SBA Regulations. In the event of any conflict between the governing law and the SBA Regulations (defined below), the SBA Regulations shall control. "SBA Regulations" means all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 20811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time. In the event that this Agreement conflicts with any other contract or agreement between the parties, now or in the future including the Womply Developer Order Form, this Agreement shall control with respect to any Referred Loan unless the other contract or agreement specifically states that it supersedes this Agreement.

10.    **Arbitration**. Without limiting a party's right to seek injunctive or other equitable relief in court, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court. The prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees.

**womply**

11. **Independent Contractors**. This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors. Neither party has, or may represent that it has, any authority under or as a result of this Agreement to act on behalf of the other party in any way.

12. **Notices**. Any notice or other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been duly given on the day of service if served personally or upon receipt if sent by facsimile transmission with confirmation or if mailed by First Class mail, registered or certified, postage prepaid, and addressed to the respective parties at the addresses set forth above, or at such other addresses as may be specified by either party pursuant to the terms and provisions of this section.

13. **Assignment**. Neither party may assign, without the prior written consent of the other, its rights, duties or obligations under this Agreement to any person or entity, in whole or in part; provided, however, that this Agreement may be assigned by a party without the consent of the other to any successor corporation or entity whether by purchase of all or substantially all of the assets relating to this Agreement, a sale of a controlling interest of the capital stock of the assigning party, by merger, consolidation or otherwise. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

14. **Force Majeure**. Neither party will be liable for failure or delay in performance of any of its obligations under this Agreement arising out of any event or circumstance beyond that party's reasonable control; *provided*, *however*, that such party promptly notifies the other party of the nature and duration of the force majeure event and resumes performance as soon as possible.

15. **Severability**. Any provision of this Agreement that is determined to be unenforceable or unlawful shall not affect the remainder of the Agreement and shall be severable therefrom, and the unenforceable or unlawful provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

16. **Entire Agreement**. Excluding separate agreements Blueacorn may have for the purchase of Womply's products and services, this Agreement constitutes the entire agreement between the parties and supersedes any and all prior communications or agreements between them, whether written or oral, with respect to the subject matter hereof. This Agreement may not be amended, modified or any provision hereof waived, except in a writing signed by the parties hereto. No waiver by either party, whether express or implied, of any provision of this Agreement, or of any breach thereof, shall constitute a continuing waiver of such provision or a breach or waiver of any other provision of this Agreement.

17. **Press Releases**. Any news release, public announcement, advertisement, or other publicity released by either party concerning this Agreement shall be subject to the prior approval of the other party, which approval shall not be unreasonably withheld or delayed. The parties will cooperate with each other to issue a joint press release announcing their relationship established by this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Amendment Effective Date.

**Womply:**

By: _____

Name: Toby Scammell

Title: Founder

**Blueacorn**

By: _____

Name: Barry Calhoun

Title: CEO

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

**womply**

EXHIBIT A

APPLICATION REVIEW PROCESS

Attached Hereto

## PPP Fast Lane Data Collection Overview
Updated May 11, 2021

## Summary
The following conditions must be met individually prior to Womply sending an application to BlueAcorn:
- Email verified
- Phone verified
- Name, address, EIN, other basic info passes SBA form validation
- Business Activity check (as defined by Blue Acorn) passed
- Tax Document check passed
- KYC check passed
- Bank is verified and fundable based on global limits per bank account and RDFI rules
- Fraud is not detected
- Application info (email, phone, tax ID, bank account) has not been associated with any other application that was declined for fraud
- Other less common criteria pass including First Draw PPP loan number validation/disbursement, as appropriate.

## KYC
Womply uses Persona as the primary KYC vendor for our lenders. In some cases we also use Docusign ID Check (LexisNexis KBA).

Persona analyzes the following for each applicant:
- Database lookup (using DOB, SSN, Name)
- US Sanctions & watchlist check (including OFAC)
- Government ID authentication
- Government ID barcode scan (depends on other factors and ID type)
- Video Selfie

Persona automatically declines users with:
- foreign IPs and proxies/VPNs/Tor
- IDs that are expired (beyond the grace period set by states)
- >3 devices used across any inquiry
- Any selfie that fails their automated liveness check

Womply only passes applications through to lenders if the applicant has been "Approved" by Persona. Their approval requires passing, at minimum, the government database check, the ID check, and the selfie check.

