IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OTO ANALYTICS, INC. d/b/a WOMPLY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:21-cv-2636-B |
| | § | |
| CAPITAL PLUS FINANCIAL, LLC, | § | |
| CROSSROADS SYSTEMS, INC., ERIC | § | |
| DONNELLY, BA FIN ORION, LLC d/b/a | § | |
| BLUEACORN, and BARRY CALHOUN | § | |
| | § | |
| Defendants. | § | |

**CAPITAL PLUS' BRIEF IN SUPPORT OF**
**MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

## CONTENTS

INTRODUCTION ...................................................................................................1

BACKGROUND ....................................................................................................3

    I.     The SBA administered PPP by delegating authority to private lenders to issue PPP loans, then guaranteeing 100% of qualifying loans made by such lenders. ........................................................................................................3

    II.    Capital Plus issued PPP loans as a lender with "delegated authority" from the SBA. ....................................................................................................5

    III.   In 2021, PPP ran out of money except under a provision for lenders like Capital Plus. ................................................................................................5

    IV.   Womply and Blueacorn sign two agreements to work together....................6

    V.    In the Referral Agreement with Blueacorn, Womply agreed to perform the essential underwriting tasks for the loans it referred. .........................6

    VI.   In the Order Form, Womply agreed to provide a "Service" largely comprising and defined as the same underwriting tasks outlined in the Referral Agreement. .................................................................................9

APPLICABLE LAW ............................................................................................12

ARGUMENT ......................................................................................................13

    I.     Womply is an "agent" under federal law governing PPP. ........................13

    II.    As an Agent who did not "directly contract" with Capital Plus, Womply cannot hold Capital Plus responsible for payment of fees. ..........................19

    III.   As an agent, Womply cannot collect fees from Capital Plus because it did not execute or provide to the SBA a "compensation agreement" for its work on the relevant loans. ...................................................................21

    IV.   Womply's claims seek fees well in excess of federal law capping agent fees under PPP. .....................................................................................21

    V.    Womply fails to plead even facially meritorious claims for negligent misrepresentation, promissory estoppel, and breach of oral contract. ...........24

CONCLUSION ....................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baylor Univ. v. Sonnichsen,*
221 S.W.3d 632 (Tex. 2007).................................................................................................25

*City of Clinton, Ark. v. Pilgrim's Pride Corp.,*
654 F. Supp. 2d 536 (N.D. Tex. 2009)..................................................................................25

*Colson Servs. Corp. v. Ins. Co. of N. Am.,*
874 F. Supp. 65 (S.D.N.Y. 1994) .........................................................................................14

*D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.,*
973 S.W.2d 662 (Tex. 1998)..................................................................................................25

*Daniel T.A. Cotts PLLC v. American Bank, N.A.,*
No. 2:20-CV-185, 2021 WL 2196636 (S.D. Tex. Feb. 9, 2021) ................................... 20, 21

*Estate of Miranda v. Navistar, Inc.,*
No. 21-40421, 2022 WL 109219 (5th Cir. Jan. 12, 2022)....................................................18

*First Bank of Lexington v. Sanders,*
946 F.2d 1185 (6th Cir. 1991) ..............................................................................................17

*Fretz Constr. Co. v. S. Nat. Bank of Houston,*
626 S.W.2d 478 (Tex. 1981)..................................................................................................25

*In re I.G. Servs., Ltd.,*
No. 04-5041-C, 2004 WL 5866105 (Bankr. W.D. Tex. Dec. 22, 2004) ..........................7, 8

*Ironshore Eur. DAC v. Schiff Hardin, L.L.P.,*
912 F.3d 759 (5th Cir. 2019)...................................................................................12, 13, 20, 25

*Johnson v. JP Morgan Chase Bank, N.A.,*
488 F. Supp. 3d 144 (S.D.N.Y. 2020)............................................................................5, 16, 20

*Juan Antonio Sanchez, PC v. Bank of South Texas,*
494 F. Supp. 3d 421 (S.D. Tex. 2020) ..................................................................................21

*Lopez v. Bank of America, N.A.,*
505 F. Supp. 3d 961 (N.D. Cal. 2020)...................................................................................20

*Norris v. Hearst Tr.,*
500 F.3d 454 (5th Cir. 2007)..................................................................................................13

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015)...........................................................................................................17

*Quadvest, L.P. v. San Jacinto River Auth.,*
    7 F.4th 337 (5th Cir. 2021)......................................................................................... 12, 14

*Radix Law PLC v. JP Morgan Chase Bank NA,*
    508 F. Supp. 3d 515 (D. Ariz. 2020) .............................................................................21

*Roof Sys., Inc. v. Johns Manville Corp.,*
    130 S.W.3d 430 (Tex. App.—Houston [14th Dist.] 2004, no pet.) ..................................25

*Taylor v. Charter Med. Corp.,*
    162 F.3d 827 (5th Cir. 1998)......................................................................................6, 13

*Thompson v. Ill. Dep't of Prof'l Reg.,*
    300 F.3d 750 (7th Cir. 2002)...................................................................................... 12, 14

**Statutes**

15 U.S.C. § 36 ......................................................................................................................6

15 U.S.C. § 636 .............................................................................................................. 12, 19

Bank Secrecy Act, Pub. L. No. 91-508, 84 Stat. 1114-24 (1970) (codified as amended
    in scattered sections of 12 U.S.C., 18 U.S.C., and 31 U.S.C.).........................................5, 7

Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No.
    116-136, 134 Stat. 281 (2020)..........................................................................................20

**Rules**

Fed. R. Evid. 201(b) .............................................................................................................13

**Regulations**

13 C.F.R. § 103.1..........................................................................................................*passim*

85 Fed. Reg. 20811 (Apr. 15, 2020)......................................................................................21

86 Fed. Reg. 3692 (Jan. 14, 2021) ..........................................................................................3

86 Fed. Reg. 3712 (Jan. 14, 2021) ........................................................................................12

**Treatises**

Restatement (Second) of Torts § 552B...................................................................................25

**Other Authorities**

Stacy Cowley, *The Paycheck Protection Program is out of money*, N.Y. Times, May 4, 2021
(updated Aug. 17, 2021) ............................................................................................................... 6

Treas., Cmty. Dev. Fin. Insts. Fund: CDFI Certification,
https://www.cdfifund.gov/programs-training/certification/cdfi (last visited Jan.
25, 2022) ........................................................................................................................................ 5

## INTRODUCTION

Plaintiff Oto Analytics, Inc. d/b/a Womply's ("Womply") claims against Defendants Capital Plus Financial, LLC, Crossroads Systems, Inc. and Eric Donnelly (collectively, "Capital Plus") are a thinly-veiled effort to circumvent federal statutory and regulatory restrictions on compensation an "agent" can receive in connection with the Paycheck Protection Program ("PPP"). These statutory and regulatory restrictions preclude Womply's claims in three respects: (1) Womply cannot hold Capital Plus "responsible" for fees because they had no ***direct*** contractual relationship; (2) Womply failed to file a "compensation agreement" with the SBA; and (3) Womply's claimed fees exceed the regulatory cap on the amount of fees an agent can collect for the services Womply provided. As a result, Womply's claims against Capital Plus should be dismissed.