Furthermore, Womply manually reviews selfies & IDs prior to funding. This manual review may or may not be conducted before the application is sent to BlueAcorn for their review. During manual review, Womply's team visually reviews each ID & selfie and declines any applications that slipped through automated filtering. For example, animations, deep fakes, and other info may be "Approved" by Persona's automated review but declined by Womply's KYC team.

Additionally, Womply sometimes requires Docusign ID Check when users sign promissory notes (e.g. if manual review of Persona KYC data hasn't been completed by that time).

We summarize KYC data on the KYC Details pdf file that is provided with each application.

## Business Activity

For BlueAcorn, there are two ways that applicants can provide evidence that they were in business on or around Feb 15, 2020:

1. Instant verification via Plaid looking for any transaction activity in February 2020. As of May 10th, we require that an applicant has at least 5 transactions in the month of February 2020.
2. Manual upload of bank statements from February 2020. Bank documents are analyzed for fraud and OCR'd by one or more of our third party providers.

Applications are only sent to BlueAcorn if they meet one or more of the criteria set forth above for business activity in February 2020.

We summarize bank data on the Bank Data pdf file that is provided with each application.

## Tax Documents

Here's an overview of our tax document analysis:

### Instant classification

Since March 14, we've been conducting real-time evaluations of 100% of the tax documents uploaded during our PPP Fast Lane application flow. This provides a first pass to determine if the forms look legitimate. We use a machine-learning platform to detect the type of document uploaded (e.g. Schedule type, year) and to provide the Borrower with feedback about whether they provided the correct forms. This significantly reduces error rates upfront and acts as our first fraud check. Applications that don't pass this instant classification are unlikely to pass through to BlueAcorn without correction from the Borrower.

### Second tax document review

100% of tax and bank documents uploaded in the application process go out for third party classification, verification, and data extraction. The extracted data goes through mathematical checks to determine if the values and calculations on the forms would be permissible for submission under IRS rules. In all cases, a human reviews the documents and confirms the OCR extraction is correct. We match the extracted tax IDs to the application to ensure the form matches the applicant. We have seen an extremely low error rate on this process (under 1%), which is significantly below the error rate we've seen from human-only reviews. In cases where math errors or other problems are significant, the document is flagged as suspicious.

### Third tax document review

All documents flagged as suspicious by our second tax review undergo a third automated fraud review.

In addition, of the documents *not* flagged as suspicious by our third-party review, we sample about 1 in 3 documents for a third tax document review. This review involves a variety of checks to detect if the document has been photoshopped or shows other evidence of tampering.

### Final tax document review

# womply

In cases where our secondary or tertiary review suggests the document is fraudulent, we perform another human review. Ultimately, more than half of documents flagged for this final review are deemed to be not fraudulent, despite the multiple checks and flags. This suggests to us that our filtering continues to be quite strict. But it also highlights that, without a way to definitively confirm the data on the tax documents (e.g., with an IRS API or Transcript), we are unable to distinguish between a well-executed fake document and a real one.  Visually, they will look identical. Nonetheless, to avoid program paralysis based on the mere possibility of fraud, our process considers documents that pass through all of these fraud checks acceptable.

Applications are only sent to BlueAcorn if they pass the review outlined above and they are the correct form and year, with a tax ID that matches the application.

We summarize relevant tax documents on the Tax pdf provided with each application.

## Bank Verification

Womply verifies the association of the applicant to the bank account in one or more of the following ways:

1 Instant verification: We compare Plaid Auth data to the account number that's manually entered by the user. We also use the Plaid Identity feature (where available) for comparison purposes to application data.

2 Manual verification: We compare the uploaded documents (bank statement, direct deposit form, and/or check) to the account number that's manually entered by the user.

- We exclude certain banks that have a high rate of KYC related fraud.
- We don't allow bank changes after an application is submitted.
- Once a reject is received on a bank account we prohibit that account from being used (by any applicant across any lender).
- We limit the total number of deposits that can be made to a single bank account by any lenders (4) and the total number of tax IDs that can be associated with a single bank account (2).
- We restrict deposits to new bank accounts as determined by logic that we've agreed upon with various RDFIs.