Contrary to Womply's current vigorous effort to disclaim "agent" status, there is little question Womply meets the regulatory definition of "Agent." There are two components to determining "agent" status: (1) the person acts in a representative capacity for "Applicants" or "Participants" in SBA programs; and (2) the person "conduct[s] business with the SBA." Womply acted as a representative of the almost 86,521 "Applicants" whose applications Womply helped prepare and referred to Capital Plus, and Womply acted as a representative of a "Participant"—namely, Blueacorn on whose behalf Womply reviewed and scrubbed applications. Womply "conduct[ed] business with the SBA," which is an incredibly broad term, by "processing" applications on behalf of Blueacorn and by "preparing and submitting" applications on behalf of the applicants.

Womply's effort to avoid the "Agent" label by invoking the "technology service" provider exception is meritless. This exception was designed to exempt from regulatory oversight entities that provide general business technology services—such as accounting software or search engine optimization. Womply's services do not come close to fitting within this narrow exception. First, this exception only exempts an entity that provides technology service which does "not include

underwriting"; the purported "technology services" described in the Womply-Blueacorn contracts "include underwriting." Second, the exception, which is an interpretation of the regulatory definition of "Agent," cannot be read to cover Womply because it would be invalid. Since Womply meets the regulatory definition of "Agent" without question, the interpretative regulation cannot be read to exempt Womply or else the interpretation would be invalid as inconsistent with the regulatory definition. Third, Womply did not simply provide technology services; Womply provided the services of real people manually reviewing applications. The only reasonable interpretation of the "technology services" exception is that it applies to entities which provide technology and only technology.

When Womply signed the two contracts at issue with Blueacorn—contracts negotiated and executed **without the involvement of Capital Plus**—Womply apparently feared it would be subject to the regulatory cap on agent fees. Even though Womply expected to be paid by Capital Plus and even though Womply was very concerned about Capital Plus paying, Womply conspicuously did not contract directly with Capital Plus. The only explanation for this otherwise curious decision is simple: Womply believed that by avoiding a contractual relationship with a lender (*i.e.*, Capital Plus) it could avoid the regulatory cap because Womply (mistakenly) believed the cap would not apply if the fees were passed through an intermediary, like Blueacorn.

Womply's regulatory avoidance ploy, however, turns out to have been too clever by half. Apparently, Womply failed to realize that a lender is only "responsible" for paying agent fees for which the lender "directly" contracts. This statutory and regulatory restriction destroys Womply's strategy of effectively looking to Capital Plus for payment but avoiding a direct contractual relationship; Womply is simply left without any recourse against Capital Plus. Additionally, however Womply structured its arrangement, Womply was required to submit its "compensation agreement" to the SBA. Womply failed to do this, and as numerous federal courts have found applying the PPP regulations, an agent, like Womply, who fails to submit the agreement cannot recover any fees.

Even if Womply could recover against Capital Plus, Womply is still subject to the regulatory cap.  The cap sets a limit on the total amount of fees an agent may "collect" from a lender; the fact that the fees are passed through an intermediary makes no difference because the fees are still **collected** from the lender.  This is especially true here where Womply claims the intended payment scheme was for the fees to be paid out of an account jointly owned by Capital Plus.

Finally, Womply's effort to avoid the cap by claiming it was providing services beyond those covered by the cap is belied by the agreements with Blueacorn.  Those agreements make clear that the service for which Womply seeks compensation was the service of "assistance in preparing an application for a PPP loan (including referral to the lender)."  The fact that Womply used technology to provide this service does not permit Womply to charge fees in excess of the cap.

Because Womply's monetary claims (counts 2, 3, 4, 5, 6, 7, 8 and 10) all seek to collect from Capital Plus in violation of federal law, the Court should dismiss these with prejudice.  This Court should dismiss Womply's declaratory judgment claim (count 1) because the regulatory cap applies to Womply's so-called "Technology Fees."  Additionally, the Court should dismiss all of Womply's monetary claims that seek to recover for amounts in excess of the cap—*i.e.*, that seek to recovery under the Order Form for the "Technology Fee."  Finally, Womply fails to bother pleading even facially meritorious claims for negligent misrepresentation (count 4), promissory estoppel (count 5), and breach of oral contract (count 7).

## BACKGROUND

### I.  The SBA administered PPP by delegating authority to private lenders to issue PPP loans, then guaranteeing 100% of qualifying loans made by such lenders.

In 2020, Congress authorized the Small Business Administration ("SBA") to administer the Paycheck Protection Program ("PPP") to support small businesses during the COVID-19 pandemic.  Am. Compl. ¶¶1, 26 (ECF No. 20).  Under PPP, private lenders act under "delegated authority [from the SBA] to make PPP loans."  Interim Final Rule on PPP as Amended by Economic Aid Act, 86

Fed. Reg. 3692, 3694 (Jan. 14, 2021).  In turn, the SBA guaranteed the qualifying loans made by such lenders.  *Id.*; Am. Compl. ¶¶1, 4, 26.  To the extent the borrower uses the proceeds as required by the statutory and regulatory requirements, repayment of the loan may be "forgiven," triggering SBA's guarantee—effectively meaning the federal government paid off the loan for the borrower.  Am. Compl. ¶¶1, 26.  SBA promulgates and ensures compliance with the regulations and guidance for PPP. Am. Compl. ¶1.

To obtain a PPP loan, the prospective borrower must complete an SBA Borrower Application (Form 2483) that demonstrates the borrower was eligible.  86 Fed. Reg. at 3704.  To be eligible, generally an applicant must have been in business as of February 15, 2020 or self-employed as of that date, and have filed a Form 1040 Schedule C for 2019.  *Id.* at 3695.  The maximum amount that could be borrowed turned on a formula that was based on a borrower's payroll figures in 2019 (or in 2020 for loans made in 2021) or on net income (for self-employed borrowers) as reported on the applicable tax return.  *Id.* at 3700.  As part of the application process, the borrower must "submit documentation sufficient to establish eligibility and to demonstrate the qualifying payroll amount, which may include, as applicable, payroll records, payroll tax filings, Form 1099-MISC, Schedule C or F, income and expenses from a sole proprietorship, or bank records."  *Id.*, at 3695.

While lenders must determine if applicants are eligible, the lenders "may rely on certifications of the borrower to determine eligibility."  *E.g.*, 86 Fed. Reg. at 3694.  The lender is absolved of liability for any non-qualifying loans if the lender acted in "good faith" in relying on the applicants' certifications and documentation.  *Id.* at 3708.  The lender, however, must do some basic "underwriting."  Specifically, the PPP Regulations contain a section titled, "What do lenders have to do in terms of loan underwriting?"  *Id.* at 3707–08.  The regulations enumerate four "underwriting" steps:

(1)  confirm receipt of the borrower certifications in the Form 2483 application;

(2) confirm receipt of documentation showing employment status of the applicant or if a business, documents showing employees as of February 2020;

(3) confirm the historic payroll (if the applicant had employees) by examining the documentation submitted; and

(4) comply with the Bank Secrecy Act ("BSA") or similar anti-money laundering procedures, such as a customer identification program ("COP"), designed to make sure the lender confirms the identity of the applicant.