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f



Audit Trail

| | |
|---|---|
| **TITLE** | Womply - Blueacorn Referral Agreement & Womply Developer... |
| **FILE NAME** | Womply Developer Agreement - Final.docx and 1 other |
| **DOCUMENT ID** | e103cc00bf0fa2d8e2e37ff2ef66181b9495251f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

**SENT**
**05 / 19 / 2021**
08:38:42 UTC-8

Sent for signature to Barry Calhoun (barry@blueacorn.co) and Toby Scammell (toby@womply.com) from pamela@womply.com
IP: 136.158.28.2

**VIEWED**
**05 / 19 / 2021**
08:43:00 UTC-8

Viewed by Toby Scammell (toby@womply.com)
IP: 98.42.53.44

**SIGNED**
**05 / 19 / 2021**
08:44:10 UTC-8

Signed by Toby Scammell (toby@womply.com)
IP: 98.42.53.44

**VIEWED**
**05 / 19 / 2021**
08:51:04 UTC-8

Viewed by Barry Calhoun (barry@blueacorn.co)
IP: 107.126.40.17

**SIGNED**
**05 / 19 / 2021**
08:56:35 UTC-8

Signed by Barry Calhoun (barry@blueacorn.co)
IP: 107.126.40.17

**COMPLETED**
**05 / 19 / 2021**
08:56:35 UTC-8

The document has been completed.

# EXHIBIT 4

**Womply Developer Order Form**

| Client: | Blue Acorn |
|---|---|
| Effective Date: | May 10th, 2021 |
| API Access End Date: | The earlier of twelve (12) months from Effective Date or when this Order or the Agreement is terminated (the "Term"). |

| Service | Fees |
|---|---|
| Tax Documents<br>Bank Data<br>Identity<br>Account Verification<br>PPP Portfolio Management System | The Technology Fee set forth in Section 3 below. |

This Womply Developer Order Form agreement ("**Agreement**") is entered into as of the Effective Date and is between Oto Analytics, Inc. d/b/a Womply ("**Womply**") and the Client listed above. This Agreement includes and incorporates (i) the above Order Form, (ii) any Order Forms subsequently entered into by the parties, and (iii) the Additional Terms and Conditions set forth below. Unless set forth otherwise, undefined capitalized terms are defined in the PPP Loan Referral Agreement between the Parties (the "**Referral Agreement**"). To the extent there is a conflict between the Order Form Terms and the Referral Agreement, the Order Form Terms shall take precedence.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Womply:**

By: _____

Name: Toby Scammell

Title: Founder

**Client:**

By: _____

Name: Barry Calhoun

Title: CEO

testcomply

**Additional Terms and Conditions**

1.      Service.

1.1.    Access. Subject to the Client's compliance with the terms and conditions of this Agreement, Womply hereby agrees that during the Term, the Client has the non-exclusive right to: (i) use the Service (detailed on the Order Form) with an application owned and operated by the Client (the "**Client Application**") provided to end users (consumers or businesses) (the "**End Users**"), and (iii) use the End User information and data provided via the Service (the "**Output**") solely in the Client Application for the purpose of processing Referrals.

1.2.    Restrictions. Unless Womply specifically agrees in writing, Client will not, and will use commercially reasonable efforts to make sure third parties do not: (i) attempt to reverse engineer (except as permitted by law), decompile, disassemble, or otherwise attempt to discover the source code, object code, or underlying structure, ideas, or algorithms of the Service; (ii) modify, translate, or create derivative works based on the Service; (iii) make the Service or Output available to, or use the Service or Output for the benefit of anyone other than Client or End Users; (iv) sell, resell, license, sublicense, distribute, rent or lease any Service or Output to any third party, or include any Service or Output in a service bureau, time-sharing, or equivalent offering or (v) attempt to create a substitute or similar service through use of, or access to, the Services or Output. Client will use the Service and Output only in compliance with (i) the rights granted hereunder and (ii) any agreements between Client and End Users. All use of the Service and Output must be only as provided herein and only in accordance with the rights of business partners in Womply's privacy policy and applicable user documentation (and all other Womply-provided written instructions).

1.3.    Ownership. Except for the rights expressly granted under this Section 1, Womply reserves and retains all right, title, and interest in and to the Service and any related Output, software, products, works, and other intellectual property created, used, or provided by Womply for the purposes of this Agreement. To the extent the Client provides Womply with any feedback relating to the Service (including, without limitation, feedback related to usability, performance, interactivity, bug reports and test results) ("**Feedback**"), Womply will own all right, title and interest in and to such Feedback (and the Client hereby makes all assignments necessary to achieve such ownership).