*Id.* In addition to the above steps, the lender was obligated to "review" each application. *Id.* at 3708 ("Each lender's underwriting obligation under the PPP is limited to the items above and reviewing the 'Paycheck Protection Borrower Application Form.'").

The lender may outsource all or part of the underwriting to a third party rather than conducting the underwriting itself. *Johnson v. JP Morgan Chase Bank, N.A.*, 488 F. Supp. 3d 144, 149 (S.D.N.Y. 2020); Am. Compl. ¶28. For example, a lender can employ a "Lender Service Provider" ("LSP") or other types of "Agents." *See* 13 C.F.R. §103.1(a) & (d) (defining each term).

## II. Capital Plus issued PPP loans as a lender with "delegated authority" from the SBA.

Capital Plus is a Certified Community Development Financial Institution ("CDFI"), focused on service low-income communities. Am. Compl. ¶44.[1] Womply alleges that in January 2021, Capital Plus announced that it had "partnered" with Blueacorn, which acts as an LSP for lenders, to process PPP loans. Am. Compl. ¶46. Working with Blueacorn, Capital Plus funded hundreds of thousands of relatively small PPP loans. Am. Compl. ¶50.

## III. In 2021, PPP ran out of money except under a provision for lenders like Capital Plus.

The deadline to submit applications for PPP loans was May 31, 2021. Am. Compl. ¶75. On May 4, 2021, however, the SBA announced that funds for PPP loans had been exhausted with one exception: namely, $8 billion remained set aside for loans made by Community Financial Institutions,

---

[1] Womply incorrectly uses the term "Certified Community Development Institution." *See* U.S. Dep't of Treas., Cmty. Dev. Fin. Insts. Fund: CDFI Certification, https://www.cdfifund.gov/programs-training/certification/cdfi (last visited Jan. 25, 2022).

like Capital Plus, that served disadvantaged borrowers.[2]  15 U.S.C. §36(A)(xi)(I) (defining "Community Financial Institutions").  As a result, as of May 4, 2021, an entity like Womply that was in the business of referring PPP applicants to lenders could no longer refer such loans unless it could partner with a lender like Capital Plus that still qualified to fund the loans.

## IV. Womply and Blueacorn sign two agreements to work together.

In early May 2021, Womply and Blueacorn began discussing Womply referring loans to Capital Plus.  Am. Compl. ¶55.  Womply alleges that Capital Plus' involvement in these negotiations consisted of Donnelly's participation in a May 11, 2021 phone call where Capital Plus represented that Blueacorn would refer all of Womply's loan applications to Capital Plus; that Capital Plus deposited all fees received from the SBA in a joint account owned by Capital Plus and Blueacorn; and that Capital Plus would give Womply "visibility" into the joint account.  Am. Compl. ¶58.  Womply does **not** allege that **any** terms of Womply's compensation were discussed with Capital Plus.  Nor does Womply allege that Capital Plus ever saw its agreements with Blueacorn until after this dispute erupted.

On May 19, 2021, Womply signed two agreements with Blueacorn.  Am. Compl. ¶59.  The first agreement was titled PPP Loan Referral Agreement, Am. Compl. Ex. 3 (ECF No. 20, at 49: "Referral Agreement"), and the second was titled Womply Developer Order Form, *id.* Ex. 4 (ECF No. 20, at 58: "Order Form").

## V. In the Referral Agreement with Blueacorn, Womply agreed to perform the essential underwriting tasks for the loans it referred.

Under the Referral Agreement, Womply agreed to exercise "commercially reasonable efforts to . . . comply with the application review process set forth on Exhibit A."  Referral Agreement §1.2.

---

[2] *See* Stacy Cowley, *The Paycheck Protection Program is out of money*, N.Y. Times, May 4, 2021 (updated Aug. 17, 2021), https://www.nytimes.com/2021/05/04/business/paycheck-protection-program-closes.html (reporting "[s]ome money--around $8 billion—is still available through a set-aside for community financial institutions, which generally focus on lending to businesses run by women, minorities and other underserved communities.").  The Court may take judicial notice of this fact.  *See Taylor v. Charter Med. Corp.*, 162 F.3d 827, 829 (5th Cir. 1998).

Womply further represents in Section 1.2 that the "information accompanying any referral complies with the regulatory guidance from the SBA." *Id.* The "information" accompanying a referral—namely, the borrower's application and associated documents—demonstrates that the applicant is qualified for a PPP loan. As a result, Womply represents for each loan it refers that, based on the information provided, the applicant meets the SBA eligibility guidance for PPP loans. *Id.*[3]

The recitals to the Referral Agreement state that Blueacorn "desires to engage in . . . initial underwriting" of PPP loans, and in Section 1.2, Womply "acknowledges and agrees that Blueacorn will **not** conduct an independent review of the referred loans . . . prior to submission to a third party lender." *Id.* (emphasis added). The only fair reading of these two provisions is that Blueacorn hired Womply to conduct the initial underwriting.

In Exhibit A, Womply agrees that ten conditions "must be met" before Womply sends an application to Blueacorn. Referral Agreement Ex. A. The conditions include verifying the applicant is who they claim to be, confirming the applicant meets the PPP eligibility requirements, and assuring no fraud has been detected. *Id.* To ensure these conditions are met, Womply agreed to undertake the following procedures:

**KYC**. Womply also agrees to conduct a "KYC" or "Know Your Customer," which is designed to comply with BSA or anti-money laundering requirements. *Id.*; *see In re I.G. Servs., Ltd.*, No. 04-5041-C, 2004 WL 5866105, *1 (Bankr. W.D. Tex. Dec. 22, 2004). For KYC, Womply agrees initially to confirm the applicant's identity using an electronic service (called Persona) before forwarding an application. *See* Referral Agreement Ex. A. Womply's obligations, however, do not end once the application has been forwarded. Womply further agrees to "manually" review each

---

[3] In the Referral Agreement, Womply disclaims responsibility for the "accuracy or completeness" of any information "provided by an applicant." Referral Agreement §1.2. This is consistent with the SBA Regulations described above, which permit the lender to rely on the accuracy of the information provided by the applicant. *See* 86 Fed. Reg. at 3708.

submission "prior to funding" of the loan; this manual review involves "Womply's team visually" reviewing each submission to make sure the applicant did not fool the automated system. *Id.*

> **Business Activity**. As noted above, in underwriting PPP loans, a lender must confirm receipt of documents evidencing the borrower was in business "on or around February 15, 2020," which was the key eligibility requirement for PPP loans. 86 Fed. Reg. at 3707–08. Under Exhibit A, Womply would accept bank statements submitted using either an automated service (Plaid) or manual upload. *See* Referral Agreement Ex. A. Womply further required that applicants using the Plaid service show "at least 5 transactions in the month of February 2020"—presumably to establish the applicant was conducting actual business. *Id.*