1.4.    Privacy and Authorization. The Client represents that its privacy policy shall, for the duration of this Agreement, (a) be maintained in a manner that is compliant with applicable law and (b) obtain sufficient consents and provide sufficient notice for Womply to use and process End User data in accordance with Womply's Privacy Policy.

2.      Disclaimers.

2.1.    Section 1.2 of the Referral Agreement is hereby incorporated by reference.

2.2.    The Services includes integrations with and/or links to certain third-party service providers (including, without limitation, Plaid, Docusign, LexisNexis, Teslar, Inscribe, Ocrolus, AWS Mechanical Turk, Mindee, Persona, Twilio, Sendgrid, etc.) ("**Third-Party Providers**"). WOMPLY HAS NO CONTROL OVER AND ASSUMES NO RESPONSIBILITY FOR THE ACTIONS, ERRORS, OR OMISSIONS OF THE THIRD PARTY PROVIDERS.

2.3.    Section 1.3 of the Referral Agreement is hereby incorporated by reference.

2.4.    OTHER THAN AS SET FORTH IN SECTION 1.2 OF THE REFERRAL AGREEMENT, THE SERVICE AND ANYTHING ELSE PROVIDED BY WOMPLY HEREUNDER IS PROVIDED "AS IS." TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER WOMPLY NOR ITS AFFILIATES, SUPPLIERS, LICENSORS, OR DISTRIBUTORS MAKE ANY WARRANTY OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, OR ANY WARRANTY THAT THE SERVICE IS FREE FROM DEFECTS. EXCEPT AS EXPRESSLY SET FORTH HEREIN, WOMPLY DOES NOT MAKE ANY OTHER WARRANTY AS TO THE OUTPUT THAT MAY BE OBTAINED FROM USE OF THE SERVICE.

3.      Technology Fee.

3.1.    The Client agrees to the following:

testComply

3.1.1. The Client or any of the Client's third party lenders will not process any Second Draw Referred Loans for any First Draw Referred Loans from Womply without the express consent and direction from Womply.

3.2.    If Womply collects forgiveness information and submits such info to the SBA on behalf of the Client or the Client's lender, then the Client shall pay Womply $100 per loan. Womply will only participate in this activity if both it and the Client agree.

3.3.    Client shall pay Womply the technology fees described below for (i) each loan originated by Client under the PPP resulting from a Referral plus, if applicable, (ii) each Second Draw loan associated with a First Draw Referral (the "**Technology Fees**").

| Referred Loan Volume | Referral Fee Percentage |
|---|---|
| 1 through unlimited Referred Loans | Womply shall receive the first $250 from any Lender Processing Fee, plus 1/3 of the remaining Lender Processing Fee after the $250 is subtracted |

3.4.    The Technology Fee payable to Womply for any Referred Loan shall be reduced by any Referral Fee paid to Womply in respect of such Referred Loan. By way of example, if the Referred Loan has a principal amount of $50,000 and if Client receives a Lender Processing Fee of $2,500, then the Technology Fees payable to Womply shall be as follows:

_Lender Fee_:  $2,500

_Referral Fee_:  $500 (i.e., 1% of the value of the Referred Loan, as defined the by the PPP Loan Referral Agreement)

_Technology Fee_:  $499.99 (i.e., $250 plus 1/3 of the $2,250 Lender Processing Fee less $500 Referral Fee (paid separately))

3.5.    Within five (5) days after Blueacorn receives its fees from the the lender that submitted the Referred Loan to the SBA, Client will pay Womply all associated Technology Fees for each applicable Referred Loan. Womply shall return any Technology Fees paid in the event that the SBA or other governmental agency requires Client to return the Lender Processing Fee. Additionally, Womply shall return any portion of the Technology Fees paid that the SBA or other governmental agency determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements. Such return of fees will occur within fifteen (15) days of Womply receiving notice of such return of fees from Client. All payments herein shall be made by wire transfer.

3.6.    Each party shall be responsible for and pay any and all applicable taxes, customs, withholding taxes, duties, assessments and other governmental impositions resulting from its own activities under this Agreement.

3.7.    Unpaid invoices are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all expenses of collection. All payments made are non-refundable, non-cancellable, and not subject to set-off.