> **Tax Returns**. As noted above, data on tax returns provides the basis for confirming eligibility and the amount of any PPP loan, and part of the lender's underwriting responsibility is to confirm payroll data from the returns. In the Referral Agreement, Womply agreed to perform two underwriting tasks related to tax returns. *Id.* First, Womply agreed to work with the applicants to make sure that they submitted the correct documentation with their applications. *Id.* Specifically, Womply agreed to use an electronic, "instant classification" system to determine if the returns provided by the applicant were the correct forms and, if not, "to provide the Borrower with feedback about whether they provided the correct forms." *Id.* In other words, Womply agreed to work with the applicants to correct mistakes in their applications. Second, once Womply determined the correct forms had been submitted, Womply agreed to review the returns to make sure they looked legitimate, using both electronic and manual review in a three-step review process. *Id.*

> **Bank Statements**. In addition to the above, Womply agreed to verify the bank account into which PPP proceeds would be deposited. *Id.* Womply agreed to do so using both instant (electronic) verification and a manual review. *Id.*

**VI. In the Order Form, Womply agreed to provide a "Service" largely comprising and defined as the same underwriting tasks outlined in the Referral Agreement.**

While Womply claims the Technology Fee provides access to a computer platform that does more than assist in preparing applications and process referrals, this allegation is squarely contradicted by the Order Form attached to the complaint.  Under the Order Form, Womply agreed to provide a "Service" for a "Technology Fee."  The "Service" is defined using a chart:

| Service |
| --- |
| Tax Documents |
| Bank Data |
| Identity |
| Account Verification |
| PPP Portfolio Management System |

The Order Form does not provide any further definition of these capitalized terms, except to provide in the paragraph below the chart, "undefined capitalized terms are defined in the PPP Loan Referral Agreement." *Id.* The first four undefined capitalized terms match precisely the four categories of tasks outlined in Exhibit A to the Referral Agreement:

1.  "Tax Documents" corresponds to the various steps Womply agreed to take in regarding tax returns submitted by applicants;

2.  "Bank Data" is what Womply agreed to examine to confirm business activity as of February 2020;

3.  "Identity" is what the KYC steps in Exhibit A are designed to confirm; and

4.  "Account Verification" is presumably a reference to the steps Womply agreed to take to verify the existence of the bank account provided by the applicant.

To the extent there is any doubt that the "Service" listed in the Order Form constitutes the steps in Exhibit A to the Referral Agreement, that doubt is eliminated by the fact that the Order Form incorporates Section 1.2 of the Referral Agreement, which in turn obligates Womply to perform the

9

steps in Exhibit A.[4]  As a result, the only fair reading of what "Service" Womply agreed to provide under the Order Form must include the service of performing all the underwriting tasks in Exhibit A.

Womply claims the "Technology Fee" was compensation for access to Womply's "Technology Platform."  Am. Compl. ¶64.  The term "Technology Platform," however, does not appear in the attached contracts.  Moreover, the description of the "Technology Platform" provided in the Amended Complaint contains features like "lender-facing portal" that allows lenders to perform many functions and "Applications Programming Interfaces" that allow lenders to communicate with the SBA.  Am. Compl. ¶67(c)–(f).  While Womply may have a "Technology Platform" with these features, the Order Form does not mention any of this.  This makes sense given that Womply claims it was not contracting with a lender or even an LSP, so these lender-features would have been irrelevant.  Am. Compl. ¶68(a); Referral Agreement §1.3 ("Neither Blueacorn nor Womply is a lender or lender service provider as defined by the SBA.").  The features that appear in the Order Form definition of "Service"—and thus the portions of the "Technology Platform" service that were provided--are those enumerated at sub-paragraphs 68(a) ("Integrated Know Your Customer") and (b) ("Bank data and tax data").[5]  Those features relate solely to processing applications.

---

[4] Order Form § 2.1 ("Section 1.2 of the Referral Agreement is hereby incorporated by reference."). The intent to incorporate Section 1.2(i) is reinforced by the language of the limitation of liability provision in the Order Form.  *Id.* §8.  While the Order Form disclaims liability for certain types of losses, it carves out—and therefore places on Womply—liability arising under Section 1.2(i) . . . of the Referral Agreement."  This carve-out would be necessary only if the parties expressly intended for the Order Form to incorporate the Referral Agreement.

[55] The Order Form says the "Services includes integration with/or links to certain third-party service providers" and then contains a parenthetical with examples.  Order Form §2.2 ("including without limitation . . . etc.").  In the next sentence, Womply disclaims responsibility for these services.  This provision, however, cannot to be read to mean any of the listed examples of third-party services actually were integrated into the "Service."  However, a number of the services listed are the same third-party services named in Exhibit A as services Womply would use to verify information in the applications.

Tellingly, whatever the "Service" is that Womply claimed to provide, the Order Form grants Blueacorn a limited right to use it.  Specifically, the Order Form provides that Blueacorn can provide the "Service" to consumers or businesses to provide information, but Blueacorn can use the "information and data provided via the Service (the 'Output') **solely** . . . for the purpose of processing Referrals."  Order Form § 1.1.  In other words, contrary to Womply's claim, Womply was not licensing Blueacorn a technology platform for managing a loan portfolio; rather Womply was providing Blueacorn with a service solely for the purpose of processing loan referrals.  This is confirmed by the fact that as Womply's complaint notes, within days of Capital Plus submitting the loans to the SBA (the deadline to submit was May 31), Womply took the position that it had no further obligation to provide Blueacorn with any documents. Am. Compl. ¶ 81 ("Womply had no obligation to provide Blueacorn . . . with any documents or information. . . . .").

The terms of the Technology Fee confirm that it was nothing more than compensation for processing referrals.  First, the Technology Fee was calculated based on the number of referred loans that were funded and represented a percentage of the fees paid on the loan.  If Womply was licensing technology, why would the amount due depend solely on the number of loans successfully referred and funded and the size of the fees generated.  Second, to the extent Womply provided any service after the loan was referred, the Order Form called for a distinct charge separate from the "Technology Fee."  Order Form § 3.2 ("If Womply collects forgiveness information and submits such info to the SBA . . . then [Blueacorn] shall pay Womply $100 per loan.").  Third, the "Technology Fee" effectively incorporates the "Referral Fee" because the calculation of the Technology Fee contains a credit for the Referral Fee.  Order Form §3.4.  Specifically, the Order Form calculates a "Technology Fee" that effectively equals at least 40% of lender fees paid by SBA on a given loan, but then says a portion of

11

this amount equal to the Referral Fee is deducted out. *Id.*[6]  As a result, even if the Referral Fee were $0 or the Referral Agreement was terminated or voided, Womply still would get the exact same amount as a Technology Fee for referring loans.  The economics of the agreements is that Womply gets 40% of all lender fees as compensation for each referred loan.