4.    Representations and Warranties. Each party represents, warrants, and covenants that: (a) it has the full right, power and authority to execute this Agreement and perform its obligations hereunder; (b) its performance hereunder will not conflict with any obligation it has to any third party; and (c) it has and will maintain such comprehensive general liability and other insurance as is necessary to cover any claims and losses associated with its obligations under this Agreement.

5.    Term; Termination.

5.1.    The term of this Agreement shall be for the Term detailed in the Order Form.

5.2.    Notwithstanding Section 5.1 above, either party may terminate this Agreement at its option by providing no less than thirty (30) days' written notice ("**Notice of Termination**") to the other party. Either party may also terminate this Agreement immediately upon delivery of a Notice of Termination if the other party is in material breach of any warranty, representation, covenant or obligation under this Agreement or

the Referral Agreement and is not able to cure such breach within seven (7) calendar days of receiving the Notice of Termination.

5.3.    Upon Client's receipt of a Notice of Termination, Client may request from Womply, and Womply shall reasonably provide to Client, a plan for transmitting to Client electronic copies of loan files in its possession that relate to the Referred Loans, to the extent not otherwise in the possession of Client. Womply will not unreasonably withhold its cooperation in such selection and transmission. Both parties shall agree upon a data format and method of transmission. Womply shall reasonably provide such requested information to Client no later than thirty (30) days following the termination of this Agreement.

5.4.    The following Sections shall survive termination or expiration of this Agreement: 1.2, 1.3, 1.4, 2, 3 (to the extent Referral Fees remain outstanding), 4, 5.3, 5.4, 5.5, and 6 through 16.

5.5.    Womply shall be entitled to all Technology Fees accrued in connection with Referred Loans pursuant to the terms and provisions of Section 3 above, including services provided after termination of this Agreement pursuant to Client's request.

6.    Confidentiality.

6.1.    During the course of performing this Agreement, each party may have access to confidential or proprietary information of the other party, as well as confidential customer information that accompanies each Referral ("**Confidential Information**"). The protection of confidential customer information is required at all times and Client and Womply shall at all times comply with relevant state and federal regulations regarding disclosure of such Confidential Information, including if applicable the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801-6809) and the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.).

6.2.    A party's Confidential Information shall not include any information which (i) becomes part of the public domain through no act or omission of the other party; (ii) is lawfully acquired by the other party on a non-confidential basis from a third party without any breach of a confidentiality obligation; (iii) is disclosed by such party to a third party without any obligation of confidentiality; or (iv) was independently developed by the other party without reference to such party's Confidential Information. Each party agrees to use the other party's Confidential Information only as necessary to perform its obligations under this Agreement or to address any issues related to fraud or investigations into fraud related to the Referred Loans and to maintain the confidentiality of the other party's Confidential Information using at least the same degree of care in safeguarding the other's Confidential Information as it uses in safeguarding its own Confidential Information, subject to a minimum standard of reasonable diligence and protection to prevent any unauthorized copying, use, distribution, installation or transfer of possession of such information. If required by law, the receiving party may disclose Confidential Information of the disclosing party, provided the receiving party gives adequate prior notice of such disclosure to the disclosing party to permit the disclosing party to intervene and to request protective orders or other confidential treatment therefor.  Notwithstanding the foregoing, the confidentiality protections set forth in this Section 6 do not apply to the use of the Confidential Information by any third-party lenders to which the Referred Loans are sent for processing.

7.    Indemnification.

7.1.    Subject to Section 7.3, each party ("Indemnifying Party") shall indemnify, defend, and hold the other party, its officers, directors, employees, representatives and agents ("Indemnified Parties"), harmless from and against any Claim (defined below) to the extent resulting from infringement, conflict with, or violation by the Indemnifying Party of any intellectual property rights, contracts rights, or tort rights (including the right of publicity or right of privacy) of any third party. Indemnifying Party agrees to promptly pay and fully satisfy any and all Losses (defined below), including, without limitation, reasonable attorneys' fees, actually incurred, or sustained, as a result of any Section 7.1 Claims. "Claim" means any third-party claim, legal or equitable, cause of action, suit, litigation, proceeding (including a regulatory or administrative proceeding), complaint, demand, charge, investigation, audit, arbitration, mediation, or other process for settling disputes or disagreements, including, without limitation, any of the foregoing processes or procedures in which injunctive or equitable relief is sought. "Losses" mean and include any loss, assessment, fine, penalty, deficiency, interest, payment, expense, cost, debt, indebtedness, liability, lien, judgment, or damage, which is both (a) sustained, incurred, or accrued and (b) paid to an unaffiliated third party.