Finally, the Order Form purports to give Womply the right to veto making certain loans. Order Form §3.1.  As the pandemic lingered, Congress authorized borrowers who had taken out a PPP loan already to request a second draw.  *See* 15 U.S.C. §636(a)(37); Interim Final Rule on PPP Second Draw Loans, 86 Fed. Reg. 3712 (Jan. 14, 2021).  The Order Form prohibits the lender to whom a loan is referred from "process[ing] any Second Draw Referred Loans for any First Draw Referred Loans from Womply without the express consent and direction from Womply."  *Id.*  In other words, Womply reserves the right to veto second-draw loans in a contract that Womply claims only deals with providing "technology services."  Am Compl. ¶66.

## APPLICABLE LAW

On a motion to dismiss, the Court may consider "the complaint, any documents attached to the complaint, and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint."  *Ironshore Eur. DAC v. Schiff Hardin, L.L.P.*, 912 F.3d 759, 763 (5th Cir. 2019) (citation omitted).  "If an attached exhibit contradicts a factual allegation in the complaint, 'then indeed the exhibit and not the allegation controls.'"  *Quadvest, L.P. v. San Jacinto River Auth.*, 7 F.4th 337, 345 (5th Cir. 2021) (citation omitted); *see Thompson v. Ill. Dep't of Prof'l Reg.*, 300 F.3d 750, 754 (7th

---

[6] The Technology Fee consists of $250 per loan plus one-third of all fees (minus the $250) paid by SBA on a particular loan, which for the loans in question was $2,500 or less.  Order Form §3.4.  The Referral Fee was netted out, so it did not change this preceding math.  As a result, on a loan with a $2,500 fee, the Technology Fee would equal $999.99 or 40% of the fees paid by SBA to Capital Plus. For those loans with fees less than $2,500, the Technology Fee would exceed 40% of the fees paid by SBA to Capital Plus.  Womply alleges it is owed $76 million out of $187 million in total fees or 40.64%. Am. Compl. ¶6.

Cir. 2002).  In addition, the Court may take judicial notice of facts that are "generally known" and "capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned."  *Taylor*, 162 F.3d at 829; *Norris v. Hearst Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) (court may consider matters of public record); Fed. R. Evid. 201(b).  Further, "dismissal under [R]ule 12(b)(6) may be appropriate based on a successful affirmative defense" where that defense "appear[s] on the face of the complaint."  *Ironshore Eur. DAC*, 912 F.3d at 763 (citation omitted).

## ARGUMENT

Womply's claims run afoul of the provisions of the PPP enabling statute and SBA regulations governing the compensation that an agent can receive.  As a threshold matter, based on the activity alleged in the Amended Complaint and attached contracts, Womply acted as an "agent" in connection with the PPP loans at issue.  Because Womply did not have a direct contract with Capital Plus, all of Womply's claims seeking to hold Capital Plus "responsible" for fees (counts 2, 3, 4, 5, 6, 7, 8, and 10) must be dismissed.  Similarly, because Womply does not allege it filed a "compensation agreement" with the SBA, those same claims must be dismissed.  Even if the Court were to find that Womply can recover from Capital Plus, Womply seeks fees in excess of the regulatory cap.  As a result, Womply's declaratory judgment claim, seeking a declaration that the cap does not apply, should be dismissed. As well, Womply's monetary damage claims (counts 2, 3, 4, 5, 6,7, 8, and 10) must be dismissed to the extent the claims seek recovery in excess of the cap.  Womply also fails to plead cognizable claims for negligent misrepresentation, promissory estoppel, and breach of contract.

## I.    Womply is an "agent" under federal law governing PPP.

Womply acted as an "agent."  The regulatory definition of "Agent" means "an authorized representative" or "any other person representing an Applicant or Participant by conducting business with the SBA."  13 C.F.R. §103.1(a) ("Agent means an authorized representative, including an attorney,

accountant, consultant, packager, lender service provider, or any other person representing an Applicant or Participant by conducting business with SBA."). Womply acted in both capacities.

Womply simply provides the naked allegation that it was not acting as an "authorized representative," nor did it "conduct business with the SBA." Am. Compl. ¶68(d). But Womply's conclusory allegations are contradicted by other allegations in the Amended Complaint and the Referral Agreement and Order Form. It is a "well-settled rule that when a written instrument contradicts allegations in a complaint to which it is attached, **the exhibit trumps the allegations**." *Thompson*, 300 F.3d at 754 (emphasis in original)); *accord Quadvest*, 7 F.4th at 345 ("the exhibit and not the allegation controls").

The regulatory definition of "Agent" does not define "authorized representative" in any specialized manner. But the common understanding of this phrase is any person "endowed with authority" by another. *Colson Servs. Corp. v. Ins. Co. of N. Am.*, 874 F. Supp. 65, 68 (S.D.N.Y. 1994) (citing Webster's Third New International Dictionary (Unabridged)). Womply was endowed with authority by the applicants, at a minimum, to refer their applications to PPP lenders. Referral Agreement §3 (Womply represents "has the full right, power, and *authority* to . . . perform" the contract (emphasis added)); §1.1 (Womply has the "absolute discretion" to determine whether to refer particular application). The Referral Agreement and the Order Form, which incorporates section 1.2 of the Referral Agreement, confirm this understanding because they presume Womply has access to the applicants' most sensitive personal information, such as bank accounts and tax returns. Referral Agreement Ex. A. The Order Form further confirms that Womply acted as an "authorized representative" of the applicant because Section 3.1 gave Womply the right to veto a loan that a lender might otherwise want to give to the applicant. Order Form §3.1. This means the applicants endowed Womply with significant authority to represent them in dealing with SBA lenders. Under the Order Form, Womply even claims ownership of the documents submitted by applicants—the so-called

14

"Output" of the "Service—which which includes sensitive personal financial information, Order Form § 1.3—how could Womply make such a claim unless it acted with authority from the applicants?

Womply also meets the requirement of "any other person representing an Applicant or Participant." By eliminating the word "authorized," this category appears to capture anyone acting even in an informal representative capacity. Womply "represented" both Applicants and Participants. Even if Womply was not an "authorized" representative, Womply "represented" Applicants in helping prepare their applications (*e.g.*, making sure the correct tax returns were provided) and in referring their applications. Womply also represented "Participants," namely Blueacorn. "Participants" is a broad term covering any person or entity that "participates" in an SBA program. 13 C.F.R. §103.1(g). Blueacorn participated in the PPP program as a "partner" with Capital Plus. Am. Compl. ¶46. Womply represented Blueacorn by reviewing applications for Blueacorn. *E.g.*, Referral Agreement §1.2 ("Womply acknowledges and agrees that Blueacorn will **not** conduct an independent review of the referred loans . . . prior to submission to a third party lender." (emphasis added)).

Womply conducted business with the SBA because its contractual obligations constitute "[p]reparing or **processing** on behalf of a lender or participant . . . an application" for PPP loans. 13 C.F.R. §103.1(b)(2) (defining "conduct business with the SBA") (emphasis added). The multi-step process of reviewing and scrubbing applications that Womply agreed to undertake under Exhibit A amounts to "processing" applications.