7.2.    Subject to Section 7.3, the Client will defend, indemnify and hold Womply harmless from and against all Claims to the extent resulting from Client breach of Section 1.2. The Client agrees to promptly

pay and fully satisfy any and all Losses, including, without limitation, reasonable attorneys' fees, actually incurred, or sustained, as a result of any Section 7.2 Claims.

7.3.     The Indemnified Party shall: (i) promptly notify the Indemnifying Party in writing of any Losses for which the Indemnified Party seeks indemnification; (ii) provide reasonable cooperation to the Indemnifying Party and its legal representatives in the investigation of any matter which is the subject of indemnification; and (iii) permit the Indemnifying Party to have full control over the defense and settlement of any matter subject to indemnification. The Indemnified Party shall have the right to participate in the defense at its own expense.

8.     Limitation of Liability. EXCEPT WITH RESPECT TO SECTION 1.2(I) AND SECTION 5 OF THE REFERRAL AGREEMENT OR A BREACH OF SECTION 6 OF THIS AGREEMENT AND EACH PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, (I) NEITHER PARTY WILL BE LIABLE OR OBLIGATED WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR UNDER ANY CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, RELIANCE OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA OR USE, AND (II) NEITHER PARTY'S LIABILITY SHALL EXCEED THE AMOUNTS PAID AND PAYABLE (IN THE CASE OF CLIENT'S BREACH ONLY) TO WOMPLY DURING THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY.

9.     Choice of Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof. Notwithstanding the foregoing or any provision of this Agreement to the contrary, this Agreement is subject to all Applicable Laws, including SBA Regulations. In the event of any conflict between the governing law and the SBA Regulations (defined below), the SBA Regulations shall control. "SBA Regulations" means all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 20811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time. In the event that this Agreement conflicts with any other contract or agreement between the parties, now or in the future including the Womply Developer Order Form, this Agreement shall control with respect to any Referred Loan unless the other contract or agreement specifically states that it supersedes this Agreement.

10.     Arbitration. Without limiting a party's right to seek injunctive or other equitable relief in court, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court. The prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees.

11.     Independent Contractors. This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors. Neither party has, or may represent that it has, any authority under or as a result of this Agreement to act on behalf of the other party in any way.

12.     Notices.  Any notice or other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been duly given on the day of service if served personally or upon receipt if sent by facsimile transmission with confirmation or if mailed by First Class mail, registered or certified, postage prepaid, and addressed to the respective parties at the addresses set forth above, or at such other addresses as may be specified by either party pursuant to the terms and provisions of this section.

13.     Assignment.  Neither party may assign, without the prior written consent of the other, its rights, duties or obligations under this Agreement to any person or entity, in whole or in part; provided, however, that this Agreement may be assigned by a party without the consent of the other to any successor corporation or entity whether by purchase of all or substantially all of the assets relating to this Agreement,

a sale of a controlling interest of the capital stock of the assigning party, by merger, consolidation or otherwise. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

14.     Force Majeure. Neither party will be liable for failure or delay in performance of any of its obligations under this Agreement arising out of any event or circumstance beyond that party's reasonable control; provided, however, that such party promptly notifies the other party of the nature and duration of the force majeure event and resumes performance as soon as possible.

15.     Severability.  Any provision of this Agreement that is determined to be unenforceable or unlawful shall not affect the remainder of the Agreement and shall be severable therefrom, and the unenforceable or unlawful provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

16.     Entire Agreement.   Excluding the Referral Agreement, this Agreement constitutes the entire agreement between the parties and supersedes any and all prior communications or agreements between them, whether written or oral, with respect to the subject matter hereof. This Agreement may not be amended, modified or any provision hereof waived, except in a writing signed by the parties hereto. No waiver by either party, whether express or implied, of any provision of this Agreement, or of any breach thereof, shall constitute a continuing waiver of such provision or a breach or waiver of any other provision of this Agreement.

16.     Press Releases.   Any news release, public announcement, advertisement, or other publicity released by either party concerning this Agreement shall be subject to the prior approval of the other party, which approval shall not be unreasonably withheld or delayed. The parties will cooperate with each other to issue a joint press release announcing their relationship established by this Agreement.