Womply's contractual obligations also constitute "[p]reparing or submitting on behalf of an applicant an application for" a PPP loan. 13 C.F.R. §103.1(b)(1). According to the two contracts, Womply "prepared" the application by assisting in compiling the needed documentation—such as making sure the applicant submitted the correct tax returns—and by checking the information supplied. Alternatively, Womply also "submitted" the application by forwarding the application to Blueacorn for referral to Capital Plus with the intent to have such application funded by the SBA.

15

Womply also claims because it is a "technology service" provider, it is not an agent.  Am. Compl. ¶68(d).  This claim is meritless.  Womply's claim that technology service providers are not agents is based on a note contained in the SBA's Standard Operating Procedure 50 10 ver. 6 ("SOP"): "Note: SBA does not consider entities providing technology services that do **not** include underwriting to be Agents."  *E.g.*, SOP 50 10 ver. 6, at 185 (emphasis added) (https://www.sba.gov/document/sop-50-10-lender-development-company-loan-programs-0) (hereafter "SOP").[7]  This exception cannot apply to Womply for multiple reasons.

To begin with, Womply's services, as described in the Referral Agreement and Order Form, include "underwriting."  While the SOP does not provide a formal definition of "underwriting,"[8] the PPP regulations define what constitutes "underwriting" for PPP loans.  *See supra*, at 3 (discussing 86 Fed. Reg. 3707–08).  The regulations use the word "underwriting" to refer to the process of collecting the application, reviewing the documentation to confirm eligibility, and taking certain steps to avoid fraud.  As a result, Womply cannot qualify for the technology services exception if its services **include** any of these "underwriting" functions.

The services provided by Womply as described in the Referral Agreement Exhibit A and the "Service" in the Order Form map perfectly onto the underwriting steps required for PPP loans.  *See supra*, at 3.  In addition to gather the proper documentation and reviewing for completeness and veracity, Womply's services are designed to determine and confirm if applicants actually qualify for

---

[7] The SOP, which is an interpretative regulation as opposed to a formal regulation, was written to address traditional SBA loans, called "7(a) loans," not PPP loans.  Nevertheless, regulations governing 7(a) loans apply to PPP loans except to the extent they conflict with specific provisions of the PPP and its implementing regulations, so the SOP applies to the PPP absent a conflict.  *Johnson*, 488 F. Supp. 3d at 155.

[8] The SOP, however, contains a detailed description of required "underwriting" for 7(a) loans.  *See* SOP, at 247–64.  "Underwriting" is a process that includes gathering needed documentation, reviewing applications, and making a determination of an applicants' eligibility for a loan. "Underwriting" as used in the SOP includes any of these actions.

PPP loans; in fact, Womply represents the "information accompanying any referral complies with the regulatory guidance from the SBA"—*i.e.*, Womply represents that to the best of its knowledge, the applicant is qualified.  Referral Agreement §1.2; Order Form §2.1 (incorporating Referral Agreement §1.2).  As noted above, the logical reading of the agreements is that Womply was retained to perform "initial underwriting."  *See supra*, at 15.  The fact that even Womply's "technology" contract—the Order Form—contained a provision giving Womply veto power over making certain loans underscores the absurdity of Womply's claim that its technology "Service" did not include "underwriting."

Womply argues it did not provide "underwriting services" because a recital to the Referral Agreement says the lender "retains ultimate responsibility for all loan decisions, . . . including underwriting."  The fact that the lender retained "ultimate" responsibility for underwriting—which presumably is the case with every lender—does not contradict the fact that Womply provided services that "**include**" underwriting as a component.

Even if the technology services provided by Womply did not include underwriting (which they did), Womply cannot fall within the ambit of the exception because if the interpretative note covered Womply, it would be invalid and unenforceable.  The "note" appears in an interpretive regulation, *First Bank of Lexington v. Sanders*, 946 F.2d 1185, 1189 (6th Cir. 1991) (the SBA's SOP is an "interpretive" regulation), and thus it must be consistent with and cannot contradict the regulatory definition it interprets, which is the regulatory definition of "Agent."  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 104–05 (2015).  The regulatory definition of "Agent" turns on whether an entity "conduct[s] business with SBA."  13 C.F.R. §103.1(a) & (b).  If an entity is retained by an applicant, participant, or lender and "conduct[s] business with the SBA," it is an "Agent."  The regulatory definition of "conduct business with SBA" does not turn on whether the services—*e.g.*, processing, preparing, or submitting applications—are performed by humans or machines.  As a result, the note

cannot exempt from "Agent" status any entity whose services include processing, preparing or submitting applications even if done purely by technology. And Womply's agreements with Blueacorn clearly call for Womply to process, prepare, and/or submit applications; as a result, whatever the "note" means, it cannot save Womply.

Not surprisingly, Womply's effort to invoke the "technology services" exception runs counter to the clear purposes of the exception. The note is designed to exempt from being an Agent an entity that provides general office technology services—such as Microsoft accounting or payroll software—or search engine optimization services for internet marketing purposes. This makes sense because the conduct of such entities would not constitute "conduct[ing] business with SBA" as defined in the regulation. In contrast, Womply was "conduct[ing] business with SBA."

Finally, Womply cannot seek shelter in the "technology services" exception because Womply also provided human services—multiple levels of manual review and interaction with applicants. The only logical reading of the note is that it exempts entities that provide **only** technology services. This interpretation is required to avoid an absurd result. The note exempts an entire "**entity**" if it provides the applicable technology services. As a result, if the note exempted every entity that bundled some "technology service" with its other non-technological services from being deemed an "Agent," then the note would render the regulations governing "Agents" toothless. For example, an entity that provided out-sourced loan officers to a lender, which would be an "Agent," could avoid regulatory oversight as an "Agent" by providing the loan officers with computers, claiming it provided technology services. To avoid this absurd result, at a minimum, the note must be construed to exempt entities providing technology services and no more. *See Estate of Miranda v. Navistar, Inc.*, No. 21-40421, 2022 WL 109219, *4 & n.34 (5th Cir. Jan. 12, 2022) (F.4th publication forthcoming) (courts construe regulations to avoid absurd results).

## II.    As an Agent who did not "directly contract" with Capital Plus, Womply cannot hold Capital Plus responsible for payment of fees.

Because Womply was acting as an agent, Womply had to comply with various rules governing agent compensation.  The statute authorizing PPP provides that lenders shall not be "responsible" for paying fees to an agent with whom it does not directly contract:  "A lender **shall only be responsible** for paying fees to an agent for services for which the lender **directly contracts** with the agent."  15 U.S.C. §636(a)(36)(P)(iii) (emphasis added).  Womply never directly contracted with Capital Plus, yet all of Womply's claims here seek to hold Capital Plus "responsible for paying fees" to Womply.

Womply alleges that it did not have a direct contractual relationship with Capital Plus.  Am. Compl. ¶56 ("Capital Plus would have no contractual obligation to pay Womply for the referral and technology services it provided.").  In fact, Capital Plus had no involvement in the negotiations or execution of the contracts between Womply and Blueacorn.  *See generally* Am. Compl. ¶¶55–57, 59, 61–71.  As a result, all of Womply's claims against Capital Plus run afoul of the statutory or regulatory bar on holding Capital Plus "responsible" for Womply's fees.

Womply's Amended Complaint added a claim alleging an oral agreement with Capital Plus to give Womply "visibility" in a joint account.  Am. Compl. ¶170.  Womply does not allege that the oral agreement involved Womply promising to provide any services to Capital Plus.  Am. Compl. ¶165. Womply does not allege that Capital Plus even discussed the services Womply would provide, much less that a contract was formed to provide such services.  At most, this alleged contract involved Capital Plus' promising to provide something to Womply and nothing more.  This alleged contract (even if it constituted an enforceable "contract," which it does not) does not satisfy the statutory requirement for a "direct contract" for services by the agent.  The statute says the lender is only responsible for paying an agent for "**services** for which the lender **directly contracts**."  Moreover, as noted below, Womply's alleged oral contract claim should be dismissed because from the face of the allegations, the Court can conclusively infer a lack of mutuality of obligation, consideration, and

19

even acceptance by either party. *Ironshore Eur. DAC*, 912 F.3d at 763 ("[D]ismissal under [R]ule 12(b)(6) may be appropriate based on a successful affirmative defense" where that defense "appear[s] on the face of the complaint." (citation omitted)).

Dismissal on these grounds is justified because Womply structured its agreement in this defective fashion in order improperly to circumvent the limit on agent fees by arguing that such limits apply only where a lender is a party to the contract. *E.g.*, Am. Compl. ¶¶68 & 68(a) ("[N]either Blueacorn nor Womply is an SBA-regulated lender, so the SBA Agent Fee Cap does not apply to the Agreements between Blueacorn and Womply."). By eschewing a direct contractual relationship with Capital Plus, however, Womply squarely triggered Capital Plus' absolute immunity from any responsibility for fees. *Johnson*, 488 F. Supp. 3d at 157 ("Accordingly, the Court holds that, absent an agreement between agent and lender, lenders are not required to pay agent fees under the text of the CARES Act or its implementing regulations. And because plaintiffs do not allege that they entered into any agreement with defendants regarding agent fees, the Court holds that they are not entitled to any such fees."); *see also, e.g.*, *Daniel T.A. Cotts PLLC v. American Bank, N.A.*, No. 2:20-CV-185, 2021 WL 2196636, *6 (S.D. Tex. Feb. 9, 2021) (dismissing plaintiff's state law claims where the basis relied on the same facts and legal theory as declaratory judgment claim for fees because "without a compensation agreement, Plaintiff is not entitled to any portion of American Bank's lender fees"); *Lopez v. Bank of America, N.A.*, 505 F. Supp. 3d 961, 974 (N.D. Cal. 2020) (dismissing remaining state law claims for unjust enrichment, conversion, money had and received, breach of contract, and unfair competition where court had dismissed declaratory judgment claim for PPP fees where plaintiff had failed to allege a compensation agreement with the lender). As a result, each of Womply's claims seeking monetary relief against Capital Plus (counts 2, 3, 4, 5, 6, 7, 8, and 10) must be dismissed.

III.    **As an agent, Womply cannot collect fees from Capital Plus because it did not execute or provide to the SBA a "compensation agreement" for its work on the relevant loans.**

Womply's claims against Capital Plus also fail because Womply did not file a "compensation agreement" with the SBA.  For an agent to collect fees, the agent must execute and provide to the SBA a "compensation agreement."  This can be done either by filing a Form 159 with the SBA or by having an SBA-approved LSP Agreement.  13 C.F.R. §103.5(a).  Federal courts have uniformly held that this requirement applies to the PPP.  *E.g.*, *Radix Law PLC v. JP Morgan Chase Bank NA*, 508 F. Supp. 3d 515, 519–20 (D. Ariz. 2020) ("But Form 159 was not completed.  Lacking that, Plaintiff is not entitled to payment of its agent fees by Defendant.  The Court joins the increasing number of courts across the country, including this Court, that have addressed this issue and unanimously held the same." (citing eight courts holding the same)).  Womply does not allege that it even executed or submitted to the SBA a Form 159.  As a consequence, Womply cannot recover any fees if Womply was acting as an agent under state-law theories.  *E.g.*, *Daniel T.A. Cotts PLLC*, 2021 WL 2196636 at *6 (dismissing various state law claims attempting to recover fees without filing a compensation agreement); *Juan Antonio Sanchez, PC v. Bank of South Texas*, 494 F. Supp. 3d 421, 439–41 (S.D. Tex. 2020) (same).

IV.    **Womply's claims seek fees well in excess of federal law capping agent fees under PPP.**

Womply's claim for fees also violates the regulatory cap on agent fees.  The Act authorizing the PPP authorized the SBA to establish limits on agent fees, and the SBA did so, repeatedly issuing regulations containing limits.  *E.g.*, Interim Final Rule on PPP, 85 Fed. Reg. 20811, 20816 (Apr. 15, 2020); 86 Fed. Reg. at 3709.  The regulation provides in relevant part:  "The total amount that an agent may collect from the lender for assistance in preparing an application for a PPP loan (including referral to the lender) may not exceed: a. One (1) percent for loans of not more than $350,000 . . . ."  *Id.*

Womply does not dispute that the claimed fees exceed the cap.  Womply, however, claims the cap at most applies to the Referral Fee (which is the maximum amount permitted by the cap).  Womply

21

claims the cap does not apply to its Technology Fee because that fee compensated for "extensive technology services that allow lenders to process, track, and manage their PPP loan portfolios." Am. Compl. ¶68(d).

First, this is wrong because according to the terms of the Order Form, the "Technology Fee" compensated Womply for processing applications and referrals. The Referral Fee and Technology Fee do not compensate Womply for distinct services. As explained above, the two fees compensate for the same bundle of services. *See supra*, at 11-12 (discussing the Technology Fee). The "Service"—as defined in the Order Form—is redundant of the Exhibit A obligations in the Referral Agreement. This understanding is confirmed by the fact that the Order Form incorporates the section 1.2 obligations of the Referral Agreement. Order Form § 2.1. Moreover, this understanding is confirmed by the manner in which the Technology Fee is calculated, which essentially makes the Referral Fee irrelevant. The alleged distinction between these two fees is nothing more than subterfuge to circumvent the cap.

Second, looking at just the four corners of the Order Form, the Technology Fee represents compensation for a "Service" to provide "assistance in preparing an application . . . including referral" for a PPP loan. The component parts of the "Service"—"Tax Documents," "Bank Data," "Identity," and "Account Verification"—make up the process of preparing an application for a PPP loan. Womply's description of these components confirms that these services were designed to assist in preparing applications including referral. *See* Am. Compl. ¶67(a) (describing the "Integrated Know Your Customer" feature") & (b) (describing the "[b]ank data and tax data" feature). Even more damning is the fact that the "Output" from the "Service" could be used "**solely** . . . for the purpose of processing Referrals." Order Form §1.1 (emphasis added). How can Womply claim with a straight face that the "Technology Fee" was compensation for anything other than processing referrals? The fact that the "Technology Fee" was payable based on the number of loans referred and calculated

22

based on the amount of fees generated from the resulting loans further confirms the fee was compensation for referrals—*i.e.*, a disguised referral fee.

The cap does not contain a technology exception; the cap applies to any fees for the service of "assisting in preparing" an application, including referral to the lender, regardless of whether the assistance takes the form of technology or otherwise.  The language of the cap does not permit an agent to seek additional fees as compensation for "the development" of the technology used by the agent.  Am. Compl. ¶66 ("The Technology Fees compensate Womply for . . . the development of . . . the Technology Platform.").  The cap says the "total amount" that an agent can collect is 1% of the loan amount.

Third, the fact that Womply charged an additional, distinct fee for services provided after referral also confirms that the "Technology Fee" represents compensation for assistance in preparing the application, including the referral, and nothing more.  Order Form §3.2.

Finally, even if the "Service" included additional functionality, Womply cannot avoid the plain language of the cap, which applies to the "**total amount** . . . **for** assistance in preparing an application for a PPP loan (including referral to the lender)."  Womply elected to define the "Technology Fee" as compensation for the "Service" as a whole.  If Womply failed to provide the functionality for preparing applications and processing referrals, Womply would earn no "Technology Fee," and thus the Technology Fee is compensation "for" the activity subject to the cap.  Moreover, given Womply's contractual decision, there is no way to allocate some portion of the fee as compensation for particular components.  The "Technology Fee" is the "total amount" of compensation for the activity subject to the cap.  Worse, accepting Womply's position would eviscerate the cap because it would never apply when an agent charged a single fee for a bundle of services.

Womply also argues that because the cap only applies to fees collected from a lender, the cap does not apply to fees paid by Blueacorn.  Am. Compl. ¶68(a).  This argument is particularly frivolous

because Womply explicitly pleads that the fees were payable from an account that was owned jointly by Capital Plus. Am. Compl. ¶58. The Order Form also says the "Technology Fee" comes out of the "*Lender* Processing Fee." Order Form §§3.3–3.5 (emphasis added). Moreover, the plain language of the cap says it applies to any fees "collected" from a lender; there is no language limiting the cap to only payments that come "directly" from a lender. The SBA knew how to limit application of the cap to "direct" payments from a lender. The immediately preceding sentence says a lender is only responsible for paying fees for which it "directly" contracts. The SBA could have said the cap applied to fees paid "directly" by the lender; instead, the SBA elected to use a broader concept, applying the cap to any effort by an agent to "collect" (without limitation) fees from a lender.

Womply also makes the bizarre argument that it may have acted as a "Referral Agent" but that it is not covered by the cap because the regulation uses the word "agent," not "Referral Agent." Br., at 16. There is zero authority supporting the notion that a "Referral Agent' is not also an "Agent" or that these are mutually exclusive, and Womply fails to explain how it could have acted as a "Referral Agent" without also meeting the regulatory definition of "Agent." Womply's argument—that the cap does not apply to "Referral Agents"—also would render the cap meaningless since it applies to agent fees for referrals.

Because the regulatory cap applies, the Court should dismiss Womply's claim (count 1) for a declaration that the regulatory cap does not apply to the Technology Fees. Am. Compl. ¶120. With regard to Womply's claims for monetary relief, the Court should either dismiss the claims to the extent the claims are based on recovery under the Order Foe of the Technology Fee, which Womply concedes exceeds the cap.

## V.     Womply fails to plead even facially meritorious claims for negligent misrepresentation, promissory estoppel, and breach of oral contract.

In addition to the violations of federal law, other principles require dismissal of Womply's negligent misrepresentation (count 4), promissory estoppel (count 5), and oral contract (count 7)

claims.    First, Womply's negligent misrepresentation claim fails because it is based on "representations" that are promises of future performance.  *Roof Sys., Inc. v. Johns Manville Corp.*, 130 S.W.3d 430, 439 (Tex. App.—Houston [14th Dist.] 2004, no pet.).  Second, Womply seeks legally impermissible damages for both negligent misrepresentation and promissory estoppel: benefit of the bargain damages (the amounts owed under the Blueacorn agreements), Am. Compl. ¶¶148 (negligent misrepresentation) & 155 (promissory estoppel); *D.S.A., Inc. v. Hillsboro Indep. Sch. Dist.*, 973 S.W.2d 662, 663–64 (Tex. 1998) (adopting Restatement (Second) of Torts §552B);  *Fretz Constr. Co. v. S. Nat. Bank of Houston*, 626 S.W.2d 478, 483 (Tex. 1981), and Womply fails to plead a theory of detrimental reliance or out-of-pocket damages.  Third, the promissory estoppel claim should be dismissed for failure to allege a cognizable promise:  While Womply alleges that Donnelly promised to pay Technology Fees in excess of 1% of the PPP loan amount, Am. Compl. ¶150, Womply alleges only one conversation took place with Donnelly where no such promise was made.  *Id.*  ¶58; *e.g.*, *City of Clinton, Ark. v. Pilgrim's Pride Corp.*, 654 F. Supp. 2d 536, 544-45 (N.D. Tex. 2009) (pleading "vague and indefinite statements" justifies dismissal).  Fourth, Womply's alleged oral contract claim should be dismissed because from the face of the allegations, the Court can conclusively infer a lack of mutuality of obligation, consideration, and acceptance by either party.  *Ironshore Eur. DAC*, 912 F.3d at 763; *Baylor Univ. v. Sonnichsen*, 221 S.W.3d 632, 635 (Tex. 2007).

## CONCLUSION

Because Womply's Amended Complaint fails to state a claim upon which relief can be granted against Capital Plus, the Court should grant this Motion and dismiss Womply's causes of action against Capital Plus.

Dated: January 31, 2022                    Respectfully submitted,

                                           SUSMAN GODFREY L.L.P.


                                           */s/ Harry P. Susman*
                                           Terrell W. Oxford
                                           TX State Bar No. 15390500
                                           Harry P. Susman
                                           TX State Bar No. 24008875
                                           Megan E. Griffith
                                           TX State Bar No. 24122748
                                           1000 Louisiana Street, Suite 5100
                                           Houston, Texas 77002-5096
                                           Telephone:  (713) 651-9366
                                           Fax:  (713) 654-6666
                                           toxford@susmangodfrey.com
                                           hsusman@susmangodfrey.com
                                           mgriffith@susmangodfrey.com

                                           **Attorneys for Capital Plus Financial, LLC,
                                           Crossroads Systems, Inc. and Eric Donnelly**


## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2022, a true and correct copy of the foregoing document was filed with the Court and served on all counsel of records via the Electronic Case Filing (ECF) system in the United States District Court for the Northern District of Texas.

                                           */s/ Harry P. Susman*
                                           **Harry P. Susman**

26