IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OTO ANALYTICS, INC. d/b/a WOMPLY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2636-B |
| | § | |
| CAPITAL PLUS FINANCIAL, LLC, | § | |
| CROSSROADS SYSTEMS, INC., ERIC | § | |
| DONNELLY, BA FIN ORION, LLC d/b/a | § | |
| BLUEACORN, and BARRY CALHOUN | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF JASON P. BLOOM IN SUPPORT OF PLAINTIFF WOMPLY'S OPPOSITION TO THE BLUEACORN DEFENDANTS' MOTION TO DISMISS**

I, Jason P. Bloom, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1.      I am a member of the bar of this Court and am a partner at the law firm of Haynes and Boone, LLP, counsel for Plaintiff Oto Analytics, Inc. d/b/a Womply ("Womply").

2.      I respectfully submit this Declaration to provide the Court with certain materials cited in Womply's Memorandum of Law in Opposition to the Blueacorn Defendants' Motion to Dismiss.

3.      Attached hereto as Exhibit 1 is a true and correct copy of a press release issued by Capital Plus Financial, LLC ("Capital Plus") and Crossroads Systems, Inc. ("Crossroads"), dated January 11, 2021, which is available at https://capitalplusfin.com/2021/01/11/capital-plus-financial-partners-with-blueacorn-to-expedite-ppp-loan-relief-to-small-businesses/.

4.      Attached hereto as Exhibit 2 is a true and correct copy of a *Dallas Business Journal* article titled *DFW Non-Bank Business Works to Bring PPP to Underserved Communities*, dated

January 12, 2021, which is available at https://www.bizjournals.com/dallas/news/2021/01/12/ community-development-ppp.html.

5.      Attached hereto as <u>Exhibit 3</u> is a true and correct copy of a press release issued by BA Fin Orion, LLC d/b/a Blueacorn, dated June 9, 2021, which is available at https://blueacorn.co/press-releases/.

6.      Attached hereto as <u>Exhibit 4</u> is a true and correct copy of excerpts from Crossroads' quarterly Over-the-Counter ("OTC") filing with the Securities Exchange Commission ("SEC") for the period ending April 30, 2021, dated June 14, 2021, which is available on the SEC's Electronic Data Gathering, Analysis, and Retrieval ("EDGAR") system and at https://crossroads.com/for-investors/.

7.      Attached hereto as <u>Exhibit 5</u> is a true and correct copy of a *New York Times* article titled *How Two Start-Ups Reaped Billions in Fees on Small Business Relief Loans*, dated June 27, 2021, which is available at https://www.nytimes.com/2021/06/27/business/ppp-relief-loans-blueacorn-womply.html.

8.      Attached hereto as <u>Exhibit 6</u> is a true and correct copy of a letter from Robert H. Alpert and Eric A. Donnelly to Crossroads shareholders, dated July 8, 2021, which was obtained from https://crossroads.com/for-investors/ on or about August 25, 2021.[*]

9.      Attached hereto as <u>Exhibit 7</u> is a true and correct copy of excerpts from Crossroads' quarterly OTC filing with the SEC for the period ending July 31, 2021, dated September 14, 2021, which is available on the SEC's EDGAR system and at https://crossroads.com/wp-content/uploads/2021/12/CRSS_Q3-2021-OTC-Disclosure-Statement.pdf.

---

[*] Crossroads appears to have since removed the letter from its investor webpage.

10.     Attached hereto as <u>Exhibit 8</u> is a true and correct copy of a *ProPublica* article titled *They Promised Quick and Easy PPP Loans.  Often, They Only Delivered Hassle and Heartache*, dated January 14, 2022, which is available at https://www.propublica.org/ article/they-promised-quick-and-easy-ppp-loans-often-they-only-delivered-hassle-and-heartache.

11.     Attached hereto as <u>Exhibit 9</u> is a true and correct copy of excerpts from Crossroads' annual OTC filing with the SEC for the period ending October 31, 2021, dated January 31, 2022, which is available on the SEC's EDGAR system and at https://crossroads.com/wp-content/uploads/2022/01/FY-2021-Annual-Disclosure-Statement_CRSS.pdf.

12.     Attached hereto as <u>Exhibit 10</u> is a true and correct copy of a page on Capital Plus's website titled "About Us," which is available at https://capitalplusfin.com/about-us/.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 14th day of February 2022 in Dallas, Texas.


<u>/s/ Jason P. Bloom</u>
Jason P. Bloom

-3-

# Capital Plus Financial Partners with Blueacorn to Expedite PPP Loan Relief to Small Businesses - Capital Plus Financial

**DALLAS, Texas, January 11, 2021** – Crossroads Systems, Inc. (OTCQB: CRSS) ("Crossroads" or the "Company"), a holding company focused on investing in businesses that promote economic vitality and community development, through its wholly owned subsidiary Capital Plus Financial ("CPF"), today announced that it is continuing to address potential barriers to accessing capital for minority and underserved communities by partnering with Blueacorn to provide a simple and efficient platform for small businesses across the country to apply for first and second draw Paycheck Protection Program ("PPP") loans via the Small Business Administration ("SBA").

In the Economic Aid to Hard-Hit Small Businesses, Non-Profits, and Venues Act, Congress set aside $15 billion across first and second draw PPP loans for lending by community financial institutions like CPF. Separately, the SBA has set aside $15 billion and $25 billion, respectively, for first and second draw PPP loans for borrowers with a maximum of 10 employees or for loans less than $250,000 to borrowers in low-or-moderate income neighborhoods.

Eligibility for a second draw loan requires borrowers to have exhausted the remainder of their first draw loans, have no more than 300 employees, and demonstrate at least a 25% reduction in gross receipts between comparable quarters in 2019 and 2020. For most borrowers, the maximum loan amount of a second draw loan is 2.5x average monthly 2019 or 2020 payroll costs up to $2 million.

To ensure increased access to PPP funds for minority, underserved, veteran, and women-owned business concerns, the SBA is accepting applications only from community financial institutions for at least the first two (2) days following the reopening of the loan portal on January 11, 2021. In collaboration with FinTech platform Blueacorn, CPF has developed an easy-to-use application wizard that automatically completes and submits all necessary documentation directly to the lender. Prospective applicants can access the loan portal at https://blueacorn.co/.

"We are proud to be working alongside Blueacorn to make sure that struggling businesses receive the capital they need as quickly as possible," said Crossroads CEO Eric Donnelly. "CDFI's like CPF have seen firsthand the impact that the pandemic has had on minority-owned businesses in low-to-moderate income tracts. Many of these businesses are
8214 Westchester Dr. Suite 950 Dallas, Texas 75225 Main: 214-999-0149
relying on PPP lending to stay afloat, and CPF stands ready to inject the capital necessary to continue building communities back even stronger."

### About Crossroads Systems
Crossroads Systems, Inc. (OTCQB: CRSS) is a holding company focused on investing in businesses that promote economic vitality and community development. Crossroads' subsidiary, Capital Plus Financial (CPF), is a certified Community Development Financial Institution (CDFI) and certified B- Corp, which supports Hispanic homeownership with a long term, fixed-rate single-family mortgage product.

### About Blueacorn
Blueacorn is an online financial platform catering to underserved business communities allowing them to receive and access business funding. Blueacorn provides solutions to business owners who may have gaps or lack financing through their online platform

**Important Cautions Regarding Forward-Looking Statements**

*This press release includes forward-looking statements that relate to the business and expected future events or future performance of Crossroads Systems, Inc. and Capital Plus Financial and involve known and unknown risks, uncertainties and other factors that may cause its actual results, levels of activity, performance or achievements to differ materially from any future results, levels of activity, performance or achievements expressed or implied by these forward-looking statements. Words such as, but not limited to, "believe," "expect," "anticipate," "estimate," "intend," "plan," "targets," "likely," "will," "would," "could," and similar expressions or phrases identify forward-looking statements. Forward-looking statements include, but are not limited to, statements about Crossroads Systems' and Capital Plus Financial's ability to implement their business strategy, and their ability to achieve or maintain profitability. The future performance of Crossroads Systems and Capital Plus Financial may be adversely affected by the following risks and uncertainties: economic changes affecting homeownership in the geographies where Capital Plus Financial conducts business, developments in lending markets that may not align with Capital Plus Financial's expectations and that may affect Capital Plus Financial's plans to grow its portfolio, variations in quarterly results, developments in litigation to which we may be a party, technological change in the industry, future capital requirements, regulatory actions or delays and other factors that may cause actual results to be materially different from those described or anticipated by these forward-looking statements. For a more detailed discussion of these factors and risks, investors should review Crossroads Systems' annual and quarterly reports. Forward-looking statements in this press release are based on management's beliefs and opinions at the time the statements are made. All forward-looking statements are qualified in their entirety by this cautionary statement, and Crossroads Systems undertakes no duty to update this information to reflect future events, information or circumstances.*

*©2020 Crossroads Systems, Inc., Crossroads and Crossroads Systems are registered trademarks of Crossroads Systems, Inc. All trademarks are the property of their respective owners.*

**Company Contact:**
Crossroads Systems
ir@crossroads.com

**Investor Relations Contact:**
Gateway Investor Relations
Matt Glover and Tom Colton
CRSS@gatewayir.com
(949) 574-3860

<u>**EXHIBIT 2**</u>

# DFW non-bank business works to bring PPP to underserved communities

Dallas Business Journal (Texas)

January 12, 2021 Tuesday

Copyright 2021 American City Business Journal, Inc. All Rights Reserved

# Dallas Business Journal

**Length:** 723 words

**Byline:** Catherine Leffert

## Body

Capital Plus Financial Partners, a certified community development financial institution (CDFI), entered the Payment Protection Program lending game Monday, and partnered with a technology solutions firm to run the front-end operations.

As small non-banks flex their small business lending muscles, some need additional technological support, which is what Bedford-based Capital Plus sought in its partnership with BlueAcorn - an online financial platform that will provide PPP hopefuls with a portal for a quick and easy application which will then be processed and underwritten by Capital Plus.

Capital Plus primarily functions to support Hispanic homeownership in Texas. In 2020, it tried to get involved with PPP lending, but as a small business of about 30 employees, wasn't prepared early enough to take on the effort, CEO Eric Donnelly said.

"We were a lot more intentional about Round 2, and wanted to make it really efficient," Donnelly said. "That was the beauty of linking up with BlueAcorn. They had been successful providing that solution on Round 1 for their banking partners."

The Small Business Administration announced that Monday, CDFIs and other community financial institutions (CFI) would get a two-day head start to begin processing PPP loans for borrowers who did not receive a PPP loan in the last round.

At least $15 billion of the $285 billion in PPP renewal from the stimulus law - a $900 billion program to help mitigate the effects of the COVID-19 pandemic - is set aside for CFIs, such as Capital Plus. Community financial institutions,

DFW non-bank business works to bring PPP to underserved communities

which included CDFIs and other types of institutions, made up about 10 percent of all PPP participating lenders in 2020.

Though Capital Plus wasn't equipped to handle PPP lending in the first round last summer, it directed nearly 20 applicants to The First State Bank, which had an average loan size of $48,000, Donnelly said. The First State Bank ended up doing 81 PPP loans in North Texas worth about $8 million. Capital Plus is a subsidiary and the only material asset of Crossroads Systems, Inc. Crossroads also reached a definitive agreement to acquire holding company Rice Bancshares in 2019, which owns and operates The First State Bank.

So that it was ready to handle the renewed loan program, Donnelly said it began planning its partnership with BlueAcorn several months prior. BlueAcorn was especially appealing as a portal-provider because of its mission to help underserved communities, similar to the mission of Capital Plus.

Capital Plus operates in Dallas, Houston, San Antonio and the Rio Grande Valley, but will be accepting PPP borrowers nationwide. At the time of the interview with Donnelly, he had seen about 20 applicants in just the first couple of hours that the portal was open. He also worked with the Latino Business Action Network and the Stanford Latino Entrepreneurship Initiative to advertise Capital Plus' involvement in PPP.

Donnelly said he didn't know quite what to expect in terms of the amount of potential borrowers, but hopes to help as many small businesses as possible. The SBA also urged lenders to prioritize efforts for borrowers in underserved and disadvantaged communities.

"It's certainly scary to jump out into an area that we don't have a lot of experience, but I sort of feel like everybody is in an unknown," Donnelly said. "I would rather be trying to find solutions for small businesses then sitting on the sidelines trying to figure out when the right time to jump in is."

Capital Plus' normal homeownership loan business is down about 25 percent, due to many of its 1,300 borrowers being furloughed or laid off. Donnelly said the company had worked with borrowers on forbearance and was ready to work with PPP borrowers to handle their specific situations as well.

Donnelly said a potential challenge could be keeping up with guidelines and regulations that the Department of Treasury and SBA put out as they happen, but thinks the federal organizations have been performing strong overall.

On Wednesday, CFIs can continue processing applications for second draw PPP loans, or those who previously received a PPP loan prior - granted that they have 300 employees or less and have suffered a 25 percent reduction in gross receipts.

Did you find this article useful? Why not subscribe to Dallas Business Journal for more articles?

**Load-Date:** January 12, 2021

EXHIBIT 3

# Press Releases - Blueacorn.co

## Blueacorn helps process over $14 billion in loans throughout the Paycheck Protection Program

*Partnerships with Prestamos, Capital Plus Financial facilitate over 860,000 loans to small businesses across the U.S.*

June 9, 2021

Blueacorn, a leading Lender Service Provider, today announced that it has successfully processed approximately $14 billion in small business loans throughout the duration of the Small Business Administration (SBA) Payment Protection Program (PPP), in partnership with Prestamos, a leading Community Development Financial Institution (CDFI) and subsidiary of Chicanos Por La Causa (CPLC), and Capital Plus Financial, an innovative CDFI and B-Corp subsidiary of Crossroads Systems, Inc. (OTCQX: CRSS). Together with its partners, Blueacorn has provided support to communities that were otherwise overlooked by larger financial institutions throughout the duration of the program.

Since the beginning of the program, Blueacorn and its partners helped more than 860,000 small businesses, approximately 80% of which are minority owned, leveraging proprietary technologies and best-in-class fraud detection software to ensure PPP funds reached those who need them most.

"Blueacorn's mission is to help the backbone of the American economy — small businesses, independent contractors and the self-employed — gain access to the PPP funding they are eligible for and need during these challenging times," Blueacorn CEO Barry Calhoun said. "Previous rounds of the program saw the majority of funds distributed to larger businesses via traditional banks, overlooking gig workers and mom-and-pop shops who need this support the most. Every one of these files is a family, and we are immensely proud of how many families we were able to support over these last few months."

"In order to help meet the need and provide equitable emergency relief to small businesses and independent contractors, we understood early on that we needed to advocate, facilitate access and align our efforts with other partners to reach those that wouldn't have received funding otherwise. Our PPP loans serve as a great example of CPLC's heart-meets-business philosophy," said David Adame, Chicanos Por La Causa President & CEO. "The vital and strategic deployment of PPP funding helped traditionally unbanked and underserved communities, including racially and ethnically diverse small business owners that were initially left out. I am most proud that we made a positive impact on so many entrepreneurs helping them to keep their doors open and take care of their families."

"As a minority led and focused CDFI, Capital Plus Financial has seen first-hand how the pandemic has disproportionately impacted minority-owned businesses," Capital Plus Financial CEO Eric Donnelly said. "We are immensely proud of what we have accomplished with Blueacorn, providing these communities with the capital they need and deserve to build back stronger than before."

Working with both Prestamos and Capital Plus Financial, Blueacorn will introduce a portal in the coming weeks to facilitate the PPP loan forgiveness process for its borrowers.

## ABOUT BLUEACORN

Blueacorn is a Lender Service Provider that helps simplify the application processes for grant and lending programs for small businesses, independent contractors, and the self-employed through the use of high-quality, proprietary lending software and fraud detection tools.

## ABOUT CPLC PRESTAMOS

CPLC Prestamos is an award-winning Community Development Financial Institution and Community Development Entity that has provided small business loans and high-quality technical support services to business owners in underserved communities since 1980. CPLC Prestamos now offers loan products and investment opportunities nationwide with experienced culturally and linguistically competent bilingual advisors in Arizona, California, Nevada, New Mexico and Texas.

## ABOUT CROSSROADS SYSTEMS AND CAPITAL PLUS FINANCIAL

Crossroads Systems, Inc. (OTCQB: CRSS) is a holding company focused on investing in businesses that promote economic vitality and community development. Crossroads' subsidiary, Capital Plus Financial (CPF), is a certified Community Development Financial Institution (CDFI) and certified B- Corp, which supports Hispanic homeownership in Texas.

## Media Contacts

Blue Acorn
Svetlana Vaisman

Capital Financial Plus
Andy Boian

CPLC Prestamos
Maria Jesus Cervantes

## EXHIBIT 4

# CROSSROADS SYSTEMS, INC

A Delaware Corporation
4514 Cole Avenue, Suite 1600
Dallas, TX 75205

_____

(214) 999-0149
www.crossroads.com

**SIC CODE: 6712**

# Quarterly Report
**For the Period Ending:** April 30, 2021
(the "Reporting Period")

The number of shares outstanding of our Common Stock is **5,971,994** SHARES as of April 30, 2021.

The number of shares outstanding of our Common Stock was **5,971,994** SHARES as of October 31, 2020 (end of previous reporting period)

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Exchange Act of 1934):

Yes: ☐          No: ☒ (Double-click and select "Default Value" to check)

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐          No: ☒

Indicate by check mark whether a change in control of the company has occurred over this reporting period:

Yes: ☐          No: ☒

## Part A          General Company Information

**Item 1   Name of the issuer and its predecessors (if any) and the address of its principal executive officers**

> Crossroads Systems, Inc
> Prior Symbol CRDS - Bankruptcy Plan
> Effective October 3, 2017; Current CRSS

**The address of the issuer's principal executive offices.**

> Crossroads Systems, Inc
> 4514 Cole Avenue, Suite 1600
> Dallas, TX 75205
> (214) 999-0149
> www.crossroads.com; www.capitalplusfin.com
> ir@crossroads.com; info@capitalplusfin.com

**Item 2   Shares Outstanding**

| | COMMON STOCK | | |
| --- | --- | --- | --- |
| | **As of April 30, 2021** | **As of October 31, 2020** | **As of October 31, 2019** |
| Number of Shares Authorized | 75,000,000 | 75,000,000 | 75,000,000 |
| Number of Shares outstanding | 5,971,774 | 5,971,774 | 5,971,994 |
| Number of Shares in Public Float | 1,522,790 | 1,522,221 | 1,330,241 |
| Total Number of Shareholders of record | 100 | 162 | 157 |
| Total Number of Shareholders holding at least 100 shares | 44 | 57 | 52 |

**List of securities offerings and shares issued for services in the past two years**

**None**

**Item 3   Financial information for the issuer's most recent fiscal period.**

The Company has provided the following financial statements for the most recent fiscal year ending April 30, 2021, which are attached hereto as Exhibit A and are hereby incorporated by reference:

- Consolidated Balance Sheet
- Consolidated Statement of Operations
- Consolidated Statement of Changes in Equity
- Consolidated Statement of Cash Flows
- Notes to the Consolidated Financial Statements

**Similar financing information for such part of the two preceding fiscal years as the issuer or its predecessor has been in existence.**

The Company has provided the following financial statements for the two most recent fiscal years ending October 31, 2020, and October 31, 2019 ("Fiscal 2020"), and ("Fiscal 2019"):

- Report of Independent Public Accounting Firm
- Consolidated Balance Sheet
- Consolidated Statement of Operations
- Consolidated Statement of Changes in Equity
- Consolidated Statement of Cash Flows
- Notes to the Consolidated Financial Statements

These are published as Exhibit A to "Annual Reports" for each of Fiscal 2020 and Fiscal 2019 and filed through the OTC Disclosure and News Service, available at www.otcmarkets.com, and are hereby incorporated by reference.

**Item 4    Management's Discussion and Analysis**

The following discussion provides information and analysis of the Company's results of operations and its liquidity and capital resources and should be read in conjunction with the Company's Consolidated Financial Statements and the other financial information included in Exhibit A and elsewhere in this Quarterly Report. This discussion contains forward-looking statements that involve risks and uncertainties. The Company's actual results could differ materially from those anticipated in these forward-looking statements as a result of any number of factors.

The Company's operating and reporting period is on a fiscal year ending on October 31. The quarterly reporting period is from February 1, 2021, to April 30, 2021.  The comparative period is from February 1, 2020, to April 30, 2020

**Fiscal 2021 Financial Overview & Results of Operations**

**Operations**

Total revenue from operations for the six months ended April 30, 2021, was $483.9 million compared to $17.2 million for the same period of 2020.  The increase in revenue was the result of the Company participating in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA"). The Company earned fees from the program totaling approximately $464.4 million. The Company has taken the full amount of fees earned during the period from the program into income.  The operating revenue for the period was $19.8M compared to $17.2 million. The increase was from increased home sales and portfolio growth.  Net operating income before taxes and non-controlling interest for the six months ended April 30, 2021, was $150.3 million compared to $2.2 million for the same period of 2020.

**Net Earnings Per Share**

Net earnings per share from operations before taxes and after non-controlling interests for the six months ended April 30, 2021, was $25.16 compared to $0.19 for the six months ended April 30, 2020.  The increase in the earnings per share was primarily due to the Company's participation in the PPP lending program.

## Results of Operations

Comparison of the Three Months Ended April 30, 2021, to the Three Months Ended April 30, 2020

The following table sets forth selected consolidated operating results stated in dollars and percentage from the prior year:

| | For the Three Months Ended | | Increase/(Decrease) | |
| | April 30, 2021 | April 30, 2020 | $ | % |
|---|---|---|---|---|
| REVENUES | | | | |
| Interest income | $ 5,596,975 | $ 3,034,272 | $ 2,562,703 | 84.5% |
| Property sales | 6,641,800 | 6,423,312 | 218,488 | 3.4% |
| Other revenue | 464,303,570 | 81,047 | 464,222,523 | 572784.7% |
| Total revenues | 476,542,345 | 9,538,631 | 467,003,714 | 4895.9% |
| | | | | |
| COSTS AND EXPENSES | | | | |
| Interest expense | 2,155,291 | 1,569,158 | 586,132 | 37.4% |
| Cost of properties sold | 5,602,611 | 5,457,218 | 145,394 | 2.7% |
| General and administrative | 317,603,771 | 481,437 | 317,122,334 | 65869.9% |
| Salaries and wages | 781,454 | 687,361 | 94,093 | 13.7% |
| Total costs and expenses | 326,143,128 | 8,195,175 | 317,947,953 | 3879.7% |
| | | | | |
| Income from operations | 150,399,217 | 1,343,456 | 149,055,760 | 11094.9% |
| | | | | |
| OTHER EXPENSES | | | | |
| Interest expense | (123,838) | (211,876) | 88,038 | -41.6% |
| Total other expenses | (123,838) | (211,876) | 88,038 | -41.6% |
| | | | | |
| Income before income tax provision | 150,275,378 | 1,131,581 | 149,143,798 | 13180.1% |
| | | | | |
| INCOME TAX PROVISION | (27,883,562) | (164,582) | (27,718,980) | 16842.0% |
| | | | | |
| NET INCOME | 122,391,816 | 966,999 | 121,424,818 | 12556.9% |
| Less: net income attributable to non-controlling interests | (155,432) | (157,068) | 1,636 | -1.0% |
| | | | | |
| NET INCOME ATTRIBUTABLE TO CONTROLLING INTERESTS | $122,236,384 | $ 809,931 | $ 121,426,454 | 14992.2% |
| | | | | |
| Earnings (loss) per share: | | | | |
| | | | | |
| Cash income attributable to common shareholders | 150,119,946 | 974,513 | 149,145,434 | 15304.6% |
| Weighted average shaes outstanding | 5,971,994 | 5,971,994 | - | 0.0% |
| Cash income per share | $ 25.14 | $ 0.16 | $ 24.97 | 15304.6% |

### *Total Revenues*

Total property sales revenue from the sale of recently rehabilitated homes was $6.6 million for the quarter ended April 30, 2021, compared to $ 6.4 million for the quarter ended April 30, 2020.  Sales during the second quarter of 2021 were relatively flat compared to the quarter ended April 30, 2020, due to lower homes being available for sale during the period.

Total interest income revenue generated from the Company's mortgage note receivable portfolio increased to $5.6million for the quarter ended April 30, 2021, compared to $3.0 million for the quarter ended April 30, 2020.  The increase was the result of growth in the total mortgage note receivable portfolio during the period and the addition of PPP loans to the portfolio.  The Company funded approximately $3.5B in PPP loans generating an annual interest rate of 1%.

Other revenues include processing fees the company earned from originating PPP loans during the quarter ended April 30, 2021.  The increase in revenues for processing fees was the result of the Company participatoin in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA"). The Company earned fees from the program totaling approximately $464.4 million for the quarter. The Company has taken the full amount of

fees earned during the period from the program into income. The Company funded approximately 200,000 loans during the period.  No such fees were earned during the quarter ended April 30, 2020.

### Cost of Goods Sold

The cost of goods sold related to the sale of homes were at $5.6 million for the quarter ended April 30, 2021, compared to $ 5.5 million for the quarter ended April 30, 2020, as sales remained relatively flat for the comparative periods.

Cost of goods sold includes all the direct costs of the inventory sold as well as the costs related to the rehabilitation of the homes sold.  In addition, cost of goods sold includes carrying costs of all the properties sold and inventory on hand.

The second component of the cost of goods sold is the interest expense on the mortgage note receivable portfolio.  The interest expense related to the portfolio income was $2.2 million for the quarter ended April 30, 2021, compared to $1.6 million for the quarter ended April 30, 2020.   The interest expense was higher due to the Company's participation in the PPP program.  The Company borrowed $3.9 billion from the Federal Reserve Board to fund the loans it had originated at 35 bps per annum.  The Company accrued approximately $790,000 in interest expenses related to these borrowing.  This was offset by lower debt costs on the mortgage note portfolio.

### Operating Expenses

Operating expenses consist primarily of the following: compensation, sales and marketing, technology, legal, professional fees, insurance, and other operating expenses.

Total operating expenses were $318.4 million for the quarter ended April 30, 2021, compared to $1.2 million for the quarter ended April 30, 2020. Of these operating expenses approximately $317 million are related to the PPP loan program the Company participated in.  These expenses represent the fees paid to the loan servicer provider for the origination and forgiveness of the PPP loans and were paid and accrued based on amounts earned during the quarter.  Normal operating expenses as a percentage of total revenues were at 12.0% for the quarter ended April 30, 2021 and decreased slightly from 12.3% from the same reporting period of 2020.

### Other Income/Expense

The other interest expense relates to interest from acquisition debt.  Total other interest expenses decreased $88,000 from the quarter ended April 30, 2021, compared to the quarter ended April 30, 2020, due to the principal reduction on this debt.  The balance on the acquisition debt as of April 30, 2021, was $9.8 million compared to $11.9M at April 30, 2020.

Comparison of the Six Months Ended April 30, 2021, to the Six Months Ended April 30, 2020

| | For the Six Months Ended | | Increase/(Decrease) | |
| | April 30, 2021 | April 30, 2020 | $ | % |
|---|---|---|---|---|
| REVENUES | | | | |
| Interest income | $ 8,866,882 | $ 6,214,126 | $ 2,652,756 | 42.7% |
| Property sales | 10,640,860 | 10,603,712 | 37,148 | 0.4% |
| Other revenue | 464,354,061 | 365,368 | 463,988,693 | 126992.1% |
| Total revenues | 483,861,803 | 17,183,206 | 466,678,597 | 2715.9% |
| | | | | |
| COSTS AND EXPENSES | | | | |
| Interest expense | 3,558,240 | 3,084,739 | 473,501 | 15.3% |
| Cost of properties sold | 9,217,053 | 9,127,287 | 89,767 | 1.0% |
| General and administrative | 318,101,557 | 974,053 | 317,127,504 | 32557.5% |
| Salaries and wages | 1,526,832 | 1,360,825 | 166,007 | 12.2% |
| Total costs and expenses | 332,403,682 | 14,546,903 | 317,856,779 | 2185.0% |
| | | | | |
| Income from operations | 151,458,121 | 2,636,303 | 148,821,818 | 5645.1% |
| | | | | |
| OTHER EXPENSES | | | | |
| Interest expense | (261,609) | (395,322) | 133,713 | -33.8% |
| Total other expenses | (261,609) | (395,322) | 133,713 | -33.8% |
| | | | | |
| Income before income tax provision | 151,196,512 | 2,240,981 | 148,955,531 | 6646.9% |
| | | | | |
| INCOME TAX PROVISION | (27,996,007) | (295,952) | (27,700,055) | 9359.6% |
| | | | | |
| NET INCOME | 123,200,505 | 1,945,029 | 121,255,476 | 6234.1% |
| Less: net income attributable to non-controlling interests | (314,137) | (315,863) | 1,726 | -0.5% |
| | | | | |
| NET INCOME ATTRIBUTABLE TO CONTROLLING INTERESTS | $ 122,886,368 | $ 1,629,166 | $121,257,202 | 7442.9% |
| | | | | |
| Earnings (loss) per share: | | | | |
| | | | | |
| Cash income attributable to common shareholders | 141,186,702 | 1,925,118 | 139,261,584 | 7233.9% |
| Weighted average shaes outstanding | 5,971,994 | 5,971,994 | - | 0.0% |
| Cash income per share | $ 23.64 | $ 0.32 | $ 23.32 | 7233.9% |

## *Total Revenues*

Total property sales revenue from the sale of recently rehabilitated homes was $10.6 million for the six months ended April 30, 2021, and April 30, 2020.   Sales were flat during the period due to the fewer completed homes being available for sale during the period.

Total interest income revenue generated from the Company's mortgage note receivable portfolio increased to $8.9 million for the six months ended April 30, 2021, compared to $6.2 million for the six months ended April 30, 2020. The increase was the result of growth in the total mortgage note receivable portfolio during the period and the addition of PPP loans to the portfolio.  The Company funded approximately $3.5B in PPP loans generating an annual interest rate of 1%.

Other revenues include processing fees the company earned from originating PPP loans during the six-month period ended April 30, 2021.  .  The increase in revenues for processing fees was the result of the Company participation in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA"). The Company earned fees from the program totaling approximately $464.4 million for the six month period ended April 30, 2021. The Company has taken the full amount of fees earned during the period from the program into income. The Company funded approximately 200,000 loans during the period.  No such fees were earned during the six-month period ended April 30, 2020.

*Cost of Goods Sold*

The cost of goods sold related to the sale of homes was $9.2 million for the six months ended April 30, 2021, compared to $9.1 million for the same period of 2020. Cost of goods sold includes all the direct costs of the inventory sold as well as the costs related to the rehabilitation of the homes sold. In addition, cost of goods sold includes carrying costs of all the properties sold and inventory on hand.

The second component of the cost of goods sold is the interest expense on the mortgage note receivable portfolio. The interest expense related to the portfolio income was $3.6 million for the six months ended April 30, 2021, compared to $3.1 million for the six months ended April 30, 2020. The interest expense was higher due to the Company's participation in the PPP program. The Company borrowed $3.9 billion from the Federal Reserve Board to fund the loans it had originated at 35bps per annum and the term of the advances matches exactly with the term of the PPP loan issued to the company's customers The Company accrued approximately $790,000 in interest expenses related to these borrowing. This was offset by lower debt costs on the mortgage note portfolio.

*Operating Expenses*

Operating expenses consist primarily of the following: compensation, sales and marketing, technology, legal, professional fees, insurance, and other operating expenses.

Total operating expenses were $319.6 million for the six months ended April 30, 2021, compared to $2.3 million for the six months ended April 30, 2020. Of these operating expenses, $317 million are related to the PPP loan program the Company participated in. These expenses represent the fees paid to the loan servicer provider for the origination and forgiveness of the PPP loans and were paid and accrued based on amounts earned during the period.Normal operating expenses as a percentage of total revenues were at 13.9% for the six months ended April 30, 2021 and increased slightly from 13.5% from the same reporting period of 2020.

*Other Income/Expense*

The other interest expense relates to interest from acquisition debt. Total other interest expenses decreased $134,000 for the six months ended April 30, 2021, from the six months ended April 30, 2020, due to the principal reduction on the debt. The balance on the acquisition debt as of April 30, 2021was $9.8 million compared to $11.9 million at April 30, 2020. The company received a deferral of principal payments for three months starting in April 2020. This principal amount will be due at the end of the loan period.

**Liquidity and Capital Resources**

We define liquidity as our ability to generate sufficient cash to fund current loan demand at the subsidiary level and to operate on an ongoing basis. Our liquidity requirements are met primarily through cash flow from operations, receipt of pre-paid and maturing balances in our loan portfolios, debt financing, and preferred equity investments.

As of April 30, 2021, Capital Plus Financial had cash and lines of credit available with its current banking partners in excess of $30.0 million.

The Company also offers a Preferred Equity instrument to its bank partners which is considered a qualified investment under the Community Reinvestment Act ("CRA") investment test for banks. Banks purchase units of the preferred investment which generates cash for the Company and provides banks with an "innovative" investment, providing more favorable CRA assessment from their regulators.

*Working Capital*

*Mortgage Note Portfolio*

The mortgage note portfolio consists of $132.0 million of long term fixed, amortizing single family residential mortgages in the Dallas/Fort Worth, Houston, and San Antonio markets.  The Company provides a mortgage for the purchase of a property with an equity down payment from the potential buyer.  Our mortgage portfolio is comprised of first-time home buyers, and in over 60% of the cases, first time credit recipients. We believe the risk associated with these borrowers is mitigated by their history of debt aversion. Plainly said, those who have shown the financial discipline to operate without debt should be rewarded and not punished as is often the case with a zero-credit score borrower attempting to qualify for a mortgage. Each borrower is manually underwritten, and all are given the opportunity to demonstrably prove their ability to repay. A 43% debt to income ("DTI") ratio is the maximum ratio for approved mortgages, but the average DTI ratio in our portfolio is 29.5%, further reinforcing the quality of our borrowers. All mortgages are originated in house and are Qualified Mortgages (QM).  Our weighted average rate on the portfolio was 10.39% at April 30, 2021.

The Company has a default rate below 3% per year and when it does take a property back into inventory, it is able to put it back into its rehab cycle and resell it.  Given its ability to rehab and resell the properties at a profit, the Company has determined a reserve for delinquent and defaulted mortgages is not necessary as of April 30, 2021.

As of April 30, 2021, the Company had a mortgage note receivable balance of $132.0 million compared to $121.4 million as of April 30, 2020.

In addition, the company carries higher value residential mortgage notes held for sale in its securities portfolio held to provide needed liquidity.  From time to time, the Company will also provide commercial real estate loans as part of its community development mission.  The outstanding balance of these loans at April 30, 2021, was $1.4 million compared to $ 6.2 million at April 30, 2020.

*Inventory*

Inventory consists of properties that are currently undergoing remodeling or are being held for sale. Inventory includes the initial costs of acquiring the property, remodeling costs, real estate taxes, and other direct costs incurred while remodeling the property. All indirect overhead costs, such as compensation of sales personnel, management, and advertising costs are charged to salaries and wages, or other general and administrative expenses as incurred.

The initial direct costs to acquire properties and remodeling costs account for approximately 89% of the cost of properties sold in the consolidated statement of operations for the quarter ended April 30, 2021. As of April 30, 2021,100 properties were being remodeled and 13 were completed and held for sale. Generally, the Company holds properties in inventory from acquisition to resale for 3 to 4 months.

The Company regularly evaluates inventories that are slow-moving or incurring costs in excess of budgeted costs. The Company determined a reserve for slow-moving inventory was not necessary as of April 30, 2021.

As of April 30, 2021, gross inventory was $11.2 million compared to $11.5 million as of April 30, 2020, a decrease of approximately $300,000.

*Revolving Credit Facility*

The Company has a revolving line of credit for the acquisition of properties and another for its mortgage loans.  The outstanding balance on the inventory line at April 30, 2021, was $9.5 million compared to $9.9 million at April 30, 2020, which is in line with the inventory expectations during the spring selling season.

The outstanding balance on the mortgage loan revolving credit facility was $40.1 million as of April 30, 2021, compared to $ 44.9 million as of April 30, 2020.  The decrease is the result of moving loans from the revolving credit facilities to a term credit facility during the fourth quarter of 2020.

**Cash Flows Provided by Operations**

*Continuing Operations*

Net cash used by operating activities during the six months ended April 30, 2021, was $3.3 billion compared to $3.0 million of net cash used for the six months ended April 30, 2020. The primary reason for this increase was the Company's participation in the PPP loan program and its funding of $3.5 billion in loans.

**Cash Flows Used in Investing and Financing Activities**

Net cash provided by financing activities during the six months ended April 30, 2021, was $3.9 billion compared to $ 2.5 million for the six months ended April 30, 2020.  The primary reason for this increase was the Company's participation in the PPP loan program and its funding from the Federal Reserve of $3.9 billion to fund its PPP loans.

There are no known trends, events, or uncertainties that have or are reasonably like to have a material impact on the company's short-term or long-term liquidity. The internal sources of liquidity are profits generated from the company's operating subsidiary, Capital Plus Financial, and its external sources of liquidity remain debt and equity from banking institutions that assist in the institutions compliance with the Community Reinvestment Act (CRA). The company has no material commitments for capital expenditures and the expected source of funds for such expenditures. There are no known trends, events, or uncertainties that had had or that are reasonably expected to have a material impact on the net sales or revenues or income from continuing operations. There are no significant elements of income or loss that do not arise from the company's continuing operations. There are also no causes for any material changes from period to period in one or more line items on the company's financial statements nor are the seasonal aspects that had a material effect on the financial condition of the results of operations.

**Critical Accounting Policies and changes**

N/A

**Off-Balance Sheet Arrangements.**

NA

**Item 5   Legal Proceedings**

Any current past, pending or threatened legal proceedings or administrative actions either by or against the issuer that could have a material effect on the issuer's business, financial condition, or operations and any current, past or pending trading suspensions by a securities regulator.

None

**Item 6   Defaults upon senior securities.**

None

**Item 7   Other Information.**

None

**CROSSROADS SYSTEMS, INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1.   COMPANY PROFILE AND NATURE OF OPERATIONS

Crossroads Systems, Inc. (OTCQX: CRSS) (the "Company", "CRSS" or "Parent") was an intellectual property licensing company headquartered in Austin, Texas. Founded in 1996 as a product solutions company, Crossroads created some of the storage industry's most fundamental patents and licensed patents to more than 50 companies prior to filing for reorganization under Chapter 11 of the Federal Bankruptcy Code on August 13, 2017.

On December 18, 2017, the Parent acquired 100% of the common equity of Capital Plus Financial, LLC ("CPF"), a Texas based community development financial institution ("CDFI").  CPF's mission is to make homeownership available to the Hispanic market throughout Texas.  CPF is also a certified B Corporation which is a group of for-profit companies certified to meet rigorous standards of social and environmental performance, accountability, and transparency. CPF operates in Texas where it acquires, renovates, and sells single-family homes providing seller financing through notes receivable.

**Principals of Consolidation**

The consolidated financial statements include the accounts of CRSS and CPF. Capital Mortgage Servicing, LLC ("CMS") is wholly owned by CPF.  (Collectively, "we", "us", or the "Company").  All significant intercompany accounts and transactions have been eliminated in consolidation.

## 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The operations are for the period from November 1, 2020, to April 30, 2021.

**Cash and Cash Equivalents**

The Company considers all currency on hand, money market accounts, and highly liquid investments purchased with an original maturity of three months or less to be cash equivalents.  Restricted cash includes escrow accounts related primarily to CMS's mortgage servicing obligations.

**Notes Receivable**

The Company originates predominantly 30-year notes receivable through sales of rehabilitated homes or purchases notes receivable that are secured by an assignment of a deed of trust.  The Company intends to hold the notes for the long-term as it has the ability to fund additional notes receivable through borrowings from lenders that are secured by the notes receivable and properties. Notes receivables are stated at their unpaid principal balances less an allowance for loan losses if any. The average contractual interest rate per note was approximately 10.39% as of April 30, 2021. Interest income is recognized monthly per the terms of the respective loan agreements.  Notes receivable have maturities that range from 4 to 30 years.  All of the Company's loans and underlying collateral are located in Texas.

The Company uses payment history to monitor the credit quality of the notes receivable on an ongoing basis. The Company assesses the carrying value of its notes receivable for impairment when it determines that impairment indicators are present. Notes are evaluated for impairment when it is probable the Company will be unable to collect all amounts due for scheduled principal and interest payments, including notes in the process of repossession. Impaired notes are generally measured based on the fair value of the collateral.  Impaired notes, or portions thereof, are charged off when deemed uncollectible.  A specific reserve is created for impaired notes based on the fair value of the underlying collateral.  No specific impairment was deemed necessary as of April 30, 2021.

APPX. 019

**CROSSROADS SYSTEMS, INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Other Note Payable**

The Company assumed a note payable in the December 2017 acquisition of CPF with an outstanding principal balance as of the date of the acquisition totaling $1,827,750 (the "Other Note"). The Other Note is subordinate to the other debt obligations, accrues interest at 6.50% per annum, calls for monthly payments of principal and interest of $22,710, and matures on December 31, 2026.  The balance on the Other Note was $1,241,453 at April 30, 2021.

Future minimum principal payments for the Other Note are as follows for the years ending October 31:

| | | |
|---|---|---:|
| 2021 | $ | 97,218 |
| 2022 | | 204,151 |
| 2023 | | 217,823 |
| 2024 | | 232,411 |
| Thereafter | | 489,850 |
| | $ | 1,241,453 |

**Paycheck Protection Program Loan**

On April 20, 2020, the Company qualified for and received a loan under the Paycheck Protection Program ("PPP"), a program implemented by the U.S. Small Business Administrative ("SBA") under the Coronavirus Aid, Relief, and Economic Security Act, from a qualified lender (the "PPP Lender"), for an aggregate principal amount of $376,800. The PPP Loan bears interest at a rate of 1.0% per annum, with the first six months interest deferred, has a term of two years, and is unsecured and guaranteed by the U.S. Small Business Administration. The principal amount of the PPP Loan is subject to forgiveness under the Paycheck Protection Program upon the Company's request to the extent that the PPP Loan proceeds are used to pay expenses permitted by the Paycheck Protection Program, including payroll costs, covered rent, and mortgage obligations, and covered utility payments incurred by the Company. The Company has applied for forgiveness of the PPP Loan for these covered expenses. To the extent that all or part of the PPP Loan is not forgiven, the Company will be required to pay interest on the PPP Loan at a rate of 1.0% per annum, and commencing in November 2020, principal and interest payments will be required through the maturity date in April 2022. The terms of the PPP Loan provide for customary events of default including, among other things, payment defaults, breach of representations and warranties, and insolvency events. The PPP Loan may be accelerated upon the occurrence of an event of default.

The Company applied for forgiveness in November of 2020 and is awaiting a response from the SBA.

**7.  OPERATING LEASES**

The Company is obligated, as lessee, under non-cancelable operating lease agreements for office space located in Bedford, Texas, and Houston, Texas. The lease agreements require monthly payments of $12,600 through their expiration in December 2022.

Future minimum payments required under non-cancelable operating lease agreements are as follows for the years ending October 31:

| | | |
|---|---|---:|
| 2021 | $ | 75,600 |
| 2022 | | 151,200 |
| 2023 | | 25,200 |
| | $ | 252,000 |

Rent expense associated with non-cancelable operating leases for the period ended April 30, 2021, was $75,600 and is included in general and administrative expenses in the consolidated statement of operations.

**Item 9 Certifications**

**10)**              **Issuer Certification**

I, Eric Donnelly, certify that:

I have reviewed this quarterly disclosure statement of Crossroads Systems, Inc.

Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Date: June 14, 2021

Eric Donnelly
Chief Executive Officer

I, Farzana Giga, certify that:

I have reviewed this quarterly disclosure statement of Crossroads Systems, Inc.

Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Date: June 14, 2021

Farzana Giga
Chief Financial Officer

APPX. 021

# EXHIBIT 5

**The New York Times**   https://www.nytimes.com/2021/06/27/business/ppp-relief-loans-blueacorn-womply.html

## *How Two Start-Ups Reaped Billions in Fees on Small Business Relief Loans*

Blueacorn and Womply processed one-third of all Paycheck Protection Program loans this year, stepping in when big lenders wouldn't.

**By Stacy Cowley and Ella Koeze**
Published June 27, 2021   Updated Oct. 11, 2021

Though Congress approved billions in aid for small companies to help them keep paying their employees during the pandemic, there was a big problem: It wasn't reaching the tiniest and neediest businesses.

Then two small companies came out of nowhere and, through an astute mix of technology and advertising — and the dogged pursuit of an opportunity that big banks missed — found a way to help those businesses. They also helped themselves. For their work, the companies stand to collect more than $3 billion in fees, according to a New York Times analysis — far more than any of the 5,200 participating lenders.

One of the companies, Blueacorn, didn't exist before the pandemic. The other, Womply, founded a decade ago, sold marketing software. But this year, they became the breakout stars of the Paycheck Protection Program, the government's $800 billion relief effort for small businesses. Between them, the two companies processed a third of all P.P.P. loans made this year, the Times analysis found.

Blueacorn and Womply aren't banks, so they couldn't actually lend any money. Rather, they acted as middlemen, charging into a gap between what big banks wouldn't do and what small banks couldn't do. First, they unleashed marketing blitzes encouraging freelancers, gig workers, sole proprietors and other small merchants to apply for loans through their websites. Next, they directed those applications to lenders. In return, they took a hefty cut of the fees that lenders made on each loan.

"Millions of businesses were being left out," said Barry Calhoun, the chief executive of Blueacorn, which was founded last year solely to help companies obtain P.P.P. loans. "Tiny businesses, self-employed individuals and minority communities are left out in the cold, over and over and over. Addressing that is a core mission for us."

When the government started the Paycheck Protection Program in April 2020, it quickly found that banks, from national giants to regional players, gravitated to bigger loans to more established businesses because they were easier to make and more lucrative. The program's largest lender, JPMorgan Chase, refused to even make loans of less than $1,000.

To encourage banks to lend to smaller businesses, Congress in December raised the fees for small loans. And in February, the government tweaked the program's rules so that unprofitable solo businesses, which had previously been ineligible, could get loans. Suddenly, there was a lot of money to be made — if only someone could get businesses in the door.

"Literally free money for those who qualify," a Blueacorn advertisement on Facebook read. Womply banners adorned billboards and New York City buses. "Get up to $50,000 in PPP," read one. "Apply now!"

Those appeals were wildly successful. From late February to May 31, when the program ended, the companies processed 2.3 million loans. Most were for less than $17,000, and the vast majority went to solo ventures, which are more likely to be run by women and people of color.

All that hustle had downsides, including widespread customer service failures. And some lenders now have regrets about signing rushed deals that delivered most of the profit to their partners.

## A Light-Bulb Moment

In December, Congress said that banks making Paycheck Protection Program loans below $50,000 would be paid 50 percent of the loan's value, up to a maximum of $2,500. (Earlier, the maximum a lender could earn was 5 percent of a loan's value.) So a $5,000 loan that previously made the lender $250 was now worth 10 times more. By making small-dollar loans more profitable for lenders, Congress was hoping to help the neediest.



**More small P.P.P. loans were made in 2021 than in 2020 — and even more fees were earned on them.**

An increase in the fees that banks received for issuing the smaller loans made them more lucrative.

Note: Data from 2021 includes all loans made through May.   •   Source: Analysis of data from the Small Business Administration

But reaching out to borrowers and collecting their paperwork were still challenging — or, for Blueacorn and Womply, a light-bulb moment.

Blueacorn, based in Scottsdale, Ariz., was founded in April 2020 to help small businesses find P.P.P. lenders. After Congress made the fee change, the group of entrepreneurial coders who founded the start-up decided to build a system to simplify the paperwork, betting that it would encourage more lenders to make loans to the smallest businesses.

In San Francisco, Toby Scammell, the chief executive of Womply, had a similar idea. Founded in 2011 by Mr. Scammell and backed by venture capitalists, Womply provides restaurants, retailers and other small enterprises with tools to manage their customer lists, marketing campaigns and payments. Mr. Scammell had earlier discovered that banks didn't want to bother with P.P.P. loans for many of Womply's clients.

"We tried to convince lenders to serve the smallest businesses and they said no," Mr. Scammell said in an interview last month. "I just couldn't get them to do it. I finally got fed up and said, 'Here, we can hand it to you on a silver platter.'"



An advertisement for Womply on a New York City bus.  Stacy Cowley/The New York Times

So in late February, Womply started a web-based interface called Fast Lane through which borrowers could apply for P.P.P. loans of up to $50,000. Womply gathered their information, handled borrowers' questions, ran fraud and identity checks and bundled the loan documents into a package that it steered to one of its partner lenders. All the lender would have to do, Womply said, was submit the paperwork to the government and fund the loan.

## A Big Impact

When Blueacorn and Womply started their systems in late February, the volume of P.P.P. lending shot up. Largely because of the two companies' efforts, lenders made 5.8 million loans of $50,000 or less this year, up from 3.6 million in 2020. The program's average loan size dropped from just over $100,000 last year to $41,560 this year. And the six most active lenders this year each partnered with Blueacorn or Womply, or both.

Blueacorn worked with just two lenders: Prestamos CDFI, a nonprofit lender, and a small mortgage lender called Capital Plus Financial. Last year, Prestamos made 935 P.P.P. loans totaling $27 million. This year, working with Blueacorn, it made 494,415 loans — more than any other lender — for a total of $7.7 billion.



David Adame, the president and chief executive of Chicanos Por La Causa, in Phoenix.  Cassidy Araiza for The New York Times

"What we did together is absolutely incredible," said David Adame, the chief executive of Chicanos Por La Causa, the parent organization of Prestamos. "The myth that you can't serve communities of color, or underserved communities, with a technology model, at scale — we've blown that away."

Womply's impact was even broader. It teamed with 17 lenders and processed 1.4 million loans, totaling more than $20 billion — about 7 percent of the total P.P.P. money given out this year. "It was an amazing team effort," said Adam Seery, the managing director of Harvest Small Business Finance, Womply's largest lender.

Also in late February, Blueacorn and Womply got an unexpected tailwind from a major rule change by the Small Business Administration, which oversaw the loan program. Concerned that women and minority-led businesses were being disproportionately left out, the Biden administration overhauled the loan formula to award sole proprietors — a group that includes contractors and gig workers — loans based on their reported revenue rather than profit. Overnight, millions more qualified for help. Drawn in by the marketing campaigns, they stampeded toward the two companies.

By early March, "we were overrun with demand," said Blueacorn's Mr. Calhoun, a private equity veteran who joined the company that month to help manage its growth. "We had a 24-hour period where we went from 15,000 new customer service tickets to 27,000," he recalled. "Those are Amazon-like levels."

Blueacorn rented call centers and trained hundreds of temporary workers to troubleshoot. Womply redeployed nearly all of its 200 employees to work on loan issues. Both companies still struggled to keep up. On Reddit groups and social media sites, thousands of borrowers complained about delays, poor communication and problems resolving errors.

Louis Glatthorn, an Uber driver in Boone, N.C., who goes by Bob, applied on Womply's website on April 7 and signed the paperwork two weeks later for a $7,818 loan. But the money — which is listed in government records as approved — has not been paid by Benworth Capital, one of Womply's partners. Mr. Glatthorn's attempts to reach Womply for help have been unsuccessful.

"You can never talk to a person or actually make contact," he said. A Womply representative declined to comment on Mr. Glatthorn's experience.

Others had a smoother run. Dan Bourque, an Uber driver in San Francisco, saw Womply's ads and applied for a loan in mid-April. Seventeen days later, he had a $10,477 deposit — funded by Fountainhead SBF, another of Womply's partner lenders — in his bank account. For that loan, the process "was flawless," he said.

## The Money Pours In

The millions of tiny loans the two tech companies enabled, coupled with Congress's decision to make small loans more lucrative, led to gigantic payouts for small lenders. Last year, Prestamos made $1.3 million for its lending. This year, it will collect nearly $1.2 billion, according to a New York Times calculation of lenders' fees based on government data.



José Martinez, the president of Prestamos, in Phoenix. He said that Blueacorn will get a "significant" portion of the $1.2 billion that Prestamos is collecting from the government.  Cassidy Araiza for The New York Times

But because of the deals they struck with Blueacorn and Womply, the lenders will keep only a fraction of their earnings. Blueacorn will get a "significant" portion of the $1.2 billion that Prestamos is collecting, said José Martinez, the lender's president. He declined to disclose the deal's terms, but said they were "fair and aligned" with each partner's contribution.

### Prestamos made over a billion dollars in P.P.P. loan fees in 2021.

A significant portion of those fees will be paid to Blueacorn, the company it partnered with.

|  | 2020 | 2021 |
|---|---|---|
| Number of P.P.P. loans | 935 | 494,415 |
| Total amount loaned | $27 million | $7.7 billion |
| **Total fees earned** | **$1.3 million** | **$1.2 billion** |
| Fees per $100 loaned | $4.71 | $15.30 |

Note: Data from 2021 includes all loans made through May.  •  Source: Analysis of data from the Small Business Administration

Blueacorn declined to comment on its fees. But an earnings report this month from Capital Plus Financial, the other lender that partnered with Blueacorn, provides some clues. This year, Capital Plus made 473,241 Paycheck Protection Program loans totaling $7.7 billion, for which it will collect $1.1 billion in fees. In the earnings report for the quarter that ended April 30, the publicly traded parent company of Capital Plus said that the lender earned $464 million in fees during the quarter for its loans. Of that amount, it kept just $150 million.

Through its two partners, Blueacorn will take in at least $1 billion this year on the loans it processed, according to a Times calculation and two people familiar with the matter.

### Capital Plus Financial began making P.P.P. loans only this year.

It partnered with Blueacorn (and Womply) to make the loans.

|  | 2020 | 2021 |
|---|---|---|
| Number of P.P.P. loans | 0 | 473,241 |
| Total amount loaned | $0 | $7.7 billion |
| **Total fees earned** | **$0** | **$1.1 billion** |
| Fees per $100 loaned | n/a | $14.66 |

Note: Data from 2021 includes all loans made through May.  •  Source: Analysis of data from the Small Business Administration

Womply is poised for an even bigger haul. Seven lenders that partnered with Womply on Fast Lane agreed to pay the company at least half — and often much more — of what they collected on each loan, according to five people with knowledge of the financial arrangements. The company is likely to take in fees of

$1.7 billion to $3 billion, according to a Times analysis.



Toby Scammell, the founder and chief executive of Womply.
Womply

But Womply is locked in fee disputes with some of its partners. At least three lenders signed deals that they believed would operate on a sliding scale, where they would owe Womply the top rate — 80 percent of the lender fee — only on loans above a certain volume threshold. But when it came to collect, Womply told two of them that it believed it was owed its top rate on every loan it had processed.

**Womply's fees for the small loans added up.**

For several lenders, the fees they owed to Womply increased — from 50 percent of what they collected to 80 percent — as Womply sent more loans their way. That, coupled with a flat $250 per-loan charge, left lenders owing Womply their entire fee on some loans.

|  | $10,000 loan | $3,000 loan | $1,000 loan |
|---|---|---|---|
| Fee paid to lender | $2,500 | $1,500 | $500 |
| Lowest amount paid to Womply | $1,500 | $1,000 | $500 |
| Highest amount | $2,250 | $1,450 | $500 |
| **Lender kept** | **$250 - $1,000** | **$50 - $500** | **$0** |

Note: Calculations reflect the terms for several, but not all, of Womply's lenders.   •   Sources: Small Business Administration; interviews with Womply lender partners

Womply declined to comment on its fees. In a statement, the company said it was "incredibly proud" of its work delivering P.P.P. funding to one million businesses through its partners.

Two lenders said they would never work with Womply again. "At those rates, I'm in the hole and losing money on many of these loans," said one lender, who asked for anonymity because Womply's loan contract prohibits lenders from disclosing its terms. "It's disturbing and disgusting."

<u>EXHIBIT 6</u>

# Fiscal Second Quarter Shareholder Report for the Three Months Ended April 30, 2021

# Crossroads Systems, Inc.

**Delaware**                                    **74-284664**
*(State of Incorporation)  (IRS Employer Identification No.)*

**4514 Cole St.**
**Suite 1600**
**Dallas, TX 75205**
*(Address of principal executive office)*

**(214) 999-0149**
*(Company's telephone number)*

**Common Stock**
**$0.001 Par Value**
**Trading Symbol: CRSS**
**Trading Market: OTCQX**

**75,000,000 Common Shares Authorized**

**5,971,994 Shares Issued and Outstanding as of April 30, 2021**

Dear Shareholder:

At this moment last year, we were dealing with the pending impact of COVID-19 and working alongside state and local partners to mitigate the immediate fallout to our business and our borrowers. Today, as the U.S. starts to find its way back to normalcy, we find ourselves in the strongest financial position we have ever been in.

I would like to extend a warm welcome to those of you who are new to the Crossroads and Capital Plus Financial story. As I have said in the past, Capital Plus is a double-bottom line business. For us, our social impact is just as important as our financial performance, and we are always working diligently to identify opportunities that enable us to maximize returns to all stakeholders.

In December of 2020, I penned a piece in the Silicon Valley Business Journal in which I called upon the government to extend much-needed financial support to small businesses across the country. Throughout the pandemic-ravaged year, I had the chance to hear firsthand from minority small business owners, many of whom were depending on the next round of PPP loans to keep their businesses afloat and employees on payroll. We were well equipped to lead the charge for the program's second draw as a result of our CDFI status, our focus on delivering financial products and support to low to moderate income borrowers, and our expertise in culturally sensitive underwriting.

We applaud the administration's intentional efforts to give CDFIs an unobstructed head start in the latest PPP round and a similar landscape to finish PPP. That three CDFIs finished to be the top 10 PPP lenders in the country is validation of the role that CDFIs play in delivering relief to the most underserved businesses and communities. Last quarter we highlighted our intention to participate in the second federal PPP program and announced our partnership with Blueacorn. With the help of loan service providers like Blueacorn and tremendous referral partnerships with banking institutions who were either not participating in the 2021 round or needed an outlet for nonbank customers, we were able to issue and approve loan applications at an unprecedentedly rapid pace. Within just five months, we have approved 472,036 loans at an average amount of $16,062. In total, this amounts to $7.6 billion in funding, more than 80% of which went directly to companies and independent contractors of color. As a result of our early dominance in PPP lending, Capital Plus was ranked the fourth largest PPP lender by net dollar amount and the second largest by the number of loans approved. Blueacorn's early traction amongst sole proprietors and independent contractors was critical to scaling the operation and enabling us to compete with the country's largest financial institutions.

Operationally, the approval process was an incredibly secure one. Though we leaned heavily on our loan service providers for support on the front end, we were thorough in reviewing applications on the back end. Whereas most lenders use one to two layers of identity verification and customer compliance mechanisms, we used four. This investment

in KYC 'knowing your customers' substantially reduced fraud, which is evidenced by a negligible rate of active fraud cases of less than .25bps. While we have dealt with applicant frustration of having to re-verify information and/or identity before funding, we made the decision that we would rather have frustrated applicants than fraudulent borrowers. The team at Blueacorn has detected, reported, and most importantly, stopped an overwhelming number of fraudsters at the gate. Our focus with Blueacorn now turns to forgiveness but ever mindful of impact, and how we can stabilize the hundreds of thousands of businesses served. The work does not simply stop at loaning money to businesses in need; we must find ways to educate, mentor, and ensure these businesses stabilize and thrive once the economy recovers.

The program will result in Capital Plus holding the $7.6 billion in loans on its balance sheet until they are forgiven. Given the comprehensive underwriting process and the simplified forgiveness paperwork that most of our borrowers are eligible for, we anticipate full forgiveness. In terms of interest, we issue PPP loans at a rate of 1%. With a 35-bps cost of capital through the SBA's credit facility, we recognize a 65-bps spread, which nets out as interest income. Additionally, as of April 30, 2021, the balance sheet held $440 million of restricted cash, which is being held to fund loans in future periods.

Along with the windfall associated with the PPP loan program, our core single-family mortgage business continued to perform exceptionally well. CPF's outstanding mortgage loan portfolio balance at the end of the quarter grew to $132 million. Income from property sales increased 59% to $6.6 million from $4.2 million. Additionally, we have seen consistent portfolio outperformance with respect to delinquency. For the fourth consecutive quarter, our borrowers have collectively represented a single-family delinquency rate lower than that reported by the Federal Home Loan Mortgage Corporation (Freddie Mac), reaffirming the notion that our borrowers are in fact creditworthy and deserve access to traditional mortgage financing.

The housing market in Texas is extremely tight right now, and the demand for new housing bodes well not just for our core business, but also for our borrowers' financial health. An analysis of housing trends for the first calendar quarter of 2021 conducted by Texas A&M University showed that single-family housing starts have increased 25.1% year-over-year. Accompanied by a 10.4% annual increase in the Texas home price index, we have conclusive evidence to suggest that these trends are not dying anytime soon. As we continue to ramp up our small business and alternative lending initiatives, we are also committed to capitalizing on the growth in the single-family mortgage business by increasing our housing inventory, growing our sales team, and finding new, innovative ways to provide housing to prospective borrowers.

Last year signaled to CEOs that we are living in a different era—one where racial equity is a business and moral imperative. This has been core to Capital Plus' mission since its inception. As Capital Plus worked on the frontlines issuing PPP loans, we uncovered

hurdles in the banking system for Black and minority individuals and businesses. Organizations like One Million Truths (OMT), a platform dedicated to truth and reconciliation in America, shine light on endemic bias and systemic racism by documenting first-person testimonies from Black Americans about their experiences with racism. These truths are submitted under 18 different categories, including banking, and are helping Capital Plus tell the stories of Black-owned businesses that have not received funding due to what could be systemic racism and endemic bias. Together, we are committed to improving economic opportunities for Black and minority-owned businesses and achieving fairness and balance while doing the necessary work to restore confidence in the banking system. Capital Plus is proud to issue some of its PPP earnings to support One Million Truths and its mission.

Over the last 18 months, we have worked tirelessly to show that Capital Plus' business belongs inside the traditional banking system where we can leverage our success. While we made some progress in demonstrating that a minority led institution can profitably serve minorities safely and soundly, our goal was not reached on the acquisition of Rice Bancshares. Officially, we were invited to withdraw our application and reapply given how much has changed for the company in 2021. Though we are disappointed that our success and scale in reaching underserved businesses in communities of color was ultimately a barrier to our bank application, it will not deter us from staying true in our mission to break down barriers to capital not just for small businesses but also for the users of basic banking services. Our extensive experience in the banking space as well as our participation in this round of PPP lending has reasserted an inconvenient truth: the banking system is riddled with bias and there is much work to be done to create a more inclusive and equitable one.

Our strategic analysis concludes that we are now overcapitalized. In order to be good stewards of capital and fulfill our duty to our business and to shareholders, we intend to pay out a special dividend of $40 per share on July 26, 2021. We will still retain $120 million of liquidity to further our mission. We will continue to achieve our double bottom line mission of achieving acceptable returns for our shareholders while delivering exceptional impact on the communities we serve.

As a CDFI, Capital Plus retains its strong commitment to creating economic opportunity for minority individuals and small businesses in communities that are disenfranchised, underserved, underbanked, and underfunded. When communities are underserved, they are undeveloped, individuals are undervalued, and growth opportunities are lost. These small businesses are the backbone of community value and identity which also affect real estate, neighborhood desirability, and safety. The focus of our transformation over the coming months is to break down the barriers to capital that low to moderate income and minority individuals face.

Capital Plus is far from the first CDFI and MDI applicant to combat the inequities of the banking system, but it is quickly becoming one of the most impactful. The events of the past few months as well as those that will transpire over the coming weeks will play a significant role in the transformation of our business from a single-family mortgage lending institution in Texas to a nationally recognized small business lender. We are thankful that you are joining us in this journey and welcome your continued support of our social enterprise.

Saludos Cordiales,


Robert H. Alpert & Eric A. Donnelly

## EXHIBIT 7

# CROSSROADS SYSTEMS, INC

A Delaware Corporation
4514 Cole Avenue, Suite 1600
Dallas, TX 75205

(214) 999-0149
www.crossroads.com

**SIC CODE: 6712**

# Quarterly Report
**For the Period Ending:** July 31, 2021
(the "Reporting Period")

The number of shares outstanding of our Common Stock is **5,971,994** SHARES as of July 31, 2021.

The number of shares outstanding of our Common Stock was **5,971,994** SHARES as of October 31, 2020 (end of previous reporting period)

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Exchange Act of 1934):

Yes: ☐          No: ☒ (Double-click and select "Default Value" to check)

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐          No: ☒

Indicate by check mark whether a change in control of the company has occurred over this reporting period:

Yes: ☐          No: ☒

## Part A        General Company Information

**Item 1   Name of the issuer and its predecessors (if any) and the address of its principal executive officers**

> Crossroads Systems, Inc
> Prior Symbol CRDS - Bankruptcy Plan
> Effective October 3, 2017; Current CRSS

**The address of the issuer's principal executive offices.**

> Crossroads Systems, Inc
> 4514 Cole Avenue, Suite 1600
> Dallas, TX 75205
>  (214) 999-0149
> www.crossroads.com; www.capitalplusfin.com
> ir@crossroads.com; info@capitalplusfin.com

**Item 2   Shares Outstanding**

|  | COMMON STOCK | | |
|---|---|---|---|
|  | **As of July 31, 2021** | **As of October 31, 2020** | **As of October 31, 2019** |
| Number of Shares Authorized | 75,000,000 | 75,000,000 | 75,000,000 |
| Number of Shares outstanding | 5,971,774 | 5,971,774 | 5,971,994 |
| Number of Shares in Public Float | 1,662,842 | 1,522,221 | 1,330,241 |
| Total Number of Shareholders of record | 136 | 162 | 157 |
| Total Number of Shareholders holding at least 100 shares | 43 | 57 | 52 |

**List of securities offerings and shares issued for services in the past two years**

**None**

**Item 3   Financial information for the issuer's most recent fiscal period.**

The Company has provided the following financial statements for the most recent fiscal year ending July 31, 2021, which are attached hereto as Exhibit A and are hereby incorporated by reference:

- Consolidated Balance Sheet
- Consolidated Statement of Operations
- Consolidated Statement of Changes in Equity
- Consolidated Statement of Cash Flows
- Notes to the Consolidated Financial Statements

**Similar financing information for such part of the two preceding fiscal years as the issuer or its predecessor has been in existence.**

The Company has provided the following financial statements for the two most recent fiscal years ending October 31, 2020, and October 31, 2019 ("Fiscal 2020"), and ("Fiscal 2019"):

- Report of Independent Public Accounting Firm
- Consolidated Balance Sheet
- Consolidated Statement of Operations
- Consolidated Statement of Changes in Equity
- Consolidated Statement of Cash Flows
- Notes to the Consolidated Financial Statements

These are published as Exhibit A to "Annual Reports" for each of Fiscal 2020 and Fiscal 2019 and filed through the OTC Disclosure and News Service, available at www.otcmarkets.com, and are hereby incorporated by reference.

**Item 4   Management's Discussion and Analysis**

The following discussion provides information and analysis of the Company's results of operations and its liquidity and capital resources and should be read in conjunction with the Company's Consolidated Financial Statements and the other financial information included in Exhibit A and elsewhere in this Quarterly Report. This discussion contains forward-looking statements that involve risks and uncertainties. The Company's actual results could differ materially from those anticipated in these forward-looking statements as a result of any number of factors.

The Company's operating and reporting period is on a fiscal year ending on October 31. The quarterly reporting period is from May 1, 2021, to July 31, 2021.  The comparative period is from May 1, 2020, to July 31, 2020

**Fiscal 2021 Financial Overview & Results of Operations**

**Operations**

Total revenue from operations for the nine months ended July 31, 2021, was $970.5 million compared to $27.5 million for the same period of 2020.  The increase in revenue was the result of the Company participating in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA"). The Company earned fees from the program totaling approximately $930.0 million. The Company has taken the full amount of fees earned during the period from the program into income.  The operating revenue for the period was $40.5 million compared to $27.1 million for the same period of 2020. The increase was from increased home sales and portfolio growth.  Net operating income before taxes and non-controlling interest for the nine months ended July 31, 2021, was $320.2 million compared to $3.5 million for the same period of 2020.

**Net Earnings Per Share**

Net earnings per share from operations before taxes and after non-controlling interests for the nine months ended July 31, 2021, was $53.54 compared to $0.51 for the nine months ended July 31, 2020.  The increase in the earnings per share was primarily due to the Company's participation in the PPP lending program.

## Results of Operations

Comparison of the Three Months Ended July 31, 2021, to the Three Months Ended July 31, 2020

The following table sets forth selected consolidated operating results stated in dollars and percentage from the prior year:

| | For the Three Months Ended | | Increase/(Decrease) | |
| | July 31, 2021 | July 31, 2020 | $ | % |
|---|---|---|---|---|
| REVENUES | | | | |
| Interest income | $ 14,910,841 | $ 3,125,498 | $ 11,785,343 | 377.1% |
| Property sales | 6,092,931 | 7,132,600 | (1,039,669) | -14.6% |
| Other revenue | 465,610,289 | 12,881 | 465,597,408 | 3614606.1% |
| Total revenues | 486,614,061 | 10,270,979 | 476,343,082 | 4637.8% |
| | | | | |
| COSTS AND EXPENSES | | | | |
| Interest expense | 5,576,284 | 1,271,583 | 4,304,701 | 338.5% |
| Cost of properties sold | 5,391,903 | 6,298,319 | (906,416) | -14.4% |
| General and administrative | 290,766,065 | 513,128 | 290,252,937 | 56565.4% |
| Salaries and wages | 19,204,171 | 743,053 | 18,461,118 | 2484.5% |
| Total costs and expenses | 320,938,423 | 8,826,083 | 312,112,340 | 3536.2% |
| | | | | |
| Income from operations | 165,675,638 | 1,444,896 | 164,230,742 | 11366.3% |
| | | | | |
| OTHER EXPENSES | | | | |
| Interest expense | (111,250) | (155,626) | 44,376 | -28.5% |
| Total other expenses | (111,250) | (155,626) | 44,376 | -28.5% |
| | | | | |
| Income before income tax provision | 165,564,388 | 1,289,270 | 164,275,118 | 12741.7% |
| | | | | |
| INCOME TAX PROVISION | (38,452,695) | (152,446) | (38,300,249) | 25123.8% |
| | | | | |
| NET INCOME | 127,111,693 | 1,136,824 | 125,974,869 | 11081.3% |
| Less: net income attributable to non-controlling interests | (155,773) | (157,068) | 1,295 | -0.8% |
| | | | | |
| NET INCOME ATTRIBUTABLE TO CONTROLLING INTERESTS | $126,955,920 | $ 979,756 | $ 125,976,164 | 12857.9% |
| | | | | |
| Earnings (loss) per share: | | | | |
| | | | | |
| Cash income attributable to common shareholders | 126,955,920 | 1,132,202 | 125,823,718 | 11113.2% |
| Weighted average shaes outstanding | 5,971,994 | 5,971,994 | - | 0.0% |
| Cash income per share | $ 21.26 | $ 0.19 | $ 21.07 | 11113.2% |

### *Total Revenues*

Total property sales revenue from the sale of recently rehabilitated homes was $6.1 million for the quarter ended July 31, 2021, compared to $ 7.1 million for the quarter ended July 31, 2020.  Sales during the third quarter of 2021 were relatively flat compared to the quarter ended July 31, 2020, due to lower homes being available for sale during the period.

Total interest income revenue generated from the Company's mortgage note receivable portfolio and from the PPP loan program was $14.9 million for the quarter ended July 31, 2021, compared to $3.1 million for the quarter ended July 31, 2020.  The increase was the result of growth in the total mortgage note receivable portfolio during the period and the addition of PPP loans to the portfolio.  The Company funded approximately $6.1 billion in PPP loans generating an annual interest rate of 1%.

Other revenues include processing fees the company earned from originating PPP loans during the quarter ended July 31, 2021.  The increase in revenues for processing fees was the result of the Company participation in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA"). The Company earned fees from the program totaling approximately $465.6 million for the quarter. The Company has taken the full amount of

fees earned during the period from the program into income. The Company funded approximately 400,000 loans during the period.  No such fees were earned during the quarter ended July 31, 2020.

### Cost of Goods Sold

The cost of goods sold related to the sale of homes were at $5.4 million for the quarter ended July 31 2021, compared to $ 6.3 million for the quarter ended July 31, 2020, as sales remained relatively flat for the comparative periods.  The Company experienced increased costs for labor and materials during the period resulting from supply shortages, retailer supply chain disruptions and material inflation.

Cost of goods sold includes all the direct costs of the inventory sold as well as the costs related to the rehabilitation of the homes sold.  In addition, cost of goods sold includes carrying costs of all the properties sold and inventory on hand.

The second component of the cost of goods sold is the interest expense on the mortgage note receivable portfolio.  The interest expense related to the portfolio income was $5.6 million for the quarter ended July 31, 2021, compared to $1.3 million for the quarter ended July 31, 2020.   The interest expense was higher due to the Company's participation in the PPP program.  The Company borrowed $6.4 billion from the Federal Reserve Bank of Cleveland to fund the loans it had originated at 35 bps per annum.  The Company accrued approximately $4.6 million in interest expenses related to these borrowing.  This was offset by lower debt costs on the mortgage note portfolio.

### Operating Expenses

Operating expenses consist primarily of the following: compensation, sales and marketing, technology, legal, professional fees, insurance, and other operating expenses.

Total operating expenses were $310.0 million for the quarter ended July 31, 2021, compared to $1.3 million for the quarter ended July 31, 2020. Of these operating expenses, $289.4 million are related to the PPP loan program the Company participated in.  These expenses represent the fees paid to the loan servicer provider for the origination and forgiveness of the PPP loans and were paid and accrued based on amounts earned during the quarter.  In addition, the company paid executive, board and employee bonuses in the amount of $18.7 million.  Normal operating expenses as a percentage of total revenues were at 8.6% for the quarter ended July 31, 2021 decreasing from 12.2% from the same reporting period of 2020.   The decrease was the result of increased interest income from the PPP loan program.

### Other Income/Expense

The other interest expense relates to interest from acquisition debt.  Total other interest expenses decreased by approximately $44,000 from the quarter ended July 31, 2021, compared to the quarter ended July 31, 2020, due to the principal reduction on this debt.  The balance on the acquisition debt as of July 31, 2021, was $9.0 million compared to $11.6M at July 31, 2020.

Comparison of the Nine Months Ended July 31, 2021, to the Nine Months Ended July 31, 2020

| | For the Nine Months Ended | | Increase/(Decrease) | |
| | July 31, 2021 | July 31, 2020 | $ | % |
|---|---|---|---|---|
| REVENUES | | | | |
| Interest income | $ 23,777,722 | $ 9,339,624 | $ 14,438,098 | 154.6% |
| Property sales | 16,733,791 | 17,736,312 | (1,002,521) | -5.7% |
| Other revenue | 929,984,144 | 378,249 | 929,605,895 | 245765.6% |
| Total revenues | 970,495,657 | 27,454,185 | 943,041,472 | 3435.0% |
| | | | | |
| COSTS AND EXPENSES | | | | |
| Interest expense | 9,134,509 | 4,356,322 | 4,778,187 | 109.7% |
| Cost of properties sold | 14,468,546 | 15,425,606 | (957,060) | -6.2% |
| General and administrative | 609,024,279 | 1,487,181 | 607,537,098 | 40851.6% |
| Salaries and wages | 20,731,003 | 2,103,878 | 18,627,125 | 885.4% |
| Total costs and expenses | 653,358,337 | 23,372,987 | 629,985,350 | 2695.4% |
| | | | | |
| Income from operations | 317,137,320 | 4,081,198 | 313,056,122 | 7670.7% |
| | | | | |
| OTHER EXPENSES | | | | |
| Interest expense | (372,859) | (550,947) | 178,088 | -32.3% |
| Other income/(expenses) | 3,447,921 | - | 3,447,921 | 0% |
| Total other expenses | 3,075,062 | (550,947) | 3,626,009 | -658.1% |
| | | | | |
| Income before income tax provision | 320,212,382 | 3,530,251 | 316,682,131 | 8970.5% |
| | | | | |
| INCOME TAX PROVISION | (69,991,591) | (448,398) | (69,543,193) | 15509.3% |
| | | | | |
| NET INCOME | 250,220,791 | 3,081,853 | 247,138,938 | 8019.2% |
| Less: net income attributable to non-controlling interests | (469,910) | (472,931) | 3,021 | -0.6% |
| | | | | |
| NET INCOME ATTRIBUTABLE TO CONTROLLING INTERESTS | $ 249,750,881 | $ 2,608,922 | $247,141,959 | 9473.0% |
| | | | | |
| Earnings (loss) per share: | | | | |
| | | | | |
| Cash income attributable to common shareholders | 271,594,104 | 3,057,320 | 268,536,784 | 8783.4% |
| Weighted average shaes outstanding | 5,971,994 | 5,971,994 | - | 0.0% |
| Cash income per share | $    45.48 | $    0.51 | $    44.97 | 8783.4% |

### Total Revenues

Total property sales revenue from the sale of recently rehabilitated homes was $16.7 million for the nine months ended July 31, 2021 compared to $17.7 million for the period ended July 31, 2020.   Sales were flat during the period due to the fewer completed homes being available for sale during the period given tight inventory levels in Texas making it more difficult to find blighted homes to restore.

Total interest income revenue generated from the Company's mortgage note receivable portfolio increased to $27.3 million for the nine months ended July 31, 2021, compared to $9.3 million for the nine months ended July 31, 2020. The increase was the result of growth in the total mortgage note receivable portfolio during the period and the addition of PPP loans to the portfolio.  The Company funded approximately $6.1 billion in PPP loans generating an annual interest rate of 1%.

Other revenues include processing fees the Company earned from participation in the Payment Protection Program (PPP) administered by the Small Business Administration ("SBA"). Total fees earned during the nine month period were $930.0 million.  The Company did not generate such fees for the same period in 2020.  The Company has taken the full amount of fees earned during the period from the program into income. The Company funded approximately 400,000 loans during the period.

*Cost of Goods Sold*

The cost of goods sold related to the sale of homes was $14.5 million for the nine months ended July 31, 2021, compared to $15.6 million for the same period of 2020. Cost of goods sold includes all the direct costs of the inventory sold as well as the costs related to the rehabilitation of the homes sold. In addition, cost of goods sold includes carrying costs of all the properties sold and inventory on hand.

The second component of the cost of goods sold is the interest expense on the mortgage note receivable portfolio. The interest expense related to the portfolio income was $9.1 million for the nine months ended July 31, 2021, compared to $4.4 million for the nine months ended July 31, 2020. The interest expense was higher due to the Company's participation in the PPP program. The Company borrowed $6.4 billion from the Federal Reserve Board to fund the loans it had originated at 35 bps per annum and the term of the advances matches exactly with the term of the PPP loan issued to the company's customers The Company accrued approximately $5.5 million in interest expenses related to these borrowing. This was offset by lower debt costs on the mortgage note portfolio.

*Operating Expenses*

Operating expenses consist primarily of the following: compensation, sales and marketing, technology, legal, professional fees, insurance, and other operating expenses.

Total operating expenses were $629.8 million for the nine months ended July 31, 2021, compared to $3.6 million for the nine months ended July 31, 2020. Of these operating expenses, $606.4 million are related to the PPP loan program the Company participated in. These expenses represent the fees paid to the loan servicer provider for the origination and forgiveness of the PPP loans and were paid and accrued based on amounts earned during the period. In addition, the Company paid executive, board and employee bonuses in the amount of $18.7 million during the period. Normal operating expenses as a percentage of total revenues were at 11.6% for the nine months ended July 31, 2021 and decreased from 13.5% from the same reporting period of 2020 as a result of increased interest income from the PPP loan program in 2021.

*Other Income/Expense*

The other interest expense relates to interest from acquisition debt. Total other interest expenses decreased $178,000 for the nine months ended July 31, 2021, from the nine months ended July 31, 2020, due to the principal reduction on the debt. The balance on the acquisition debt as of July 31, 2021was $9.0 million compared to $11.9 million at July 31, 2020. The company received a deferral of principal payments for three months starting in April 2020. This principal amount will be due at the end of the loan period.

**Liquidity and Capital Resources**

We define liquidity as our ability to generate sufficient cash to fund current loan demand at the subsidiary level and to operate on an ongoing basis. Our liquidity requirements are met primarily through cash flow from operations, receipt of pre-paid and maturing balances in our loan portfolios, debt financing, and preferred equity investments.

As of July 31, 2021, Capital Plus Financial had cash and lines of credit available with its current banking partners in excess of $30.0 million.

The Company also offers a Preferred Equity instrument to its bank partners which is considered a qualified investment under the Community Reinvestment Act ("CRA") investment test for banks. Banks purchase units of the preferred investment which generates cash for the Company and provides banks with an "innovative" investment, providing more favorable CRA assessment from their regulators.

*Working Capital*

*Mortgage Note Portfolio*

The mortgage note portfolio consists of $132.7 million of long term fixed, amortizing single family residential mortgages in the Dallas/Fort Worth, Houston, and San Antonio markets. The Company provides a mortgage for the purchase of a property with an equity down payment from the potential buyer. Our mortgage portfolio is comprised of first-time home buyers, and in over 60% of the cases, first time credit recipients. We believe the risk associated with these borrowers is mitigated by their history of debt aversion. Plainly said, those who have shown the financial discipline to operate without debt should be rewarded and not punished as is often the case with a zero-credit score borrower attempting to qualify for a mortgage. Each borrower is manually underwritten, and all are given the opportunity to demonstrably prove their ability to repay. A 43% debt to income ("DTI") ratio is the maximum ratio for approved mortgages, but the average DTI ratio in our portfolio is 29.5%, further reinforcing the quality of our borrowers. All mortgages are originated in house and are Qualified Mortgages (QM). Our weighted average rate on the portfolio was 10.36% at July 31, 2021.

The Company has a default rate below 3% per year and when it does take a property back into inventory, it is able to put it back into its rehab cycle and resell it. Given its ability to rehab and resell the properties at a profit, the Company has determined a reserve for delinquent and defaulted mortgages is not necessary as of July 31, 2021.

As of July 31, 2021, the Company had a mortgage note receivable balance of $132.7 million compared to $121.4 million as of July 31, 2020.

In addition, the company carries higher value residential mortgage notes held for sale in its securities portfolio held to provide needed liquidity. From time to time, the Company will also provide commercial real estate loans as part of its community development mission. The outstanding balance of these loans at July 31, 2021, was $1.4 million compared to $ 6.2 million at July 31, 2020.

*Inventory*

Inventory consists of properties that are currently undergoing remodeling or are being held for sale. Inventory includes the initial costs of acquiring the property, remodeling costs, real estate taxes, and other direct costs incurred while remodeling the property. All indirect overhead costs, such as compensation of sales personnel, management, and advertising costs are charged to salaries and wages, or other general and administrative expenses as incurred.

The initial direct costs to acquire properties and remodeling costs account for approximately 86% of the cost of properties sold in the consolidated statement of operations for the quarter ended July 31, 2021. As of July 31, 2021, 87 properties were being remodeled and 15 were completed and held for sale. Generally, the Company holds properties in inventory from acquisition to resale for 3 to 4 months.

The Company regularly evaluates inventories that are slow-moving or incurring costs in excess of budgeted costs. The Company determined a reserve for slow-moving inventory was not necessary as of July 31, 2021.

As of July 31, 2021, gross inventory was $10.6 million compared to $10.5 million as of July 31, 2020.

*Revolving Credit Facility*

The Company has a revolving line of credit for the acquisition of properties and another for its mortgage loans. The outstanding balance on the inventory line at July 31, 2021, was $7.7 million compared to $9.9 million at July 31, 2020. The variance in the balance is a result of having few properties available for rehab.

The outstanding balance on the mortgage loan revolving credit facility was $42.1 million as of July 31, 2021, compared to $ 44.9 million as of July 31, 2020.  The decrease is the result of moving loans from the revolving credit facilities to a term credit facility during the fourth quarter of 2020.

**Cash Flows Provided by Operations**

*Continuing Operations*

Net cash used by operating activities during the nine months ended July 31, 2021, was $5.6 billion compared to $3.0 million of net cash used for the nine months ended July 31, 2020. The primary reason for this increase was the Company's participation in the PPP loan program and its funding of $6.1 billion in loans.

**Cash Flows Used in Investing and Financing Activities**

Net cash provided by financing activities during the nine months ended July 31, 2021, was $6.2 billion compared to $1.6 million for the nine months ended July 31, 2020.  The primary reason for this increase was the Company's participation in the PPP loan program and its funding from the Federal Reserve of $6.4 billion to fund its PPP loans.

There are no known trends, events, or uncertainties that have or are reasonably like to have a material impact on the company's short-term or long-term liquidity. The internal sources of liquidity are profits generated from the company's operating subsidiary, Capital Plus Financial, and its external sources of liquidity remain debt and equity from banking institutions that assist in the institutions compliance with the Community Reinvestment Act (CRA). The company has no material commitments for capital expenditures and the expected source of funds for such expenditures. There are no known trends, events, or uncertainties that had had or that are reasonably expected to have a material impact on the net sales or revenues or income from continuing operations. There are no significant elements of income or loss that do not arise from the company's continuing operations. There are also no causes for any material changes from period to period in one or more line items on the company's financial statements nor are the seasonal aspects that had a material effect on the financial condition of the results of operations.

**Critical Accounting Policies and changes**

N/A

**Off-Balance Sheet Arrangements.**

NA

**Item 5   Legal Proceedings**

Any current past, pending or threatened legal proceedings or administrative actions either by or against the issuer that could have a material effect on the issuer's business, financial condition, or operations and any current, past or pending trading suspensions by a securities regulator.

None

**Item 6   Defaults upon senior securities.**

None

**Item 7   Other Information.**

None

**CROSSROADS SYSTEMS, INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

## 1.   COMPANY PROFILE AND NATURE OF OPERATIONS

Crossroads Systems, Inc. (OTCQX: CRSS) (the "Company", "CRSS" or "Parent") was an intellectual property licensing company headquartered in Austin, Texas. Founded in 1996 as a product solutions company, Crossroads created some of the storage industry's most fundamental patents and licensed patents to more than 50 companies prior to filing for reorganization under Chapter 11 of the Federal Bankruptcy Code on August 13, 2017.

On December 18, 2017, the Parent acquired 100% of the common equity of Capital Plus Financial, LLC ("CPF"), a Texas based community development financial institution ("CDFI").  CPF's mission is to make homeownership available to the Hispanic market throughout Texas.  CPF is also a certified B Corporation which is a group of for-profit companies certified to meet rigorous standards of social and environmental performance, accountability, and transparency. CPF operates in Texas where it acquires, renovates, and sells single-family homes providing seller financing through notes receivable.

### Principals of Consolidation

The consolidated financial statements include the accounts of CRSS and CPF. Capital Mortgage Servicing, LLC ("CMS") is wholly owned by CPF.  (Collectively, "we", "us", or the "Company").  All significant intercompany accounts and transactions have been eliminated in consolidation.

## 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The operations are for the period from November 1, 2020, to July 31, 2021.

### Cash and Cash Equivalents

The Company considers all currency on hand, money market accounts, and highly liquid investments purchased with an original maturity of three months or less to be cash equivalents.  Restricted cash includes escrow accounts related primarily to CMS's mortgage servicing obligations.

### Notes Receivable

The Company originates predominantly 30-year notes receivable through sales of rehabilitated homes or purchases notes receivable that are secured by an assignment of a deed of trust.  The Company intends to hold the notes for the long-term as it has the ability to fund additional notes receivable through borrowings from lenders that are secured by the notes receivable and properties. Notes receivables are stated at their unpaid principal balances less an allowance for loan losses if any. The average contractual interest rate per note was approximately 10.36% as of July 31, 2021. Interest income is recognized monthly per the terms of the respective loan agreements.  Notes receivable have maturities that range from 20 months to 30 years.  All of the Company's loans and underlying collateral are located in Texas.

The Company uses payment history to monitor the credit quality of the notes receivable on an ongoing basis. The Company assesses the carrying value of its notes receivable for impairment when it determines that impairment indicators are present. Notes are evaluated for impairment when it is probable the Company will be unable to collect all amounts due for scheduled principal and interest payments, including notes in the process of repossession. Impaired notes are generally measured based on the fair value of the collateral.  Impaired notes, or portions thereof, are charged off when deemed uncollectible.  A specific reserve is created for impaired notes based on the fair value of the underlying collateral.  No specific impairment was deemed necessary as of July 31, 2021.

**CROSSROADS SYSTEMS, INC**
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**

**Other Note Payable**

The Company assumed a note payable in the December 2017 acquisition of CPF with an outstanding principal balance as of the date of the acquisition totaling $1,827,750 (the "Other Note"). The Other Note is subordinate to the other debt obligations, accrues interest at 6.50% per annum, calls for monthly payments of principal and interest of $22,710, and matures on December 31, 2026.  The balance on the Other Note was $1,193,238 at July 31, 2021.

Future minimum principal payments for the Other Note are as follows for the years ending October 31:

| | | |
|---|---|---:|
| 2021 | $ | 49,003 |
| 2022 | | 204,151 |
| 2023 | | 217,823 |
| 2024 | | 232,411 |
| Thereafter | | 489,850 |
| | $ | 1,193,238 |

**Paycheck Protection Program Loan**

On April 20, 2020, the Company qualified for and received a loan under the Paycheck Protection Program ("PPP"), a program implemented by the U.S. Small Business Administrative ("SBA") under the Coronavirus Aid, Relief, and Economic Security Act, from a qualified lender (the "PPP Lender"), for an aggregate principal amount of $376,800. The PPP Loan bears interest at a rate of 1.0% per annum, with the first nine months interest deferred, has a term of two years, and is unsecured and guaranteed by the U.S. Small Business Administration. The principal amount of the PPP Loan is subject to forgiveness under the Paycheck Protection Program upon the Company's request to the extent that the PPP Loan proceeds are used to pay expenses permitted by the Paycheck Protection Program, including payroll costs, covered rent, and mortgage obligations, and covered utility payments incurred by the Company. The Company has applied for forgiveness of the PPP Loan for these covered expenses. To the extent that all or part of the PPP Loan is not forgiven, the Company will be required to pay interest on the PPP Loan at a rate of 1.0% per annum, and commencing in November 2020, principal and interest payments will be required through the maturity date in April 2022. The terms of the PPP Loan provide for customary events of default including, among other things, payment defaults, breach of representations and warranties, and insolvency events. The PPP Loan may be accelerated upon the occurrence of an event of default.

The Company applied for forgiveness in November of 2020 and is awaiting a response from the SBA.

**7.  OPERATING LEASES**

The Company is obligated, as lessee, under non-cancelable operating lease agreements for office space located in Bedford, Texas, and Houston, Texas. The lease agreements require monthly payments of $12,600 through their expiration in December 2022.

Future minimum payments required under non-cancelable operating lease agreements are as follows for the years ending October 31:

| | | |
|---|---|---:|
| 2021 | $ | 37,800 |
| 2022 | | 151,200 |
| 2023 | | 25,200 |
| | $ | 214,200 |

Rent expense associated with non-cancelable operating leases for the period ended July 31, 2021, was $113,400 and is included in general and administrative expenses in the consolidated statement of operations.

**Item 9 Certifications**

**10)** **Issuer Certification**

I, Eric Donnelly, certify that:

I have reviewed this quarterly disclosure statement of Crossroads Systems, Inc.

Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Date: Sept 14, 2021

Eric Donnelly
Chief Executive Officer

I, Farzana Giga, certify that:

I have reviewed this quarterly disclosure statement of Crossroads Systems, Inc.

Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and

Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Date: Sept 14, 2021

Farzana Giga
Chief Financial Officer

<u>**EXHIBIT 8**</u>

**ProPublica**

# They Promised Quick and Easy PPP Loans. Often, They Only Delivered Hassle and Heartache.

More than a million government-approved loans ended up being canceled, including some that would have gone to people who needed the loans and applied just as they were told.



Daniel Fishel for ProPublica

by **Lydia DePillis** and **Derek Willis**

Jan. 14, 12:30 p.m. EST

*ProPublica is a nonprofit newsroom that investigates abuses of power. Sign up to receive <u>our biggest stories</u> as soon as they're published.*

In May 2021, Terry Kilcrease thought he saw a lifeline. He was out of work, living in a hotel in Lewisville, Texas, when he ran across a promising ad on Facebook. People who worked for themselves, it said, could still get loans from the government's then-13-month-old pandemic Paycheck Protection Program.

Kilcrease had just started selling credit card processing systems to small businesses in early 2020 before the pandemic killed much of the need for cash registers. He hadn't thought he was eligible for the $800 billion program. But the ad, posted by a company called Blueacorn, convinced him it was worth a try.

"We've created a 60-second quiz that can tell you if you qualify and how much you can get," one <u>ad promised</u>. So Kilcrease registered on the Blueacorn site and answered a few basic questions about his business.

"With a few clicks of a mouse, I had applied," Kilcrease said. It was so quick, he doesn't recall many details. Blueacorn checked for all required documents before passing along Kilcrease's approved application to a lender, Prestamos.

Soon after, Kilcrease received loan documents from the Small Business Administration saying he'd been approved for a $4,790 forgivable loan, which he signed electronically and returned. The money would arrive in his bank account within ten business days, Blueacorn estimated.

Kilcrease was relieved.

"It was everything I needed to get going," he said. "Just that little bitty bit."

But the money never made it to Kilcrease. And it never appeared for hundreds of thousands of other applicants, either.

ProPublica has been tracking PPP loans since the government first posted millions of them in July 2020. We kept updating our interactive database as the SBA disclosed more loan information. When the last round of the PPP closed, in May 2021, we noticed something strange: The number of loans the government said it had made kept shrinking with every new release.

By the time the SBA posted its latest update in late November, about 575,000 loans had disappeared, subtracted from an original total of 11.8 million. Most of them came through non-bank online lenders or banks that worked with web platforms such as Blueacorn, which solicited and processed huge volumes of applications for small-dollar loans in the final months of the program.

When we checked with the SBA, they told us the total number of cancelled loans actually topped 1 million. A sizeable number of those were likely applied for by people who were attempting to defraud the program and didn't make it through additional screening — it's unclear how many, since the lenders we talked to declined to specify.

But plenty of would-be borrowers were acting in good faith. Scores of them wrote in to our tip lines, perplexed that they had been listed as loan recipients, since they had applied but never received any money.

Their situations sounded a lot like Kilcrease's: a quick approval in spring 2021, followed by some kind of snafu, and then a monthslong runaround from companies like Blueacorn, eventually resulting in no money after the lender the companies worked with withdrew its initial approval.

The phenomenon prompted the law firm Bailey Glasser to file a pair of lawsuits late last year against Prestamos and another Blueacorn client called Capital Plus Financial on behalf of people who had similar experiences. Prestamos has denied wrongdoing, and Capital Plus Financial declined to comment on pending litigation except to say that the plaintiff was ineligible for a loan.

This game of pingpong was maddening for prospective borrowers who had been told money was on the way, whether they were eligible for the program or not. It was also a hassle for lenders, who never got paid for

hundreds of thousands of loans they sent to the SBA (though they reaped billions for those that did get funded). And it likely could have been prevented if the SBA had required more screening on the front end, before approving loans in the first place.

SBA spokesperson Christalyn Solomon said that the agency delegated that responsibility to lenders, which acted as "agents of the government to approve and disburse loans." The SBA then assigned each loan a number, which confirmed that the government would guarantee it.

"Loans were removed for the FOIA Public Data Set because they were canceled by the lender," Solomon wrote in an email. Several hundred thousand loans were also approved and then canceled before the SBA started publishing data on loans worth less than $150,000 in December 2020.

Blueacorn said it worked hard to reach as many self-employed people as possible, but wasn't able to quickly obtain some information that would have been helpful in filtering out ineligible applicants. Prestamos, the lender to which Blueacorn submitted Kilcrease's application, declined to comment on individual borrowers, citing confidentiality guidelines. But Prestamos said that a majority of its approximately 50,000 canceled loans resulted from borrowers not signing their loan documents.

Kilcrease's bank rejected his PPP loan deposit in early June, yet Blueacorn continued to assure him the money was coming. "Don't worry, your funds are secure and you will be funded soon," a Blueacorn support worker wrote in a July message. "Both management and engineering are working on a solution as we speak."



Kilcrease's correspondence with Blueacorn after his bank rejected his PPP deposit. *Courtesy of Terry Kilcrease*

For weeks, not much happened. In August, Kilcrease got through to someone at Prestamos, the lender Blueacorn was working for. She asked for his 2020 tax return, which documented $5,600 in gross income. Then, e-mails show, she told Kilcrease he had provided conflicting numbers to Blueacorn and to the IRS, and his application would be formally denied.

Kilcrease said that he might have been confused about what information Blueacorn was initially asking for when he clicked a few buttons to apply back in May. But then why would they have approved him in the first place, and put him through months of hope, frustration and disappointment?

"They saw a whole lot of profit in people like me, sole proprietors," said Kilcrease, citing the fee that lenders received for successfully funding small PPP loans. "They were given a hope, and it was just dashed, with no

remorse and no recourse for anybody.”

The first round of the PPP, which kicked off in April 2020, mostly went to the largest small businesses. Clogged by applications from companies big enough to have bankers and accountants, the $349 billion fund was exhausted within weeks.

Realizing the need among actual mom-and-pops, Congress authorized another $320 billion in June 2020. That round reached millions more main-street-type companies: coffee shops, hair salons, restaurants, real estate agents.

By winter, the coronavirus recession was still hammering people who'd missed out on earlier rounds. Congress authorized the lending of unused funds and added more, while the incoming Biden administration tailored the rules to help sole proprietorships and independent contractors.

That's when financial technology companies — user-friendly websites with automated application platforms that often partner with lenders to supply loans — saw a big opportunity.

In the earlier stages of the PPP, banks mostly served existing customers that already had documents on file, making it easy to process their government-backed loans. But as Congress pushed to include businesses on the fringes of the financial system, lenders had to deal with huge numbers of applicants they'd never assessed before.

They often outsourced that task to websites — we'll call them loan processors — that marketed PPP loans to the self-employed and other small businesses and performed the basic checks required by the SBA. The SBA paid a fee for each funded loan to the lender, which in turn gave a cut to the processor for finding and vetting a borrower.

December's stimulus package boosted fees up to $2,500 or 50% of small loans, whichever was less. Loan processors, which utilized aggressive social media outreach to people who had had any kind of self-employment income before Feb. 15, 2020, churned through millions of loan applications quickly.

In an effort to keep barriers to entry low, the SBA required very little verification on the front end. Once an application was approved and assigned an SBA loan number, borrowers were forbidden from applying elsewhere. So loan processors had every reason to lock them in quickly, with few anti-fraud measures, said independent fintech analyst Jason Mikula — even if it meant dealing with verification questions later on.

“At the end of the day, if they end up rejecting someone for being suspicious, they're actually losing money,” said Mikula, noting that building automated fraud models takes time and money, even under normal circumstances. “There were no incentives in place to encourage these companies to be particularly careful about how they went about funding these things.”

An arms race followed. Fintechs competed for the self-employed, advertising their easy routes to quick, forgivable cash; some said they

employed rigorous verification tools following SBA approval. But Blueacorn was the one that got really lucky.

By May 2021, the Biden administration had <u>changed the rules again</u> to prioritize loans made by community development financial institutions, which have access to <u>special funding</u> from the Treasury Department to support underserved populations. Blueacorn, which launched in Phoenix in 2020, happened to partner with two of them: Prestamos CDFI, an arm of the nonprofit service group Chicanos Por La Causa, and Capital Plus Financial, the CDFI subsidiary of a larger holding company called Crossroads Systems.

Those relationships allowed Blueacorn to keep lending through the end of the PPP on May 31, while other lenders were locked out.

By the end, the two CDFIs appeared to have processed more than $15 billion in loans to 955,000 small businesses, nearly all with Blueacorn. Blueacorn declined to detail its fee split arrangement with banks and other vendors. But Crossroads Systems said in an <u>earnings report</u> that it had made approximately $930 million on the program, $606 million of which went to its loan processors. (Crossroads also <u>paid out a $40 per share special dividend</u> as a result of what it called the "windfall" fee income, while keeping $120 million to reinvest in lower-income communities.)

Fintechs have positioned themselves as champions of the little guy, reaching truck drivers and dog walkers, especially people of color, who'd been overlooked by the big banks.

The companies' promises to get money to thousands of independent workers from underserved communities is <u>broadly</u> <u>true</u> — but also somewhat overblown.

In May, June, and July, about 285,000 loans disappeared from the SBA's loan database. The companies that originally processed the loans told ProPublica there were a number of reasons why so many ended up canceled after having been approved by the SBA. Some appear to have been held up by borrower errors and second thoughts, but many cancellations were the result of the SBA's loose requirements for pre-approval screening.

One of the largest sources of canceled loans was Biz2Credit, an online lender founded in 2007, which withdrew about 115,000 loans after approving an original total of more than 300,000. A representative of the company, crisis communications consultant Michael Sitrick, said that the company employed "detailed underwriting protocols" after submitting the loans to the SBA. Canceled loans, he said, resulted from a combination of applications determined to be fraudulent after further checks, people who didn't respond to additional requests for documentation and people who voluntarily withdrew their applications.

"Lenders were required to stop fraud whenever they found it," Sitrick wrote in an email. "Given the sophistication of widely available document forgeries and other enterprise fraud, it was virtually impossible to detect fraud only by reviewing select documents prior to submission to the SBA."

The pile of canceled loans also included about 30,000 made by an entity newly created by the lender Fountainhead, which prior to the pandemic had specialized in SBA-backed loans. Still, they had thousands of borrowers who didn't sign their loan documents and inexplicable cancellations by the SBA itself after the agency had approved loans and banks had paid out the money.

"On occasion it would say 'duplicate tax ID discovered,'" said Fountainhead's chief operating officer, Michael Bland, referring to the SBA. "OK, well, what was your screening on the front end for? You went through your process and approved it, we closed it, I don't know why that might be an issue now."

Last month, Blueacorn lending partner Crossroads Systems agreed to purchase Fountainhead for an undisclosed amount.

When the SBA posted its most recent database update the day before Thanksgiving, it had dropped another 294,000 loans. About 140,000 of them belonged to the two CDFIs that had primarily worked with Blueacorn, Prestamos and Capital Plus, which accelerated their business in the three weeks after the program closed to regular lenders. In May alone, they approved at least 458,300 loans.

At the peak of the program, Blueacorn said, it had 300 people in the Phoenix area reviewing a deluge of loan applications. A quick scan of each one would usually lead to a quick signoff by the SBA.

But sometimes, between approval and funding, Blueacorn would find flags of fraudulent activity like an improbable concentration of applicants with very similar paperwork in a small geographic area — hairdressers making more than $100,000 a year on the south side of Chicago, for example. The processor would ask those borrowers for more documentation, and if they failed to provide it, cancel the loans.

Blueacorn said that thousands of loans it had approved and attempted to fund, meanwhile, were rejected by banks where applicants had savings accounts. Some of the banks had run their own know-your-customer checks on the accounts and sent them back to the processor for additional verification. Others cut off fintech processors entirely if they seemed to be vectors for fraud, causing problems for those who were genuine.

"Towards the end of the program, the willingness of recipient banks to work with PPP lenders got worse by the minute," said Barry Calhoun, Blueacorn's CEO.

Eric Kinney is the senior vice president for risk at Oxygen, a banking platform for small businesses. He said he saw so many people attempting to move PPP money into offshore accounts or into cryptocurrency assets that he blocked loan proceeds from "four main PPP lenders."

"There are a couple lenders who we've said no to, we're not going to accept any more payments," Kinney said, declining to name the companies. "A referral channel that has a high fraud rate on it, it's our job as a company to monitor that and block certain situations."

APPX. 049

Loan processors would try to work with borrowers and their banks to provide the requested information. If that didn't succeed, they had the option of putting the money on a debit card, but that required even more documentation from borrowers, resulting in an outpouring of angry posts on internet message boards like Trustpilot, the Better Business Bureau, Reddit and Facebook.

Now, borrowers who were approved but never received their money are plaintiffs in two lawsuits filed against Prestamos CDFI and Capital Plus Financial last October and December, saying that the failure to fund the loans constitutes a breach of contract. In a <u>motion to dismiss</u>, Prestamos said that the loan document created no obligation to actually fund the loan, and a spokesperson declined to comment further on the case. Capital Plus Financial hasn't yet filed any responses, but told ProPublica that the sole named plaintiff had provided an "illegible" tax return that wasn't signed, which is why the company decided to revoke his loan.

Blueacorn's Calhoun said much of the hassle could have been avoided from the beginning had the SBA allowed lenders to access more documents that would ensure the borrower was legitimate. Creating a quick way for certified, regulated loan processors to pull an applicant's tax records, for example, would have provided a hard check on who was eligible.

"A few adjustments would've gotten rid of a lot of the lazy fraud," said Calhoun. "Because there was so much ambiguity, it encouraged a lot of people."

This happened more smoothly in other countries where companies file federal taxes quarterly or even monthly, allowing the government to know their exact income without the need for lenders to request documentation that was sometimes difficult to verify. Instead, the SBA allowed applicants to file draft tax returns, which can easily be manipulated.

The whole experience left Terry Kilcrease feeling cynical.

"The big companies made out like fat cats, the lenders made out like fat cats, all these companies that already had plenty of money," Kilcrease said. "The people like me who are struggling to get there were just completely forgotten about."

**CORRECTION**

*Jan. 14, 2022: Correction: This story originally misstated the name of a lender that was responsible for 30,000 canceled loans. It was Fountainhead SBF, not Fountainhead Commercial Capital, which is a sister firm.*

---

**Lydia DePillis**
Lydia DePillis covers federal agencies.

✉ lydia.depillis@propublica.org   🐦 @lydiadepillis   📱 202-913-3717

---

**Derek Willis**



Derek Willis was a news applications developer at ProPublica, focusing on politics and elections.

✉ Derek.Willis@propublica.org   🐦 @derekwillis   📱 202-904-1168

🔒 Signal: 202-904-1168

## EXHIBIT 9

# CROSSROADS SYSTEMS INC.

a Delaware Corporation
4514 Cole Avenue, Suite 1600
Dallas, TX 75205
(214) 999-0149
www.crossroads.com

### SIC CODE: 6712

# Annual Report
### For the Period Ending: October 31, 2021
(the "Reporting Period")

The number of shares outstanding of our Common Stock is **5,971,994** SHARES as of OCTOBER 31, 2021.

The number of shares outstanding of our Common Stock was **5,971,994** SHARES as of JULY 31, 2021 (end of previous reporting period)

Indicate by check mark whether the company is a shell company (as defined in Rule 405 of the Securities Act of 1933 and Rule 12b-2 of the Exchange Act of 1934):

Yes: ☐          No: ☒ (Double-click and select "Default Value" to check)

Indicate by check mark whether the company's shell status has changed since the previous reporting period:

Yes: ☐          No: ☒

Indicate by check mark whether a change in control of the company has occurred over this reporting period:

Yes: ☐          No: ☒

**Part A**          **General Company Information**

**Item 1)  Name of the issuer and its predecessors (if any)**

> Crossroads Systems, Inc
> Prior Symbol CRDS - Bankruptcy Plan Effective October 3, 2017;
> Current CRSS: OTCQX

**Item 2)  Address and principal executive offices**

> Crossroads Systems, Inc
> 4514 Cole Avenue, Suite 1600
> Dallas, TX 75205
> (214) 999-0149
> www.crossroads.com; www.capitalplusfin.com
> ir@crossroads.com; info@capitalplusfin.com

**Item 3)  Jurisdiction and date of incorporation and organization**

> Delaware Corporation, Active
> September 26, 1996

Has the issuer or any of its predecessors ever been in bankruptcy, receivership, or any similar proceeding in the past five years?

> Yes: ☒          No: ☐

**Part B**          **Share Structure**

**Item 4)  The exact title and class of securities outstanding**

| | |
|---|---|
| Trading symbol: | CRSS |
| Exact title and class of securities outstanding: | Common Shares |
| CUSIP: | 22766K103 |
| Par or stated value: | $0.001 |

**Item 5)  Par or state value and description of security**

> Crossroads Systems, Inc. (OTCQX: CRSS), Amended and Restated Certificate of Incorporation authorizes the Company to issue 75,000,000 shares of Common Stock, par value $0.001 per share. As of October 31, 2021, there were 5,971,994 shares of Common Stock issued and outstanding.

> **A.  Par or Stated Value.**

> Common Stock: $.001 per share

> **Common or Preferred Stock.**

> 1.  Common Stock dividend, voting and preemption rights: Each share of Common Stock has one vote on each matter submitted to a vote of the stockholders of the Company. Subject to the provisions of applicable law and the rights of the holders of the outstanding shares of preferred stock, if any, the holders of shares of Common Stock are entitled to receive, when and as declared by the Board of Directors of the Company, out of the assets of the Company legally available therefor, dividends or other distributions, whether payable in cash, property or securities of the Company.

2. Preferred Stock dividend, voting, conversion and liquidation rights as well as redemption or sinking fund provisions: n/a
3. Other material rights of Common or Preferred Stockholders: n/a
4. Any provision in the issuer's charter or by-laws that would delay, defer or prevent a change in control of the issuer: The Company's charter includes a tax benefits protection provision that prohibits any transfer of the Company's shares to the extent that, as a result of such transfer, a person would become a 4.99% stockholder of the Company or the percentage stock ownership of any current 4.99% stockholder would increase.

**Item 6)**  **The number of shares or total amount of securities outstanding for each class of securities authorized**

| | | |
|---|---|---|
| Total shares authorized: | 75,000,000 | as of date: October 31, 2021 |
| Total shares outstanding: | 5,971,994 | as of date: October 31, 2021 |
| Number of shares in the Public Float: | 1,464,867 | as of date: October 31, 2021 |
| Total number of shareholders of record: | 134 | as of date: October 31, 2021 |
| Total number of shareholders of record (holding at least 100 shares): | 41 | as of date: October 31, 2021 |

**Item 7)**  **Transfer Agent**

Name:    American Stock Transfer & Trust Company
Phone:   (866) 703-9077
Email:   TCajuste@astfinancial.com

Is the Transfer Agent registered under the Exchange Act?[1]  Yes: ☒    No: ☐

**Part C**   **Business Information**

**Item 8) The nature of the issuer's business.**

**A.  Business Development.**

Crossroads Systems Inc., (OTCQX: CRSS) was an intellectual property licensing company headquartered in Austin, Texas. Founded in 1996 as a product solutions company, CRSS created some of the storage industry's most fundamental patents and has licensed patents to more than 50 companies since 2000. CRSS's fiscal year-end is October 31.

On August 13, 2017, the Company filed for re-organization under Chapter 11 of the Federal Bankruptcy Code (the "Plan") which had been accepted by the holders of more than 2/3 of the preferred shares of the Company. In connection with the filing, the Company entered into restructuring support agreements with 210/CRDS Investment LLC ("210") and with certain holders of the Company's series F preferred stock. Subject to the terms and conditions of the Plan and the restructuring support agreement with 210, Dallas-based 210 invested $4 million cash in the Company in exchange for shares of the reorganized Company's common stock representing approximately 49.49% of the common stock of the reorganized Company. In addition, 210 committed to provide up to $10 million of financing for the Company to use (subject to the terms and conditions of the Plan and the 210 RSA) to implement its strategy of monetizing its intellectual property assets and pursuing investments in companies that generate profit and positive cash flows, thus creating long-term shareholder value. The Plan provided for the payment of all creditor claims in full, for holders of preferred shares to receive their pro rata share of $2.7 million in cash plus 8% of the common stock of the reorganized Company, and for holders of common stock to exchange their existing shares of common stock for an equivalent number of new shares of the common stock of the reorganized Company, which shares would constitute approximately

42.5% of the outstanding shares of common stock of the reorganized Company. The Plan was approved by the Court on September 18, 2017 and effective October 3, 2017, The Company was delisted from the Nasdaq exchange to the Over-the-Counter ("OTC") Pink Sheets on September 10, 2017, 10 days after the exchange filed its Form 25.

On December 18, 2017, Crossroads Systems Inc., closed on the acquisition of 100% of the common equity of Capital Plus Financial, LLC ("CPF"), a Texas based community development financial institution ("CDFI"), $30.8 million in cash and 49.5% or 2,955,028 of newly issued common stock. This transaction did not trigger any change of control, however, did grant CPF owners/management two board seats.

On September 14, 2021, Crossroads entered into an advisory agreement with Enhanced Capital Group, an investment firm committed to socially responsible investment initiatives and impact manager of P10 Holdings, Inc ("P10"), a leading, specialized multi-asset class private markets solutions provider.

On September 24, 2021, Crossroads acquired Rise Line Business Credit, LLC ("RLBC") a nationwide asset-based lending firm that provides innovative working capital solutions. This transaction did not trigger any change of control or change in board seats.

On December 16, 2021, Crossroads reached an agreement in principle to acquire Fountainhead, a leading national, non-bank, direct commercial lender specializing in business financing for small to midsize businesses. The deal remains subject to the consent of and final approval by the Small Business Administration (SBA) and is expected to close in the first half of 2022.

As of the date of this report, Crossroads is currently involved in the following litigation.

**Greathouse v. Capital Plus Financial, LLC and Crossroads Systems, Inc.**

On December 29, 2021, Eric Greathouse filed a case in the Eastern District of Arkansas against the Company and Capital Plus Financial, LLC ("CPF") on behalf of himself and a putative nationwide class of Paycheck Protection Program ("PPP") borrowers, who allegedly timely applied for PPP loans with Defendant CPF as the lender and who had their loans approved by the SBA but did not receive the PPP loan proceeds. The action asserts breach of contract and unjust enrichment against the defendants in connection with his and the putative class's claims. The Company denies allegations of any wrongdoing and intends to vigorously defend the case.

**Oto Analytics, Inc. D/B/A Womply v. Capital Plus Financial, LLC, Crossroads Systems, Inc., Eric Donnelly, Ba Fin Orion, LLC d/b/a Blueacorn, and Barry Calhoun**

On September 9, 2021, Womply commenced this action in the 95th Judicial District Court Dallas County TX (docket number DC-21-13097), which the Company and other defendants removed to the Northern District of Texas. Following removal and an amendment of their original complaint on December 23, 2021, the case alleges various torts, including fraud and tortious interference with contract, in connection with Womply's allegations regarding its entitlement to the fees Womply allegedly earned by creating and providing technology infrastructure for the federal Paycheck Protection Program ("PPP"). The Company denies allegations of any wrongdoing and intends to vigorously defend the case.

In 2018, the Company settled two outstanding legal matters dating back to 2013, and prior management and business lines since shuttered as part of the reorganization into a financial holding company. The matters were related to the Crossroads patent business and royalties owed to the Company.

**B. Business of Issuer.**

Crossroads primary and secondary SIC Codes are 6712.

Crossroads Systems Inc., (OTCQX: CRSS), is a holding company focused on investing in businesses that promote economic vitality and community development. Crossroads' subsidiary, Capital Plus Financial (CPF), is a certified Community Development Financial Institution (CDFI) and certified B-Corp that supports Hispanic homeownership with a long-term, fixed-rate single-family mortgage product. CPF was acquired on December 18, 2017.

Crossroads' primary subsidiary is Capital Plus Financial. CPF was originally formed in 1992 to provide mortgage financing within the state of Texas. Throughout its life, CPF has evolved to serve the Hispanic population by providing credit that is otherwise unavailable.

CPF has injected over $250 million into under-served communities and populations in Texas. CPF is committed to continuing to serve communities in which it has a history of 25 years, as well as expanding its reach to serve its expanding customer base.

The other integral part of the CPF's mission is to provide affordable housing. This is done through the substantial rehabilitation of blighted homes in low to moderate-income areas. Through this process, communities are improved and housing that is safe and sustainable is provided to hundreds of people a year looking to make their way up the socio-economic ladder.

Crossroads advisory agreement with Enhanced Capital Group ("ECG") will immediately expand CPF's credit assets and is expected to infuse more than $250 million into emerging communities across the country over the next 12 to 18 months by leveraging ECG's deep experience investing in small businesses and projects that spur job creation; promote environmental sustainability; support women, minority, and veteran-owned enterprises; and stimulate underserved communities. The agreement allows for significant loan growth to be booked on CPF's balance sheet and in return, ECG will receive a management and incentive fee. The company targets ECG-originated assets, in aggregate and with proper financing in place, to yield in excess of 20% return on equity for Crossroads, while dramatically expanding its impact footprint.

Crossroads acquired RLBC in September 2021, a nationwide asset-based lending firm that provides innovative working capital solutions. Through this transaction, Crossroads anticipates being able to provide better accessibility to banking for small businesses and assist in their transition into the conventional banking system where many are currently underserved. The merger also expands Crossroads' impact product offering to small businesses that are in asset-heavy sectors such as manufacturing, distribution, retail and consumer products, business services, staffing, and technology services.

The consolidated company currently has 34 full-time employees between Dallas-Fort Worth, Houston, and San Antonio. The financial results of Crossroads are consolidated and include the operating results of CPF and RLBC.

The Company has not at any time been a "shell company" as defined in Rule 405 of the Securities Act of 1933, as amended, and Rule 12b-2 of the Securities Exchange Act of 1934, as amended.

As with any operating company, we are subject to a growing number of local, national, and international laws and regulations. These laws are often complex and are frequently changing. Changing or growing regulations could impose additional compliance burdens and costs on us and could subject us to significant liability for any failure to comply.

**Item 9**              **The nature of the products or services offered**

**The nature of products or services offered.**

Through our subsidiary, CPF's core business is to provide mortgage financing to Hispanic homeowners within the state of Texas. CPF achieves this via purchasing blighted, single-family homes in low to moderate-income areas within the state. It then renovates and refurbishes these properties and sells them to the Hispanic community. The targeted homes are generally 900 to 1,400 sq. ft., 2-3 bedrooms, and currently range in value from $100,000 to $175,000 (after renovations).

Typically, targeted properties meet some or all of the following criteria:
- Outdated, especially the kitchens and bathrooms;
- Little current curb appeal;
- Atypical layouts or features that turn buyers away;
- Not well maintained;
- Sellers looking for a quick sale; and
- Sellers seeking a cash buyer, who is not reliant upon financing contingencies.

While there is natural competition from community banks on the financing side of the business, there are multiple factors that have kept this to a minimum, including but not limited to bank compliance regulation costs, borrower distrust of the banking system, and small balance size of the mortgages provided.

During fiscal 2021, CPF actively participated in the second round of the Cares Act implementation of the Paycheck Protection Program ("PPP") through the United States Department of the Treasury and SBA. PPP loans have an interest rate of 1.0%; principal and interest payments are deferred for nine months from the date of disbursement; a five-year loan term to maturity for loans made on or after June 5, 2020 (loans made prior to June 5, 2020, have a two-year term, however, borrowers and lenders may mutually agree to extend the maturity for such loans to five years); and is unsecured and guaranteed by the SBA. CPF was in the top 5 lenders in the country.

CPF is, as are all regulated lending institutions, dependent on the continued regulatory approval of our loan offerings. We comply with the Texas Department of Savings and Mortgage Lending regulations as well as federal lending guidelines. We subject ourselves to annual compliance, fair lending, and servicing audits to ensure that our procedures remain in compliance and are kept abreast of the latest regulatory changes.

Our subsidiary RLBC's core business is to provide financing solutions across a wide array of industries, including manufacturing, distribution, logistics, transportation, retail and consumer, business services, staffing, and technology services. RLBC provides customized lending solutions to businesses seeking an alternative to the traditional bank and non-bank lenders that cannot meet their capital and service needs.

RLBC's client solutions typically include asset-based revolving lines of credit and senior secured term loans with loan facilities ranging from $2M to $15M with the ability to agent and syndicate larger transactions. RLBC offers customized loan structures, providing liquidity by monetizing both traditional working capital assets, such as inventory and accounts receivable, while also including real estate, machinery, and equipment and intangible assets as eligible collateral.

RLBC maintains offices in New York and provides national coverage.

**Item 10          The nature and extent of the issuer's facilities.**

The Company is obligated, as lessee, under non-cancelable operating lease agreements for office space located in Bedford, Texas, and Houston, Texas. The lease agreements require monthly payments totaling $12,600 through their expiration in December 2022.

Future minimum payments required under non-cancelable operating lease agreements are as follows for the years ending October 31:

Rent expense associated with non-cancelable operating leases for the year ended October 31, 2021 was $137,475.

|      | Bedford | Houston | Total |
|------|---------|---------|-------|
| 2022 | $109,800 | $41,400 | $151,200 |
| 2023 | 109,800 | 6,900 | 116,700 |
| 2024 | 18,300 | - | 18,300 |
|      | $237,900 | $ 48,300 | $286,200 |

**Part D          Management Structure and Financial Information**

**Item 11          Company Insiders (Officers, Directors, and Control Persons).**

**A.  Officers, Directors, and Control Persons.**

The following table shows the number of shares of Common Stock beneficially owned by directors, executive officers, and persons known by the Company to beneficially own more than five percent (5%) of the issued and outstanding shares of Common Stock of the Company as of October 31, 2021.

The percentage of beneficial ownership is calculated assuming 5,971,994 shares of the Company's Common Stock (net of treasury shares) were outstanding as of October 31, 2021. Except as otherwise indicated, and subject to applicable community property laws, to the Company's knowledge, each person has sole voting and dispositive power with respect to all shares of Common Stock beneficially shown as owned by that person.

| Beneficial Owner/Shareholder Name | Business Address | Affiliation with Company (e.g., Officer/Director/Owner of more than 5%) | Number of Shares | % Ownership | Class of Shares |
|---|---|---|---|---|---|
| Eric Donnelly (Donnelly 2018 Trust) | Dallas, TX | Executive Officer, Director, and Control Person | 718,590 | 12.0% | Common |
| Farzana Giga (Giga Investments, LLC) | Frisco, TX | Executive Officer, Director and Control Person & Member of Audit Committee | 618,683 | 10.4% | Common |
| Robert Alpert (210/CRDS Investments) | Dallas, TX | Chairman of the Board & Control Person | 546,142 | 9.1% | Common |
| Clark Webb (210/CRDS Investments) | Dallas, TX | Director & Control Person & Member Audit Committee | 646,143 | 10.8% | Common |
| Claire Gogel | Dallas, TX | Independent Director | 193,438 | 3.2% | Common |
| James Perez Foster | Boulder, CO | Independent Director & Member Audit Committee | 601 | 0.01% | Common |
| Ray Kembel | Dallas, TX | Independent Director & Member Audit Committee | 401 | 0.01% | Common |
| Mark Crockett | Fort Worth, TX | Officer and Owner of more than 5% | 466,233 | 7.8% | Common |
| Charles A Vose III | Dallas, TX | Owner of more than 5% | 485,474 | 8.1% | Common |

**Robert H. Alpert - Chairman of the Board**

Robert Alpert has served as Chairman of the Board since October 2017. He is the Chairman and Co-CEO of P10, Inc. (formerly P10 Holdings, Inc.) He is also the co-founder and principal of 210 Capital, LLC. Mr. Alpert is a director of Elah Holdings, Inc., Collaborative Imaging, LLC, and Chairman of the Board of Redpoint Insurance Group, LLC. He is also the co-founder of Homebuilder Capital Advisors, LLC and the co-founder and managing member of Merfax Financial Group, LP. Mr. Alpert previously served as the Chief Executive Officer and Chairman of the Board of GlobalSCAPE, Inc. Prior to founding 210 Capital, Mr. Alpert was the founder and portfolio manager of Atlas Capital Management, L.P.

**Eric Donnelly – Director and Chief Executive Officer**

Eric Donnelly has served as a director and as Chief Executive Officer since December 2017. Mr. Donnelly has spent his 20-year career focused on supporting small businesses and developing low to moderate income communities with an emphasis on Hispanic homeownership. He has served as Capital Plus Financial LLC's Chief Executive Officer since 2014 after having been hired by the company's founder in 2012 to scale the 25-year social enterprise. Mr. Donnelly has grown the company into one of the largest Community Development Financial Institutions in the country and under his leadership has achieved its B Corp certification further reinforcing the company's commitment to community impact as well as shareholder value growth. In 2005 after many years in commercial banking, Mr. Donnelly founded a national small balance commercial real estate finance company focused on delivering long term, fixed rate options to small business owners. He is an active Hispanic entrepreneur and leader whose passion it is to improve underserved and underbanked market segments. Mr. Donnelly is a graduate of Southern Methodist University with a Bachelor of Arts in Economics. Mr. Donnelly is on the board of InBankshares, a community bank based in Raton, NM serving the New Mexico and Colorado Front Range markets. He was a participant in the BBVA Momentum program for Social Entrepreneurs, a 2017 graduate of the Stanford Latino Entrepreneur Initiative, and a continuing mentor to Latino entrepreneurs participating in the Stanford program.

**James Pérez Foster – Independent Director & Member of Audit Committee**

James Pérez Foster has served as a director since February 2018 and is an Audit Committee member. Mr. Pérez Foster is a seasoned board member with national banking and Community Development Financial Institution (CDFI) board experience. He is a technology executive and management consultant with more than 25 years of strategic growth, impact investment advisory, and community engagement experience. A published expert on U.S. underserved market segments for global financial services and banking institutions, Mr. Pérez Foster is the founder of Bainbridge Advisors, LLC, a consulting, and research firm that serves financial institutions and federal agencies. Mr. Pérez Foster also founded Solera National Bancorp, a federally chartered bank holding company that is credited as one of the first Hispanic-markets focused commercial banks in the country. Mr. Pérez Foster has a BA in International Relations from Syracuse University's Maxwell School of Citizenship and Public Affairs.

**Farzana Giga – Director and Chief Financial Officer & Member of Audit Committee**

Farzana Giga has served as the Chief Financial Officer and board member of Crossroads Systems, Inc. since December 2017 and the Chief Financial Officer of Capital Plus Financial since 2014. Ms. Giga's background includes extensive experience in strategic financial planning and structuring as well as financial operations in public and private organizations. Her most recent experience included managing a private equity fund focused on residential seller financing including acquisitions, mortgage origination, and mortgage servicing for a portfolio exceeding $100M. In 2014, during her tenure at the private equity fund, Ms. Giga partnered to acquire Capital Plus Inc and form Capital Plus Financial which was then acquired by Crossroads Systems in 2017. Ms. Giga currently serves on the board of Zigatta LLC, a technology solutions company, and Capital IBE Holding, LLC, a privately held Puerto Rican financial institution. Ms. Giga is also a member of the OTCQX Issuer Advisory Council. Ms. Giga is a Certified Public Accountant, Certified Management Accountant in Ontario, Canada, and received her Bachelor of Arts, Economics from the University of Toronto.

**Claire Gogel – Independent Director**

Claire Gogel has served as a director since October 2017. Ms. Gogel was an Independent Director and member of the Finance and Restructuring Committee at SunEdison, Inc., and served in that position from 2016 when she was appointed as an independent director by Greenlight Capital. From 2009 to 2014, Ms. Gogel served as a partner and analyst at Greenlight Capital, a hedge fund in New York. From 2001 to 2009, Ms. Gogel was the founder and portfolio manager of Perennial Advisors, a long-short equity hedge fund. Ms. Gogel's professional experience also includes positions as a portfolio manager at Discovery Partners and as a research associate at Cardinal Investment Company. Ms. Gogel earned a Bachelor of Arts degree with High Honors from The University of Texas at Austin.

**Ray Kembel – Independent Director & Member of Audit Committee**

Ray Kembel has served as a director since February 2018 and is the Chairman of the Audit Committee. Mr. Kembel is a tenured finance executive with a broad knowledge of real estate and credit finance. He is currently an Executive Vice President with Oakwood Bank in Texas. Prior to joining Oakwood Bank, Mr. Kembel helped develop the Dallas commercial banking platform for Green Bancorp, Inc. (NASDAQ: GNBC), recently acquired by Veritex Bank (NASDAQ: VBTX). Ray previously spent 10 years with Staubach Capital Partners, a private equity group under The Staubach Company umbrella, acquired by JLL (NYSE: JLL). He began his career with Bank of America (NYSE: BAC). Mr. Kembel holds a BBA degree from The University of Texas at San Antonio and an MBA from The University of Dallas.

**C. Clark Webb – Director & Member of Audit Committee**

C. Clark Webb has served as a director since October 2017 and serves as a member of the Audit Committee. Mr. Webb is the Co-CEO and a Director of P10, Inc. (formerly P10 Holdings, Inc.). He is also the co-founder and principal of 210 Capital, LLC. Additionally, Mr. Webb serves as the Chairman of the Board of Elah Holdings, Inc., and Chairman of the Board of Collaborative Imaging LLC. Previously, Mr. Webb was Founder and Managing Member of P10 Capital Management, Co-Portfolio Manager of the Lafayette Street Fund, and a Partner at Select Equity Group, L.P. Mr. Webb holds a B.A. from Princeton University.

**Board Compensation**

The non-executive members of the Board of Directors each receive $3,750 per quarter for their service on the Board of Directors. The Chairman of the Board receives an additional $900 per quarter and the Chairman of the Audit Committee receives an additional $600 per quarter. The three independent board members were paid a one-time bonus of $300,000 during 2021.

The following table discloses compensation received by the Company's Chief Executive Officer and Chief Financial Officer, for the fiscal year 2021.

| Name and Principal Position | Fiscal Year | Salary ($) | Bonus ($) | Option Awards (Fair Value $) | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|
| Eric Donnelly, Chief Executive Officer | 2021 | $350,000 | $8,899,474 | N/A | N/A | $9,249,474 |
| Farzana Giga, Chief Financial Office | 2021 | $300,000 | $8,899,474 | N/A | N/A | $9,199,474 |

**B.   Legal/Disciplinary History.**

None of the persons listed in Item 11.A above have, in the last five years, been the subject of: (1) a conviction in a criminal proceeding or named as a defendant in a pending criminal proceeding (excluding traffic violations and other minor offenses); (2) the entry of an order, judgment, or decree, not subsequently reversed, suspended or vacated, by a court of competent jurisdiction that permanently or temporarily enjoined, barred, suspended or otherwise limited such person's involvement in any type of business, securities, commodities, or banking activities; (3) a finding or judgment

by a court of competent jurisdiction (in a civil action), the Securities and Exchange Commission, the Commodity Futures Trading Commission, or a state securities regulator of a violation of federal or state securities or commodities law, which finding or judgment has not been reversed, suspended, or vacated; or (4) the entry of an order by a self-regulatory organization that permanently or temporarily barred, suspended or otherwise limited such person's involvement in any type of business or securities activities

### C. Disclosure of Family Relationships.

There are no family relationships among and between the issuer's directors, officers, persons nominated or chosen by the issuer to become directors or officers, or beneficial owners of more than five percent (5%) of any class of the issuer's equity securities.

### D. Disclosure of Related Party Transactions.

On September 14, 2021, the Company entered into an advisory agreement with Enhanced Capital Group, an investment firm committed to socially responsible investment initiatives and impact manager of P10, Inc., a leading, specialized multi-asset class private markets solutions provider. Mr. Alpert and Mr. Webb, who are members of the Company's board of directors, are Co-Chief Executive Officers and Directors of P10, Inc. Mr. Alpert is chairman of the board of P10, Inc. As of October 31, 2021, the Company had financed $7.5 million in these loans.

Capital Plus Financial leases office space on a month-to-month basis from 210 Capital whose principals are Mr. Alpert and Mr. Webb. Monthly payments under the lease were $1,700 and total rental payments for the year ended October 31, 2021, were $6,800 with rent owed at October 31 totaled $6,800.

The Company leased office space in Dallas, Texas on a month-to-month basis from Southwest Federated, Inc., a related party through common ownership. Monthly payments under the lease were $4,500 and total rental payments for the year ended October 31, 2021 were $31,500. The lease was terminated in 2021.

### E. Disclosure of Conflicts of Interest.

Not Applicable

### Item 12          Financial information for the issuer's most recent fiscal period.

The Company has provided the following financial statements for the most recent fiscal year ending October 31, 2021 which are attached hereto as Exhibit A and are hereby incorporated by reference:

- Consolidated Balance Sheet
- Consolidated Statement of Operations
- Consolidated Statement of Changes in Equity
- Consolidated Statement of Cash Flows
- Notes to the Consolidated Financial Statements

### Item 13          Similar financing information for such part of the two preceding fiscal years as the issuer or its predecessor has been in existence.

The Company has provided the following financial statements for the two most recent fiscal years ending October 31, 2021 and October 31, 2020 ("Fiscal 2021"), and ("Fiscal 2020"):

- Report of Independent Public Accounting Firm
- Consolidated Balance Sheet
- Consolidated Statement of Operations
- Consolidated Statement of Changes in Equity

- Consolidated Statement of Cash Flows
- Notes to the Consolidated Financial Statements

These are published as Exhibit A to "Annual Reports" for each of Fiscal 2021 and Fiscal 2020 and filed through the OTC Disclosure and News Service, available at www.otcmarkets.com, and are hereby incorporated by reference.

**Item 14          The name, address, telephone number, and email address of each of the following outside providers that advise the issuer on matters relating to operations, business development, and disclosure:**

Securities Counsel

| | |
|---|---|
| Name: | Adam Finerman |
| Firm: | BakerHosteltler |
| Address 1: | 45 Rockfeller Plaze |
| Address 2: | New York, NY 10011 |
| Phone: | (212) 589-4233 |
| Email: | info@bakerlaw.com |

Auditor

| | |
|---|---|
| Name: | Bridget M. Quin |
| Firm: | Baker Tilly Virchow Krause LLP |
| Address 1: | 9 Wood Avenue South, Suite 801, |
| Address 2: | Iselin, NJ 08830-2734 |
| Phone: | (848) 467-3909 |
| Email: | info@bakertilly.com |

Investor Relations Consultant

| | |
|---|---|
| Name: | Tom Colton and Matt Glover |
| Firm: | Gateway Investor Relations |
| Address 1: | 4685 MacArthur Court, Suite 400 |
| Address 2: | Newport Beach, CA 92660 |
| Phone: | (949) 574-3860 |
| Email: | crss@gatewayir.com |

**Item 15**        **Management's Discussion and Analysis or Plan of Operation.**

### A.  Plan of Operation

This item is not applicable, as the Company has had revenues in each of the last two fiscal years.

### B.  Management's Discussion and Analysis of Financial Condition and Results of Operations.

The following discussion provides information and analysis of the Company's results of operations and its liquidity and capital resources and should be read in conjunction with the Company's Consolidated Financial Statements and the other financial information included in Exhibit A & elsewhere in this Annual Report. This discussion contains forward-looking statements that involve risks and uncertainties. The Company's actual results could differ materially from those anticipated in these forward-looking statements as a result of any number of factors.

The Company's operating and reporting period is on a fiscal year ending on October 31.

### Fiscal 2021 Financial Overview & Results of Operations

| | For the Twelve Months Ended | | Increase/(Decrease) | |
| | October 31, | October 31, 2020 | $ | % |
|---|---|---|---|---|
| REVENUES | | | | |
| Interest income | $   40,267,184 | $   12,633,818 | $ 27,633,366 | 219% |
| Property sales | 21,372,291 | 23,461,898 | (2,089,607) | -9% |
| PPP administrative fees | 868,422,947 | - | 868,422,947 | |
| Other revenue | 580,914 | 538,876 | 42,038 | 8% |
| Total revenues | 930,643,336 | 36,634,592 | 894,008,744 | 2440% |
| | | | | |
| COSTS AND EXPENSES | | | | |
| Interest expense | 15,165,963 | 5,712,138 | 9,453,825 | 166% |
| Cost of properties sold | 18,284,646 | 20,297,457 | (2,012,811) | -10% |
| General and administrative | 3,197,133 | 2,027,976 | 1,169,157 | 58% |
| PPP processing fees | 628,095,999 | - | 628,095,999 | |
| Salaries and wages | 3,841,942 | 2,839,113 | 1,002,829 | 35% |
| Management bonus | 20,798,948 | - | 20,798,948 | |
| Total costs and expenses | 689,384,631 | 30,876,684 | 658,507,947 | 2133% |
| | | | | |
| Income from operations | 241,258,705 | 5,757,908 | 235,500,797 | 4090% |
| | | | | |
| OTHER INCOME (EXPENSES) | | | | |
| Grant income - CDFI rapid response program | 1,826,265 | - | 1,826,265 | 0% |
| Interest expense | (476,746) | (734,005) | 257,259 | -35% |
| Total other income | 1,349,519 | (734,005) | 2,083,524 | -284% |
| | | | | |
| Income before income tax provision | 242,608,224 | 5,023,903 | 237,584,321 | 4729% |
| | | | | |
| INCOME TAX PROVISION | (47,209,875) | (1,377,572) | (45,832,303) | 3327% |
| | | | | |
| NET INCOME | 195,398,349 | 3,646,331 | 191,752,018 | 5259% |
| Less: net income attributable to non-controlling interests | (630,000) | (631,726) | 1,726 | 0% |
| | | | | |
| NET INCOME ATTRIBUTABLE TO CONTROLLING INTERESTS | $   194,768,349 | $   3,014,605 | $191,753,744 | 6361% |
| | | | | |
| Earnings (loss) per share: | | | | |
| | | | | |
| Cash income attributable to common shareholders | 216,611,572 | 4,392,177 | 212,219,395 | 4832% |
| Weighted average shares outstanding | 5,971,994 | 5,971,994 | - | 0% |
| Cash income per share | $        36.27 | $        0.74 | $        35.54 | 4832% |

**Operations**

Fiscal 2021 was a transformational year for the Company. CPF's participation in the 2nd round of the Cares Act implementation of the Paycheck Protection Program ("PPP") along with its partnership with ECG and Crossroads' acquisition of RLBC expanded the Company's footprint nationally and its commitment to community development. Participation in PPP resulted in total revenue from operations for the fiscal year ended October 31, 2021 of $930.6 million compared to $36.6 million for the same period of 2020, or 2,440%. The Company did not have a significant impact from the ECG and RLBC transactions but expects to in the future.  Net operating income before taxes and minority interest for the fiscal year ended October 31, 2021 was $242.6 million compared to $5.0 million for the same period of 2020.

**Net Earnings Per Share**

Net earnings per share from operations before taxes and after minority interests for the year ended October 31, 2021 was $36.27 compared to $0.74 for the fiscal year ended October 31, 2020 representing an increase of 4,832% year over year primarily due to participating in the PPP.  RLBC's impact was minimal as the merger was completed in mid-September.

**Gross Sales**

Gross income from the sale of recently rehabilitated homes was $21.4 million for the year ended October 31, 2021, compared to $23.5 million for the year ended October 31, 2020.  The decrease in gross sales was the result of lower unit sales due to a tight housing market which was offset by higher sales prices for the fiscal year ended October 31, 2021.

Interest income as reported was $40.3 million compared to $12.6 million in 2020.  Interest income generated from the Company's mortgage note receivable portfolio increased to $13.4 million for the year ended October 31, 2021 compared to $12.6 million for the year ended October 31, 2020.  The increase was the result of growth in the total mortgage note receivable portfolio during the year.  The additional increase of $26.9 million was from CPF's participation in PPP.  As of October 31, 2021, the Company did not have any forbearance agreements in place from the prior year where it has 234 borrowers in forbearance.

Processing fee income generated from the Company's participation in PPP was  $868.4 million for the year ended October 31, 2021. PPP loans generate interest income of one percent per annum until the loans are forgiven. The Company had no such revenues for the fiscal year ended October 31, 2020.

**Cost of Goods Sold**

The cost of goods sold related to the sale of homes decreased by 10% to $18.3 million for the fiscal year ended October 31, 2021 from $20.3 million for the fiscal year ended October 31, 2020. The decrease was the result of fewer home sales and costs on those homes during fiscal year 2021.

Cost of goods sold includes all the direct costs of the inventory sold as well as the costs related to the rehabilitation of the homes sold.  In addition, cost of goods sold includes carrying costs of all the properties sold and inventory on hand.

The second component of the cost of goods sold is the interest expense on the mortgage note receivable portfolio. The interest expense related to the mortgage portfolio was $4.8 million for the year ended October 31, 2021 compared to $5.7 million for the year ended October 31, 2020. The decrease in interest expense was the result of a lower debt balance and continued lower rates. The remaining interest expense of $10.4 million was associated with the PPP and interest paid on the loan facility.

Processing fee expense related to PPP was $628.1 million for the year ended October 31, 2021. Interest expense on the Federal PPP Liquidity Facility ("PPPLF") on the PPP loans is 35 bps per annum. The Company had no such expenses for the fiscal year ended October 31, 2020. These fees were paid to the Company's lending service partners.

**Operating Expenses**

Total operating expenses (general administrative and salaries/wages) increased approximately $2.2 million from $4.8 million from the fiscal year ended October 31, 2020 to $7.0 million for the year ended October 31, 2021.  Operating expenses as a percentage of total revenues, net of PPP revenue and expense increased from 13.3% for the fiscal year ended October 31, 2020 to 18.9% for the fiscal year ended October 31, 2021.  The increase in operating expenses was primarily due to one-time performance related employee and board bonuses of $960,000, a breakup fee of $250,000 to FSB Rice for withdrawing our application to acquire FSB Rice, and a non-cash stock option expense of $183,000. In addition, legal fees expense increased as we negotiated the Enhanced Advisory Agreement and the acquisition of RLBC.

Operating expenses consist primarily of the following: compensation, sales and marketing, technology, legal, professional fees, insurance, and other operating expenses.

The Company incurred an employee and management bonus expense for the year ended October 31, 2021, totaling $20.8 million which includes a $3 million accrual. The Company had no such expense for the year ended October 31, 2021.

**Other Income/Expense**

The other interest expense relates to interest from acquisition debt.  Total other interest expenses decreased by $257,000 from the October 31, 2020 fiscal year-end to the October 31, 2021 fiscal year-end due to a declining interest rate and lower debt balance.  The total debt repayment of the acquisition debt for the fiscal year was $4.6 million.

**Liquidity and Capital Resources**

We define liquidity as our ability to generate sufficient cash to fund current loan demand at the subsidiary level and to operate on an ongoing basis. Our liquidity requirements are met primarily through cash flow from operations, receipt of pre-paid and maturing balances in our loan portfolios, debt financing, and preferred equity investments.

As of October 31, 2021, CPF had lines of credit available with its current banking partners in excess of $7.8 million in addition to cash on hand. We continue to monitor our financings needs.

The Company also offers a Preferred Equity instrument to its bank partners which is considered a qualified investment under the Community Reinvestment Act ("CRA") investment test for banks.  Banks purchase units of the preferred investment which generates cash for the Company and provides banks with an "innovative" investment, providing a more favorable CRA assessment from their regulators.

**Working Capital**

**Mortgage Note Portfolio**

The mortgage note portfolio consists of $132.0 million of long term fixed, amortizing single-family residential mortgages in the Dallas/Fort Worth, Houston, San Antonio, and McAllen markets.  The Company provides a mortgage for the purchase of a property with an equity down payment from the potential buyer.  Our mortgage portfolio is comprised of first-time home buyers, and in over 60% of the cases, first-time credit recipients. We believe the risk associated with these borrowers is mitigated by their history of debt aversion. Plainly said, those who have shown the financial discipline to operate without debt should be rewarded and not punished as is often the case with a zero credit score borrower attempting to qualify for a mortgage. Each borrower is manually underwritten, and all are given the

opportunity to demonstrably prove their ability to repay. A 43% debt to income ("DTI") ratio is the maximum ratio for approved mortgages, but the average back-end DTI ratio in our portfolio is 29.6%, further reinforcing the quality of our borrowers. All mortgages are originated in house and are Qualified Mortgages (QM).  Our weighted average rate on the portfolio was 10.33% at October 31, 2021.

The Company has a default rate below 3% per year and when it does take a property back into inventory, it is able to put it back into its rehab cycle and resell it.  Given its ability to rehab and resell the properties at a profit, the Company has determined a reserve for delinquent and defaulted mortgages is not necessary as of October 31, 2021.

As of October 31, 2021, the Company had a mortgage note receivable balance of $132.0 million compared to $128.8 million as of October 31, 2020.

**PPP Loan Portfolio**

During fiscal 2021, CPF funded approximately $6.3 billion in PPP loans with a stated interest rate of one percent and a five-year loan term.  The loans are unsecured and fully guaranteed by the SBA and are eligible for forgiveness.  As of the fiscal year ended, approximately 63% of the loans were forgiven and the outstanding loan balance was approximately $2.8 billion.  The loans are pledged to the federal reserve PPPLF and accrue interest at 35bps per annum.  As of October 31, 2021, the balance on the PPPLF was $3.1 billion.

**Inventory**

Inventory consists of properties that are currently undergoing remodeling or are being held for sale. Inventory includes the initial costs of acquiring the property, remodeling costs, real estate taxes, and other direct costs incurred while remodeling the property.  All indirect overhead costs, such as compensation of sales personnel, management, and advertising costs are charged to salaries and wages or other general and administrative expenses as incurred.

The initial direct costs to acquire properties and remodeling costs account for approximately 86% of the cost of properties sold in the consolidated statement of operations for the year ended October 31, 2021.  As of October 31, 2021, 60 properties were being remodeled and 34 were completed and held for sale.  Generally, the Company holds properties in inventory from acquisition to resale for 4 to 6 months. The increase is due to the recent shortage of materials.

The Company regularly evaluates inventories that are slow-moving or incurring costs in excess of budgeted costs. The Company determined a reserve for slow-moving inventory was not necessary as of October 31, 2021.

As of October 31, 2021, gross inventory was $10.2 million compared to $10.5 million as of October 31, 2020, a decrease of $300,000 or 3%. The decrease in inventory as of October 31, 2021 compared to October 31, 2020 is the result of lower inventory on hand. However, the company is starting to increase inventory to get homes ready for the upcoming Spring season of 2022.

**Revolving Credit Facility**

The Company has a revolving line of credit for the acquisition of properties and another for its mortgage loans.  The outstanding balance on the inventory line at October 31, 2021 was $6.4 million compared to $7.5 million at October 31, 2020.  The decrease in outstanding balance is the result of decreasing inventories.  In addition, the Company has two lines totaling $3.0 million for new housing development projects.  The outstanding balance on these facilities was $600,000.

The outstanding balance on the mortgage loan revolving credit facility was $43.2 million as of October 31, 2021, compared to $37.5 million as of October 31, 2020.  The Company paid off a term credit facility with an outstanding balance of approximately $16.0 million during the period.

**Cash Flows Provided by Operations**

**Continuing Operations**

Net cash used by operating activities during the year ended October 31, 2021 was $2.3 billion compared to $1.0 million of net cash used for the year ended October 31, 2020. The main driver of cash usage was the funding of $2.8 billion in PPP loans during the year ended October 31, 2021. The PPP loans were funded through the PPPLF.

**Cash Flows Used in Investing and Financing Activities**

Net cash provided by financing activities during the year ended October 31, 2021 was $2.9 billion compared to $1.9 million for the year ended October 31, 2020.  The increase in cash provided by financing activities was the result of drawing $6.4 billion on the federal reserve's PPP loan facility during the year.  This facility had been reduced to $3.1 billion for the year ended October 31, 2021. The PPPLF bears an interest of 35 bps per year.

There are no known trends, events, or uncertainties that have or are reasonably like to have a material impact on the company's short-term or long-term liquidity.  The internal sources of liquidity are profits generated from the company's operating subsidiary, Capital Plus Financial, and its external sources of liquidity remain debt and equity from banking institutions that assist in the institutions compliance with the Community Reinvestment Act (CRA). The company has no material commitments for capital expenditures and the expected source of funds for such expenditures. There are no known trends, events, or uncertainties that had or that are reasonably expected to have a material impact on the net sales or revenues or income from continuing operations. There are no significant elements of income or loss that do not arise from the company's continuing operations. There are also no causes for any material changes from period to period in one or more line items on the company's financial statements nor are the seasonal aspects that had a material effect on the financial condition of the results of operations.

   **C.   Off-Balance Sheet Arrangements.**
     NA

**Item 20**            **Issuer's Certifications.**

**10)**            **Issuer Certification**

*Principal Executive Officer:*

The issuer shall include certifications by the chief executive officer and chief financial officer of the issuer (or any other persons with different titles but having the same responsibilities).

The certifications shall follow the format below:

I, Eric Donnelly, certify that:

> 1. I have reviewed this Annual Disclosure Statement of Crossroads Systems, Inc;
>
> 2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and
>
> 3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Eric Donnelly                                    Date: January 31, 2022
Chief Executive Officer

*Principal Financial Officer:*

I, Farzana Giga, certify that:

> 1. I have reviewed this Annual Disclosure Statement of Crossroads Systems, Inc;
>
> 2. Based on my knowledge, this disclosure statement does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this disclosure statement; and
>
> 3. Based on my knowledge, the financial statements, and other financial information included or incorporated by reference in this disclosure statement, fairly present in all material respects the financial condition, results of operations, and cash flows of the issuer as of, and for, the periods presented in this disclosure statement.

Farzana Giga                                    Date: January 31, 2022
Chief Financial Officer

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2021

## 1. COMPANY PROFILE AND NATURE OF OPERATIONS

Crossroads Systems, Inc. (OTCQX: CRSS) ("CRSS" or "Parent") was an intellectual property licensing company headquartered in Austin, Texas. Founded in 1996 as a product solutions company, CRSS created some of the storage industry's most fundamental patents and licensed patents to more than 50 companies prior to filing for re-organization under Chapter 11 of the Federal Bankruptcy Code on August 13, 2017.

On December 18, 2017, the Parent closed on the acquisition of 100% of the common equity of Capital Plus Financial, LLC ("CPF"), a Texas based community development financial institution ("CDFI"). CPF's mission is to make homeownership available to the Hispanic market throughout Texas. CPF is also a certified B Corporation which is a group of for-profit companies certified to meet rigorous standards of social and environmental performance, accountability and transparency. In Texas, CPF acquires, renovates, and sells single family homes providing seller financing through notes receivable. During the fiscal year ended October 31, 2021, CPF participated in the second round of the Cares Act implementation of the PPP through the United States Department of the Treasury and Small Business Administration ("SBA").

CRSS entered into an advisory agreement with Enhanced Capital Group ("ECG") on September 14, 2021, an investment firm committed to socially responsible investment initiatives and impact manager of P10 Holdings, Inc ("P10"), a leading, specialized multi-asset class private markets solutions provider. The advisory agreement allows for the participation in loans infusing capital into emerging communities though small businesses and projects that spur job creation, promote environmental sustainability, support women, minority and veteran-owned businesses and stimulate underserved communities across the country.

## 2. BUSINESS COMBINATION

Crossroads acquired 100% of the equity interests in Rise Line Business Credit, LLC ("RLBC") on September 24, 2021 for cash consideration totaling $10,079,046, funded through cash on hand. RLBC is a nationwide asset-based lending firm that provides innovative working capital solutions. Through this transaction, Crossroads anticipates being able to provide better accessibility to banking for small businesses and assist in their transition into the conventional banking system where many are currently underserved. The acquisition was accounted for using the acquisition method of accounting where the results of operations for RLBC are included beginning September 24, 2021. The fair value of the net assets acquired in the acquisition equaled the purchase price so no goodwill was recorded and management identified no intangibles for recognition. Net assets acquired in the acquisition included approximately $2.2 million in cash, $283,000 in interest receivable and other current assets, $7.6 million of asset-based loans and $16,000 of current liabilities.

## 3. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America. The operations are for the period from November 1, 2020, through October 31, 2021 with operations for RLBC included from the September 24, 2021 acquisition date through October 31, 2021.

### Principals of Consolidation

The consolidated financial statements include the accounts of CRSS, CPF and RLBC. Capital Mortgage Servicing, LLC ("CMS") is wholly owned by CPF (collectively, "we", "us", or the "Company"). All significant intercompany accounts and transactions have been eliminated in consolidation.

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2021

## 3. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, CONTINUED

**Cash and Cash Equivalents**

The Company considers all currency on hand, money market accounts, and highly liquid investments purchased with an original maturity of three months or less to be cash equivalents. Restricted cash includes approximately $3 million in escrow accounts related primarily to CMS's mortgage servicing obligations, $302 million in funds due to the Federal Reserve to payoff PPP loans in transit and $5 million held in accounts restricted for PPP related liabilities.

**Mortgage Notes Receivable**

The Company originates predominantly 30 year notes receivable through sales of rehabilitated homes or purchases notes receivable that are secured by an assignment of a deed of trust. The Company intends to hold the notes until maturity as it has the ability to fund the notes receivable through borrowings from lenders that are secured by the notes receivable and properties. Mortgage notes receivable are stated at their unpaid principal balances less an allowance for loan losses. The average contractual interest rate per note was approximately 10.33% as of October 31, 2021. Interest income is recognized monthly per the terms of the respective loan agreements. Mortgage notes receivable have maturities that range from 4 to 30 years. All of the Company's loans and underlying collateral are located in Texas.

The Company uses payment history to monitor the credit quality of the mortgage notes receivable on an ongoing basis. The Company assesses the carrying value of its mortgage notes receivable for impairment when it determines that impairment indicators are present. Notes are evaluated for impairment when it is probable the Company will be unable to collect all amounts due for scheduled principal and interest payments, including notes in the process of repossession. Impaired notes are generally measured based on the fair value of the collateral. Impaired notes, or portions thereof, are charged off when deemed uncollectible. A specific reserve is created for impaired notes based on the fair value of the underlying collateral. No specific impairment was deemed necessary as of October 31, 2021.

The Company may also receive escrow payments for property taxes and insurance included in its mortgage note receivable collections. The liabilities associated with these escrow collections totaled $3,113,208 as of October 31, 2021 and are included in escrow liabilities on the consolidated balance sheet.

**Allowance for Loan Losses on Mortgage Notes Receivable**

The allowance for loan losses reflects management's estimate of probable and inherent losses in the notes receivable balances that may be uncollectible based upon review and evaluation of the loan portfolio as of the consolidated balance sheet date. An allowance for loan losses is determined after giving consideration to, among other things, the loan characteristics, including the financial condition of borrowers, the value and liquidity of collateral, delinquency and historical loss experience.

In addition, the Company considers such factors as changes in the nature and volume of the portfolio, overall portfolio quality, and current economic conditions in the application of various strategies to mitigate risks associated with the portfolio. The Company has determined that an allowance for probable and inherent loan losses was not required as of October 31, 2021.

The Company's policy is to place a note receivable on nonaccrual status when either principal or interest is past due and remains unpaid for 90 days or more. Accrued interest receivable is reversed for notes placed on nonaccrual status. Payments received on nonaccrual notes receivable are accounted for on a cash basis, first to interest and then to principal, as long as the remaining book balance of the asset is deemed to be recoverable. The accrual of interest resumes when the past due principal becomes current. The unpaid principal balance of notes receivable on nonaccrual status was $1,075,618 at October 31, 2021.

The Company assesses the collectability of notes receivable on a note by note basis to determine if formal foreclosure proceedings are necessary. The total principal balance of notes receivable for which the Company has begun formal foreclosure proceedings totaled $1,537,835 as of October 31, 2021.

7

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2021

## 3.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES, CONTINUED

**Commercial/Other Notes Receivable**

From time to time, the Company will provide higher value financing for residential or commercial real estate. As of October 31, 2021, the Company had an outstanding balance of $1.1 million in such financing on residential property. The interest rate on the financing for the residential property is 9.99%. The residential property requires monthly principal and interest payments based on 30-year amortization schedule maturing in 2049.

In 2021, the Company entered into an advisory agreement with Enhanced Capital Group to begin funding impact loans to infuse capital into emerging communities by financing a building project and a minority owned business. The Company funded two impact loans with outstanding principal of $7.1 million as of October 31, 2021.

The Company acquired two asset-based loans in the RLBC acquisition which totaled $7.8 million as of October 31, 2021. The asset-based loans were recorded at their estimated fair values at acquisition which approximated their amortized cost basis which includes the origination amount of the loan adjusted for applicable accrued interest, net deferred fees, audit and legal costs and cash collections. One of the two asset-based loans, a revolving loan totaling $3.6 million, is in default. The Company is in negotiations to settle the loan and believes the estimated value of the secured collateral is sufficient to cover the loan's outstanding balance.

Due to their individually significant balances, the Company continually monitors commercial/other notes receivable for potential losses and the need for an allowance for loan losses. Notes are stated at amounts due from customers, net of allowance for loan losses. The Company determines the allowance by considering several factors including the aging of the past due balance, the customer's payment history, and the Company's previous loss history. The Company establishes an allowance reserve composed of specific and general reserve amounts. As of October 31, 2021, all commercial/other notes receivable, except for the $3.6 million asset-based loan discussed above, were current and in good standing, and based on the borrowers' history and values of the associated properties, the Company determined no allowance for loan losses was required as of October 31, 2021.

**Paycheck Protection Loans Receivable**

The Company is actively participating in the second round of the Coronavirus Aid, Relief, and Economic Security Act (the "CARES Act") implementation of the PPP through the United States Department of the Treasury and SBA. PPP loans have the following characteristics: an interest rate of 1.0%; principal and interest payments are deferred for nine months from the date of disbursement; a five-year loan term to maturity for loans made on or after June 5, 2020 (loans made prior to June 5, 2020 have a two-year term, however borrowers and lenders may mutually agree to extend the maturity for such loans to five years); and they are unsecured and guaranteed by the SBA.

Interest is recognized as interest income in the consolidated statements of operations when earned and deemed collectible. PPP administrative fee revenue are deferred and recognized over the estimated life of the loans. PPP administrative fee revenue for all loans paid in full or forgiven are recognized as earned at the time paid in full. Management estimated life for all loans equal to or less than $150,000 to be 12-months while the administrative fees for all loans greater than $150,000 are amortized over their stated terms, an average of 60-months. As of October 31, 2021, approximately $70 million in PPP administrative fees were deferred.

**Inventory**

Inventory consists of properties that are currently undergoing remodeling or are being held for sale. Inventory is stated at the lower of its cost or net realizable value using the specific identification method. Repair costs, commissions, closing costs, interest and other costs associated with individual properties are included in the cost of the property and are expensed as part of the cost of sales when the property is sold.

The Company regularly evaluates inventories that are aged significantly or incurring costs in excess of budgeted costs. The Company determined that no reserves or impairments of inventory were necessary as of October 31, 2021.

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2021

## 4.  MORTGAGE NOTES RECEIVABLE, CONTINUED

A detailed aging of mortgage notes receivable that are past due as of October 31, 2021 are as follows:

|  |  | % |
|---|---|---|
| Total notes receivable | $ 132,009,666 | 100.0 |
| Past due notes receivable: |  |  |
| 31-60 days past due | $ 3,315,139 | 2.5 |
| 61-90 days past due | 128,662 | 0.1 |
| 91-120 days past due | 647,255 | 0.5 |
| Greater than 120 days past due | 428,363 | 0.3 |
| Total past due notes receivable | $ 4,519,419 | 3.4 |

## 5.  COMMERICAL/OTHER NOTES RECEIVABLE

The principal balance outstanding on the other notes receivable and the expected principal collections for the next five years and thereafter are as follows for the years ending October 31:

|  | Residential/ Commercial Loans | Asset-based Loans | Total |
|---|---|---|---|
| 2022 | $ 267,228 | $ 7,612,843 | $ 7,880,071 |
| 2023 | 127,530 | - | 127,530 |
| 2024 | 128,406 | - | 128,406 |
| 2025 | 6,653,877 | - | 6,653,877 |
| 2026 | 597,151 | - | 597,151 |
| Thereafter | 1,026,282 | - | 1,026,282 |
|  | $ 8,800,474 | $ 7,612,843 | $ 16,413,317 |

All other notes receivable were current and in good standing as of October 31, 2021 except for $3.6 million in asset-based loans previously discussed in Note 3.

## 6.  PAYCHECK PROTECTION PROGRAM LOANS RECEIVABLE

On March 27, 2020, the U.S. Congress approved, and former President Trump signed into law, the CARES Act. The CARES Act provides approximately $2 trillion in financial assistance to individuals and businesses resulting from the outbreak of COVID-19. The CARES Act, among other things, provides certain measures to support individuals and businesses in maintaining solvency through monetary relief in the form of financing and loan forgiveness and/or forbearance. The primary catalyst of small business stimulus in the CARES Act is referred to as the PPP, an SBA loan that temporarily supports businesses in order to retain their workforce during the COVID-19 pandemic. Through the CARES Act, the initiative calls for select lenders to extend loans to small businesses to cover payroll, occupancy and operating expenses through the PPP. Furthermore, the PPP includes a 100% guarantee from the federal government for loans up to $10 million and principal forgiveness for borrowers if the funds are used primarily for retaining employees. The Company, as a CDFI, began participating as a lender for the second round of the PPP.

APPX. 072

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2021

**20. SUBSEQUENT EVENTS**

In accordance with ASC 855, *Subsequent Events*, the Company evaluated all material events or transactions that occurred after October 31, 2021, the consolidated balance sheet date, and through January 27, 2022, the date the consolidated financial statements were available to be issued, noting the following events or transactions for disclosure as subsequent events.

As part of the Company's participation as a lender in the PPP, a total of 260,134 loans were forgiven and/or paid in full as of December 31, 2021 resulting in approximately $32 million of the deferred PPP fees being earned and recognized as income subsequent to the consolidated balance sheet date and through December 31, 2021.

On December 16, 2021, the Company reached an agreement in principle to acquire a leading national, non-bank, direct commercial lender specializing in business financing for small to midsize businesses at a purchase price of tangible book value. The deal remains subject to the consent of and final approval by the SBA and is expected to close in the first half of 2022.

On January 6, 2022, the Company granted the CEO and CFO management 298,600 options in accordance with the Company's stock option plan.

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2020

## 1.   COMPANY PROFILE AND NATURE OF OPERATIONS

Crossroads Systems, Inc. (OTC Pink: CRSS) (the "Company", "CRSS" or "Parent") was an intellectual property licensing company headquartered in Austin, Texas. Founded in 1996 as a product solutions company, Crossroads created some of the storage industry's most fundamental patents and licensed patents to more than 50 companies prior to filing for reorganization under Chapter 11 of the Federal Bankruptcy Code on August 13, 2017.

On December 18, 2017, the Parent acquired 100% of the common equity of Capital Plus Financial, LLC ("CPF"), a Texas based community development financial institution ("CDFI"). CPF's mission is to make homeownership available to the Hispanic market throughout Texas. CPF is also a certified B Corporation which is a group of for-profit companies certified to meet rigorous standards of social and environmental performance, accountability and transparency. CPF operates in Texas where it acquires, renovates, and sells single-family homes providing seller financing through notes receivable.

### Principals of Consolidation

The consolidated financial statements include the accounts of CRSS and CPF. Capital Mortgage Servicing, LLC ("CMS") is wholly owned by CPF. (collectively, "we", "us", or the "Company"). All significant intercompany accounts and transactions have been eliminated in consolidation.

## 2.   SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

### Basis of Presentation

The consolidated financial statements are prepared using the accrual basis of accounting in accordance with accounting principles generally accepted in the United States of America ("U.S. GAAP"). The operations are for the period from November 1, 2019 through October 31, 2020.

### Cash and Cash Equivalents

The Company considers all currency on hand, money market accounts, and highly liquid investments purchased with an original maturity of three months or less to be cash equivalents. Restricted cash includes escrow accounts related primarily to CMS's mortgage servicing obligations.

### Notes Receivable

The Company originates predominantly 30-year notes receivable through sales of rehabilitated homes or purchases notes receivable that are secured by an assignment of a deed of trust. The Company intends to hold the notes for the long-term as it has the ability to fund additional notes receivable through borrowings from lenders that are secured by the notes receivable and properties. Notes receivable are stated at their unpaid principal balances less an allowance for loan losses, if any. The average contractual interest rate per note was approximately 10.44% as of October 31, 2020. Interest income is recognized monthly per the terms of the respective loan agreements. Notes receivable have maturities that range from 4 to 30 years. All of the Company's loans and underlying collateral are located in Texas.

The Company uses payment history to monitor the credit quality of the notes receivable on an ongoing basis. The Company assesses the carrying value of its notes receivable for impairment when it determines that impairment indicators are present. Notes are evaluated for impairment when it is probable the Company will be unable to collect all amounts due for scheduled principal and interest payments, including notes in the process of repossession. Impaired notes are generally measured based on the fair value of the collateral. Impaired notes, or portions thereof, are charged off when deemed uncollectible. A specific reserve is created for impaired notes based on the fair value of the underlying collateral. No specific impairment was deemed necessary as of October 31, 2020.

**CROSSROADS SYSTEMS, INC. AND SUBSIDIARIES**
NOTES TO CONSOLIDATED FINANCIAL STATEMENTS
OCTOBER 31, 2020

## 13. INCOME TAXES, CONTINUED

Management assesses the available positive and negative evidence to estimate whether sufficient future taxable income will be generated to permit use of the existing deferred tax assets. While the Company projects annual taxable income to increase steadily into the future, future profitability depends heavily on the Company's ability to borrow at rates averaging those incurred during the year ended October 31, 2020. Positive or negative changes in average borrowing rates greater than 0.50% could materially affect estimates of future taxable income and any related valuation allowances.

As of October 31, 2020, a valuation allowance of $8.7 million was recorded against the deferred tax asset so that only the portion of the deferred tax asset that is more likely than not to be realized remains at October 31, 2020. The valuation allowance is due primarily to the significant amount of deferred tax assets expiring over the next two years. The amount of the deferred tax asset considered realizable, however, could be adjusted if estimates of future taxable income during the carryforward period are reduced or increased.

## 14. SUBSEQUENT EVENTS

In accordance with ASC 855, *Subsequent Events*, the Company evaluated all material events or transactions that occurred after October 31, 2020, the consolidated balance sheet date, and through January 20, 2021, the date the consolidated financial statements were available to be issued, noting the following transaction for disclosure as a subsequent event.

The Company has partnered with an outside party to participate as a lender in the second round of the PPP loan program implemented by the SBA which opened for non-bank financial institutions on January 13, 2020.

**EXHIBIT 10**



(https://capitalplusfin.com/home/)

(817) 656-5153 (tel:+18176565153)     ENGLISH

*Providing Affordable Housing & Financing for Families*

ABOUT US    COMMUNITY IMPACT    PRODUCTS    INVENTORY    SERVICES    IN THE NEWS    CONTACT

# About Us

We support economically disadvantaged communities providing affordable
Housing and Single Family Residential Mortgage in Texas.

## Our History

Capital Plus Financial is a Certified Community Development Institution serving the Hispanic community in the state of Texas. CPF's management team has over 20 years of community development and single-family mortgage experience before its CDFI certification in 2017. Capital Plus Financial ("CPF") is a real estate financial institution specializing in residential mortgage lending in the Hispanic single-family residential market of the Dallas/Fort Worth, Houston, and San Antonio areas.

In December 2017, CPF was acquired by Crossroads Systems, Inc. (http://crossroads.com/), (OTCQB: CRSS) a holding company focused on investing in businesses that promote economic vitality and community development.

MAKING HOMEOWNERSHIP A REALITY FOR OVER 25 YEARS

## "We share in a belief that we can all do our part to make the dream of homeownership available to an underserved population."

## Our Team

Committed to continuing to serving the community.

APPX. 076



**Trina Melgar**
Closing Coordinator and Funder



**Mayra Lopez**
Sales & Marketing



**Brenda Gallegos**
Loan Processor

# Our Certifications

 **We are a Certified Community Development Financial Institution (CDFI)**

Capital Plus Financial is dedicated to enhancing the quality of life of the families their mission supports by providing the opportunity for homeownership through residential mortgage loans and other educational services.

We share in a belief that we can all do our part to make the dream of Homeownership available to an underserved population. Capital Plus Financial seeks to improve low to moderate income areas of Texas with fully restored homes and provide mortgage financing to those who are otherwise ostracized from the conventional mortgage market.

**Capital Plus Financial became a Certified B Corporation in 2017**

B Corps are socially and environmentally sustainable companies that have been certified by the nonprofit B Lab as meeting high levels of performance, accountability, and transparency. We've evaluated how our practices impact our employees, our community, the environment, and our customers.

We are proud to join them in redefining success in business, so that one day everyone uses business as a force for good. To learn more about our certification, check out our B Corp profile (https://www.bcorporation.net/community/capital-plus-financial-llc).



---

Capital Plus Financial, LLC NMLS ID 1700858

📞 (817) 656-5153 (tel:+18176565153)   ✉ info@capitalplusfin.com (mailto:info@capitalplusfin.com)     CONNECT WITH US

📍 2247 Central Dr Bedford, TX 76021

(https://www.google.com/maps/place/2247+Central+Dr,+Bedford,+TX+76021,+USA/@32.8434304,-97.1362966,17z/data=!3m1!4b1!4m5!3m4!1s0x864e7f 97.1341079)

Capital Plus Financial LLC, © Copyright 2017 All rights reserved.

APPX. 077

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OTO ANALYTICS, INC. d/b/a WOMPLY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2636-B |
| | § | |
| CAPITAL PLUS FINANCIAL, LLC, | § | |
| CROSSROADS SYSTEMS, INC., ERIC | § | |
| DONNELLY, BA FIN ORION, LLC d/b/a | § | |
| BLUEACORN, and BARRY CALHOUN | § | |
| | § | |
| Defendants. | § | |

**DECLARATION OF TOBY SCAMMELL**

I, Toby Scammell, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the Chief Executive Officer and founder of Oto Analytics, Inc. d/b/a Womply ("Womply"). I provide this declaration to provide information and background about Womply; its contract negotiations with BA Fin Orion, LLC d/b/a Blueacorn ("Blueacorn") and Capital Plus Financial, LLC ("Capital Plus"); my reliance on representations by Blueacorn and Capital Plus during those negotiations; Womply's, Blueacorn's, and Capital Plus's performance and course of dealing under those contracts; and Blueacorn's and Capital Plus's refusal to pay Womply's fees for the services it provided them under the contracts. This declaration is based upon my personal knowledge, and I would be competent to testify to the following facts if called upon to do so.

**Womply's Background**

2.      I founded Womply in 2011 to help small businesses that are underserved by technology. I graduated from the University of Southern California in 2006 with a bachelor's

degree in international relations with an emphasis in global business. I have over 15 years of experience working in business, startups, and management consulting.

3.　　Womply began as a commerce platform for small businesses. It provided marketing and financial tools to facilitate reputation management, email marketing, business intelligence, and customer relationship management to more than 500,000 small businesses and their customers. Womply has over ten years of investment in small business data technology, including identifying and onboarding small businesses efficiently, and leveraging unique data to market to small businesses.

4.　　Through the end of 2019, Womply had raised over $60 million in multiple rounds of equity funding from more than 50 professional investors, venture capital funds, growth equity funds, and corporations.

5.　　In March 2020, in response to the COVID-19 pandemic, Congress enacted the Paycheck Protection Program ("PPP"), which allowed qualifying small businesses to obtain government-guaranteed loans from private lenders to cover expenses such as payroll, rent, and utilities. These loans were forgivable if certain conditions were met. The United States Small Business Administration ("SBA") administered the PPP, paid lenders processing fees for each approved PPP loan, and guaranteed PPP loans.

6.　　In April 2020, Womply launched a website that helped small businesses understand the PPP program. This site allowed borrowers to enter their business details and then matched them with one or more lenders that could accept their PPP loan application. Womply received referral fees from lenders for these referrals. Unfortunately, many of the small businesses that Womply referred were not able to get loans because lenders lacked the technology tools necessary to accept, process, manage, and fund loans at large scale.

APPX. 079

7.      Despite the incentives provided to lenders by the PPP, many small businesses were unable to obtain PPP loans. Larger lenders that participated in the PPP focused their lending on larger loans in order to maximize their fees, which were based on the size of the loan, and on loans to existing customers.[1] Many smaller lenders that participated in or sought to participate in the PPP did not have sufficient experience, personnel, or technological capabilities needed to process, manage, and track a large volume of modestly sized loans for small businesses.

8.      In November 2020, Womply acquired Insurgent, Inc. d/b/a FundRocket ("FundRocket") for approximately $15 million in stock, and obtained its technology platform and personnel who had expertise in loan file management, small business data analysis, and fraud detection.

9.      In December 2020, Congress passed legislation that included a new round of PPP funding. In order to encourage lenders to serve the smallest businesses that had had difficulty getting PPP loans, this legislation increased the fees lenders would receive on small loans, *i.e.*, loans of $50,000 or less. Nevertheless, small businesses still struggled to obtain PPP loans, because increasing fees for lenders did not address the logistical difficulties of providing a large volume of loans.

10.     In January 2021, Womply relaunched its website through which potential borrowers seeking PPP loans could enter their own information and find a matching lender that was willing to accept their PPP loan application. Womply referred those potential borrowers to lenders that were responsible not only for determining whether to fund the PPP loans and funding the loans, but also for processing, managing, and tracking the loans.

---

[1] *See* SBA Office of Inspector General, "Inspection of SBA's Implementation of the Paycheck Protection Program," Report 21-07 (Jan. 14, 2021), *available at* https://www.sba.gov/sites/default/files/2021-01/SBA%20OIG%20Report-21-07.pdf.

11.     In January and February 2021, Womply sought to partner with larger financial companies to help the smallest businesses get PPP loans, including Intuit, Capital One, PayPal, American Express, Square, and H&R Block. These companies refused to do so. As a result, Womply decided to develop its own technology platform and raised tens of millions of dollars in emergency financing to support PPP operations.

12.     Womply leveraged its existing commerce platform and small business expertise, plus the technology and team acquired through Fundrocket, to develop a technology platform that would substantially reduce these structural barriers that prevented small businesses from obtaining PPP loans. Those efforts required Womply to invest substantial amounts of time and money, without any guarantee that the initiative would be commercially successful.

**Womply's Technology Platform**

13.     In February 2021, Womply released a technology platform it developed in conjunction with Teslar Software ("Teslar") that made it substantially easier and more cost-effective for lenders to process, manage, and track their PPP loans, particularly smaller PPP loans to the smallest businesses (the "Technology Platform"). Womply provided (i) a borrower-facing internet portal, called "PPP Fast Lane," through which PPP loan applicants could enter all of their loan information and upload documents; and (ii) a new lender-facing portal that gave lenders the tools to process, manage, and track PPP loans, and incorporated numerous integrated technology services that allowed lenders to collect, verify, and understand the information and documentation provided by applicants. Eight lenders and their partners contracted with Womply for the use of its Technology Platform.

APPX. 081

14.     In Womply's contracts with lenders, Womply generally agreed to arbitrate disputes because the SBA paid loan processing fees directly to lenders, so the lenders would have funds to pay Womply in the event there was a dispute over fees. It would not make business sense to agree to arbitrate disputes with a counterparty that did not have funds, because that counterparty would not be able to satisfy any arbitral award. I sought to ensure that Womply had a clear line of sight to funds in any dispute resolution process, whether through arbitration, litigation, indemnification, or other process.

15.     Womply referred to lenders, and the SBA approved, more than 1.4 million PPP loans to small businesses across the country totaling more than $20 billion in principal amount.

**Blueacorn's Proposal to Womply Regarding Capital Plus**

16.     Blueacorn is a lender service provider to PPP lenders. In April 2021, I was introduced to "Capital Plus/Blueacorn," including Blueacorn's CEO Barry Calhoun ("Calhoun") and Capital Plus's CEO Eric Donnelly ("Donnelly"), "to share what we've been doing to deter, detect, & catch fraud" in PPP loans. True and correct copies of these emails are attached as Exhibit 1 hereto.

17.     In early May 2021, the SBA changed the rules regarding which lenders were able to participate in the PPP program. This caused significant turmoil across the PPP program because most lenders, including Womply's lender partners, were prevented from submitting more applications to the SBA unless they were designated as Community Development Financial Institutions ("CDFIs") or Minority Depository Institutions ("MDIs"). Shortly after this rule change, Calhoun texted me with a proposal. Calhoun proposed that Womply refer PPP loan applicants to Blueacorn's partner, Capital Plus, which was a CDFI. Under Calhoun's proposal, Womply would contract with Blueacorn and provide both Blueacorn and Capital Plus with access to Womply's Technology Platform. In return for referring the loans and providing technology

- 5 -

services, Womply would receive fees from Blueacorn for the Womply-referred PPP loans that Capital Plus funded and managed through the Technology Platform.

18.      Calhoun's proposal and our subsequent negotiations are reflected in numerous emails and text messages described below.

19.      On May 4, 2021, Calhoun texted me: "Do you need a home? I might be able to help. . . . I have cdfi's and MDI's. Let's catch up tomorrow." I responded: "We have 365k submitted to SBA but not yet approved. . . . We have another 960k that are still being worked on by applicants[.] Anyway, I'm free to chat tomorrow." True and correct screenshots of these text messages are attached as Exhibit 2 hereto.

20.      On May 5, 2021, Calhoun texted me: "Cpf [Capital Plus Financial] is interested in helping. Still haven't actually spoken w him." A true and correct screenshot of this text message is attached as Exhibit 3 hereto.

21.      On May 6, 2021, Calhoun texted me: "If I [g]et cap plus on board, what's the dollar volume you're thinking and the fee size in total and number of files[?] Trying to forecast for them." I responded: "Maybe we start with 100k apps? $1.5b in volume. $225m in total fees." Calhoun replied: "Ok, let me work some more. Your ach bank or mine? Cap plus would have to get an acct there." I responded: "Our system [referring to our Technology Platform] can generate a NACHA file that works for any bank. We could handle either way, whatever you guys think is easiest." True and correct screenshots of these text messages are attached as Exhibit 4 hereto.

22.      Later on May 6, 2021, I texted Calhoun: "Our team put together our contracts for Capital Plus with flat 50/50 economics, which are ready to send. I am assuming you and CP would handle whatever you guys agree to on your end. Lmk if you're thinking about the structure differently." A true and correct screenshot of this text message is attached as Exhibit 5 hereto.

23.     On May 7, 2021, Calhoun "added Adam Spencer" ("Spencer"), a consultant at "elev8 Advisors Group," to an email thread discussing "a draft of the agreement." Womply's President sent Spencer "the draft of the agreements reflecting the terms that Barry and Toby agreed to." We scheduled a call with Spencer later that day. True and correct copies of these emails are attached as Exhibit 6 hereto.

**Contract Negotiations among Blueacorn, Capital Plus, and Womply**

24.     On May 9, 2021, at 9:00 AM, Womply personnel had a call with Spencer regarding "diligence items." Womply personnel asked "whether this is the list from capital plus," and discussed "a direct sync up call with capital plus." Womply personnel stated that, during the call, "Adam [Spencer] was planning to bring cap plus into the conversation in the evening's call." True and correct copies of these emails are attached as Exhibit 7 hereto.

25.     On May 9, 2021, at 6:00 PM, I emailed Calhoun an overview of contract structures and processes for Womply to refer PPP loans to Capital Plus through Blueacorn. I wrote that "[i]f our agreements aren't with Capital Plus directly, I think we'd just want an email from them confirming they understand the high level structure and economics. Usually we deal directly with lenders." I also wrote that Womply would need the "Capital Plus promissory note" and "names of people who would need access" to the Technology Platform. True and correct copies of these emails are attached as Exhibit 8 hereto.

26.     Later on May 9, 2021, at 10:56 PM, I emailed Calhoun a "Womply Developer Order Form – Blueacorn" (the "Order Form") and "PPP Loan Referral Agreement – BlueAcorn" (the "Referral Agreement"; together with the Order Form, the "Agreements"). I wrote: "Hey Barry, I redlined the agreements according to our discussion. I think this captures everything we've discussed with no surprises. Only questions from me: 1 Which entity is our counter party? 2 Who is executing for that entity? If we don't know what entity this is, can you share some basic info so

- 7 -

we have enough visibility to ensure that the structure here is appropriate from an SBA pov and that we can have clear line of sight to the funds?" Calhoun responded at 11:00 PM: "BA Fin Orion[.] It's a clean entity." On May 10, 2021, at 12:05 AM, I replied: "Ok, clean versions attached. Pam please circulate for our signatures. Barry, we'd like to get some confirmation from Cap Plus that they're aware of the terms and our involvement (simple email with high level bullets is fine). And Adam [Spencer] mentioned that we would have visibility into and FBO account with Evolve? It would be great to get that setup this week." Calhoun responded at 2:12 AM: "I'll get this done." True and correct copies of these emails are attached as Exhibit 9 hereto.

27. On May 10, 2021, at 5:32 AM, Calhoun texted me: "I'm going to get a call later today with you, me, and Eric Donnelly at cap plus. What's your schedule like [this] after[]noon?" I responded: "Let's do a call this morning." Calhoun replied: "I'm in a meeting. I'll hit you up as soon as it's over[.] Can you get me your two agreements in [W]ord? Counsel wants to make a couple of minor tweaks." I responded: "They didn't change from last night. Should be in your email." Calhoun replied: "Found them." True and correct screenshots of these text messages are attached as Exhibit 10 hereto.

28. Later on May 10, 2021, Calhoun texted me: "Shoot me the contract, I'll try him now before my next call." A true and correct screenshot of this text message is attached as Exhibit 11 hereto.

29. On May 10, 2021, at 5:12 PM, I emailed Calhoun: "Hi Barry, in our user-facing interface each loan application shows the lender name. I assume that name should be 'Capital Plus Financial' but please let me know if they have a preferred way of displaying this info." Calhoun responded: "Yes." True and correct copies of these emails are attached as Exhibit 12 hereto.

APPX. 085

30.     On May 11, 2021, at 6:29 AM, I texted Calhoun that the "contract update being done on our side this am to account for whatever legal terms from the developer agreement need to be included in the main doc[.] . . . [L]et me know if any issues on your side re documentation/etc." A true and correct screenshot of this text message is attached as Exhibit 13 hereto.

31.     On May 11, 2021, at 10:36 AM, I emailed Calhoun: "Hi Barry, our attorney Gina is cc'd. Can you connect her with your attorney so they can have a quick call to wrap up final contract points?" A true and correct copy of this email is attached as Exhibit 14 hereto.

32.     On May 11, 2021, at 1:50 PM, I texted Calhoun: "Intro to your lawyers[.] Intro to cap plus." Calhoun responded: "Lisa should be calling you[.] I'll call Eric [Donnelly] ASAP[.] . . . Eric is good from now until 5:30 mountain time. What works for you?" I replied: "That works." Calhoun then texted me Donnelly's contact information. A true and correct screenshot of these text messages is attached as Exhibit 15 hereto.

33.     Later on May 11, 2021, I had a telephone call with Calhoun and Donnelly. During this call:

   a.   Calhoun and Donnelly each represented to me that Blueacorn would pass all Womply-referred PPP loans to Capital Plus for origination. We specifically discussed how the fees paid by the SBA to Capital Plus as lender would be deposited, and Calhoun and Donnelly further each represented to me that: (i) Blueacorn and Capital Plus had a joint account at Evolve Bank & Trust (the "Joint Account") into which all fees received from the SBA for PPP loans funded by Capital Plus were deposited directly, (ii) the SBA fees for all Womply-referred PPP loans funded by Capital Plus would be deposited directly into the Joint

- 9 -

Account, and (iii) Blueacorn and Capital Plus would provide Womply with visibility into the Joint Account so that Womply could verify when Blueacorn and Capital Plus received funds from the SBA. I would have had no way of knowing that Blueacorn and Capital Plus had a Joint Account or that they used Evolve Bank & Trust unless they told me, so these representations were particularly significant to me;

b. Calhoun, Donnelly, and I agreed to the financial terms regarding Blueacorn's and Womply's fee structure;

c. Calhoun, Donnelly, and I agreed that both Blueacorn and Capital Plus would have access to Womply's Technology Platform;

d. Calhoun represented that Blueacorn would be responsible for underwriting and would perform its own analysis of the application data it received from Womply; and

e. Donnelly asked whether Womply had any exclusivity obligations to other lenders that might prevent Womply from providing referrals or technology services to Blueacorn and Capital Plus.

34.    After the call, I emailed Calhoun and Donnelly "the language from our agreement" with another partner to show that "[i]t clearly excludes Fast Lane loans, which are the only loans we're sending you." Donnelly responded: "I appreciate you sending this over. I'm glad we were able to connect today and look forward to working together." True and correct copies of these emails are attached as Exhibit 16 hereto.

- 10 -

35.     On May 11, 2021, at 7:23 PM, I texted Calhoun: "Were our lawyers able to connect?" Calhoun responded: "I gave ginas email to my guys." I replied: "Ok I'll check with her." A true and correct screenshot of these text messages is attached as Exhibit 17 hereto.

36.     On May 12, 2021, at 2:05 PM, Womply's counsel emailed Calhoun: "Hi Barry, Just following up here. Would you connect me with your counsel so I can work through a couple items with him? Thanks[.]" At 2:11 PM, Calhoun responded "Here you go," and copied Jeff Meyerson, a partner at Radix Law. True and correct copies of these emails are attached as Exhibit 14 hereto.

37.     On May 12, 2021, at 2:44 PM, Womply's counsel emailed Blueacorn's counsel: "Hi Jeff, Toby asked that I reach out to you. . . . Two specific questions for you, based on your feedback to Toby: 1. You had suggested removal of the MDA [Master Developer Agreement[2]] reference – is this because you won't be accessing the API [application programming interface[3]]? Will Capital access the API at some point? 2. It's my understanding Blue Acorn is acting as the lender service provider on behalf of Capital. How do you typically ensure in these agreements that Capital will fulfill its rev share obligations? Does Capital sign as an additional party or otherwise provide a guarantee?" At 3:37 PM, Blueacorn's counsel responded: "Gina, Attached are our comments to the PPP Loan Referral Agreement. Given the process that we believe will be followed, there isn't a need for the developer order form or the MDA in connection with this agreement. Blueacorn will submit the loans referred to it to one of its third-party lenders since it is not a lender itself. This is being sent concurrently to my client and remains subject to the review and comment." True and correct copies of these emails are attached as Exhibit 14 hereto.

---

[2] Womply's Master Developer Agreement is posted on Womply's website and provides terms for the use of Womply's technology.

[3] "Application programming interface" refers to Womply's Technology Platform.

38.     On May 12, 2021, at 5:57 PM, I texted Calhoun: "Your lawyers said they're drafting agreement updates. Anything important on contract we should discuss on that before we start shipping loans to SBA?" Calhoun responded: "Not that I'm aware of. Jeff gets the gist of the deal." A true and correct screenshot of these text messages is attached as Exhibit 18 hereto.

39.     On May 12, 2021, at 8:23 PM, I texted Calhoun: "Are we good to send your apps to SBA?" Calhoun responded: "Just got agreement[.] Actually, your attorney is just now acknowledging receipt[.] It was sent to her at 3:37 pst." I replied: "If we're agreed in principle and there's nothing crazy from the lawyers, then I'm ok moving forward to sba if you are." A true and correct screenshot of these text messages is attached as Exhibit 19 hereto.

40.     On May 13, 2021, at 9:16 AM, Calhoun texted me: "Has she reviewed now?" I responded: "Yeah I just read it. Biggest problem is Womply can't legally be on the hook for 'underwriting' – that has to be on your side (either with BA or your LSP/lender). This has been a hard line from our lawyers. We can attest to collecting the data and applying the rules, but the liability for the accuracy of the info and good faith review falls to LSP/Lender. I'll be free in 35 min if you want to chat." Calhoun replied: "Ya I'll call you. I think this is a wording issue. I'm on w attorney on unrelated issue. I'll cal[l] when done." A true and correct screenshot of these text messages is attached as Exhibit 20 hereto.

41.     On May 13, 2021, at 1:24 PM, Calhoun texted me: "How are we doing on agreement?" At 6:49 PM, he followed up: "I've got a cleared runway. You coming?" I responded: "Both of our lawyers are too slow." Calhoun replied: "Mine?" I responded: "Yeah and mine." Calhoun replied: "I'll chew on mine. What do I need to say?" I responded: "They only sent back 1 of 2 contracts. The one they sent back is the easy one, which pays the referral fee of 1%. They didn't return the developer agreement, likely because of the api misunderstanding. I just pressed

mine again to not wait." Calhoun replied: "I'll call in 10 min." I responded: "Ok, I think we should just submit some tonight. Let's get at least 25k moving to SBA. If we are agreed on high level terms I would do it on that understanding." Calhoun replied: "I'm good, I'll tell David to move the first file[.] But we have to have this signed quickly." I responded: "Tomorrow." True and correct screenshots of these text messages are attached as Exhibit 21 hereto.

42.     On May 14, 2021, at 10:01 AM, I emailed Calhoun, Womply's counsel, and Blueacorn's counsel a draft of the Referral Agreement. I wrote: "I reviewed and believe this matches our discussion. Also, do you have any redlines on the Womply Developer Order form (which governs the technology services/data APIs/etc)? Let's do a call ASAP if there are any questions so we can wrap this up and sign today." At 12:07 PM, Blueacorn's counsel provided "revisions to your latest draft of the agreement." At 12:53 PM, Womply's counsel responded: "We'll take a look. Do you have an eta on the markup of the developer agreement?" At 12:54 PM, Blueacorn's counsel replied: "We still don't believe that agreement is applicable here as the API being accessed will be Blueacorn's and not Womply's." At 12:58 PM, Womply's counsel responded: "I think there is a disconnect from what you are telling us and what we're hearing from our CEO and his conversation with BA's CEO. Blue Acorn's API may be involved in the integration, but the entire business relationship is dependent on Blueacorn relying on Womply's technology platform to process these referrals. We can adjust what we call the API, but the $250/Referral Fee plus the per-Referral Technology Fee are part of the agreed-to business arrangement." True and correct copies of these emails are attached as Exhibit 22 hereto.

43.     On May 14, 2021, at 1:03 PM, I texted Calhoun: "Lawyers are spinning. I asked them to schedule a call for all of us including you and me." Calhoun responded: "I'm trying to manage right now. Dealing w womply[.] My guy hates that agreement, trying to navigate[.] I think

I just fixed[.] I think I fixed it. Part duex." I replied: "I just told my lawyer to call yours. Dunno why they don't like to pick up the phone." Calhoun responded: "I laid it all out. Jeff gets the deal now[.] He said he'll get it done." A true and correct screenshot of these text messages is attached as Exhibit 23 hereto.

44.     On May 14, 2021, at 1:06 PM, Womply's counsel emailed Calhoun and Blueacorn's counsel and proposed "an all-hands call" with "counsel and the CEOs on the call to figure this out." At 1:07 PM, Blueacorn's counsel responded: "Can you call me? I just spoke to Barry and I think we may have a solution." At 3:32 PM, Womply's counsel emailed Calhoun, Blueacorn's counsel, and me "the referral agreement" with "an updated draft of the Development Agreement" to follow "shortly." True and correct copies of these emails are attached as Exhibit 22 hereto.

45.     On May 14, 2021, at 6:05 PM, Calhoun texted me: "We good?" I responded: "Just checked and Jeff has the docs (or maybe dropped me off the thread?)," and attached "the language we sent back." Calhoun replied: "I think I'm fin[e] w that part." True and correct screenshots of these text messages are attached as Exhibit 24 hereto.

46.     On May 15, 2021, at 8:58 AM, I texted Calhoun: "I think contract is with your lawyer. Can you get him to send back today?" Calhoun responded: "Was just trying to track where this is. I'll text him now." A true and correct screenshot of these text messages is attached as Exhibit 25 hereto.

47.     On May 15, 2021, at 2:28 PM, Womply's counsel emailed Calhoun, Blueacorn's counsel, and me "[u]pdated agreements . . . for your review. Please note we've updated the referral agreement to account for lenders receiving the lender processing fee from the SBA and not Blueacorn." A true and correct copy of this email is attached as Exhibit 22 hereto.

- 14 -

48.     On May 15, 2021, at 4:23 PM, I texted Calhoun: "I had our guys kick back the full updates based on their discussion yesterday. Let's do a call with everyone if any issues so we can wrap this up." Calhoun responded: "I just saw 2 min ago[.] I'll review shortly." A true and correct screenshot of these text messages is attached as Exhibit 26 hereto.

49.     On May 16, 2021, I texted Calhoun: "Any update from your lawyer? Happy to schedule a call with everyone to wrap this up." Calhoun responded: "He now owes me three things. I'm on him. I haven't seen anything since you're [*sic*] guys sent revisions back." A true and correct screenshot of these text messages is attached as Exhibit 27 hereto.

50.     On May 17, 2021, I texted Calhoun: "Jeff cut a clause that restricts BA from submitting a second draw for a loan without Womply permission. Goal on our side is to ensure that if we send the first draw loan through we don't get cut out of the second draw (eg if there's an extension). Bit of a remote possibility but not sure why you'd object. Call if you want to discuss. I think that's the final clause that's not resolved." Calhoun responded: "That's not a deal point to me." A true and correct screenshot of these text messages is attached as Exhibit 28 hereto.

51.     On May 18, 2021, at 8:31 AM, I texted Calhoun: "You good with exhibit? If so I will circulate agreement for signature." Calhoun responded: "Just waiting on Lisa's sign off." At 10:52 AM, Calhoun texted me: "Lisa is good to go." I responded: "Cool, I will get it sent out for our signatures." A true and correct screenshot of these text messages is attached as Exhibit 29 hereto.

52.     On May 18, 2021, at 3:30 PM, I texted Calhoun: "What's the legal entity name?" Calhoun responded: "I'll double check. . . . BA FIN Orion." I replied: "LLC?" Calhoun responded: "Yes." I replied: "Cool, will get it sent out again." A true and correct screenshot of these text messages is attached as Exhibit 30 hereto.

53.     On May 19, 2021, I texted Calhoun: "I checked the agreement and signed." Calhoun responded: "Me too." A true and correct screenshot of these text messages is attached as Exhibit 31 hereto.

54.     True and correct copies of the executed PPP Loan Referral Agreement and Womply Developer Order Form between Womply and Blueacorn are attached as Exhibit 32 hereto.

55.     Section 10 of the Agreements states: "Without limiting a party's right to seek injunctive or other equitable relief in court, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court. The prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees."

56.     I agreed that Womply would arbitrate disputes under the Agreements with Blueacorn because Calhoun and Donnelly represented to me that Blueacorn and Capital Plus had a Joint Account into which the SBA would pay loan processing fees directly, and that Womply would have visibility into that Joint Account. These representations gave me assurance that Womply would be able to obtain fees directly from Blueacorn, and that Capital Plus would not be able to withhold funds from Blueacorn. I would not have agreed that Womply would arbitrate disputes with Blueacorn under the Agreements if Calhoun and Donnelly did not make these representations. It would not make business sense to agree to arbitrate disputes with a counterparty that did not have funds, because that counterparty would not be able to satisfy any arbitral award. I sought to ensure that Womply had a clear line of sight to funds in any dispute resolution process, whether through arbitration, litigation, indemnification, or other process, and would not have agreed to any dispute resolution process that did not include the party with funds.

- 16 -

## Performance under the Agreements

57.     Under the Agreements, Womply referred potential PPP loan borrowers to Capital Plus through Blueacorn and provided access to the Technology Platform and its technology services to both Blueacorn and Capital Plus. Blueacorn employees and Capital Plus employees had direct access to the Technology Platform using their corporate email accounts. Womply referred 86,521 PPP loans to Capital Plus, which totaled more than $950 million in principal amount. From May to August 2021, Capital Plus funded those PPP loans.

58.     Blueacorn and its contractors used Womply's technologies to collaborate with Womply team members and Teslar team members on technical support subjects. On May 10, 2021, Womply created a private Slack chat channel called "ppp-fast-lane-blue-acorn" for four Womply employees, including me, and eight Blueacorn employees and contractors, including Calhoun. A true and correct screenshot of these chats is attached as Exhibit 33 hereto.

59.     On May 18, 2021, Blueacorn sent Womply via Slack chat "Capital Plus PPP Loan Documents" that would be provided to PPP loan applicants referred to Capital Plus. These forms, which the potential PPP borrower would need to sign to obtain funds, included promissory notes, consent forms, and IRS Form W-9, which stated that they were "[i]n consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021 . . . making the above loan." True and correct screenshots of these chats and attachments are attached as Exhibit 34 hereto.

60.     Also on May 18, 2021, Donnelly emailed Calhoun and others at Blueacorn and Capital Plus regarding a process for managing loans funded by Capital Plus referred through the "Womply portal." On May 19, 2021, Calhoun emailed me to "get a process in place to manage this stuff" among Capital Plus, Blueacorn, and Womply. True and correct copies of these emails are attached as Exhibit 35 hereto.

- 17 -

61.     On June 1, 2021, Donnelly emailed me about "how to handle Womply customer service inquiries we're receiving. With Blueacorn we have a dedicated CS [customer service] rep and a dedicated email address. Ideally we'd like a similar structure. Please let me know when you've got a few minutes to discuss." I responded: "Yes we can get this setup. Are you getting a lot of inquiries? I would have expected them to go to BA." Womply employees then provided Capital Plus with information about the "ways in which customers can get assistance." Donnelly replied: "I appreciate the quick reply and all the options." True and correct copies of these emails are attached as Exhibit 36 hereto.

62.     On June 2, 2021, Blueacorn sent Womply chats about a promissory note for a particular PPP loan borrower titled "Loan by Lender, Capital Plus Financial, LLC to Borrower." Blueacorn wrote that "[w]e have approval on PROM note" for this particular borrower, using "we" to refer to both Blueacorn and Capital Plus. True and correct screenshots of these chats are attached as Exhibit 37 hereto.

63.     On June 4, 2021, Blueacorn sent Womply a chat stating that "Prom Note is handled," and "I will receive the NACHA parameters from Evolve by EOD CST today and will forward to Shelly at Teslar." A true and correct screenshot of these chats are attached as Exhibit 38 hereto.

64.     On June 9, 2021, Blueacorn sent Womply a chat stating that "we will process additional fundings," and clarifying that "*we = Cap Plus." True and correct screenshots of these chats are attached as Exhibit 39 hereto.

65.     On June 24, 2021, I discussed with Capital Plus employees the language to use to inform applicants who had entered their information via Womply's website that Capital Plus would not be funding their loan. I stated that those applicants should be informed that the decision did

not reflect a rejection decision by Womply; rather, the rejection resulted from applying the "rules BlueAcorn/CapPlus have asked us to apply." Capital Plus agreed that "we set the rules" and "you are the ones applying them." True and correct copies of these emails are attached as Exhibit 40 hereto.

66.     On June 25, 2021, Donnelly represented to the SBA that "we're working with Womply" on particular loans, and Capital Plus's and Womply's personnel discussed those loans. True and correct copies of these emails are attached as Exhibit 41 hereto.

**Blueacorn's and Capital Plus's Refusal to Pay Womply**

67.     Womply has not received any payments from Blueacorn or Capital Plus for the referral services or technology services it provided under the Agreements.

68.     On July 1, 2021, Womply sent an invoice to Blueacorn for "the total outstanding balance for loans funded through 6/28/2021." Calhoun forwarded this invoice to Capital Plus personnel, stating: "I need to know when we start getting paid in these," referring to loan processing fees from the SBA. Capital Plus personnel responded: "They've been billed [to the SBA] as of Monday. I'll let you know once we start collecting." Calhoun then forwarded this correspondence to me. True and correct copies of these emails are attached as Exhibit 42 hereto.

69.     On July 21, 2021, Womply sent an invoice to Blueacorn indicating that more than $76 million was due to Womply in outstanding referral fees and separate technology fees, not including the finance charge applicable to late fees. A true and correct copy of this invoice is attached as Exhibit 43 hereto.

70.     On July 22, 2022, Womply's President emailed me that "we still haven't received any payments from Blue Acorn." I responded that he should "email Barry" and "[l]et him know that I shared his previous commitment to make a substantial payment by end of last week and ask

him for an update on when they expect to make their first payment and how much it'll be for." True and correct copies of these emails are attached as Exhibit 42 hereto.

71.     On August 4, 2021, Womply sent a second invoice to Blueacorn indicating that more than $76 million was due to Womply in outstanding Technology Fees and Referral Fees, not including the finance charge applicable to late fees. A true and correct copy of this invoice is attached as Exhibit 44 hereto.

72.     On August 13, 2021, I sent Calhoun a message via Signal: "Free to chat today? Non payment making people twitchy." Calhoun responded: " I would like to be paid as well..[.] I need your team to get its act together with capital plus, so we can all be on the right track." I replied: "You and Eric said you had an FBO account where all funds were deposited directly from the govt. Did that change?" Calhoun responded: "No." A true and correct screenshot of these Signal messages is attached as Exhibit 45 hereto.

73.     On August 18, 2021, I sent Calhoun a Notice of Termination terminating the Agreements for nonpayment. A true and correct copy of this letter is attached as Exhibit 46 hereto.

74.     Womply is currently owed $76,724,482.67 under the Agreements plus more than $7.6 million in financing charges, which continue to accrue. Womply has not received any payment from Blueacorn or Capital Plus for these amounts.


    I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

- 20 -

Dated: February 4, 2022
      Healdsburg, California



Toby Scammell

APPX. 098

## EXHIBIT 1

**To:**      cphillips@capitalplusfin.com[cphillips@capitalplusfin.com]; investigations at Blueacorn[investigations@blueacorn.co];
Farzana Giga[fgiga@capitalplusfin.com]; Eric Donnelly[edonnelly@capitalplusfin.com]
**Cc:**      Pamela Ogoy[pamela@womply.com]
**Bcc:**     Renee Brown[renee.brown@truist.com]
**From:**    Toby Scammell[toby@womply.com]
**Sent:**    Tue 4/27/2021 5:22:42 PM (UTC-07:00)
**Subject:**  Re: [EXTERNAL] Meet and greet-PPP loan fraud

Thanks Renee (bccd)

Hi Celena, Good to meet you. Are you free for a quick call? Happy to share what we've been doing to deter, detect, & catch
fraud. Pam (cc'd) can schedule on my side if you're interested. I'm also free tonight on my cell if you want to give me a call
— but text me first because I've mostly stopped answering unknown numbers.
Best,
Toby

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Tue, Apr 27 2021 at 5:11 PM, Renee Brown <Renee.Brown@truist.com> wrote:


Toby, I sincerely appreciate all your help with the PPP loan fraud we are experiencing.

I included Celena Phillips from Capital Plus who I mentioned that I spoke with a couple nights ago reference setting rules
(similar to yours) to limit the incoming PPP loan fraud Truist is experiencing.



Celena-Meet Toby, CEO from Womply, who assisted me and might be able to help Capital Plus/Blueacorn by sharing
data on blocked bank accounts.

Thank you all for your time and effort to get this under control.



*Renee Brown, CFS*


VP, Sr. Corporate Investigator


BB&T now Truist


142 Englar Rd.


Westminster, MD 21157

Office: 410-857-3414

Fax: 410-848-1274

*Renee.Brown@Truist.com*



## NOTICE OF DISCLAIMER

Any photograph contained in this correspondence has been generated and maintained as a record for the internal use of Truist Financial Corporation and its affiliates ("Truist").  No representations of any kind, directly or indirectly, are made as to this photograph or any accompanying data.  Any use of said photograph by any party not employed directly by Truist is undertaken at the risk of and is the sole responsibility of the user, who by taking possession of this photograph indemnifies and holds Truist and its affiliates harmless against all consequences of such use.  Surveillance photographs are not synchronized to transaction logs.  Truist's willingness to provide such records is not an affirmation, acknowledgment or representation to the receiving party as to the accuracy, interpretation, usefulness for a specific purpose or other characterization of the record.

*The information transmitted is intended solely for the individual or entity to which it is addressed and may contain confidential and/or privileged material. Any review, retransmission, dissemination or other use of or taking action in reliance upon this information by persons or entities other than the intended recipient is prohibited. If you have received this email in error please contact the sender and delete the material from any computer.*



**9:09**

**B**

Barry

Do you need a home? I might be able to help

> What are you thinking?

I have cdfi's and MDI's. Let's catch up tomorrow

> Ok I'm pretty open. Lmk what time works. Also have you talked to customers bank? If not I can intro you to them. They have a few hundred loans they want to try to get to a CFI

> our main issue is we have 1.5m loans with lenders and at the SBA. Disaster to try to re-route them, particularly since the $8b is going to be gone so quickly

Trying to get my data guy. I'll find a time for us to call you. Are you saying you have 1.5 in sba submitted?

**APPX. 101**



B

Barry ›

Trying to get my data guy. I'll
find a time for us to call you. Are
you saying you have 1.5 in sba
submitted?

> We have 365k submitted to SBA
> but not yet approved. The other
> 1.1m are already assigned to
> lenders and in various stages of
> processing

> We have another 960k that are
> still being worked on by
> applicants

> Anyway, I'm free to chat
> tomorrow. And lmk on customers
> bank. They're a well run shop
> and could be good for you to
> meet them if you d **APPX. 102**
> them already

**EXHIBIT 3**



Ok.  Cpf is interested in helping.
Still haven't actually spoken w
him.

EXHIBIT 4



Barry ›

If I Get cap plus on board, what's the dollar volume you're thinking and the fee size in total and number of files

1 Reply

Trying to forecast for them

( Can you send it? That's not our ad... )

> If you decide to take it down, lmk and I will go back and tell them and use this as an opportunity to point out why the SBA should engage directly with participants, all of whom are trying to do the right thing without any support or engagement

We are working on tracking it down.

> Ok, you comfortable with my message above? I want to really highlight to these guys that we are all working in good faith and

**APPX. 104**



9:09

Barry

> Ok, you comfortable with my message above? I want to really highlight to these guys that we are all working in good faith and if only the govt, etc...

> It's bs that they just do this end around

Yes.

I talk to them all the time, if they have an issue, they can just call.

We had a cs rep same done stupid crap in an email yesterday, they sent it to us. I had the person fired this am

Say

This is probably some ad partner who took a flyer.

They don't understand how any of this works

Thanks.

If I Get cap plus on board, what's the dollar v...



9:09

Barry >

of this works

Thanks.

If I Get cap plus on board, what's the dollar v...

> Maybe we start with 100k apps?
> $1.5b in volume. $225m in total
> fees.

Ok, let me work some more.

Your ach bank or mine?

Cap plus would have to get an
acct there

> Our system can generate a
> NACHA file that works for any
> bank. We could handle either
> way, whatever you guys think is
> easiest

**APPX. 106**

**EXHIBIT 5**



Our team put together our contracts for Capital Plus with flat 50/50 economics, which are ready to send. I am assuming you and CP would handle whatever you guys agree to on your end. Lmk if you're thinking about the structure differently.

## EXHIBIT 6

**Cc:**    Toby Scammell[toby@womply.com]; Mihir Sambhus[msambhus@womply.com]; Barry Calhoun[barry@blueacorn.co]
**To:**    Adam Spencer[adam@elev8withus.com]
**From:**    Cory Capoccia[cory@womply.com]
**Sent:**    Fri 5/7/2021 2:38:55 PM (UTC-07:00)
**Subject:**    Re: [EXTERNAL] Re: [EXTERNAL] Re: blueacorn // womply

Sorry Adam, got the time wrong. Bumped out to 3pm PT. But Mihir and I met your notetaker AI on the call :)

.

*Cory Capoccia*

On Fri, May 07, 2021 at 3:17 PM, Cory Capoccia <cory@womply.com> wrote:

> Sounds great. While we're waiting on the legal agreement, why don't you, Mihir, and me jump on a quick call to discuss the game plan? I sent around a calendar invite for 230pm PT
>
> meet.google.com/kbh-teio-tmn
> *
> Join by phone
> (US) +1 385-393-4863 PIN: 663 189 613#
>
>
> *Cory Capoccia*
>
> On Fri, May 07, 2021 at 3:13 PM, Adam Spencer <adam@elev8withus.com> wrote:
>
>> Hey Cory,
>>
>> That would be correct and I'm equally looking forward to it. Between you, Toby, and I'd Rolodexes I'd say we probably know, work, or have worked with all of the same people forever in payments so it should be a great time. Also, I'll be helping here on the technical side as far as the transfer of information and will need to walk through the KYC, BSA, OFAC, AML pieces and get an understanding of what that will look like in terms of keeping this as simple as possible or deciding if we want to look at any of this in a supplemental fashion to get what will be needed for our CDFI partner. So please include whoever on your side you feel best fit to also include them on our call.
>>
>> Thanks,
>>
>> Adam
>>
>> Adam Spencer
>> Managing Partner
>> ELEV8 Advisors Group
>> M: ███████████

---

**From:** Cory Capoccia <cory@womply.com>
**Sent:** Friday, May 7, 2021 2:08:49 PM
**To:** Adam Spencer <adam@elev8withus.com>
**Cc:** Toby Scammell <toby@womply.com>; Mihir Sambhus <msambhus@womply.com>; Barry Calhoun <barry@blueacorn.co>
**Subject:** Re: [EXTERNAL] Re: blueacorn // womply

Hi Barry and Adam, great to meet you both. I'm working with our attorneys to get a draft of the agreement ready. Adam, once they have something ready to review it sounds like the two of us will work on that together, is that right?

Look forward to partnering here on this.

Cory Capoccia

On Fri, May 07, 2021 at 3:06 PM, Adam Spencer <adam@elev8withus.com> wrote:

Cory/Toby/Mihir,
It's a pleasure to virtually meet each of you. I'm happy to jump on a call this afternoon, particularly around the technical and compliance side of this transaction, but please send me the first pass at the agreement as well as I will start reviewing and we run that in parallel paths here as to not be stuck with the possibility of lawyers not working timely on a weekend to get this done for all. I'll be available after 3pm PST if you want to send an invite and get things moving. Looking forward to it. Thank you all.

Best,

Adam

Adam Spencer
Managing Partner
elev8 Advisors Group
O: 877.929.9449
M: ███████████

On May 7, 2021, at 9:43 AM, Barry Calhoun <barry@blueacorn.co> wrote:

 Great to meet everybody.  I've added Adam Spencer.  I'm getting ready to be stuck on a plane for a bit...

Sent from my iPhone

On May 7, 2021, at 12:09 PM, Toby Scammell <toby@womply.com> wrote:

Hey Cory, please meet Barry, CEO of BlueAcorn. Barry, as mentioned, Cory is cofounder/president at Womply. Please add anyone on your side and we can get the referral agreement moving. It would also help in parallel for us to have a quick technical call. I've cc'd Mihir who leads Womply engineering and can sync with the right person on your side.
Best,
Toby

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

**Cc:** Toby Scammell[toby@womply.com]
**To:** Adam Spencer[adam@elev8withus.com]; Barry Calhoun[barry@blueacorn.co]
**From:** Cory Capoccia[cory@womply.com]
**Sent:** Fri 5/7/2021 9:47:33 PM (UTC-07:00)
**Subject:** Blue Acorn / Womply agreement

PPP Loan Referral Agreement - BlueAcorn.docx
Womply Developer Order Form - BlueAcorn.docx

Hi guys, attached is the draft of the agreements reflecting the terms that Barry and Toby agreed to. Please review and let us know if you have any questions/comments. There is one comment in the Developer Order form regarding forgiveness that is pending your input.

Thanks,

**To:**      Cory Capoccia[cory@womply.com]; David Rathmann[david@elev8withus.com]; Toby Scammell[toby@womply.com]
**Cc:**      Adam Spencer[adam@elev8withus.com]
**From:**   Mihir Sambhus[msambhus@womply.com]
**Sent:**   Sun 5/9/2021 11:03:43 AM (UTC-07:00)
**Subject:** Re: [EXTERNAL] Re: Womply Compliance Items

Hi David
We discussed this in today mornings 9 am PST standup with Adam. One question that was unclear to us was whether this is the list from capital plus? One of the next steps discussed was to have a direct sync up call with capital plus as well with Toby. I believe Adam was planning to bring cap plus into the conversation in the evening's call.

Thanks
Mihir

On Sun, May 9, 2021 at 10:31 AM David Rathmann <david@elev8withus.com> wrote:

> Hello Mihir,
> I wanted to check in on the requested diligence items and set up a status call for today. Would 6PM MT still work for you? Our development team is currently working on a submissions path, but that path is still dependent on many of those diligence items.
>
> David

---

**From:** Adam Spencer <adam@elev8withus.com>
**Sent:** Sunday, May 9, 2021 12:18 AM
**To:** Cory Capoccia <cory@womply.com>; Toby Scammell <toby@womply.com>; Mihir Sambhus <msambhus@womply.com>; David Rathmann <david@elev8withus.com>
**Subject:** Fwd: Whomply Compliance Items

Cory & Team,
Apologize for the late hour and what is sure to be a mildly disruptive communication but the team and I felt it was urgent to get this out this evening and make sure that we can either level set this evening and or early tomorrow at our stand-up to get the below points addressed and decide a path.

After the call with Mihir, David and I began to become increasingly uneasy about 2 critical points that David is outlining below. The first is the documentation and work flows along with action items associated with or is accompanying the applicants identity and estimated validity and risk. The second is there is both sizable risk to all parties in receipt of Womply's files due to the transfer of information and very little single sources of truth re: BSA, KYC, AML, OFAC, etc. coming out of the Womply eco-system before relying on a servicing partner to perform such Eligibility Verifications. In its current state, and now with what we know we will be asked to take on i.e. application and information integrity, forgiveness, etc. this is not going to be achievable without the benefit of time to dig in and do this appropriately.

However, if the Womply team can immediately address the data points and the intake process and corresponding validation tools that accompany these and by whom, then we can start to look to implement some possible alternatives that we can get both our Funding and Correspondence banks more comfortable with.

The Current structure as is (as we believe we have what we think is a "full view" into the front-end funnel and back end-office needs won't pass muster on their compliance processes.

Please give us an update as to the requests and please be prepared to speak to this in our morning standup.

We are still confident that we can create a path, however there are some newer have gotten more granular and we need to be pliable to the partners and program's requirements.

We look forward and will be ready to hear your feedback soon.

Best;

Adam

Adam Spencer
Managing Partner
elev8 Advisors Group
O: 877.929.9449
M: ████████



Begin forwarded message:

**From:** David Rathmann <david@elev8withus.com>
**Date:** May 8, 2021 at 7:55:25 PM MST
**To:** Adam Spencer <adam@elev8withus.com>
**Subject: Whomply Compliance Items**


Adam,
In addition to submission data, we need to have a compliance review with Whomply prior to sandbox submission testing. The following is a subset of the information we will need to provide to our partner bank for review.

**Immediate needs**
- Process documentation around Whomply's current data collection and decisioning.
  - What technology is used?
  - How is eligibility information collected?
  - How is the borrower's identity verified?
  - How is the bank account verified?
  - How is the Schedule-C verified?
  - How is Whomply certifying the borrower attestations?
  - How does Whomply currently verify the file in both automated and human verification?
    - If human verification is used? What parts of the file are human verified?
  - What are Whomply's fraud tools, both active and passive?
    - What data can be provided around active measures the borrower has passed?
    - What data can be provided around passive fraud detection? Does Whomply have a set of fraud scores?
- A sample file of 500 loans for audit
  - Eligibility information and application data
  - Information for verifying the borrower's identity
  - Information for verifying the borrower's bank account
  - Information for verifying the borrower's Schedule-C
  - Active and passive fraud prevention data
  - Certification data for attestations and submission


For us to meet our timelines, this information needs to be submitted to verification at the latest by mid-day tomorrow. Ideally, Whomply can provide elements of this immediately.
David

**APPX. 112**

Mihir Sambhus | VP of Engineering | Womply | 669 203 9720 | msambhus@womply.com

APPX. 113

**EXHIBIT 8**

**To:** Barry Calhoun[barry@blueacorn.co]
**Cc:** Noah Spirakus[noah@blueacorn.co]
**From:** Toby Scammell[toby@womply.com]
**Sent:** Sun 5/9/2021 5:27:48 PM (UTC-07:00)
**Subject:** Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: overview of approach

Three things we'd need to get going tonight:
1 Capital Plus promissory note. If it's just the SBA's normal one then we have that configured in docusign already
2 API key
3 names of people who would need access

We could load up 100 loan apps tonight so you could look at them tomorrow, decide if they're good enough to submit to SBA.

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Sun, May 9 2021 at 4:24 PM, Barry Calhoun <barry@blueacorn.co> wrote:

  Me too

  Sent from my iPhone


    On May 9, 2021, at 6:22 PM, Toby Scammell <toby@womply.com> wrote:



    Works for me, I let the team know on our side

    Toby Scammell
    Founder & CEO at Womply
    415-246-3250
    LinkedIn

    On Sun, May 9 2021 at 4:15 PM, Barry Calhoun <barry@blueacorn.co> wrote:

    Let's pause the stand up,  decide the course, and set the stage.  Then we can get everyone moving.

    Sent from my iPhone


      On May 9, 2021, at 6:09 PM, Toby Scammell <toby@womply.com> wrote:



      I'm free all night, also there's a 5p pacific standup with Adam and David plus our tech team. We can probably skip that until we decide on strategic approach? Or you and I can join and discuss with broader team?

      Toby Scammell
      Founder & CEO at Womply
      415-246-3250
      LinkedIn

On Sun, May 9 2021 at 4:02 PM, Barry Calhoun <barry@blueacorn.co> wrote:

Waiting on Noah to get back in range.  I'll bounce back to you as soon as I hear from him

Sent from my iPhone


On May 9, 2021, at 6:00 PM, Toby Scammell <toby@womply.com> wrote:



Hey Barry,
I spoke to our team and we think the process below is the most streamlined for both sides and the lowest risk (we've done this 7 times in the last two months whereas the new process we've been discussing would be new to everyone and add more risk). This structure would need to change the economics back to 50/50 because under this approach we carry the tech/support burden and need to cut in our technology partners

With this setup we can get a ton of loans sent to the SBA tomorrow.

Give me a call when you're free to discuss.

**Immediate Responsibilities**
Womply:

- Collect data from applicant including KYC, business activity, tax documents, bank data, funding instructions
- Analyze data and apply rules on behalf of the LSP/Lender
- Provide loan management interface so LSP/lender can approve/reject loans, track approvals, and generate funding files.
- Export data for LSP/Lender for audit purposes.
- Womply's team will handle applicant support, ongoing data collection, decline notifications, etc during the origination and funding process. After successful funding, we'd hand off (or continue) depending on who owns forgiveness.

LSP/Lender:

- Set requirements for loan criteria they are willing to accept (size, location, NAICs, volume, etc)
- Set logic for accepting/rejecting loans based on combination of rules and/or review, at their discretion
- Provide API key so the loan management platform instance that they control can connect to the SBA
- Provide promissory note template so loan management platform can get
- Receive NACHA file data and fund loans

**Future Responsibilities**
Servicing & forgiveness: Either Womply or the LSP/Lender could handle this process at the lender's discretion. If lender elects to handle then Womply will communicate this to the borrower through the Womply UI and also provide lender with data necessary to handle this.

**Legal Structure**
Agreement 1:

Who: Oto Analytics, Inc (d/b/a Womply) <> Either Capital Plus or their designated LSP.
What: Womply acts as a referral agent
Compensation: Womply receives govt specified referral agent fees.

Agreement 2:
Who: Oto Analytics, Inc (d/b/a Womply) <> Either Capital Plus or their designated LSP.
What: Womply provides technology services including borrower data collection, loan management platform, Docusign, and nacha file generation. We will embed our service providers in this cost and manage them so you don't need to deal with this.
Compensation: Womply receives a technology fee for each loan covering all the data, platform, and variable expenses of the user-facing and lsp/lender-facing software. LSP/Lenders cover ACH costs.

Agreement 3:
Who: Capital Plus <> Blue Acorn
What: Governs their relationship as Lender<>LSP including their economic relationship regarding LSP services provided.

If our agreements aren't with Capital Plus directly, I think we'd just want an email from them confirming they understand the high level structure and the economics. Usually we deal directly with lenders.

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

**EXHIBIT 9**

Cc:      Pamela Ogoy[pamela@womply.com]
To:      Toby Scammell[toby@womply.com]
From:   Barry Calhoun[barry@blueacorn.co]
Sent:    Mon 5/10/2021 2:12:48 AM (UTC-07:00)
Subject:  [EXTERNAL] Re: [EXTERNAL] Re: updated agreements

I'll get this done

Sent from my iPhone

On May 10, 2021, at 12:05 AM, Toby Scammell <toby@womply.com> wrote:


Ok, clean versions attached. Pam please circulate for our signatures.

Barry, we'd like to get some confirmation from Cap Plus that they're aware of the terms and our involvement (simple email with high level bullets is fine). And Adam mentioned that we would have visibility into and FBO account with Evolve? It would be great to get that setup this week. Our entity structure is straightforward: Oto Analytics, Inc (dba Womply) is a Delaware C-Corp. Everything is under this entity--IP, cash, team, etc. I'm the CEO, President, Treasurer, and I can execute this agreement. Happy to provide more detail as needed.

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Sun, May 09, 2021 at 9:17 PM, Barry Calhoun <barry@blueacorn.co> wrote:

Sorry,
I can execute.



Sent from my iPhone

On May 9, 2021, at 11:00 PM, Barry Calhoun <barry@blueacorn.co> wrote:


BA Fin Orion
It's a clean entity

Sent from my iPhone

On May 9, 2021, at 10:56 PM, Toby Scammell <toby@womply.com> wrote:


Hey Barry, I redlined the agreements according to our discussion. I think this captures everything we've discussed with no surprises. Only questions from me:
1 Which entity is our counter party?

2 Who is executing for that entity?

If we don't know what entity this is, can you share some basic info so we have
enough visibility to ensure that the structure here is appropriate from an SBA pov
and that we can have clear line of sight to the funds?
Best,
Toby

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

<Womply Developer Order Form - BlueAcorn - update.docx>
<PPP Loan Referral Agreement - BlueAcorn.docx>

<Womply Developer Order Form - BlueAcorn - Final.docx>
<PPP Loan Referral Agreement - BlueAcorn.docx>



9:10

Barry

Mon, May 10, 5:32 AM

I'm going to get a call later today
with you, me, and Eric Donnelly
at cap plus. What's your
schedule like after noon?

Also, we still haven't seen the
100 files. I had everyone ready
to go last night and they never
came

Mon, May 10, 7:35 AM

Let's do a call this morning. I'm
not sure where the gap is in
access. Team was getting
instance setup but last update
from 4a pacific was access had
been granted and the 100 deals
were loaded. I'll send an email to
coordinate so our team can walk
your folks through them.

Are you guys on slack? If so I can
setup a shared channel so we
can communicate faster.

Yes.

B

Barry ›

Are you guys on slack? If so I can setup a shared channel so we can communicate faster.

Yes.

I'm in a meeting. I'll hit you up as soon as it's over

Can you get me your two agreements in word? Counsel wants to make a couple of minor tweaks.

They didn't change from last night. Should be in your email

**APPX. 120**

Found them. Sorry

**EXHIBIT 11**



**EXHIBIT 12**

**To:**     Toby Scammell[toby@womply.com]
**From:**  Barry Calhoun[barry@blueacorn.co]
**Sent:**   Mon 5/10/2021 3:40:47 PM (UTC-07:00)
**Subject:** [EXTERNAL] Re: lender name & icon

Yes

Sent from my iPhone

On May 10, 2021, at 5:12 PM, Toby Scammell <toby@womply.com> wrote:

Hi Barry, in our user-facing interface each loan application shows the lender name. I assume that name should be "Capital Plus Financial" but please let me know if they have a preferred way of displaying this info.

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

**EXHIBIT 13**



**EXHIBIT 14**

**To:**    Gina M. Marek[gmarek@gunder.com]
**Cc:**    Jesse D. Birbach[jbirbach@gunder.com]; Jonathan Frutkin[jfrutkin@radixlaw.com];
bill.hutchinson@blueacorn.co[bill.hutchinson@blueacorn.co]; 'Barry Calhoun'[barrycalhoun@bayardbusinesscapital.com]; Noah
Spirakus[noah@blueacorn.co]; Jeff Meyerson[Meyerson@radixlaw.com]
**From:**    Jeff Meyerson[Meyerson@radixlaw.com]
**Sent:**    Wed 5/12/2021 3:36:53 PM (UTC-07:00)
**Subject:**    Womply PPP Referral Agreement
Redline Womply PPP Referral Agreement 5.12.DOCX
Womply loan referral agreementv3.DOCX

Gina,

Attached are our comments to the PPP Loan Referral Agreement.  Given the process that we believe will be followed, there isn't a
need for the developer order form or the MDA in connection with this agreement.  Blueacorn will submit the loans referred to it to
one of its third-party lenders since it is not a lender itself.  This is being sent concurrently to my client and remains subject to the
review and comment.

Jeff


Jeff Meyerson
15205 N. Kierland Blvd, Suite 200
Scottsdale, AZ 85254
Phone: 602-606-9305



CONFIDENTIALITY NOTICE: The information contained herein may be privileged and protected by the attorney/client and/or other privilege. It is confidential in nature and intended for use by the intended
addressee only. If you are not the intended recipient, you are hereby expressly prohibited from dissemination, distribution, copy or any use whatsoever of this transmission and its contents. If you receive this
transmission in error, please reply or call the sender and delete this transmission from your email and/or network.

**From:** Gina M. Marek <gmarek@gunder.com>
**Sent:** Wednesday, May 12, 2021 2:44 PM
**To:** Jeff Meyerson <Meyerson@radixlaw.com>
**Cc:** Jesse D. Birbach <jbirbach@gunder.com>
**Subject:** RE: Quick legal call

Hi Jeff,

Toby asked that I reach out to you.  A couple things on these agreements: first, we're actually updating the forms Toby sent you
slightly because of some confusion that arose with another customer, so I'll get you updated drafts soon – nothing is changing on
the financials or even on the risk shifting, just clarifying some items.

Two specific questions for you, based on your feedback to Toby:
    1.  You had suggested removal of the MDA reference – is this because you won't be accessing the API?  Will Capital access
    the API at some point?
    2.  It's my understanding Blue Acorn is acting as the lender service provider on behalf of Capital.  How do you typically
    ensure in these agreements that Capital will fulfill its rev share obligations?  Does Capital sign as an additional party or
    otherwise provide a guarantee?


Happy to discuss if that's easier.
Best,

**From:** Barry Calhoun <barry@blueacorn.co>
**Sent:** Wednesday, May 12, 2021 2:11 PM
**To:** Gina M. Marek <gmarek@gunder.com>; Jeff Meyerson <meyerson@radixlaw.com>
**Cc:** Toby Scammell <toby@womply.com>
**Subject:** Re: Quick legal call

Here you go

Sent from my iPhone

> On May 12, 2021, at 2:05 PM, Gina M. Marek <gmarek@gunder.com> wrote:
>
> Hi Barry,
>
> Just following up here.  Would you connect me with your counsel so I can work through a couple items with him?
> Thanks,
>
> Gina

**From:** Toby Scammell <toby@womply.com>
**Sent:** Tuesday, May 11, 2021 10:36 AM
**To:** Barry Calhoun <barry@blueacorn.co>; Gina M. Marek <gmarek@gunder.com>
**Subject:** Quick legal call

Hi Barry, our attorney Gina is cc'd. Can you connect her with your attorney so they can have a quick call to wrap up final contract points?
Gina is free 11:30-12:30 and 3-4 today (pacific)
.

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn


Gina M. Marek



Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
550 Allerton Street
Redwood City, CA 94063
Phone: 650-463-5242 | Fax: 877-881-3627
gmarek@gunder.com | www.gunder.com

This email and any attachments may contain private, confidential and privileged material for the sole use of the intended recipient. If you are not the intended recipient, please immediately delete this email and any attachments.


Gina M. Marek

Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
550 Allerton Street
Redwood City, CA 94063
Phone: 650-463-5242 | Fax: 877-881-3627
gmarek@gunder.com | www.gunder.com

This email and any attachments may contain private, confidential and privileged material for the sole use of the intended recipient. If you are not the intended recipient, please immediately delete this email and any attachments.

**EXHIBIT 15**



**EXHIBIT 16**

| | |
|---|---|
| **To:** | Toby Scammell[toby@womply.com]; Barry Calhoun[barry@blueacorn.co] |
| **From:** | Eric Donnelly[edonnelly@capitalplusfin.com] |
| **Sent:** | Tue 5/11/2021 6:50:47 PM (UTC-07:00) |
| **Subject:** | [EXTERNAL] Re: |

Hi Toby,
I appreciate you sending this over. I'm glad we were able to connect today and look forward to working together.

All the best,
Eric

------ Original Message ------
From: "Toby Scammell" <toby@womply.com>
To: "Barry Calhoun" <barry@blueacorn.co>; "Eric Donnelly" <edonnelly@capitalplusfin.com>
Sent: 5/11/2021 7:47:19 PM
Subject:

Hi Eric, as a followup to the question Sam raised with you, here's the language from our agreement. It clearly excludes Fast Lane loans, which are the only loans we're sending you.

"As of the First Amendment Effective Date through March 31, 2021 (or May 31, 2021, if pending legislation to extend the availability of PPP Loans becomes law), or any earlier termination of the Paycheck Protection Program or this Agreement, other than Partner's "Fast Lane" Customers (the "Excluded Applicants"), SmartBiz will be the sole and exclusive referral recipient for all of Partner's PPP Applicants for PPP Loans up to $50,000 (the "Exclusive Loan Range"), meaning that Partner will refer all PPP Applicants other than the Excluded Applicants, in each case, who are seeking a PPP Loan in the Exclusive Loan Range (the "Exclusive Applicants") to SmartBiz and only to SmartBiz. Notwithstanding the foregoing, for PPP Applications in the following stages, Partner is permitted to refer Customer to another party if no change in the status of the Customer's Application occurs after seven (7) days in each stage: Started, Pre- Qualified, Conditionally Approved, or Pending Decline. Partner may immediately refer Customer to another party if the Customer's Application is Declined or Withdrawn. Partner will not refer Customers to any other party when such Customers' Applications are in any other stage."

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

**EXHIBIT 17**



**EXHIBIT 18**



**EXHIBIT 19**



## EXHIBIT 20



Thu, May 13, 9:16 AM

Has she reviewed now?

Yeah I just read it. Biggest problem is Womply can't legally be on the hook for "underwriting" — that has to be on your side (either with BA or your LSP/lender). This has been a hard line from our lawyers. We can attest to collecting the data and applying the rules, but the liability for the accuracy of the info and good faith review falls to LSP/Lender. I'll be free in 35 min if you want to chat

Ya I'll call you. I think this is a wording issue. I'm on w attorney on unrelated issue.  I'll calm when done

**EXHIBIT 21**



Thu, May 13, 1:24 PM

How are we doing on agreement?

Thu, May 13, 6:49 PM

I've got a cleared runway.  You coming?

Both of our lawyers are too slow

Mine?

Yeah and mine

I'll chew on mine.  What do I need to say?

They only sent back 1 of 2 contracts. The one they sent back is the easy one, which pays the referral fee of 1%. They didn't return the developer agreement, likely because of the api misunderstanding.

I just pressed mine again to not wait

**APPX. 133**



Barry ›

apr misunderstanding.

I just pressed mine again to not wait



I'll call in 10 min

Ok, I think we should just submit some tonight. Let's get at least 25k moving to SBA.

If we are agreed on high level terms I would do it on that understanding

Worst case you fuck me and take all the money, but the borrowers still get paid

:)

I'm good.  I'll tell David to move the first file

But we have to have this signed quickly

B

Barry ›

But we have to have this signed quickly

1 Reply

Ok I'll chat with our team too. I think we need to flip something on our side

Our team wants to push these in a certain order. I'll ask them to chat about it

But we have to have this signed quickly

**APPX. 135**

Tomorrow

**EXHIBIT 22**

**To:**       Jeff Meyerson[Meyerson@radixlaw.com]; Gina M. Marek[gmarek@gunder.com]
**Cc:**       'Barry Calhoun'[barrycalhoun@bayardbusinesscapital.com]; Toby Scammell (toby@womply.com)[toby@womply.com]
**From:**     Jesse D. Birbach[jbirbach@gunder.com]
**Sent:**     Sat 5/15/2021 2:27:47 PM (UTC-07:00)
**Subject:**  [EXTERNAL] RE: Womply // BlueAcorn redline
Womply_Blueacorn PPP Referral Agreement (Womply Edits 5.15.21).DOCX
Womply Developer Order Form - BlueAcorn - (Womply 5.15).docx

Jeff,

Updated agreements attached for your review.  Please note we've updated the referral agreement to account for lenders receiving the lender processing fee from the SBA and not Blueacorn.

Best regards,
Jesse Birbach

---

**From:** Jesse D. Birbach
**Sent:** Friday, May 14, 2021 4:05 PM
**To:** 'Jeff Meyerson' <Meyerson@radixlaw.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>; Toby Scammell (toby@womply.com) <toby@womply.com>
**Subject:** RE: Womply // BlueAcorn redline

Jeff,

If you could share your copy of the developer agreement, I would appreciate it.

Best,
Jesse

---

**From:** Jesse D. Birbach
**Sent:** Friday, May 14, 2021 3:32 PM
**To:** 'Jeff Meyerson' <Meyerson@radixlaw.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>; Toby Scammell (toby@womply.com) <toby@womply.com>
**Subject:** RE: Womply // BlueAcorn redline

Hi Jeff (adding Toby),

Attached, you will find our response to the referral agreement attached.  This is the best we can do as far as risk allocation is concerned with the application information that will flow from Womply to Blueacorn.

I will revert with an updated draft of the Developer Agreement shortly.

Best,
Jesse

---

**From:** Jeff Meyerson <Meyerson@radixlaw.com>
**Sent:** Friday, May 14, 2021 1:07 PM
**To:** Jesse D. Birbach <jbirbach@gunder.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>
**Subject:** RE: Womply // BlueAcorn redline

Jesse,

Can you call me?  I just spoke to Barry and I think we may have a solution.

Jeff

Jeff Meyerson

15205 N. Kierland Blvd, Suite 200
Scottsdale, AZ 85254

Phone: 602-606-9305



CONFIDENTIALITY NOTICE: The information contained herein may be privileged and protected by the attorney/client and/or other privilege. It is confidential in nature and intended for use by the intended addressee only. If you are not the intended recipient, you are hereby expressly prohibited from dissemination, distribution, copy or any use whatsoever of this transmission and its contents. If you receive this transmission in error, please reply or call the sender and delete this transmission from your email and/or network.

**From:** Jesse D. Birbach <jbirbach@gunder.com>
**Sent:** Friday, May 14, 2021 1:06 PM
**To:** Jeff Meyerson <Meyerson@radixlaw.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>
**Subject:** RE: Womply // BlueAcorn redline

Jeff,

Perhaps we can schedule an all-hands call to sort this out? It would be fastest to have counsel and the CEOs on the call to figure this out.  I can coordinate times on our side and send an invite if you could send me times this afternoon when your team and CEO are free.

Best,
Jesse

**From:** Jesse D. Birbach
**Sent:** Friday, May 14, 2021 12:58 PM
**To:** 'Jeff Meyerson' <Meyerson@radixlaw.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>
**Subject:** RE: Womply // BlueAcorn redline

Hi Jeff,

I think there is a disconnect from what you are telling us and what we're hearing from our CEO and his conversation with BA's CEO.  Blue Acorn's API may be involved in the integration, but the entire business relationship is dependent on Blueacorn relying on Womply's technology platform to process these referrals.  We can adjust what we call the API, but the $250/Referral Fee plus the per-Referral Technology Fee are part of the agreed-to business arrangement.

Best,
Jesse

**From:** Jeff Meyerson <Meyerson@radixlaw.com>
**Sent:** Friday, May 14, 2021 12:54 PM
**To:** Jesse D. Birbach <jbirbach@gunder.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>
**Subject:** RE: Womply // BlueAcorn redline

We still don't believe that agreement is applicable here as the API being accessed will be Blueacorn's and not Womply's.

**APPX. 137**

Jeff

Jeff Meyerson

15205 N. Kierland Blvd, Suite 200
Scottsdale, AZ 85254

Phone: 602-606-9305



CONFIDENTIALITY NOTICE: The information contained herein may be privileged and protected by the attorney/client and/or other privilege. It is confidential in nature and intended for use by the intended addressee only. If you are not the intended recipient, you are hereby expressly prohibited from dissemination, distribution, copy or any use whatsoever of this transmission and its contents. If you receive this transmission in error, please reply or call the sender and delete this transmission from your email and/or network.

**From:** Jesse D. Birbach <jbirbach@gunder.com>
**Sent:** Friday, May 14, 2021 12:53 PM
**To:** Jeff Meyerson <Meyerson@radixlaw.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>
**Subject:** RE: Womply // BlueAcorn redline

Hi Jeff,

We'll take a look.  Do you have an eta on the markup of the developer agreement?  Thanks!

Best,
Jesse

**From:** Jeff Meyerson <Meyerson@radixlaw.com>
**Sent:** Friday, May 14, 2021 12:07 PM
**To:** Jesse D. Birbach <jbirbach@gunder.com>; Gina M. Marek <gmarek@gunder.com>
**Cc:** 'Barry Calhoun' <barrycalhoun@bayardbusinesscapital.com>; Jeff Meyerson <Meyerson@radixlaw.com>
**Subject:** RE: Womply // BlueAcorn redline

Gina and Jesse,

Attached are our revisions to your latest draft of the agreement.  If these changes are still problematic to Womply, then I would suggest that we get on a call with Toby and Barry and discuss or have them talk and let us know the resolution.

Thanks
Jeff

Jeff Meyerson

15205 N. Kierland Blvd, Suite 200
Scottsdale, AZ 85254

Phone: 602-606-9305



CONFIDENTIALITY NOTICE: The information contained herein may be privileged and protected by the attorney/client and/or other privilege. It is confidential in nature and intended for use by the intended addressee only. If you are not the intended recipient, you are hereby expressly prohibited from dissemination, distribution, copy or any use whatsoever of this transmission and its contents. If you receive this transmission in error, please reply or call the sender and delete this transmission from your email and/or network.

**From:** Toby Scammell <toby@womply.com>
**Sent:** Friday, May 14, 2021 10:01 AM
**To:** Jeff Meyerson <Meyerson@radixlaw.com>; Barry Calhoun <barry@blueacorn.co>
**Cc:** Jesse D. Birbach <jbirbach@gunder.com>; Gina M. Marek <gmarek@gunder.com>
**Subject:** Womply // BlueAcorn redline

Hi Barry & Jeff, redlined agreement attached. I reviewed and believe this matches our discussion. Also, do you have any redlines on the Womply Developer Order form (which governs the technology services/data APIs/etc)? Let's do a call ASAP if there are any questions so we can wrap this up and sign today.
Best,
Toby
.

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

Jesse D. Birbach



Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
550 Allerton Street
Redwood City, CA 94063
Phone: 650-463-5492 | Fax: 877-881-2726
jbirbach@gunder.com | www.gunder.com

This email and any attachments may contain private, confidential and privileged material for the sole use of the intended recipient. If you are not the intended recipient, please immediately delete this email and any attachments.

Jesse D. Birbach

Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
550 Allerton Street
Redwood City, CA 94063
Phone: 650-463-5492 | Fax: 877-881-2726
jbirbach@gunder.com | www.gunder.com

This email and any attachments may contain private, confidential and privileged material for the sole use of the intended recipient. If you are not the intended recipient, please immediately delete this email and any attachments.

Jesse D. Birbach



Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
550 Allerton Street
Redwood City, CA 94063
Phone: 650-463-5492 | Fax: 877-881-2726
jbirbach@gunder.com | www.gunder.com

This email and any attachments may contain private, confidential and privileged material for the sole use of the intended recipient. If you are not the intended recipient, please immediately delete this email and any attachments.

**EXHIBIT 23**



**EXHIBIT 24**

9:10

B

Barry ›

We good?

Fri, May 14, 6:05 PM

Just checked and Jeff has the
docs (or maybe dropped me off
the thread?)



Here's the language we sent
back

I'm on a plane, again. I can't get
to open, he's talking to Noah



Barry ›

back

I'm on a plane, again. I can't get
to open, he's talking to Noah

> Tied up for an hour but free after
> tonight

> Ok

**APPX. 143**

I think I'm find w that part

**EXHIBIT 25**



**EXHIBIT 26**



**EXHIBIT 27**



**EXHIBIT 28**



That's not a deal point to me

**EXHIBIT 29**



**EXHIBIT 30**



**EXHIBIT 31**



**EXHIBIT 32**



**Womply Developer Order Form**

| | |
|---|---|
| Client: | Blue Acorn |
| Effective Date: | May 10th, 2021 |
| API Access End Date: | The earlier of twelve (12) months from Effective Date or when this Order or the Agreement is terminated (the "Term"). |

| Service | Fees |
|---|---|
| Tax Documents<br>Bank Data<br>Identity<br>Account Verification<br>PPP Portfolio Management System | The Technology Fee set forth in Section 3 below. |

This Womply Developer Order Form agreement ("**Agreement**") is entered into as of the Effective Date and is between Oto Analytics, Inc. d/b/a Womply ("**Womply**") and the Client listed above. This Agreement includes and incorporates (i) the above Order Form, (ii) any Order Forms subsequently entered into by the parties, and (iii) the Additional Terms and Conditions set forth below. Unless set forth otherwise, undefined capitalized terms are defined in the PPP Loan Referral Agreement between the Parties (the "**Referral Agreement**"). To the extent there is a conflict between the Order Form Terms and the Referral Agreement, the Order Form Terms shall take precedence.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Effective Date.

**Womply:**

By: _____

Name: _Toby Scammell_____

Title: _Founder_____

**Client:**

By: _____

Name: _Barry Calhoun_____

Title: _CEO_____

**Additional Terms and Conditions**

1.    Service.

1.1.    Access. Subject to the Client's compliance with the terms and conditions of this Agreement, Womply hereby agrees that during the Term, the Client has the non-exclusive right to: (i) use the Service (detailed on the Order Form) with an application owned and operated by the Client (the "**Client Application**") provided to end users (consumers or businesses) (the "**End Users**"), and (iii) use the End User information and data provided via the Service (the "**Output**") solely in the Client Application for the purpose of processing Referrals.

1.2.    Restrictions. Unless Womply specifically agrees in writing, Client will not, and will use commercially reasonable efforts to make sure third parties do not: (i) attempt to reverse engineer (except as permitted by law), decompile, disassemble, or otherwise attempt to discover the source code, object code, or underlying structure, ideas, or algorithms of the Service; (ii) modify, translate, or create derivative works based on the Service; (iii) make the Service or Output available to, or use the Service or Output for the benefit of anyone other than Client or End Users; (iv) sell, resell, license, sublicense, distribute, rent or lease any Service or Output to any third party, or include any Service or Output in a service bureau, time-sharing, or equivalent offering or (v) attempt to create a substitute or similar service through use of, or access to, the Services or Output. Client will use the Service and Output only in compliance with (i) the rights granted hereunder and (ii) any agreements between Client and End Users. All use of the Service and Output must be only as provided herein and only in accordance with the rights of business partners in Womply's privacy policy and applicable user documentation (and all other Womply-provided written instructions).

1.3.    Ownership. Except for the rights expressly granted under this Section 1, Womply reserves and retains all right, title, and interest in and to the Service and any related Output, software, products, works, and other intellectual property created, used, or provided by Womply for the purposes of this Agreement. To the extent the Client provides Womply with any feedback relating to the Service (including, without limitation, feedback related to usability, performance, interactivity, bug reports and test results) ("**Feedback**"), Womply will own all right, title and interest in and to such Feedback (and the Client hereby makes all assignments necessary to achieve such ownership).

1.4.    Privacy and Authorization. The Client represents that its privacy policy shall, for the duration of this Agreement, (a) be maintained in a manner that is compliant with applicable law and (b) obtain sufficient consents and provide sufficient notice for Womply to use and process End User data in accordance with Womply's Privacy Policy.

2.    Disclaimers.

2.1.    Section 1.2 of the Referral Agreement is hereby incorporated by reference.

2.2.    The Services includes integrations with and/or links to certain third-party service providers (including, without limitation, Plaid, Docusign, LexisNexis, Teslar, Inscribe, Ocrolus, AWS Mechanical Turk, Mindee, Persona, Twilio, Sendgrid, etc.) ("**Third-Party Providers**"). WOMPLY HAS NO CONTROL OVER AND ASSUMES NO RESPONSIBILITY FOR THE ACTIONS, ERRORS, OR OMISSIONS OF THE THIRD PARTY PROVIDERS.

2.3.    Section 1.3 of the Referral Agreement is hereby incorporated by reference.

2.4.    OTHER THAN AS SET FORTH IN SECTION 1.2 OF THE REFERRAL AGREEMENT, THE SERVICE AND ANYTHING ELSE PROVIDED BY WOMPLY HEREUNDER IS PROVIDED "AS IS." TO THE FULLEST EXTENT PERMITTED BY LAW, NEITHER WOMPLY NOR ITS AFFILIATES, SUPPLIERS, LICENSORS, OR DISTRIBUTORS MAKE ANY WARRANTY OF ANY KIND, EXPRESS, IMPLIED, STATUTORY OR OTHERWISE, INCLUDING, BUT NOT LIMITED TO, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, NONINFRINGEMENT, OR ANY WARRANTY THAT THE SERVICE IS FREE FROM DEFECTS. EXCEPT AS EXPRESSLY SET FORTH HEREIN, WOMPLY DOES NOT MAKE ANY OTHER WARRANTY AS TO THE OUTPUT THAT MAY BE OBTAINED FROM USE OF THE SERVICE.

3.    Technology Fee.

3.1.    The Client agrees to the following:

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

3.1.1. The Client or any of the Client's third party lenders will not process any Second Draw Referred Loans for any First Draw Referred Loans from Womply without the express consent and direction from Womply.

3.2.     If Womply collects forgiveness information and submits such info to the SBA on behalf of the Client or the Client's lender, then the Client shall pay Womply $100 per loan. Womply will only participate in this activity if both it and the Client agree.

3.3.     Client shall pay Womply the technology fees described below for (i) each loan originated by Client under the PPP resulting from a Referral plus, if applicable, (ii) each Second Draw loan associated with a First Draw Referral (the "**Technology Fees**").

| Referred Loan Volume | Referral Fee Percentage |
|---|---|
| 1 through unlimited Referred Loans | Womply shall receive the first $250 from any Lender Processing Fee, plus 1/3 of the remaining Lender Processing Fee after the $250 is subtracted |

3.4.     The Technology Fee payable to Womply for any Referred Loan shall be reduced by any Referral Fee paid to Womply in respect of such Referred Loan. By way of example, if the Referred Loan  has a principal amount of $50,000 and if Client receives a Lender Processing Fee of $2,500, then the Technology Fees payable to Womply shall be as follows:

_Lender Fee_:  $2,500

_Referral Fee_:  $500 (i.e., 1% of the value of the Referred Loan, as defined the by the PPP Loan Referral Agreement)

_Technology Fee_:  $499.99 (i.e., $250 plus 1/3 of the $2,250 Lender Processing Fee less $500 Referral Fee (paid separately))

3.5.     Within five (5) days after Blueacorn receives its fees from the the lender that submitted the Referred Loan to the SBA, Client will pay Womply all associated Technology Fees for each applicable Referred Loan. Womply shall return any Technology Fees paid in the event that the SBA or other governmental agency requires Client to return the Lender Processing Fee. Additionally, Womply shall return any portion of the Technology Fees paid that the SBA or other governmental agency determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements. Such return of fees will occur within fifteen (15) days of Womply receiving notice of such return of fees from Client. All payments herein shall be made by wire transfer.

3.6.     Each party shall be responsible for and pay any and all applicable taxes, customs, withholding taxes, duties, assessments and other governmental impositions resulting from its own activities under this Agreement.

3.7.     Unpaid invoices are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all expenses of collection. All payments made are non-refundable, non-cancellable, and not subject to set-off.

4.     Representations and Warranties. Each party represents, warrants, and covenants that: (a) it has the full right, power and authority to execute this Agreement and perform its obligations hereunder; (b) its performance hereunder will not conflict with any obligation it has to any third party; and (c) it has and will maintain such comprehensive general liability and other insurance as is necessary to cover any claims and losses associated with its obligations under this Agreement.

5.     Term; Termination.

5.1.     The term of this Agreement shall be for the Term detailed in the Order Form.

5.2.     Notwithstanding Section 5.1 above, either party may terminate this Agreement at its option by providing no less than thirty (30) days' written notice ("**Notice of Termination**") to the other party. Either party may also terminate this Agreement immediately upon delivery of a Notice of Termination if the other party is in material breach of any warranty, representation, covenant or obligation under this Agreement or

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

the Referral Agreement and is not able to cure such breach within seven (7) calendar days of receiving the Notice of Termination.

5.3.    Upon Client's receipt of a Notice of Termination, Client may request from Womply, and Womply shall reasonably provide to Client, a plan for transmitting to Client electronic copies of loan files in its possession that relate to the Referred Loans, to the extent not otherwise in the possession of Client. Womply will not unreasonably withhold its cooperation in such selection and transmission. Both parties shall agree upon a data format and method of transmission. Womply shall reasonably provide such requested information to Client no later than thirty (30) days following the termination of this Agreement.

5.4.    The following Sections shall survive termination or expiration of this Agreement: 1.2, 1.3, 1.4, 2, 3 (to the extent Referral Fees remain outstanding), 4, 5.3, 5.4, 5.5, and 6 through 16.

5.5.    Womply shall be entitled to all Technology Fees accrued in connection with Referred Loans pursuant to the terms and provisions of Section 3 above, including services provided after termination of this Agreement pursuant to Client's request.

6.   Confidentiality.

6.1.    During the course of performing this Agreement, each party may have access to confidential or proprietary information of the other party, as well as confidential customer information that accompanies each Referral ("**Confidential Information**"). The protection of confidential customer information is required at all times and Client and Womply shall at all times comply with relevant state and federal regulations regarding disclosure of such Confidential Information, including if applicable the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801-6809) and the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.).

6.2.    A party's Confidential Information shall not include any information which (i) becomes part of the public domain through no act or omission of the other party; (ii) is lawfully acquired by the other party on a non-confidential basis from a third party without any breach of a confidentiality obligation; (iii) is disclosed by such party to a third party without any obligation of confidentiality; or (iv) was independently developed by the other party without reference to such party's Confidential Information. Each party agrees to use the other party's Confidential Information only as necessary to perform its obligations under this Agreement or to address any issues related to fraud or investigations into fraud related to the Referred Loans and to maintain the confidentiality of the other party's Confidential Information using at least the same degree of care in safeguarding the other's Confidential Information as it uses in safeguarding its own Confidential Information, subject to a minimum standard of reasonable diligence and protection to prevent any unauthorized copying, use, distribution, installation or transfer of possession of such information. If required by law, the receiving party may disclose Confidential Information of the disclosing party, provided the receiving party gives adequate prior notice of such disclosure to the disclosing party to permit the disclosing party to intervene and to request protective orders or other confidential treatment therefor.  Notwithstanding the foregoing, the confidentiality protections set forth in this Section 6 do not apply to the use of the Confidential Information by any third-party lenders to which the Referred Loans are sent for processing.

7.   Indemnification.

7.1.    Subject to Section 7.3, each party ("Indemnifying Party") shall indemnify, defend, and hold the other party, its officers, directors, employees, representatives and agents ("Indemnified Parties"), harmless from and against any Claim (defined below) to the extent resulting from infringement, conflict with, or violation by the Indemnifying Party of any intellectual property rights, contracts rights, or tort rights (including the right of publicity or right of privacy) of any third party. Indemnifying Party agrees to promptly pay and fully satisfy any and all Losses (defined below), including, without limitation, reasonable attorneys' fees, actually incurred, or sustained, as a result of any Section 7.1 Claims. "Claim" means any third-party claim, legal or equitable, cause of action, suit, litigation, proceeding (including a regulatory or administrative proceeding), complaint, demand, charge, investigation, audit, arbitration, mediation, or other process for settling disputes or disagreements, including, without limitation, any of the foregoing processes or procedures in which injunctive or equitable relief is sought. "Losses" mean and include any loss, assessment, fine, penalty, deficiency, interest, payment, expense, cost, debt, indebtedness, liability, lien, judgment, or damage, which is both (a) sustained, incurred, or accrued and (b) paid to an unaffiliated third party.

7.2.    Subject to Section 7.3, the Client will defend, indemnify and hold Womply harmless from and against all Claims to the extent resulting from Client breach of Section 1.2. The Client agrees to promptly

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

pay and fully satisfy any and all Losses, including, without limitation, reasonable attorneys' fees, actually incurred, or sustained, as a result of any Section 7.2 Claims.

7.3.    The Indemnified Party shall: (i) promptly notify the Indemnifying Party in writing of any Losses for which the Indemnified Party seeks indemnification; (ii) provide reasonable cooperation to the Indemnifying Party and its legal representatives in the investigation of any matter which is the subject of indemnification; and (iii) permit the Indemnifying Party to have full control over the defense and settlement of any matter subject to indemnification. The Indemnified Party shall have the right to participate in the defense at its own expense.

8.      Limitation of Liability. EXCEPT WITH RESPECT TO SECTION 1.2(I) AND SECTION 5 OF THE REFERRAL AGREEMENT OR A BREACH OF SECTION 6 OF THIS AGREEMENT AND EACH PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, (I) NEITHER PARTY WILL BE LIABLE OR OBLIGATED WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR UNDER ANY CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, RELIANCE OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA OR USE, AND (II) NEITHER PARTY'S LIABILITY SHALL EXCEED THE AMOUNTS PAID AND PAYABLE (IN THE CASE OF CLIENT'S BREACH ONLY) TO WOMPLY DURING THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY.

9.      Choice of Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof. Notwithstanding the foregoing or any provision of this Agreement to the contrary, this Agreement is subject to all Applicable Laws, including SBA Regulations. In the event of any conflict between the governing law and the SBA Regulations (defined below), the SBA Regulations shall control. "SBA Regulations" means all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 20811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time. In the event that this Agreement conflicts with any other contract or agreement between the parties, now or in the future including the Womply Developer Order Form, this Agreement shall control with respect to any Referred Loan unless the other contract or agreement specifically states that it supersedes this Agreement.

10.     Arbitration. Without limiting a party's right to seek injunctive or other equitable relief in court, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court. The prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees.

11.     Independent Contractors. This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors. Neither party has, or may represent that it has, any authority under or as a result of this Agreement to act on behalf of the other party in any way.

12.     Notices.  Any notice or other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been duly given on the day of service if served personally or upon receipt if sent by facsimile transmission with confirmation or if mailed by First Class mail, registered or certified, postage prepaid, and addressed to the respective parties at the addresses set forth above, or at such other addresses as may be specified by either party pursuant to the terms and provisions of this section.

13.     Assignment.  Neither party may assign, without the prior written consent of the other, its rights, duties or obligations under this Agreement to any person or entity, in whole or in part; provided, however, that this Agreement may be assigned by a party without the consent of the other to any successor corporation or entity whether by purchase of all or substantially all of the assets relating to this Agreement,

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

a sale of a controlling interest of the capital stock of the assigning party, by merger, consolidation or otherwise. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

14.    Force Majeure. Neither party will be liable for failure or delay in performance of any of its obligations under this Agreement arising out of any event or circumstance beyond that party's reasonable control; provided, however, that such party promptly notifies the other party of the nature and duration of the force majeure event and resumes performance as soon as possible.

15.    Severability.  Any provision of this Agreement that is determined to be unenforceable or unlawful shall not affect the remainder of the Agreement and shall be severable therefrom, and the unenforceable or unlawful provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

16.    Entire Agreement.   Excluding the Referral Agreement, this Agreement constitutes the entire agreement between the parties and supersedes any and all prior communications or agreements between them, whether written or oral, with respect to the subject matter hereof. This Agreement may not be amended, modified or any provision hereof waived, except in a writing signed by the parties hereto. No waiver by either party, whether express or implied, of any provision of this Agreement, or of any breach thereof, shall constitute a continuing waiver of such provision or a breach or waiver of any other provision of this Agreement.

16.    Press Releases.   Any news release, public announcement, advertisement, or other publicity released by either party concerning this Agreement shall be subject to the prior approval of the other party, which approval shall not be unreasonably withheld or delayed. The parties will cooperate with each other to issue a joint press release announcing their relationship established by this Agreement.

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

## womply

### 1.PPP Loan Referral Agreement

This PPP Loan Referral Agreement (the "**Agreement**") is made and entered into on May 10th, 2021 (the "**Effective Date**") by and between Oto Analytics, Inc. d/b/a Womply ("**Womply**") and BA Fin Orion, LLC ("**Blueacorn**"). In consideration of the mutual promises and covenants contained herein, and for other good and valuable consideration, Womply and Blueacorn hereby agree as follows:

**WHEREAS,** Blueacorn desires to engage in the marketing, initial underwriting, and submission to third-party lenders of loans funded and created under the U.S. Small Business Administration ("**SBA**") Paycheck Protection Program (the "**PPP**");

**WHEREAS**, Blueacorn and Womply desire to establish an independent contractor relationship whereby Womply provides referrals to Blueacorn in connection with potential loan applicants seeking loans under the PPP from third-party lenders; and

**WHEREAS**, Blueacorn and Womply specifically acknowledge that any third-party lender retains ultimate responsibility for all loan decisions, including approvals, underwriting, closings, disbursements, due diligence, and loan servicing actions (including those relating to loan deferments, loan forgiveness, and loan guarantees), as required by the SBA, and Womply will exercise all best efforts to comply with all regulatory requirements of the PPP.

**NOW THEREFORE**, in consideration of the mutual covenants, promises, and undertakings contained herein, and for such other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto do hereby agree as follows:

1.    **Referrals**.

1.1.    Womply may, from time to time, refer to Blueacorn such PPP loan applicants as Womply shall, in its sole and absolute discretion, deem appropriate (each such applicant a "**Referral**"). Womply acknowledges that sometimes the same borrower is submitted to Blueacorn by multiple referring parties. Womply will be the party paid if they were the first to submit a completed package to Blueacorn for the requested loan.

1.2.    WOMPLY SHALL EXERCISE COMMERCIALLY REASONABLE EFFORTS TO (I) COMPLY WITH THE APPLICATION REVIEW PROCESS SET FORTH ON EXHIBIT A, AND (II) WOMPLY REPRESENTS AND WARRANTS, TO ITS KNOWLEDGE AS OF THE EFFECTIVE DATE, THAT THE INFORMATION ACCOMPANYING ANY REFERRAL COMPLIES WITH THE REGULATORY GUIDANCE FROM THE SBA. NOTWITHSTANDING THE FOREGOING WOMPLY MAKES NO REPRESENTATIONS OR WARRANTIES ABOUT, AND HEREBY DISCLAIMS ALL RESPONSIBILITY FOR THE ACCURACY OR COMPLETENESS OF ANY AND ALL APPLICATION INFORMATION PROVIDED BY AN APPLICANT THAT IS DEEMD A REFERRAL HEREUNDER. WOMPLY ACKNOWLEDGES AND AGREES THAT BLUEACORN WILL NOT CONDUCT AN INDEPENDENT REVIEW OF THE REFERRED LOANS (AS DEFINED BELOW) PRIOR TO SUBMISSION TO A THIRD PARTY LENDER.

1.3.    Neither Blueacorn nor Womply is a lender or lender service provider as defined by the SBA.

2.    **Compensation**.

2.1.    The Referral Fees described in this Section 2 will be paid out of the fees actually received by Blueacorn in respect of Referred Loans (defined below) (the "**Loan Fees**").

2.2.    In consideration of Womply providing Blueacorn with Referrals, Blueacorn shall pay to Womply the referral fee set forth in the table below, which is expressed as a percentage of the outstanding balance of the Referred Loan at the time of loan disbursement (such fees, the "**Referral Fees**"), for each loan originated by Blueacorn under the PPP resulting from a Referral (such loan a "**Referred Loan**"). Blueacorn retains the right, in its sole and absolute discretion, to refuse to submit any Referred Loan to a third party lender for any reason.

| Referral Fee Amount | 1.00% for each Referred Loan |
|---|---|

2.3.    Within five (5) days after Blueacorn receives its fees from the lender that submitted the Referred Loan to the the SBA, Blueacorn will pay Womply all associated Referral Fees for such applicable Referred Loan. Womply shall return any Referral Fees paid in the event that the SBA or other governmental agency requires Blueacorn to return the Blueacorn Fee. Additionally, Womply shall return any portion of Referral Fees paid that the SBA or other

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

**womply**

governmental agency determines were not in compliance with applicable SBA and/or PPP Loan Program Requirements. Such return of fees will occur within fifteen (15) days of Womply receiving notice of such return of fees from Blueacorn.

2.4.    Each party shall be responsible for and pay any and all applicable taxes, customs, withholding taxes, duties, assessments and other governmental impositions resulting from its own activities under this Agreement. Referral Fee payments not made in accordance with the foregoing schedule are subject to a finance charge of 1.5% per month or the maximum permitted by law, whichever is lower, plus all costs of collection. Except as expressly set forth above, all Referral Fees paid are non-refundable, non-cancellable, and not subject to set-off. All payments described in this Section 2 must be made by wire transfer.

3.    **Representations and Warranties**. Each party represents, warrants, and covenants that: (a) it has the full right, power and authority to execute this Agreement and perform its obligations hereunder; (b) its performance hereunder will not conflict with any obligation it has to any third party; and (c) it has and will maintain such comprehensive general liability and other insurance as is necessary to cover any claims and losses associated with any of its obligations under this Agreement.

4.    **Term; Termination**.

4.1.    The term of this Agreement shall be one (1) year from the Effective Date (the "**Term**"), and thereafter upon the mutual written consent of both parties shall renew for successive one (1) year terms unless earlier terminated, if Notice of Termination is timely provided, in accordance with this Section 4.

4.2.    Notwithstanding Section 4.1 above, either party may terminate this Agreement at its option by providing no less than thirty (30) days' written notice ("**Notice of Termination**") to the other party. Either party may also terminate this Agreement immediately upon delivery of a Notice of Termination if the other party is in material breach of any warranty, representation, covenant or obligation under this Agreement or the Womply Developer Order Form and is not able to cure such breach within seven (7) calendar days of receiving the Notice of Termination.

4.3.    Upon Blueacorn's receipt of a Notice of Termination, Blueacorn may request from Womply, and Womply shall reasonably provide to Blueacorn, a plan for transmitting to Blueacorn electronic copies of loan files in its possession that relate to the Referred Loans, to the extent not otherwise in the possession of Blueacorn. Womply will not unreasonably withhold its cooperation in such selection and transmission. Both parties shall agree upon a data format and method of transmission. Womply shall reasonably provide such requested information to Blueacorn no later than thirty (30) days following the termination of this Agreement.

4.4.    The following Sections shall survive termination or expiration of this Agreement: 1.2, 2 (to the extent Referral Fees remain outstanding), 3, 4.3, 4.4, 4.5, and 5 through 17.

4.5.    Womply shall be entitled to all Referral Fees accrued in connection with Referred Loans pursuant to the terms and provisions of Section 2 above, including services provided after termination of this Agreement pursuant to Blueacorn's request.

5.    **Confidential Information**.

5.1.    During the course of performing this Agreement, each party may have access to confidential or proprietary information of the other party, as well as confidential customer information that accompanies each Referral ("**Confidential Information**"). The protection of confidential customer information is required at all times and Blueacorn and Womply shall at all times comply with relevant state and federal regulations regarding disclosure of such Confidential Information, including if applicable the Gramm-Leach-Bliley Act (15 U.S.C. §§ 6801-6809) and the Fair Credit Reporting Act (15 U.S.C. § 1681 et seq.).

5.2    A party's Confidential Information shall not include any information which (i) becomes part of the public domain through no act or omission of the other party; (ii) is lawfully acquired by the other party on a non-confidential basis from a third party without any breach of a confidentiality obligation; (iii) is disclosed by such party to a third party without any obligation of confidentiality; or (iv) was independently developed by the other party without reference to such party's Confidential Information. Each party agrees to use the other party's Confidential Information only as necessary to perform its obligations under this Agreement or to address any issues related to fraud or investigations into fraud related to the Referred Loans and to maintain the confidentiality of the other party's Confidential Information using at least the same degree of care in safeguarding the other's Confidential Information as it uses in safeguarding its own Confidential Information, subject to a minimum standard of reasonable diligence and protection to prevent any unauthorized copying, use, distribution, installation or transfer of possession of such

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

**womply**

information. If required by law, the receiving party may disclose Confidential Information of the disclosing party, provided the receiving party gives adequate prior notice of such disclosure to the disclosing party to permit the disclosing party to intervene and to request protective orders or other confidential treatment therefor. Notwithstanding the foregoing, the confidentiality protections set forth in this Section 5 does not apply to the use of the Confidential Information by any third-party lenders to which the Referrred Loans are sent for processing.

**6.    Indemnification**.

6.1.    Subject to Section 6.2, each party ("**Indemnifying Party**") shall indemnify, defend, and hold the other party, its officers, directors, employees, representatives and agents ("**Indemnified Parties**"), harmless from and against any Claim (defined below) to the extent resulting from (i) infringement, conflict with, or violation by the Indemnifying Party of any intellectual property rights, contracts rights, or tort rights (including the right of publicity or right of privacy) of any third party or (ii) a breach by the Indemnifying Part of Section 1.2(I). Indemnifying Party agrees to promptly pay and fully satisfy any and all Losses (defined below), including, without limitation, reasonable attorneys' fees, actually incurred, or sustained, as a result of any Claims. "**Claim**" means any third-party claim, legal or equitable, cause of action, suit, litigation, proceeding (including a regulatory or administrative proceeding), complaint, demand, charge, investigation, audit, arbitration, mediation, or other process for settling disputes or disagreements, including, without limitation, any of the foregoing processes or procedures in which injunctive or equitable relief is sought. "**Losses**" mean and include any loss, assessment, fine, penalty, deficiency, interest, payment, expense, cost, debt, indebtedness, liability, lien, judgment, or damage, which is both (a) sustained, incurred, or accrued and (b) paid to an unaffiliated third party.

6.2.    The Indemnified Party shall: (i) promptly notify the Indemnifying Party in writing of any Losses for which the Indemnified Party seeks indemnification; (ii) provide reasonable cooperation to the Indemnifying Party and its legal representatives in the investigation of any matter which is the subject of indemnification; and (iii) permit the Indemnifying Party to have full control over the defense and settlement of any matter subject to indemnification. The Indemnified Party shall have the right to participate in the defense at its own expense.

7.    **Limitation of Liability**. EXCEPT WITH RESPECT TO A BREACH OF SECTION 5 AND EACH PARTY'S INDEMNIFICATION OBLIGATIONS HEREUNDER, (I) NEITHER PARTY WILL BE LIABLE OR OBLIGATED WITH RESPECT TO ANY SUBJECT MATTER OF THIS AGREEMENT OR UNDER ANY CONTRACT, TORT, STRICT LIABILITY OR OTHER LEGAL OR EQUITABLE THEORY, WHETHER OR NOT ADVISED OF THE POSSIBILITY OF SUCH DAMAGES WHATSOEVER, FOR ANY SPECIAL, INDIRECT, INCIDENTAL, EXEMPLARY, PUNITIVE, RELIANCE OR CONSEQUENTIAL DAMAGES, INCLUDING LOSS OF PROFITS, REVENUE, DATA OR USE, AND (II) NEITHER PARTY'S LIABILITY SHALL EXCEED THE AMOUNTS PAID AND PAYABLE (IN THE CASE OF BLUEACORN'S BREACH ONLY) TO WOMPLY DURING THE TWELVE (12) MONTHS PRIOR TO THE EVENT GIVING RISE TO SUCH LIABILITY.

8.    **Recitals**. The recitals set forth above are hereby incorporated into this Agreement.

9.    **Choice of Law**. This Agreement shall be governed by and construed in accordance with the laws of the State of California, without regard to the provisions of the conflict of laws thereof. Notwithstanding the foregoing or any provision of this Agreement to the contrary, this Agreement is subject to all Applicable Laws, including SBA Regulations. In the event of any conflict between the governing law and the SBA Regulations (defined below), the SBA Regulations shall control. "SBA Regulations" means all PPP requirements and SBA guidelines under the CARES Act, the Economic Aid Act, the PPP Flexibility Act, any rules or guidance that have been issued by SBA implementing the PPP, including SBA regulations published at 86 Fed. Reg. 3692 (Jan. 14, 2021) and 85 Fed. Reg. 20811 (Apr. 15, 2020) and any subsequent Interim Final Rules and other guidance as may have been or may be subsequently issued by SBA or the U.S. Department of the Treasury with respect to the origination, servicing and forgiveness of loans under the PPP and Frequently Asked Questions, or any other applicable SBA loan requirements, including those codified in 13 CFR part 120, in each case as amended, supplemented or modified from time to time. In the event that this Agreement conflicts with any other contract or agreement between the parties, now or in the future including the Womply Developer Order Form, this Agreement shall control with respect to any Referred Loan unless the other contract or agreement specifically states that it supersedes this Agreement.

10.    **Arbitration**. Without limiting a party's right to seek injunctive or other equitable relief in court, any dispute between the parties related to the subject matter of this Agreement will be resolved by binding arbitration in the English language in San Francisco County, California under the rules of JAMS; the decision of the arbitrator will be enforceable in any court. The prevailing party in any action to enforce this Agreement shall be entitled to costs and attorneys' fees.

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

**womply**

11.   **Independent Contractors**. This Agreement is not intended to establish any partnership, joint venture, employment, or other relationship between the parties except that of independent contractors. Neither party has, or may represent that it has, any authority under or as a result of this Agreement to act on behalf of the other party in any way.

12.   **Notices**. Any notice or other communication required or permitted in this Agreement shall be in writing and shall be deemed to have been duly given on the day of service if served personally or upon receipt if sent by facsimile transmission with confirmation or if mailed by First Class mail, registered or certified, postage prepaid, and addressed to the respective parties at the addresses set forth above, or at such other addresses as may be specified by either party pursuant to the terms and provisions of this section.

13.   **Assignment**. Neither party may assign, without the prior written consent of the other, its rights, duties or obligations under this Agreement to any person or entity, in whole or in part; provided, however, that this Agreement may be assigned by a party without the consent of the other to any successor corporation or entity whether by purchase of all or substantially all of the assets relating to this Agreement, a sale of a controlling interest of the capital stock of the assigning party, by merger, consolidation or otherwise. This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns.

14.   **Force Majeure**. Neither party will be liable for failure or delay in performance of any of its obligations under this Agreement arising out of any event or circumstance beyond that party's reasonable control; *provided*, *however*, that such party promptly notifies the other party of the nature and duration of the force majeure event and resumes performance as soon as possible.

15.   **Severability**. Any provision of this Agreement that is determined to be unenforceable or unlawful shall not affect the remainder of the Agreement and shall be severable therefrom, and the unenforceable or unlawful provision shall be limited or eliminated to the minimum extent necessary so that this Agreement shall otherwise remain in full force and effect and enforceable.

16.   **Entire Agreement**. Excluding separate agreements Blueacorn may have for the purchase of Womply's products and services, this Agreement constitutes the entire agreement between the parties and supersedes any and all prior communications or agreements between them, whether written or oral, with respect to the subject matter hereof. This Agreement may not be amended, modified or any provision hereof waived, except in a writing signed by the parties hereto. No waiver by either party, whether express or implied, of any provision of this Agreement, or of any breach thereof, shall constitute a continuing waiver of such provision or a breach or waiver of any other provision of this Agreement.

17.   **Press Releases**. Any news release, public announcement, advertisement, or other publicity released by either party concerning this Agreement shall be subject to the prior approval of the other party, which approval shall not be unreasonably withheld or delayed. The parties will cooperate with each other to issue a joint press release announcing their relationship established by this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the Amendment Effective Date.

**Womply:**                                         **Blueacorn**

By: _____          By: _____

Name:  Toby Scammell                       Name:  Barry Calhoun

Title:  Founder                                   Title:  CEO

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

**womply**

EXHIBIT A

APPLICATION REVIEW PROCESS

Attached Hereto

## PPP Fast Lane Data Collection Overview
Updated May 11, 2021

## Summary
The following conditions must be met individually prior to Womply sending an application to BlueAcorn:
- Email verified
- Phone verified
- Name, address, EIN, other basic info passes SBA form validation
- Business Activity check (as defined by Blue Acorn) passed
- Tax Document check passed
- KYC check passed
- Bank is verified and fundable based on global limits per bank account and RDFI rules
- Fraud is not detected
- Application info (email, phone, tax ID, bank account) has not been associated with any other application that was declined for fraud
- Other less common criteria pass including First Draw PPP loan number validation/disbursement, as appropriate.

## KYC
Womply uses Persona as the primary KYC vendor for our lenders. In some cases we also use Docusign ID Check (LexisNexis KBA).

Persona analyzes the following for each applicant:
- Database lookup (using DOB, SSN, Name)
- US Sanctions & watchlist check (including OFAC)
- Government ID authentication
- Government ID barcode scan (depends on other factors and ID type)
- Video Selfie

Persona automatically declines users with:
- foreign IPs and proxies/VPNs/Tor
- IDs that are expired (beyond the grace period set by states)
- >3 devices used across any inquiry
- Any selfie that fails their automated liveness check

Womply only passes applications through to lenders if the applicant has been "Approved" by Persona. Their approval requires passing, at minimum, the government database check, the ID check, and the selfie check.

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

Furthermore, Womply manually reviews selfies & IDs prior to funding. This manual review may or may not be conducted before the application is sent to BlueAcorn for their review. During manual review, Womply's team visually reviews each ID & selfie and declines any applications that slipped through automated filtering. For example, animations, deep fakes, and other info may be "Approved" by Persona's automated review but declined by Womply's KYC team.

Additionally, Womply sometimes requires Docusign ID Check when users sign promissory notes (e.g. if manual review of Persona KYC data hasn't been completed by that time).

We summarize KYC data on the KYC Details pdf file that is provided with each application.

## Business Activity

For BlueAcorn, there are two ways that applicants can provide evidence that they were in business on or around Feb 15, 2020:

1. Instant verification via Plaid looking for any transaction activity in February 2020. As of May 10th, we require that an applicant has at least 5 transactions in the month of February 2020.
2. Manual upload of bank statements from February 2020. Bank documents are analyzed for fraud and OCR'd by one or more of our third party providers.

Applications are only sent to BlueAcorn if they meet one or more of the criteria set forth above for business activity in February 2020.

We summarize bank data on the Bank Data pdf file that is provided with each application.

## Tax Documents

Here's an overview of our tax document analysis:

### Instant classification

Since March 14, we've been conducting real-time evaluations of 100% of the tax documents uploaded during our PPP Fast Lane application flow. This provides a first pass to determine if the forms look legitimate. We use a machine-learning platform to detect the type of document uploaded (e.g. Schedule type, year) and to provide the Borrower with feedback about whether they provided the correct forms. This significantly reduces error rates upfront and acts as our first fraud check. Applications that don't pass this instant classification are unlikely to pass through to BlueAcorn without correction from the Borrower.

### Second tax document review

100% of tax and bank documents uploaded in the application process go out for third party classification, verification, and data extraction. The extracted data goes through mathematical checks to determine if the values and calculations on the forms would be permissible for submission under IRS rules. In all cases, a human reviews the documents and confirms the OCR extraction is correct. We match the extracted tax IDs to the application to ensure the form matches the applicant. We have seen an extremely low error rate on this process (under 1%), which is significantly below the error rate we've seen from human-only reviews. In cases where math errors or other problems are significant, the document is flagged as suspicious.

### Third tax document review

All documents flagged as suspicious by our second tax review undergo a third automated fraud review.

In addition, of the documents *not* flagged as suspicious by our third-party review, we sample about 1 in 3 documents for a third tax document review. This review involves a variety of checks to detect if the document has been photoshopped or shows other evidence of tampering.

### Final tax document review

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

wwomply

In cases where our secondary or tertiary review suggests the document is fraudulent, we perform another human review. Ultimately, more than half of documents flagged for this final review are deemed to be not fraudulent, despite the multiple checks and flags. This suggests to us that our filtering continues to be quite strict. But it also highlights that, without a way to definitively confirm the data on the tax documents (e.g., with an IRS API or Transcript), we are unable to distinguish between a well-executed fake document and a real one.  Visually, they will look identical. Nonetheless, to avoid program paralysis based on the mere possibility of fraud, our process considers documents that pass through all of these fraud checks acceptable.

Applications are only sent to BlueAcorn if they pass the review outlined above and they are the correct form and year, with a tax ID that matches the application.

We summarize relevant tax documents on the Tax pdf provided with each application.

## Bank Verification

Womply verifies the association of the applicant to the bank account in one or more of the following ways:

1 Instant verification: We compare Plaid Auth data to the account number that's manually entered by the user. We also use the Plaid Identity feature (where available) for comparison purposes to application data.

2 Manual verification: We compare the uploaded documents (bank statement, direct deposit form, and/or check) to the account number that's manually entered by the user.

- We exclude certain banks that have a high rate of KYC related fraud.
- We don't allow bank changes after an application is submitted.
- Once a reject is received on a bank account we prohibit that account from being used (by any applicant across any lender).
- We limit the total number of deposits that can be made to a single bank account by any lenders (4) and the total number of tax IDs that can be associated with a single bank account (2).
- We restrict deposits to new bank accounts as determined by logic that we've agreed upon with various RDFIs.

Doc ID: e103cc00bf0fa2d8e2e37ff2ef66181b9495251f

 **HELLOSIGN**

Audit Trail

| | |
|---|---|
| **TITLE** | Womply - Blueacorn Referral Agreement & Womply Developer... |
| **FILE NAME** | Womply Developer Agreement - Final.docx and 1 other |
| **DOCUMENT ID** | e103cc00bf0fa2d8e2e37ff2ef66181b9495251f |
| **AUDIT TRAIL DATE FORMAT** | MM / DD / YYYY |
| **STATUS** | ● Completed |

## Document History

| | | |
|---|---|---|
| **SENT** | **05 / 19 / 2021**<br>08:38:42 UTC-8 | Sent for signature to Barry Calhoun (barry@blueacorn.co) and Toby Scammell (toby@womply.com) from pamela@womply.com<br>IP: 136.158.28.2 |
| **VIEWED** | **05 / 19 / 2021**<br>08:43:00 UTC-8 | Viewed by Toby Scammell (toby@womply.com)<br>IP: 98.42.53.44 |
| **SIGNED** | **05 / 19 / 2021**<br>08:44:10 UTC-8 | Signed by Toby Scammell (toby@womply.com)<br>IP: 98.42.53.44 |
| **VIEWED** | **05 / 19 / 2021**<br>08:51:04 UTC-8 | Viewed by Barry Calhoun (barry@blueacorn.co)<br>IP: 107.126.40.17 |
| **SIGNED** | **05 / 19 / 2021**<br>08:56:35 UTC-8 | Signed by Barry Calhoun (barry@blueacorn.co)<br>IP: 107.126.40.17 |
| **COMPLETED** | **05 / 19 / 2021**<br>08:56:35 UTC-8 | The document has been completed. |

**APPX. 164**

EXHIBIT 33



**EXHIBIT 34**



8:35

## Thread
🔒 ppp-fast-lane-blue-acorn



NOTE

| | |
|---|---|
| SBA Loan # | |
| SBA Loan Name | |
| Date | |
| Loan Amount | |
| Interest Rate | 1.00% |
| Borrower | |
| Operating Company | |
| Lender | |

1.  PROMISE TO PAY:

In return for the Loan, Borrower promises to pay to the order of Lender the amount of _____ Dollars,

interest on the unpaid principal balance, and all other amounts required by this Note.

2.  DEFINITIONS:

"CARES Act" means the Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (Mar. 27, 2020), as amended by the Economic Aid Act, Pub. L. No. 116-260 (Dec. 27, 2020).
"Loan" means the loan evidenced by this Note.

"Loan Documents" means the documents related to this loan signed by Borrower.

"PPP" means the Paycheck Protection Program under the CARES Act, including the rules, regulations and guidance of the SBA with respect thereto.

"SBA" means the Small Business Administration, an Agency of the United States of America.



**Amber Aldrich** May 18th, 2021

@Mihir Sambhus 3 more docs:

📄 **Capital Plus PPP Loan Documents.pdf**
138 KB PDF

_____, in the amount of $_____.

In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021, (hereinafter called "Lender") making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows:

1.    In the event the promissory note or any other document or other writing evidencing, securing or pertaining to the above loan is misplaced or lost or incorrectly reflects the true and correct terms, conditions or provisions of the loan in the opinion of Lender, each of the undersigned shall execute, acknowledge, initial and deliver to Lender all documents and other writings that Lender requests which Lender deems necessary to replace or correct any misplaced, lost or incorrect document or other writing; and

2.    In the event Lender deems it necessary that any additional documents or other writings be executed by any of the undersigned in connection with or pertaining to the above loan which have not been requested to be executed by the undersigned on or before the date hereof (or which were requested but not executed for any reason whatsoever), each of the undersigned shall execute, acknowledge, initial and deliver to Lender all such additional documents or other writings that Lender may reasonably request in connection with such loan; and

3.    Each of the undersigned further agrees to execute, acknowledge, initial and deliver to Lender all such documents and writings and pay such additional sums requested by Lender within ten (10) days after Lender requests same.  Any request by Lender shall be deemed given and received on the earlier of (i) the date such request is actually received by one of the undersigned or (ii) three (3) days after such request is mailed, postage prepaid and addressed to any of the undersigned at the last known address of the undersigned in accordance with the records of Lender, whichever date occurs first; and

4.    If any of the undersigned refuses or fails within such ten (10) day period to (i) execute, acknowledge, initial

🗓 **8 people** are from blueacorn

Add a reply ➤

🏠 Home   💬 DMs   @ Mentions   🔍 Search   You

8:35

## Thread
🔒 ppp-fast-lane-blue-acorn

A(n)
By:
Name:

📄 **Capital Plus W-9.pdf**
141 KB PDF



📄 **Capital Plus Written Conse...**
126 KB PDF

Pursuant to applicable law, the undersigned, being the appropriate governing body pursuant to the governing documents for the borrowing entity designated on the signature page hereof ("Company"), hereby consent to the adoption of and do hereby adopt the following resolutions and acknowledge that Capital Plus Financial, LLC ("Lender") is relying on the effectiveness hereof in making a loan to Company under the Paycheck Protection Program Second Draw Loans of the Small Business Administration ("SBA") as authorized under Section 311 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"):

**RESOLVED,** that the undersigned hereby authorizes the Authorized Person named below as the appropriate person pursuant to the governing documents of the Company ("Authorized Person"), for and on behalf and in the name of the Company, to take such action necessary for the Company

🦢 **8 people** are from blueacorn

Add a reply

🏠 Home    DMs    @ Mentions    🔍 Search    You

**1 of 2**

### WRITTEN CONSENT OF GOVERNING BODY
### (SBA PPP loan)

Pursuant to applicable law, the undersigned, being the appropriate governing body pursuant to the governing documents for the borrowing entity designated on the signature page hereof ("Company"), hereby consent to the adoption of and do hereby adopt the following resolutions and acknowledge that Capital Plus Financial, LLC ("Lender") is relying on the effectiveness hereof in making a loan to Company under the Paycheck Protection Program Second Draw Loans of the Small Business Administration ("SBA") as authorized under Section 311 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"):

**RESOLVED,** that the undersigned hereby authorizes the Authorized Person named below as the appropriate person pursuant to the governing documents of the Company ("Authorized Person"), for and on behalf and in the name of the Company, to take such action necessary for the Company to borrow money and to obtain credit from the Lender, with its principal office located in Dallas, Texas, in the amount stated in the promissory note executed by Company and payable to Lender (the "Loan") and dated on or about the date hereof, hereinafter called the "Loan", including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as he or she deems reasonable;

**BE IT FURTHER RESOLVED,** that the undersigned hereby authorizes the Authorized Person, for and on behalf and in the name of the Company to prepare, execute and deliver any and all applications, certifications, promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing and to execute and deliver any and all instruments and perform any and all acts required by the Lender and/or the SBA in connection with any matters herein contained, including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as the Authorized Person, in his or her sole discretion, deems reasonable;

**BE IT FURTHER RESOLVED,** that all the acts and deeds done or to be done by the Authorized Person, in connection with the execution and delivery of any promissory notes, loan agreements, and any and all other documents, and any and all acts which may be necessary or proper to effect the borrowing, are hereby authorized, adopted, ratified, confirmed and approved as the acts and deeds of Company;

**BE IT FURTHER RESOLVED,** that the Authorized Person be and is hereby authorized and directed to take such other action and deliver such additional instruments in the name of and on behalf of Company, or otherwise to do all such further acts and things that the Authorized Person shall deem necessary or proper in order to effectively perform all of the obligations and agreements expressed to be kept and performed by Company, pursuant to the provisions of any promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing described above;

**BE IT FURTHER RESOLVED,** that any government agency, including but not limited to, the SBA, may also rely on this Written Consent when identifying any Authorized Person for purposes of any loan guaranty, loan forgiveness, or other government program related to the Loan; and

**BE IT FURTHER RESOLVED,** that any and all acts authorized pursuant to this Written Consent and performed prior to the execution of this Written Consent are hereby ratified and approved. This Written Consent shall be continuing and shall remain in full force and effect until written notice of its revocation shall have been delivered to the Lender and receipt acknowledged by the Lender in writing.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURES ON FOLLOWING PAGE]**

**IN WITNESS WHEREOF,** the undersigned have executed this consent effective as of

**AUTHORIZED PERSON:**

A(n)

By: _____

Name: _____

Title: _____

8:35 ✈

## Thread

🔒 ppp-fast-lane-blue-acorn

**General Instructions**

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/FormW9.

**Purpose of Form**

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number

• Form 1099-DIV (dividends, including those from stocks or mutual funds)
• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)
• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)
• Form 1099-S (proceeds from real estate transactions)
• Form 1099-K (merchant card and third party network transactions)
• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)
• Form 1099-C (canceled debt)
• Form 1099-A (acquisition or abandonment of secured property)

---

📄 **Capital Plus Written Conse...**
126 KB PDF

Pursuant to applicable law, the undersigned, being the appropriate governing body pursuant to the governing documents for the borrowing entity designated on the signature page hereof ("Company"), hereby consent to the adoption of and do hereby adopt the following resolutions and acknowledge that Capital Plus Financial, LLC ("Lender") is relying on the effectiveness hereof in making a loan to Company under the Paycheck Protection Program Second Draw Loans of the Small Business Administration ("SBA") as authorized under Section 311 of the Economic Aid to Hard-Hit Small Businesses, Nonprofits, and Venues Act ("Economic Aid Act"):

**RESOLVED,** that the undersigned hereby authorizes the Authorized Person named below as the appropriate person pursuant to the governing documents of the Company ("Authorized Person"), for and on behalf and in the name of the Company, to take such action necessary for the Company to borrow money and to obtain credit from the Lender, with its principal office located in Dallas, Texas, in the amount stated in the promissory note executed by Company and payable to Lender (the "Loan") and dated on or about the date hereof, hereinafter called the "Loan", including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as he or she deems reasonable;

**BE IT FURTHER RESOLVED,** that the undersigned hereby authorizes the Authorized Person, for and on behalf and in the name of the Company to prepare, execute and deliver any and all applications, certifications, promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing and to execute and deliver any and all instruments and perform any and all acts required by the Lender and/or the SBA in connection with any matters herein contained, including any renewals, extensions, consolidations or rearrangements of such indebtedness, upon such terms and at such rates as the Authorized Person, in his or her sole discretion, deems reasonable;

**BE IT FURTHER RESOLVED,** that all the acts and deeds done or to be done by the Authorized Person, in connection with the execution and delivery of any promissory notes, loan agreements, and any and all other documents, and any and all acts which may be necessary or proper to effect the borrowing, are hereby authorized, adopted, ratified, confirmed and approved as the acts and deeds of Company;

**BE IT FURTHER RESOLVED,** that the Authorized Person be and is hereby authorized and directed to take such other action and deliver such additional instruments in the name of and on behalf of Company, or otherwise to do all such further acts and things that the Authorized Person shall deem necessary or proper in order to effectively perform all of the obligations and agreements expressed to be kept and performed by Company, pursuant to the provisions of any promissory notes, loan agreements and any and all other documents and to perform any and all acts which may be necessary or proper to effect the borrowing described above;

**BE IT FURTHER RESOLVED,** that any government agency, including but not limited to, the SBA, may also rely on this Written Consent when identifying any Authorized Person for purposes of any loan guaranty, loan forgiveness, or other government program related to the Loan; and

**BE IT FURTHER RESOLVED,** that any and all acts authorized pursuant to this Written Consent and performed prior to the execution of this Written Consent are hereby ratified and approved. This Written Consent shall be continuing and shall remain in full force and effect until written notice of its revocation shall have been delivered to the Lender and receipt acknowledged by the Lender in writing.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK - SIGNATURES ON FOLLOWING PAGE]

---



**Amber Aldrich** May 18th, 2021

@Mihir Sambhus yes, working on getting everything turned around to her now. Thanks!

---

🗄 **8 people** are from blueacorn

Add a reply                    ➤

🏠 Home     🔁 DMs     @ Mentions     🔍 Search     •L• You

| Form **W-9** (Rev. October 2018) Department of the Treasury Internal Revenue Service | **Request for Taxpayer Identification Number and Certification** ▶ Go to www.irs.gov/FormW9 for instructions and the latest information. | **Give Form to the requester. Do not send it to the IRS.** |

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC   ☐ C Corporation   ☐ S Corporation   ☐ Partnership   ☐ Trust/estate

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

☐ Other (see instructions) ▶

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

Exemption from FATCA reporting code (if any) _____

(Applies to accounts maintained outside the U.S.)

5 Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

6 City, state, and ZIP code

7 List account number(s) here (optional)

**Print or type. See Specific Instructions on page 3.**

### Part I   Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see What Name and Number To Give the Requester for guidelines on whose number to enter.

**Social security number**

☐☐☐ – ☐☐ – ☐☐☐☐

or

**Employer identification number**

☐☐ – ☐☐☐☐☐☐☐

### Part II   Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

**Certification instructions.** You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

| Sign Here | Signature of U.S. person ▶ | Date ▶ |

### General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

**Future developments.** For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/FormW9.

### Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.

Cat. No. 10231X                                    Form **W-9** (Rev. 10-2018)

**Amber Aldrich** May 18th, 2021 at 9:34 AM
Capital Plus W-9.pdf

✕

Internal Revenue Service ▶ Go to www.irs.gov/FormW9 for instructions and the latest information.

1 Name (as shown on your income tax return). Name is required on this line; do not leave this line blank.

2 Business name/disregarded entity name, if different from above

3 Check appropriate box for federal tax classification of the person whose name is entered on line 1. Check only one of the following seven boxes.

☐ Individual/sole proprietor or single-member LLC ☐ C Corporation ☐ S Corporation ☐ Partnership ☐ Trust/estate

4 Exemptions (codes apply only to certain entities, not individuals; see instructions on page 3):

Exempt payee code (if any) _____

☐ Limited liability company. Enter the tax classification (C=C corporation, S=S corporation, P=Partnership) ▶ _____

Note: Check the appropriate box in the line above for the tax classification of the single-member owner. Do not check LLC if the LLC is classified as a single-member LLC that is disregarded from the owner unless the owner of the LLC is another LLC that is not disregarded from the owner for U.S. federal tax purposes. Otherwise, a single-member LLC that is disregarded from the owner should check the appropriate box for the tax classification of its owner.

Exemption from FATCA reporting code (if any) _____

☐ Other (see instructions) ▶

5 Address (number, street, and apt. or suite no.) See instructions.

Requester's name and address (optional)

6 City, state, and ZIP code

7 List account number(s) here (optional)

## Part I  Taxpayer Identification Number (TIN)

Enter your TIN in the appropriate box. The TIN provided must match the name given on line 1 to avoid backup withholding. For individuals, this is generally your social security number (SSN). However, for a resident alien, sole proprietor, or disregarded entity, see the instructions for Part I, later. For other entities, it is your employer identification number (EIN). If you do not have a number, see How to get a TIN, later.

Note: If the account is in more than one name, see the instructions for line 1. Also see What Name and Number To Give the Requester for guidelines on whose number to enter.

**Social security number**

**Employer identification number**

## Part II  Certification

Under penalties of perjury, I certify that:

1. The number shown on this form is my correct taxpayer identification number (or I am waiting for a number to be issued to me); and
2. I am not subject to backup withholding because: (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding; and
3. I am a U.S. citizen or other U.S. person (defined below); and
4. The FATCA code(s) entered on this form (if any) indicating that I am exempt from FATCA reporting is correct.

Certification instructions. You must cross out item 2 above if you have been notified by the IRS that you are currently subject to backup withholding because you have failed to report all interest and dividends on your tax return. For real estate transactions, item 2 does not apply. For mortgage interest paid, acquisition or abandonment of secured property, cancellation of debt, contributions to an individual retirement arrangement (IRA), and generally, payments other than interest and dividends, you are not required to sign the certification, but you must provide your correct TIN. See the instructions for Part II, later.

**Sign Here**

Signature of U.S. person ▶

Date ▶

## General Instructions

Section references are to the Internal Revenue Code unless otherwise noted.

Future developments. For the latest information about developments related to Form W-9 and its instructions, such as legislation enacted after they were published, go to www.irs.gov/FormW9.

## Purpose of Form

An individual or entity (Form W-9 requester) who is required to file an information return with the IRS must obtain your correct taxpayer identification number (TIN) which may be your social security number (SSN), individual taxpayer identification number (ITIN), adoption taxpayer identification number (ATIN), or employer identification number (EIN), to report on an information return the amount paid to you, or other amount reportable on an information return. Examples of information returns include, but are not limited to, the following.

• Form 1099-INT (interest earned or paid)

• Form 1099-DIV (dividends, including those from stocks or mutual funds)

• Form 1099-MISC (various types of income, prizes, awards, or gross proceeds)

• Form 1099-B (stock or mutual fund sales and certain other transactions by brokers)

• Form 1099-S (proceeds from real estate transactions)

• Form 1099-K (merchant card and third party network transactions)

• Form 1098 (home mortgage interest), 1098-E (student loan interest), 1098-T (tuition)

• Form 1099-C (canceled debt)

• Form 1099-A (acquisition or abandonment of secured property)

Use Form W-9 only if you are a U.S. person (including a resident alien), to provide your correct TIN.

If you do not return Form W-9 to the requester with a TIN, you might be subject to backup withholding. See What is backup withholding, later.

Cat. No. 10231X

Form **W-9** (Rev. 10-2018)

Shared in 🔒 ppp-fast-lane-blue-acorn ◆

 **Amber Aldrich** May 18th, 2021 at 9:34 AM
Capital Plus PPP Loan Documents.pdf ✕

loan by Lender, **Capital Plus Financial, LLC** to _____, a(n)
_____, in the amount of $_____.

In consideration of Capital Plus Financial, LLC, located at 2247 Central Drive, Bedford, Texas 76021, (hereinafter called "Lender") making the above loan, each of the undersigned, jointly and severally, do hereby agree as follows:

1.      In the event the promissory note or any other document or other writing evidencing, securing or pertaining to the above loan is misplaced or lost or incorrectly reflects the true and correct terms, conditions or provisions of the loan in the opinion of Lender, each of the undersigned shall execute, acknowledge, initial and deliver to Lender all documents and other writings that Lender requests which Lender deems necessary to replace or correct any misplaced, lost or incorrect document or other writing; and

2.      In the event Lender deems it necessary that any additional documents or other writings be executed by any of the undersigned in connection with or pertaining to the above loan which have not been requested to be executed by the undersigned on or before the date hereof (or which were requested but not executed for any reason whatsoever), each of the undersigned shall execute, acknowledge, initial and deliver to Lender all such additional documents or other writings that Lender may reasonably request in connection with such loan; and

3.      Each of the undersigned further agrees to execute, acknowledge, initial and deliver to Lender all such documents and writings and pay such additional sums requested by Lender within ten (10) days after Lender requests same. Any request by Lender shall be deemed given and received on the earlier of (i) the date such request is actually received by one of the undersigned or (ii) three (3) days after such request is mailed, postage prepaid and addressed to any of the undersigned at the last known address of the undersigned in accordance with the records of Lender, whichever date occurs first; and

4.      If any of the undersigned refuses or fails within such ten (10) day period to (i) execute, acknowledge, initial and deliver any such document or other writing requested by Lender, or (ii) pay any such fees, expenses, costs or interest, each of the undersigned, jointly and severally, agree to pay to Lender all losses, damages and expenses paid or incurred by Lender in any manner emanating therefrom or connected therewith, including (but not limited to) reasonable attorney's fees, and each of the undersigned further agree that any such failure or refusal shall constitute a default and an Event of Default under the note and all other writings evidencing, securing or pertaining to said loan; and

5.      Each of the undersigned hereby acknowledges that Lender is relying upon this agreement in making the above loan and that Lender would not make such loan unless each of the undersigned execute and deliver this agreement; and each of the undersigned further agree that this agreement (i) shall inure to the benefit of Lender and each subsequent holder of the note evidencing such loan, and (ii) shall be binding upon each of the undersigned and upon each of the heirs, personal representatives, successors and assigns of each of the undersigned.

EXECUTED

**BORROWER:**

_____

A(n) _____

By:_____

Name:_____

Title:_____

**BUSINESS PURPOSE STATEMENT**
**(SBA Paycheck Protection Program)**

I, _____, _____ of _____
a(n) _____, state as follows:

1.      To induce Capital Plus Financial, LLC, 2247 Central Drive, Bedford, Texas 76021, to extend credit to _____, a(n)_____,

I represent that the proceeds of the loan in the amount of $_____ will be used

Shared in 🔒 **ppp-fast-lane-blue-acorn** ◆

EXHIBIT 35

**To:**      Matt Yahes[matt.yahes@blueacorn.co]; Toby Scammell[toby@womply.com]
**From:**    Barry Calhoun[barry@blueacorn.co]
**Sent:**    Wed 5/19/2021 5:33:01 AM (UTC-07:00)
**Subject:**  [EXTERNAL] Re: Please Withdraw/Void DocuSign

Toby,
Who should we connect with to get a process in place to manage this stuff?

Thanks

Barry

Sent from my iPhone


> On May 19, 2021, at 8:31 AM, Matt Yahes <matt.yahes@blueacorn.co> wrote:
>
>
> do you want me to connect with someone at womply to get an overview of all the different processes?  I can probably get what Eric needs in a 20 min call.  if so, please give me a name to call.
>
> ---------- Forwarded message ---------
> From: **Eric Donnelly** <edonnelly@capitalplusfin.com>
> Date: Tue, May 18, 2021 at 8:07 AM
> Subject: Fw: Please Withdraw/Void DocuSign
> To: Barry Calhoun <barry@blueacorn.co>
> Cc: Matt Yahes <matt.yahes@blueacorn.co>, Greg Jacobson <gjacobson@capitalplusfin.com>, Farzana Giga <fgiga@capitalplusfin.com>
>
>
> A fairly benign request but since we don't have the equivalent of bank@blueacorn for Womply yet, not sure where to send this?
> Also, I'm sure you saw the $5B remaining funds email from SBA. Probably light by a couple of billion in my opinion given the ones likely falling out..
>
> ------ Forwarded Message ------
> From: "Jade Hughes" <ms.jade87@icloud.com>
> To: fgiga@capitalplusfin.com
> Cc: edonnelly@capitalplusfin.com
> Sent: 5/18/2021 6:02:30 AM
> Subject: Please Withdraw/Void DocuSign
>
> Good Morning,
>
> This morning I was sent the Ppp loan application docusign from womply. However, I didn't realize it was for the first draw until I logged into my Womply portal. I've already been funded for my first draw. Could you please withdraw/void the DocuSign, as I do not want my chances of obtaining a second draw to be ruined, and I do not want to increase the chances of getting a secondary lender review hold either.
>
> Thanks,
>
> Jade Hughes
>
> Sent from my iPhone

**EXHIBIT 33**

**To:** Crystal Stephens[cstephens@womply.com]; Toby Scammell[toby@womply.com]
**Cc:** Greg Jacobson[gjacobson@capitalplusfin.com]; connie@womply.com[connie@womply.com]
**From:** Eric Donnelly[edonnelly@capitalplusfin.com]
**Sent:** Tue 6/1/2021 5:59:59 PM (UTC-07:00)
**Subject:** [EXTERNAL] Re: [EXTERNAL] Womply/Capital Plus Customer Service

Thank you Toby and Crystal. I appreciate the quick reply and all the options. We'll let you know if anything else comes up. I hope all is well as we wind down PPP.
Thanks,
eric

On 6/1/2021 6:07:35 PM, Crystal Stephens <cstephens@womply.com> wrote:

Greg,

Happy to assist. There are several ways in which customers can get assistance:

**Option 1:**
Our FAQ can answer 99% of customer questions.

**Option 2:**
If a customer cannot find an answer in our FAQ they can fill out a support ticket here.

**Option 3:**
We have a chat team who can answer their questions. To reach the chat team they can simply log in to their application portal here.

In rare cases, Connie can assist with one-off requests, and my team can support her with those queries. Typically these are emails where the SBA has an inquiry.

Feel free to forward over the one you have.

Cheers

On Tue, Jun 1, 2021 at 4:38 PM Toby Scammell <toby@womply.com> wrote:

Hi Eric,
Yes we can get this setup. Are you getting a lot of inquiries? I would have expected them to go to BA. Crystal and Connie (ccd) can help. Let us know what you need.
Best,
Toby

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Tue, Jun 1 2021 at 3:06 PM, Eric Donnelly <edonnelly@capitalplusfin.com> wrote:

Hi Toby,
I hope you're doing well. I meant to try you earlier on this but do you have some time for me and Greg on how to handle Womply customer service inquiries we're receiving.
With Blueacorn we have a dedicated CS rep and a dedicated email address.Ideally, we'd like a similar structure.

Please let me know when you've got a few minutes to discuss.

Thanks,

Eric

--
Crystal Stephens | Sr Director of Customer Success | Womply



8:36

🔒 **ppp-fast-lane-blue-acorn**
12 members ›

Jun 2nd, 2021

**Noah** 9:35 AM
@cory we have not gotten a successful PROM note back yet, the version this morning had another issue



NOTICE - NO ORAL AGREEMENTS

RE:   Loan by Lender, Capital Plus Financial, LLC to Borrower, Shelly Whitt,a(n) BusinessTypeReplace , in the amount of $1.47.

Im calling Joe this morning to see whats going on

**Noah** 12:01 PM
We have approval on PROM note, working with compliance to get signoff on loans

💪 1    🙌 1    😃

**Jun 4th, 2021**

🗑 This message was deleted.

2 replies

**Amber Aldrich** 1:55 PM
@here Prom Note is handled. Noah is working on the compliance side of approving the loans. I will receive the

🗑 **8 people** are from blueacorn

Message ppp-fast-lane-blue-acorn

🏠 Home     DMs     @ Mentions     🔍 Search     You

**EXHIBIT 38**



**EXHIBIT 39**



**Jul 9th, 2021**

**David Rathmann** 8:41 AM
@Connie Spencer-Adams For returns, we evaluate the return reason and route to one of 3 processes.
- Normal - clear to fund as long as the strongest identity checks have been passed. We are looking at the ID and Bank account
- Enhanced Diligence - the return reason indicated potential fraud which requires additional information to be collected. This follows the previous protocol of the 3K we did not clear to fund but were SBA approved.
- Manual Review - these indicate a manual reverification of the file should be performed to ensure the verification criteria were met.
I've sent @Josh the returns queue and he is routing the return reasons. We will provide a file of the return, reason, and addenda with the route the user should take. @Noah, @Josh please jump in if I missed anything.

 **Josh Busby** 8:46 AM
joined ppp-fast-lane-blue-acorn from an invitation by David Rathmann.

**8 people** are from blueacorn





8:38

🔒 **ppp-fast-lane-blue-acorn**
12 members ›

SBA approved.
- Manual Review - these indicate a manual reverification of the file should be performed to ensure the verification criteria were met.

I've sent @Josh the returns queue and he is routing the return reasons. We will provide a file of the return, reason, and addenda with the route the user should take. @Noah, @Josh please jump in if I missed anything.

**Josh Busby** 8:46 AM
joined ppp-fast-lane-blue-acorn from an invitation by David Rathmann.

**Noah** 8:55 AM
Nope that is correct.
Yes we will process additional fundings

just no new IDL requests (new loans)

*we = Cap Plus

**Amber Aldrich** 9:15 AM
@Connie Spencer-Adams I spoke with Noah this morning regarding your question on the process for Failed Funding and he said there will be three different buckets:
- If they are manual reviews, 1 person on your end to manually review
- If they are EDD, process through EDD on your end

🔌 **8 people** are from blueacorn

Message ppp-fast-lane-blue-acorn

🏠 Home    💬 DMs    @ Mentions    🔍 Search    You

**EXHIBIT 40**

**To:** Greg Jacobson[gjacobson@capitalplusfin.com]; Crystal Stephens[cstephens@womply.com]
**Cc:** Connie Spencer-Adams[connie@womply.com]; Eric Donnely NEW CONTACT[edonnelly@capitalplusfin.com]
**From:** Toby Scammell[toby@womply.com]
**Sent:** Thur 6/24/2021 10:03:47 AM (UTC-07:00)
**Subject:** Re: Re[6]: Breakup Emails

Cool, that looks fine to me, thanks Greg

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Thu, Jun 24 2021 at 6:56 PM, Greg Jacobson <gjacobson@capitalplusfin.com> wrote:

Toby while I agree with you that we set the rules you are the ones applying them and deciding what fits and doesn't.

That is why i suggested the joint methodology language in my email earlier today.   To say that CPF had declined them when we haven't looked at the file itself would be reckless.   I've attached a redline that I think will stake out the middle ground so we can get this done.  Please see attached.

Greg

------ Original Message ------
From: "Toby Scammell" <toby@womply.com>
To: "Greg Jacobson" <gjacobson@capitalplusfin.com>
Cc: "Connie Spencer-Adams" <connie@womply.com>; "Eric Donnely NEW CONTACT"
<edonnelly@capitalplusfin.com>; "Crystal Stephens" <cstephens@womply.com>
Sent: 6/24/2021 12:42:12 PM
Subject: Re: Re[4]: Breakup Emails

Hi Greg, With other lenders, we simply tell borrowers that their lender declined them. Womply hasn't made determinations or decisions on these loans—we've only collected data and applied whatever rules BlueAcorn/CapPlus have asked us to apply. In this case I'm not sure we even understand why these businesses are being denied (not that we need to).
I'm happy for Womply to communicate the result clearly, but the decisions here are not Womply's. Are there specific changes that we made that you think aren't accurate?
Best,
Toby

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Thu, Jun 24 2021 at 6:19 PM, Greg Jacobson <gjacobson@capitalplusfin.com> wrote:

Toby -

It was my understanding that you were decisioning everyone last night.  If they hadn't already received a promissory note those that were approved should get them today and those that can't pass the tests referenced are being declined.

We also agreed you would send out declinations today that explained why those previously approved were not funded.

Since y'all inspected the documents, and have the archive of what was sent, when it was sent and importantly what wasn't sent it is important that is disclosed in the declination letters. Doing anything else would leave the applicant with the impression that CPF reviewed the information and determined eligibility and we did not do that.

Certainly we imposed criteria and the letter as drafted (with my prior change) indicates that squarely.  I'm concerned that this version below eliminates all reference to Womply and that just won't work.  We can't be anything other than straightforward about who made the determination otherwise.

Thanks
Greg


------ Original Message -----
From: "Toby Scammell" <toby@womply.com>
To: "Greg Jacobson" <gjacobson@capitalplusfin.com>
Cc: "Connie Spencer-Adams" <connie@womply.com>; "Eric Donnely NEW CONTACT"
<edonnelly@capitalplusfin.com>; "Crystal Stephens" <cstephens@womply.com>
Sent: 6/24/2021 12:00:22 PM
Subject: Re: Re[2]: Breakup Emails


Hi Greg,
Does the text below work for you? Also, will you be confirming the exact list of businesses that should receive this?

Subject: Important Update
Hello [insert first name],
We are writing to let you know that in conjunction with your lender, and based upon information you provided, your lender has determined your application does not meet the requirements for the Paycheck Protection Program. Unfortunately, your lender will not be able to fund your PPP loan.
During their review and processing of millions of loan applications, they have continually updated protocols to eliminate applications that do not meet the standards of the PPP. As part of their process, which included a thorough manual review by their service team, they concluded that a responsible lender could not fund your loan due to at least one of the following reasons: They were unable to verify your identity.
You did not submit sufficient proof that your business was operational as of February 2020.
You did not sign and accept the promissory note.
You did not submit sufficient documentation to verify eligibility as required by PPP.
You did not upload a verifiable copy of one of the following requested documents:
2019 or 2020 1099-MISC, 1099-NEC or W3
Incorporation Documents
The filed Schedule C included in your tax return (2019 or 2020 as requested)
Proof of Quarterly Tax Payment to IRS (Q4 2019 or Q1 2020 as requested)
Filed 1040 tax return (2019 or 2020 as requested)
We understand that this is not the result you were looking for. Please know, we take our efforts to verify compliance with PPP standards very seriously and simply could not verify your eligibility based upon the information you provided. This decision is final and cannot be appealed.
Best,
Womply


Toby Scammell
Founder & CEO at Womply

On Thu, Jun 24 2021 at 1:43 PM, Greg Jacobson <gjacobson@capitalplusfin.com> wrote:

Toby - I understand the intent of doing that and don't mind us accepting responsibility given we have overlayed our guidelines.  That said, when applicants do come back to us (and they will) how are we going to avoid them asking CPF for documentation that sits with Womply?

My suggestion is that we tweak it just a bit more.  If we start the letter with the following sentence I think it covers the situation more thoroughly and accurately.  This way if we do get any real push-back we have indicated in this letter our need to consult one another (us for policy and you for documentation) prior to issuing any further response.

"We are writing to let you know that in conjunction with your Lender we have determined that based upon information you provided, your application does not meet the requirements for the Paycheck Protection Program. Unfortunately, Womply and [Capital Plus or your Lender] will not be able to fund your PPP loan.

I think that should cover it but just lmk if you think we need to adjust it further.

Thanks

Greg

------ Original Message ------
From: "Toby Scammell" <toby@womply.com>
To: "Greg Jacobson" <gjacobson@capitalplusfin.com>
Cc: "Connie Spencer-Adams" <connie@womply.com>; "Eric Donnely NEW CONTACT" <edonnelly@capitalplusfin.com>
Sent: 6/24/2021 7:24:40 AM
Subject: Re: Breakup Emails

> Thanks, we'll update this so it refers to "your lender" on the decision so it still makes sense coming from Womply.
>
> Toby Scammell
> Founder & CEO at Womply
> 415-246-3250
> LinkedIn
>
> On Thu, Jun 24 2021 at 12:43 PM, Greg Jacobson <gjacobson@capitalplusfin.com> wrote:
>
> Toby - here is the final copy for the declination or "break-up" emails.
>
> Thanks
> Greg
>
> ------ Forwarded Message ------
> From: "Matt Yahes" <matt.yahes@blueacorn.co>

To: "Greg Jacobson" <gjacobson@capitalplusfin.com>; "Eric Donnelly"
<edonnelly@capitalplusfin.com>
Sent: 6/23/2021 5:31:59 PM
Subject: Breakup Emails

Greg / Eric,
Attached are the legal approved breakup emails that will go out tomorrow.

# EXHIBIT 41

**To:**      Connie Spencer-Adams[connie@womply.com]; Toby Scammell[toby@womply.com]; Eric Donnely NEW
CONTACT[edonnelly@capitalplusfin.com]
**From:**    Greg Jacobson[gjacobson@capitalplusfin.com]
**Sent:**    Fri 6/25/2021 4:18:56 AM (UTC-07:00)
**Subject:**    Fw: Re: PPP Loan ██████████████████████

please see below a request for status from the SBA.    Can you please provide this one and also confirm the
denials went out last night?

If we can get a worksheet of the denials by SBA number and borrower name,  and also confirm all else is getting
funded we can handle the vast majority of these inquiries ourselves for the next week.  We do expect the volume
to be pretty substantial.

g

------ Forwarded Message ------
From: "Eric Donnelly" <edonnelly@capitalplusfin.com>
To: "Dalton, Christopher J." <christopher.dalton@sba.gov>
Cc: "Greg Jacobson" <gjacobson@capitalplusfin.com>
Sent: 6/25/2021 12:37:25 AM
Subject: Re: PPP Loan ██████████████████

Hi Chris,
Sorry for the delayed response to your email. This looks like a loan we're working with Womply. We'll get you an
answer ASAP and also communicate the status to the borrower once we have an answer from them.
Thanks,
Eric
On Jun 24, 2021, 9:04 AM -0600, Dalton, Christopher J. , wrote:

Hello Eric,

Hope all is well. Please see the email below. ██████ is having an issue with her PPP loan as it has been
approved but she still awaiting the funds. See the attached E-Tran record of the loan. If you or somebody at
Capital Plus can reach out to her for assistance on this matter, it will greatly be appreciated. ██████ email
address is ████████████████████ or ████████████.

Thanks

Chris

Christopher Dalton
Lender Relations Specialist
New York District Office
**U.S. Small Business Administration**
(212) 264-4352

**APPX. 185**

Cell ████████████
Christopher.Dalton@sba.gov
Case 3:21-cv-03058-S    Document 46-1    Filed 02/14/22    Page 186 of 231    PageID 670



[Home Page](#) | [Twitter](#) | [Instagram](#) | [Facebook](#) | [YouTube](#) | [LinkedIn](#) | [Email Alerts](#)

**For detailed information on SBA programs for the coronavirus, please visit [www.sba.gov/coronavirus](http://www.sba.gov/coronavirus) and for information on all federal programs, visit [www.usa.gov/coronavirus](http://www.usa.gov/coronavirus) or [www.gobierno.usa.gov/coronavirus](http://www.gobierno.usa.gov/coronavirus) (en Español).**

---

**From:** dori boutique <[doriboutique@gmail.com](mailto:doriboutique@gmail.com)>
**Sent:** Thursday, June 24, 2021 10:37 AM
**To:** Dalton, Christopher J. <[christopher.dalton@sba.gov](mailto:christopher.dalton@sba.gov)>
**Subject:** eidlppp loan

CAUTION - The sender of this message is external to the SBA network. Please use care when clicking on links and responding with sensitive information. Send suspicious email to [spam@sba.gov](mailto:spam@sba.gov).

Hi Christopher,This is ████████ Minority women own small business for 14 years Covid 19 destroyed my business .SBA approved ppp loan .I email to Ms .Faranza giga capital plus ,I got respond from Greg Jacobson  i give him my information still no respond ."I NEED HELP."

My lender is Capital Plus

My loan no is ███████.

First draw ppp loan .

Amount of loan is not big but for me is really helpful to restart my business .


Thank you,

Regards,

████████

**EXHIBIT 42**

# Fwd: Womply Invoice INV07688

Begin forwarded message:

> **From:** bill hutchinson <bill.hutchinson@blueacorn.co>
> **Date:** July 1, 2021 at 9:06:55 PM EDT
> **To:** Invoices <invoices@blueacorn.co>, Noah Spirakus <noah@blueacorn.co>, Barry Calhoun <barry@blueacorn.co>, Erin Valdes <erin.valdes@blueacorn.co>
> **Cc:** Amber Aldrich <amber.aldrich@blueacorn.co>
> **Subject: Fwd: Womply Invoice INV07688**

---------- Forwarded message ----------
From: **Jessica Harris** <jharris@womply.com>
Date: Thu, Jul 1, 2021 at 3:48 PM
Subject: Womply Invoice INV07688
To: <bill.hutchinson@blueacorn.co>
Cc: Accounts Receivable <accountsreceivable@womply.com>, Partnerships Team <partnerships@womply.com>

Bill,

Attached is today's invoice showing the total outstanding balance for loans funded through 6/28/2021. Please confirm receipt of this email. Thank you for your partnership, have a great weekend!

—

**Regards,**

**Jessica Harris** | Accounts Receivable & Payable | **Womply** | (435) 363-5728 | jharris@womply.com

—

William E. Hutchinson
Chief Financial Officer
704.441.3426



*"Doing the right things, for the right reasons, for the right people"*

--

Farzana Giga
Chief Financial Officer
**Capital Plus Financial, LLC**
**Crossroads Systems, Inc.**

(p) 817-510-2235: ███████████
(a) 2247 Central Dr. Bedford, TX 76021
(e) fgiga@capitalplusfin.com



| From | **Toby Scammell** <toby@womply.com> |
|---|---|
| To | **Barry Calhoun** <barry@blueacorn.co> |
| | Thursday, July 1 2021 at 10:23 PM PDT   ✕ |

Thanks for headsup

Toby Scammell

Founder & CEO at Womply

415-246-3250

LinkedIn

On Fri, Jul 2 2021 at 4:41 AM, Barry Calhoun <barry@blueacorn.co> wrote:

> FYI
>
> Sent from my iPhone
>
> Begin forwarded message:
>
> > **From:** Farzana Giga <fgiga@capitalplusfin.com>
> > **Date:** July 1, 2021 at 9:31:33 PM EDT
> > **To:** Barry Calhoun <barry@blueacorn.co>
> > **Cc:** Erin Valdes <erin.valdes@blueacorn.co>, David Rathmann <david.rathmann@blueacorn.co>
> > **Subject: Re: Womply Invoice INV07688**

They've been billed as of Monday. I'll let you know once we start collecting.

On Thu, Jul 1, 2021 at 8:10 PM Barry Calhoun <barry@blueacorn.co> wrote:

I need to know when we start getting paid in these.

Thanks

BC

Sent from my iPhone

Begin forwarded message:

**From:** bill hutchinson <bill.hutchinson@blueacorn.co>
**Date:** July 1, 2021 at 9:06:55 PM EDT
**To:** Invoices <invoices@blueacorn.co>, Noah Spirakus <noah@blueacorn.co>, Barry Calhoun <barry@blueacorn.co>, Erin Valdes <erin.valdes@blueacorn.co>
**Cc:** Amber Aldrich <amber.aldrich@blueacorn.co>
**Subject: Fwd: Womply Invoice INV07688**

---------- Forwarded message ----------
From: **Jessica Harris** <jharris@womply.com>
Date: Thu, Jul 1, 2021 at 3:48 PM
Subject: Womply Invoice INV07688
To: <bill.hutchinson@blueacorn.co>
Cc: Accounts Receivable <accountsreceivable@womply.com>, Partnerships Team <partnerships@womply.com>

Bill,

Attached is today's invoice showing the total outstanding balance for loans funded through 6/28/2021. Please confirm receipt of this email. Thank you for your partnership, have a great weekend!

--

**Regards,**

**Jessica Harris** | Accounts Receivable & Payable | **Womply** | (435) 363-5728 | jharris@womply.com

--

William E. Hutchinson

Chief Financial Officer

704.441.3426

blueacorn

*"Doing the right things, for the right reasons, for the right people"*

---

Farzana Giga

Chief Financial Officer

**Capital Plus Financial, LLC**

**Crossroads Systems, Inc.**

(p) 817-510-2235█████████████

(a) 2247 Central Dr. Bedford, TX 76021

(e) fgiga@capitalplusfin.com

---

Me                Toby Scammell Founder & CEO at Womply 415-246-3250 LinkedIn          🔗  JUL 1

Cory              Hey Toby - we still haven't received any payments from Blue Acorn. Are there diff...   JUL 22

**Me to Cory & Thom**                                                                        JUL 22

Please email Barry and ask him. Let him know that I shared his previous commitment to make a substantial payment by end of last week and ask him for an update on when they expect to make their first payment and how much it'll be for.

Opened by Thom and Cory

**APPX. 191**

**EXHIBIT 43**



| Date: | 7/21/2021 |
|---|---|
| Invoice No. | INV07737 |

From:

Oto Analytics, Inc. (dba Womply)
548 Market Street #737451
San Francisco, CA 84104

To:

Blue Acorn LLC
30 N Gould St.
Ste 3297
Sheridan WY 82801

**New Invoice(s)**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date |
|---|---|---|---|---|---|---|---|---|
| 7/16/2021 | INV07737 | 36 | 385,525.00 | 3,855.25 | 26,575.42 | - | 30,430.67 | 8/5/2021 |

**Outstanding Invoices Awaiting Payment**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date |
|---|---|---|---|---|---|---|---|---|
| 6/21/2021 | INV07675 | 75,090 | 827,542,920.00 | 8,275,429.20 | 58,586,935.13 | - | 66,862,364.33 | 7/11/2021 |
| 6/25/2021 | INV07688 | 8,361 | 94,442,963.00 | 944,429.63 | 6,363,212.04 | - | 7,307,641.67 | 7/15/2021 |
| 7/9/2021 | INV07728 | 3,671 | 38,556,366.00 | 385,563.66 | 2,733,309.84 | - | 3,118,873.50 | 7/29/2021 |
| Unapplied payments | | | | | | - | 0.00 | |
| **Total** | | **87,158** | **960,927,774** | **9,609,278** | **67,710,032** | **0** | **77,319,310** | |

| | |
|---|---|
| Total Payment Outstanding based on Net 15 | **74,170,006.00** |
| Late fee on Outstanding Balance over Net 15 | **0.00** |

*Unpaid invoices are subject to a finance charge of **1.5%** per month or the maximum permitted by law, whichever is lower, plus all expenses of collection.*

*If you have any questions regarding this invoice, please contact AccountsReceivable@Womply.com. Wire/ACH information was communicated separately. To prevent fraud or other potential funding problems, DO NOT accept changes to wiring instructions without verbal confirmation from an authorized representative from Womply. Supporting detail included as separate attachment.*

**EXHIBIT 44**



Date:      8/4/2021
Invoice No.    INV07737

From:               Oto Analytics, Inc. (dba Womply)
                      548 Market Street #737451
                      San Francisco, CA 84104

To:                 Blue Acorn LLC
                      30 N Gould St.
                      Ste 3297
                      Sheridan WY 82801

**New Invoice(s)**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date | Late Fees |
|---|---|---|---|---|---|---|---|---|---|
| 7/31/2021 | | 0 | 0.00 | 0.00 | 0.00 | - | 0.00 | | - |

**Outstanding Invoices Awaiting Payment**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date | Late Fees |
|---|---|---|---|---|---|---|---|---|---|
| 6/21/2021 | INV07675 | 74,312 | 838,095,697.00 | 8,163,761.95 | 57,972,654.34 | - | 66,136,416.29 | 7/11/2021 | 760,568.79 |
| 6/25/2021 | INV07688 | 8,359 | 94,476,795.00 | 944,091.31 | 6,361,550.36 | - | 7,305,641.67 | 7/15/2021 | 69,403.60 |
| 7/9/2021 | INV07728 | 3,671 | 38,556,366.00 | 385,563.66 | 2,733,309.84 | - | 3,118,873.50 | 7/29/2021 | 7,797.18 |
| 7/16/2021 | INV07737 | 36 | 385,525.00 | 3,855.25 | 26,575.42 | - | 30,430.67 | 8/5/2021 | - |
| Unapplied payments | | | | | | - | - | | |
| **Total** | | **86,378** | **971,514,383** | **9,497,272** | **67,094,090** | **0** | **76,591,362** | | |

Total Payment Outstanding based on Net 15    **76,560,931.46**
Late fee on Outstanding Balance over Net 15    **837,769.57**

*Unpaid invoices are subject to a finance charge of **1.5%** per month or the maximum permitted by law, whichever is lower, plus*

*If you have any questions regarding this invoice, please contact AccountsReceivable@Womply.com. Wire/ACH information was communicated separtely. To prevent fraud or other potential funding problems, DO NOT accept changes to wiring instructions without verbal confirmation from an authorized representative from Womply. Supporting detail included as separate attachment.*

**EXHIBIT 45**



**EXHIBIT 46**

**Oto Analytics, Inc. d/b/a Womply**
548 Market Street Suite 73871
San Francisco, CA 94104

August 18, 2021

**Via First Class Mail and Email**

BA Fin Orion, LLC ("Blue Acorn")
c/o Barry Calhoun, CEO
barry@blueacorn.co

Re:   Notice of Termination

Dear Barry,

Reference is made to the PPP Loan Referral Agreement dated May 10, 2021 (the "Referral Agreement"), by and between Oto Analytics, Inc. d/b/a Womply ("Womply") and BA Fin Orion LLC ("Blue Acorn"), and the Womply Developer Order Form effective May 10, 2021 (the "Order Form," and together with the Referral Agreement, the "Agreements")., by and between Womply and Blue Acorn.

Section 2.3 of the Referral Agreement states that, "[w]ithin five (5) days after Blueacorn receives its fees from the lender that submitted the Referred Loan to the SBA, Blueacorn will pay Womply all associated Referral Fees for such applicable Referred Loan."  Section 2.2 of the Referral Agreement further provides that the Referral Fee Amount is 1.00% of the outstanding balance of each Referred Loan at the time of loan disbursement.

Section 3.5 of the Order Form states that, "[w]ithin five (5) days after Blueacorn receives its fees from the lender that submitted the Referred Loan to the SBA, [Blue Acorn] will pay Womply all associated Technology Fees for each applicable Referred Loan."  Section 3.3 of the Order Form provides that Blue Acorn must pay Womply Technology Fees equal to "the first $250 from any Lender Processing Fee, plus 1/3 of the remaining Lender Processing Fee after the $250 is subtracted."

Section 5.2 of the Order Form and Section 4.2 of the Referral Agreement cover termination, and state that "either party may terminate this Agreement at its option by providing no less than thirty (30) days' written notice ('Notice of Termination') to the other party.  Either party may also terminate this Agreement immediately upon delivery of a Notice of Termination if the other party is in material breach of any warranty, representation, covenant or obligation under this Agreement or the Referral Agreement and is not able to cure such breach within seven (7) calendar days of receiving the Notice of Termination."

As you know, Womply has referred 86,383 loans to Blue Acorn under the Agreements, and Blue Acorn has referred those loans to Capital Plus Financial ("Capital Plus") for origination. Womply calculates that Blue Acorn now owes Womply in excess of $77 million in fees under the Agreements in connection with those Referred Loans.  Blue Acorn claims that it has not been paid

by Capital Plus, but Womply disputes this.  At the same time, Blue Acorn and Capital Plus are attempting to force Womply to execute a separate agreement pursuant to which Womply would be required to provide documents to Blue Acorn and Capital Plus to which they are not entitled. Regardless of whether Blue Acorn has been paid by Capital Plus or not, it is evident that Blue Acorn and Capital Plus are coordinating with each other to deprive Womply of the fees to which it is entitled in order to gain leverage over Womply in the parties' negotiations over that separate agreement.  Blue Acorn's bad faith efforts to deprive Womply of the benefits of the Agreements constitute a material breach of the Agreements.

In any event, Womply hereby notifies Blue Acorn that Womply is exercising its option to terminate the Agreements pursuant to Section 5.2 of the Order Form and Section 4.2 of the Referral Agreement.  The Agreements will terminate automatically within 30 days according to their terms. Womply reserves all of its rights under the Agreements and applicable law, including the right to seek damages for Blue Acorn's material breach of the Agreements.

Sincerely,

/s/ Toby Scammell

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| OTO ANALYTICS, INC. d/b/a WOMPLY | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-cv-2636-B |
| | § | |
| CAPITAL PLUS FINANCIAL, LLC, | § | |
| CROSSROADS SYSTEMS, INC., ERIC | § | |
| DONNELLY, BA FIN ORION, LLC d/b/a | § | |
| BLUEACORN, and BARRY CALHOUN | § | |
| | § | |
| Defendants. | § | |

## DECLARATION OF CORY CAPOCCIA

I, Cory Capoccia, hereby declare under penalty of perjury that the following is true and correct:

1.      I am the Co-Founder, Chief Business Development Officer, and President of Oto Analytics, Inc. d/b/a Womply ("Womply"). I provide this declaration to provide information and background about Womply's contract negotiations with BA Fin Orion, LLC d/b/a Blueacorn ("Blueacorn") and Capital Plus Financial, LLC ("Capital Plus"); Womply's reliance on representations by Blueacorn and Capital Plus during those negotiations; Womply's, Blueacorn's, and Capital Plus's performance and course of dealing under those contracts (the "Agreements"); and Blueacorn's and Capital Plus's refusal to pay Womply's fees for the services it provided them under those contracts. This declaration is based upon my personal knowledge, and I would be competent to testify to the following facts if called upon to do so.

### Background

2.      I co-founded Womply with Toby Scammell ("Scammell") to help small businesses that are underserved by technology. I graduated from the University of California, Los Angeles in

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

2006 with a bachelor's degree in business economics and accounting. I have more than 12 years of experience as a technology executive.

3.      As President of Womply, I negotiated contracts with financial partners and worked closely with Womply's lender partners in connection with the Paycheck Protection Program ("PPP"), including regarding operations, customer service, and Womply's technology platform (the "Technology Platform"). Womply developed the Technology Platform with Teslar Software ("Teslar"), and the Platform incorporates numerous integrated technology services.

### Contract Negotiations among Blueacorn, Capital Plus, and Womply

4.      Blueacorn is a lender service provider to two PPP lenders, one of which is Capital Plus in Texas. In early May 2021, I learned from Scammell that Blueacorn's CEO, Barry Calhoun ("Calhoun"), texted him a proposal for Womply to refer PPP loan applicants to Blueacorn's lender partner Capital Plus. Under Calhoun's proposal, Womply would contract with Blueacorn and provide both Blueacorn and Capital Plus with access to Womply's Technology Platform. In return for referring the loans and providing technology services, Womply would receive fees from Blueacorn for the Womply-referred PPP loans that Capital Plus funded and managed through Womply's Technology Platform.

5.      Scammell led Womply's negotiations with Blueacorn and Calhoun. I was also involved in the negotiation and implementation of the agreements and communicated regularly with Scammell about them. Throughout the negotiations, Scammell told me that he wanted a clear line of sight to funds and would not agree to contract with Blueacorn unless Blueacorn received funds directly from the United States Small Business Administration ("SBA").

6.      On May 7, 2021, Scammell introduced me to Calhoun by email to "get the referral agreement moving" and "have a quick technical call." Calhoun introduced me to Adam Spencer ("Spencer"), a consultant and Founder of elev8 Advisors Group ("elev8"), to discuss "the technical

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

and compliance side of the transaction."[*] Later that day, I had a telephone call with Spencer and Womply's Head of Engineering to discuss the "technical flows and specs" for Womply's potential Agreements with Blueacorn. True and correct copies of these emails are attached as Exhibit 1 hereto.

7.      On May 8, 2021, Spencer emailed me that "[w]e will have to create some language in the agreement" regarding embedding Blueacorn's software into Womply's Technology Platform and ensuring that "all of the data" is provided to Blueacorn. Later that day, I had a telephone call with Blueacorn Personnel and Womply's Head of Engineering to discuss these issues. A true and correct copy of this email is attached as Exhibit 1 hereto.

8.      On May 9, 2021, Womply personnel had a call with Blueacorn Personnel regarding "diligence items." After the call, Womply's Head of Engineering asked "whether this is the list from capital plus" and discussed "a direct sync up call with capital plus." Womply's Head of Engineering stated that, during the call, "Adam [Spencer] was planning to bring cap plus into the conversation in the evening's call." True and correct copies of these emails are attached as Exhibit 2 hereto.

9.      Later on May 9, 2021, I asked Blueacorn Personnel to provide "Capital Plus's SBA api credentials" so that "the bank" (*i.e.*, Capital Plus) could be given access to Womply's Technology Platform. Blueacorn Personnel responded the next day that they were "[w]orking with the bank [*i.e.*, Capital Plus] to get permissions created," and would "have [the credentials] sent over first thing in the morning." True and correct copies of these emails are attached as Exhibit 3 hereto.

---

[*] Because elev8 was a consultant to Blueacorn during the contract negotiations and implementation, I use "Blueacorn Personnel" to refer to both Blueacorn and elev8 employees.

10. On May 10, 2021, I worked with Teslar to provide Blueacorn Personnel with access to the Technology Platform. True and correct copies of these emails are attached as Exhibit 4 hereto.

11. On or shortly after May 11, 2021, I learned from Scammell that, on May 11, 2021, he had a telephone call with Calhoun and Eric Donnelly ("Donnelly"), the CEO of Capital Plus. Scammell told me that during the call:

    a. Calhoun and Donnelly each represented to Scammell that (i) Blueacorn would pass all Womply-referred PPP loans to Capital Plus for origination, (ii) Blueacorn and Capital Plus had a joint account at Evolve Bank & Trust (the "Joint Account") into which all fees received from the SBA for PPP loans funded by Capital Plus were deposited directly, (iii) the SBA fees for all Womply-referred PPP loans funded by Capital Plus would be deposited directly into the Joint Account, and (iv) Blueacorn and Capital Plus would provide Womply with visibility into the Joint Account so that Womply could verify when Blueacorn and Capital Plus received funds from the SBA;

    b. Calhoun, Donnelly, and Scammell agreed to the financial terms regarding Blueacorn's and Womply's fee structure;

    c. Scammell agreed that both Blueacorn and Capital Plus would have access to Womply's Technology Platform; and

    d. Calhoun represented that Blueacorn would be responsible for underwriting and would perform its own analysis of the application data it received from Womply.

12. Scammell told me that he was comfortable with the Agreements with Blueacorn because Calhoun and Donnelly had represented to him that Blueacorn and Capital Plus had a Joint

-4-

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

Account into which the SBA would pay loan processing fees directly, and that Womply would have visibility into the Joint Account.

### Performance Under the Agreements

13.     Under the Agreements, Womply referred potential PPP loan borrowers to Capital Plus through Blueacorn and provided access to the Technology Platform and its technology services to both Blueacorn and Capital Plus. Blueacorn employees and Capital Plus employees had direct access to the Technology Platform using their corporate email accounts. Womply referred 86,521 PPP loans to Capital Plus, which totaled more than $950 million in principal amount. From May to August 2021, Capital Plus funded those PPP loans.

14.     On May 18, 2021, Donnelly emailed Calhoun and others at Blueacorn and Capital Plus regarding a process for managing loans funded by Capital Plus referred through the "Womply portal." On May 19, 2021, Calhoun emailed Scammell to "get a process in place to manage this stuff" among Capital Plus, Blueacorn, and Womply. Scammell added me to the discussion to set up calls with "Matt from Blueacorn/Capital[]Plus" regarding the process for referrals and using Womply's Technology Platform. True and correct copies of these emails are attached as Exhibit 5 hereto.

15.     On June 18, 2021, Capital Plus's Chief Financial Officer emailed Womply and Blueacorn Personnel asking Womply to request additional documents from certain potential borrowers to "BA/CPF" otherwise they "will not be able to get funds." Womply's employees responded that Womply was "sending reminders to the borrowers every day reminding them that they have outstanding documents to sign." True and correct copies of these emails are attached as Exhibit 6 hereto.

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

**Blueacorn's and Capital Plus's Refusal to Pay Womply**

16.     Womply has not received any payments from Blueacorn or Capital Plus for the referral services or technology services it provided under the Agreements.

17.     On July 1, 2021, Womply sent an invoice to Blueacorn for "the total outstanding balance for loans funded through 6/28/2021." Calhoun forwarded this invoice to Capital Plus personnel, stating: "I need to know when we start getting paid in these." Capital Plus personnel responded: "They've been billed as of Monday. I'll let you know once we start collecting." True and correct copies of these emails are attached as Exhibit 7 hereto.

18.     On July 21, 2021, Womply sent an invoice to Blueacorn indicating that more than $76 million was due to Womply in outstanding referral fees and separate technology fees, not including the finance charge applicable to late fees. A true and correct copy of this invoice is attached as Exhibit 8 hereto.

19.     On July 22, 2021, I emailed Scammell that "we still haven't received any payments from Blue Acorn." Scammell responded that Calhoun made a "previous commitment to make a substantial payment by end of last week," and that I should "email Barry" to "ask him for an update on when they expect to make their first payment and how much it'll be for." True and correct copies of these emails are attached as Exhibit 7 hereto.

20.     Later on July 22, 2021, I emailed Calhoun: "I'm checking in with you re: the timing for payment to Womply. Toby shared your previous commitment to make a substantial payment by end of last week with us, but to date we have not received any payments from Blue Acorn. Can you please provide an update on when you will make their first payment and what amount we should expect for that?" Calhoun responded: "We have not been paid by capital plus." On July 23, 2021, I replied: "Thanks, Barry. Do you have a sense for when you expect to receive payment from Cap Plus?" On July 27, 2021, after I did not receive a response, I followed up: "Could you

-6-

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

please let us know timing for when you expect to receive payment from Cap Plus?" On July 28, 2021, after not receiving a response from Calhoun, I wrote: "Hi Barry - checking back in on this thread. Can you please advise so we can communicate and set appropriate expectations with all parties impacted by the delayed payment?" Calhoun responded: "I think cap plus has been requesting information and a process for access to files on their loans. I think getting into a flow with them regarding info sharing will be really helpful in giving them confidence to start releasing funds." I forwarded this correspondence to Scammell, who wrote: "Sounds like they are holding funds hostage." True and correct copies of these emails are attached as Exhibit 9 hereto.

21.     On July 29, 2021, I emailed Calhoun and Capital Plus: "[C]an you please let us know the status of receiving payment for the referral activity we sent through to Blue Acorn and Capital Plus? We were promised that we would receive payment weeks ago according to terms of our agreement and have yet to receive any payments." On August 1, 2021, after I did not receive a response, I wrote: "I haven't heard back from either of you and so I'm following up. Can you please provide an update on this? Thanks." Calhoun asked whether Womply had "gotten everything over to cap plus that they were looking for," and I responded, "Yes." Calhoun replied that he would "reach out and see what's going on." On August 3, 2021, I wrote: "Can you please provide an update on the timing of receiving the overdue payment? Thanks." True and correct copies of these emails are attached as Exhibit 10 hereto.

22.     On August 4, 2021, Womply sent a second invoice to Blueacorn indicating that more than $76 million was due to Womply in outstanding technology fees and referral fees, not including the finance charge applicable to late fees. A true and correct copy of this invoice is attached as Exhibit 11 hereto.

23.     Womply is currently owed $76,724,482.67 under the Agreements plus more than $7.6 million in financing charges, which continue to accrue. Womply has not received any payment from Blueacorn or Capital Plus for these amounts.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Dated:  February 14, 2022
        Lehi, Utah

_____
Cory Capoccia

DocuSign Envelope ID: 5ED0F539-3713-4A21-973D-5F93FFC11432

## EXHIBIT 1

**To:**      David Rathmann[david@elev8withus.com]
**Cc:**      Adam Spencer[adam@elev8withus.com]; Barry Calhoun[barry@elev8withus.com]; Cory Capoccia[cory@womply.com]; Toby Scammell[toby@womply.com]
**From:**   Mihir Sambhus[msambhus@womply.com]
**Sent:**   Sat 5/8/2021 11:39:43 PM (UTC-07:00)
**Subject:**  Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: blueacorn // womply

Thanks David. Working with the team to create the mapping of our field names to the SBA field names we discussed in the call today. Its turning out to be quite a bit of work on our side as we have to basically map everything we were sending to teslar to sba field names. We will have a sample file uploaded tomorrow afternoon that you can test in the SBA sandbox. To coordinate better, can we connect on slack as well? can create a channel and send you invites

--
**Mihir Sambhus** | VP of Engineering | Womply | 669 203 9720 | msambhus@womply.com


On Sat, May 8, 2021 at 11:18 PM David Rathmann <david@elev8withus.com> wrote:

> Mihir,
> It was great to speak with you today. Below is the link to the sftp credentials that we discussed on today's call.
>
> https://shred.io/e663e40b47
> password: ███████████
>
> Cheers,
> David

---

> **From:** Mihir Sambhus <msambhus@womply.com>
> **Sent:** Saturday, May 8, 2021 8:36 PM
> **To:** Adam Spencer <adam@elev8withus.com>
> **Cc:** Barry Calhoun <barry@elev8withus.com>; Cory Capoccia <cory@womply.com>; David Rathmann <david@elev8withus.com>; Toby Scammell <toby@womply.com>
> **Subject:** Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: blueacorn // womply
>
> Adam,
> One item we didn't get a chance to discuss in detail was how to check if the same business has applied in your platform. We will want to filter those out from our side when we send the batch. Can we send a list of hashed SSNs for all the businesses we will be sending over in the batch tomorrow first, so you guys could do a check and tell us which ones have also applied with you?
>
> Thanks
> Mihir
>
> On Sat, May 8, 2021 at 4:36 PM Adam Spencer <adam@elev8withus.com> wrote:
>
>> For the call:
>> Mihir: We need to get a test CSV from Whomply with an ID that will tie to back to your system for each row
>>
>> Adam Spencer
>> Managing Partner
>> elev8 Advisors Group
>> O: 877.929.9449
>> M: ███████████
>>
>> On May 8, 2021, at 4:30 PM, Cory Capoccia <cory@womply.com> wrote:

Hi Adam - thanks for the quick chat. Back on track for the CSV path. Mihir is able to join the 5pm PT call. Please circulate the details and he will forward to anyone from his team who will join too.

.

**Cory Capoccia**

On Sat, May 8 2021 at 5:05 PM, Adam Spencer <[adam@elev8withus.com](mailto:adam@elev8withus.com)> wrote:

Cory/Mihir,

Cory, I gave you a call but got VM. Are you possible available anytime with Mihir? I have our tech side ready to ask a couple of questions here, and in an even bigger pivot (for the good again) than earlier this afternoon, I believe we have a direct path. elev8 is already listed with blueacorn in the SBA Developer Key access logs, and with some small ingenuity we think we can at this point hopefully have Mihir code into the Sand box and therefore submit directly into the API. We will have to create some language in the agreement around the following:

- Make this a one-time evet only. We will close the Developer Key after successful transmission as to eliminate access go forward.
- We will still need to ingest all of the data, and the SFTP and CSV is still the preferred method. We will need this to occur first, and then move to submitting across after all PII is stored and secured.
- The language around the indemnification will have to be beefed up here as we spoke about earlier today.
- We will actually have to flip this around for you as well so for you to provide us (we are still sending ours to you as well) the Lucid Charts and Process Flows along with your SBA Slug document that shows the Application Data Fields, etc. as to ensure we are fully aligned.
- We will need to be able to have your Vendor Agreements on file before hitting submit as well as to make sure we are adding them to our SLAs and listing them as approved 3rd Party Vendors as well as our others for Audit purposes, both for the SBA and the Bank(s)

Probably something else I am missing here but we can flesh out in the call if that's the case. How does 5pm PST work for everyone this evening? If that's good I will circulate the invitation.

Adam

**Adam Spencer**

Managing Partner

**elev8 Advisors Group**

 <image001.png>

**APPX. 206**

adam@elev8withus.com



**From:** Cory Capoccia <cory@womply.com>
**Date:** Saturday, May 8, 2021 at 7:04 AM
**To:** Adam Spencer <adam@elev8withus.com>
**Cc:** Toby Scammell <toby@womply.com>, Mihir Sambhus <msambhus@womply.com>, Barry Calhoun <barry@blueacorn.co>
**Subject:** Re: [EXTERNAL] Re: [EXTERNAL] Re: [EXTERNAL] Re: blueacorn // womply

Excellent. On standby!

**Cory Capoccia**

On Sat, May 8 2021 at 8:02 AM, Adam Spencer <adam@elev8withus.com> wrote:

Cory,

Appreciate the note. I'm circling up with Barry this morning and will get right back to you. We may have a fix that takes this work for your team out of scope
for your team to have to solve for. We will be circling back to you this morning

Adam

Adam Spencer

Managing Partner

elev8 Advisors Group

O: <u>877.929.9449</u>

M: ███████

<image004.png>

On May 8, 2021, at 6:39 AM, Cory Capoccia <<u>cory@womply.com</u>> wrote:

Hi Adam, could you please send over the technical flows and specs you mentioned on our call yesterday so our team can review? We believe the best approach will be to send deal data to you via a bulk CSV. Our team needs to review and map out the process details further though.

**Cory Capoccia**

On Fri, May 7 2021 at 3:38 PM, Cory Capoccia <<u>cory@womply.com</u>> wrote:

Sorry Adam, got the time wrong. Bumped out to 3pm PT. But Mihir and I met your notetaker AI on the call :)

**Cory Capoccia**

On Fri, May 07, 2021 at 3:17 PM, Cory Capoccia <<u>cory@womply.com</u>> wrote:

Sounds great. While we're waiting on the legal agreement, why don't you, Mihir, and me jump on a quick call to discuss the game plan? I sent around a calendar invite for 230pm PT

<u>meet.google.com/kbh-teio-tmn</u>

*

<u>Join by phone</u>

**Cory Capoccia**

On Fri, May 07, 2021 at 3:13 PM, Adam Spencer <adam@elev8withus.com> wrote:

Hey Cory,

That would be correct and I'm equally looking forward to it. Between you, Toby, and I'd Rolodexes I'd say we probably know, work, or have worked with all of the same people forever in payments so it should be a great time. Also, I'll be helping here on the technical side as far as the transfer of information and will need to walk through the KYC, BSA, OFAC, AML pieces and get an understanding of what that will look like in terms of keeping this as simple as possible or deciding if we want to look at any of this in a supplemental fashion to get what will be needed for our CDFI partner. So please include whoever on your side you feel best fit to also include them on our call.

Thanks,

Adam

Adam Spencer

Managing Partner

ELEV8 Advisors Group

M: ███████

<image004.png>

---

**From:** Cory Capoccia <cory@womply.com>
**Sent:** Friday, May 7, 2021 2:08:49 PM
**To:** Adam Spencer <adam@elev8withus.com>
**Cc:** Toby Scammell <toby@womply.com>; Mihir Sambhus <msambhus@womply.com>; Barry Calhoun <barry@blueacorn.co>
**Subject:** Re: [EXTERNAL] Re: blueacorn // womply

Hi Barry and Adam, great to meet you both. I'm working with our attorneys to get a draft of the agreement ready. Adam, once they have something ready to review it sounds like the two of us will work on that together, is that right? Look forward to partnering here on this.

Cory Capoccia

On Fri, May 07, 2021 at 3:06 PM, Adam Spencer <adam@elev8withus.com> wrote:

Cory/Toby/Mihir,

It's a pleasure to virtually meet each of you. I'm happy to jump on a call this afternoon, particularly around the technical and compliance side of this transaction, but please send me the first pass at the agreement as well as I will start reviewing and we run that in parallel paths here as to not be stuck with the possibility of lawyers not working timely on a weekend to get this done for all. I'll be available after 3pm PST if you want to send an invite and get things moving. Looking forward to it. Thank you all.

Best,

Adam

Adam Spencer

Managing Partner

elev8 Advisors Group

O: 877.929.9449

M: █████████

<image004.png>

On May 7, 2021, at 9:43 AM, Barry Calhoun <barry@blueacorn.co> wrote:

Great to meet everybody.  I've added Adam Spencer.  I'm getting ready to be stuck on a plane for a bit...

Sent from my iPhone

On May 7, 2021, at 12:09 PM, Toby Scammell <toby@womply.com> wrote:

Hey Cory, please meet Barry, CEO of BlueAcorn. Barry, as mentioned, Cory is cofounder/president at
Womply. Please add anyone on your side and we can get the referral agreement moving. It would also

help in parallel for us to have a quick technical call. I've cc'd Mihir who leads Womply engineering and can sync with the right person on your side.

Best,

Toby


Toby Scammell

Founder & CEO at Womply

415-246-3250

[LinkedIn](#)

--
--
Mihir Sambhus | VP of Engineering | Womply | 669 203 9720 | [msambhus@womply.com](mailto:msambhus@womply.com)

## EXHIBIT 2

| | |
|---|---|
| **To:** | Cory Capoccia[cory@womply.com]; David Rathmann[david@elev8withus.com]; Toby Scammell[toby@womply.com] |
| **Cc:** | Adam Spencer[adam@elev8withus.com] |
| **From:** | Mihir Sambhus[msambhus@womply.com] |
| **Sent:** | Sun 5/9/2021 11:03:43 AM (UTC-07:00) |
| **Subject:** | Re: [EXTERNAL] Re: Womply Compliance Items |

Hi David
We discussed this in today mornings 9 am PST standup with Adam. One question that was unclear to us was whether this is the list from capital plus? One of the next steps discussed was to have a direct sync up call with capital plus as well with Toby. I believe Adam was planning to bring cap plus into the conversation in the evening's call.

Thanks
Mihir

On Sun, May 9, 2021 at 10:31 AM David Rathmann <david@elev8withus.com> wrote:

Hello Mihir,
I wanted to check in on the requested diligence items and set up a status call for today. Would 6PM MT still work for you? Our development team is currently working on a submissions path, but that path is still dependent on many of those diligence items.

David

---

**From:** Adam Spencer <adam@elev8withus.com>
**Sent:** Sunday, May 9, 2021 12:18 AM
**To:** Cory Capoccia <cory@womply.com>; Toby Scammell <toby@womply.com>; Mihir Sambhus <msambhus@womply.com>; David Rathmann <david@elev8withus.com>
**Subject:** Fwd: Whomply Compliance Items

Cory & Team,
Apologize for the late hour and what is sure to be a mildly disruptive communication but the team and I felt it was urgent to get this out this evening and make sure that we can either level set this evening and or early tomorrow at our stand-up to get the below points addressed and decide a path.

After the call with Mihir, David and I began to become increasingly uneasy about 2 critical points that David is outlining below. The first is the documentation and work flows along with action items associated with or is accompanying the applicants identity and estimated validity and risk. The second is there is both sizable risk to all parties in receipt of Womply's files due to the transfer of information and very little single sources of truth re: BSA, KYC, AML, OFAC, etc. coming out of the Womply eco-system before relying on a servicing partner to perform such Eligibility Verifications. In its current state, and now with what we know we will be asked to take on i.e. application and information integrity, forgiveness, etc. this is not going to be achievable without the benefit of time to dig in and do this appropriately.

However, if the Womply team can immediately address the data points and the intake process and corresponding validation tools that accompany these and by whom, then we can start to look to implement some possible alternatives that we can get both our Funding and Correspondence banks more comfortable with.

The Current structure as is (as we believe we have what we think is a "full view" into the front-end funnel and back end-office needs won't pass muster on their compliance processes.

Please give us an update as to the requests and please be prepared to speak to this in our morning standup.

We are still confident that we can create a path, however there are some newer have gotten more granular and we need to be pliable to the partners and program's requirements.

We look forward and will be ready to hear your feedback soon.

Best;

Adam

Adam Spencer
Managing Partner
elev8 Advisors Group
O: 877.929.9449
M: ▮▮▮▮▮▮▮



Begin forwarded message:

**From:** David Rathmann <david@elev8withus.com>
**Date:** May 8, 2021 at 7:55:25 PM MST
**To:** Adam Spencer <adam@elev8withus.com>
**Subject: Whomply Compliance Items**

Adam,

In addition to submission data, we need to have a compliance review with Whomply prior to sandbox submission testing. The following is a subset of the information we will need to provide to our partner bank for review.

**Immediate needs**

- Process documentation around Whomply's current data collection and decisioning.
  - What technology is used?
  - How is eligibility information collected?
  - How is the borrower's identity verified?
  - How is the bank account verified?
  - How is the Schedule-C verified?
  - How is Whomply certifying the borrower attestations?
  - How does Whomply currently verify the file in both automated and human verification?
    - If human verification is used? What parts of the file are human verified?
  - What are Whomply's fraud tools, both active and passive?
    - What data can be provided around active measures the borrower has passed?
    - What data can be provided around passive fraud detection? Does Whomply have a set of fraud scores?
- A sample file of 500 loans for audit
  - Eligibility information and application data
  - Information for verifying the borrower's identity
  - Information for verifying the borrower's bank account
  - Information for verifying the borrower's Schedule-C
  - Active and passive fraud prevention data
  - Certification data for attestations and submission

For us to meet our timelines, this information needs to be submitted to verification at the latest by mid-day tomorrow. Ideally, Whomply can provide elements of this immediately.

David

--
--
Mihir Sambhus | VP of Engineering | Womply | 669 203 9720 | msambhus@womply.com

**EXHIBIT 3**

**To:**        David Rathmann[david@elev8withus.com]
**Cc:**        barry@blueacorn.co[barry@blueacorn.co]; Mihir Sambhus[msambhus@womply.com]; Cory Capoccia[cory@womply.com];
Joe Ehrhardt[joe@teslarsoftware.com]; Adam Spencer[adam@elev8withus.com]; Justin Crossman[justin.crossman@blueacorn.com]
**From:**      Noah Spirakus[noah@blueacorn.co]
**Sent:**      Sun 5/9/2021 11:05:26 PM (UTC-07:00)
**Subject:**   [EXTERNAL] Re: Teslar onboarding

Working with bank to get permissions created, will have sent over first thing in the morning.
Best,
Noah S

On Sun, May 9, 2021 at 7:03 PM David Rathmann <david@elev8withus.com> wrote:

Noah,
Please see Cory's request below. Can you please generate API credentials for Teslar with Capital Plus's SBA account?

David

---

**From:** Cory Capoccia <cory@womply.com>
**Sent:** Sunday, May 9, 2021 8:31 PM
**To:** David Rathmann <david@elev8withus.com>; Joe Ehrhardt <joe@teslarsoftware.com>; Adam Spencer
<adam@elev8withus.com>
**Cc:** Mihir Sambhus <msambhus@womply.com>
**Subject:** Teslar onboarding

Hi Adam and David, can you please provide Joe at Teslar with Capital Plus's SBA api credentials so he can onboard the
bank?

Cory Capoccia

## EXHIBIT 4

**To:**      Lisa Mead[lisa.mead@everettadvisory.com]; Cory Capoccia[cory@womply.com]; David Rathmann[david@elev8withus.com]
**Cc:**      Mihir Sambhus[msambhus@womply.com]; Toby Scammell[toby@womply.com]; Barry Calhoun[barry@blueacorn.co]; Noah Spirakus[noah@blueacorn.co]
**From:**   Shelly B. Whitt[shelly@teslarsoftware.com]
**Sent:**    Mon 5/10/2021 11:08:58 AM (UTC-07:00)
**Subject:** [EXTERNAL] Re: [EXTERNAL] Re: Teslar access for Blue Acorns team

Two new users will have login information in the next 30 mins.

Lisa— I am available for a review of the system anytime after 2:30 PM CT. Let me know what works for you and the rest of your team and I can get a meeting invite sent out.

Thank you,
Shelly B. Whitt
Implementation Engineer
4700 S. Thompson St. Suite A-102
Springdale, AR 72764
Office: (479) 927-0200
Direct: (479) 347-4029
Cell: ██████████
shelly@teslarsoftware.com

---

**From:** Lisa Mead <lisa.mead@everettadvisory.com>
**Sent:** Monday, May 10, 2021 12:47:35 PM
**To:** Cory Capoccia <cory@womply.com>; David Rathmann <david@elev8withus.com>
**Cc:** Mihir Sambhus <msambhus@womply.com>; Toby Scammell <toby@womply.com>; Shelly B. Whitt <shelly@teslarsoftware.com>; Barry Calhoun <barry@blueacorn.co>; Noah Spirakus <noah@blueacorn.co>
**Subject:** Re: [EXTERNAL] Re: Teslar access for Blue Acorns team

**Warning! External Email!-** Do **NOT** click links and use caution on all attachments!

Can we get set up to review these asap?  Thanks

Lisa Narrell-Mead, Esq.
Lisa.Mead@EverettAdvisory.com
EverettAdvisory.com
(205)617-8392

---

**From:** Cory Capoccia <cory@womply.com>
**Sent:** Monday, May 10, 2021 11:41:20 AM
**To:** David Rathmann <david@elev8withus.com>
**Cc:** Mihir Sambhus <msambhus@womply.com>; Toby Scammell <toby@womply.com>; Shelly B. Whitt <shelly@teslarsoftware.com>; Barry Calhoun <barry@blueacorn.co>; Lisa Mead <lisa.mead@everettadvisory.com>; Noah Spirakus <noah@blueacorn.co>
**Subject:** Re: [EXTERNAL] Re: Teslar access for Blue Acorns team

Yes - Shelly, can you please setup two additional accounts for Jim and Peter with the info below ASAP? Thanks

Cory Capoccia

On Mon, May 10, 2021 at 9:37 AM, David Rathmann <david@elev8withus.com> wrote:

Corry,

Would you please also add

Jim Phillips - Jim.Phillips@everettadvisory.com
Peter Brown - pbrown@everettadvisory.com

David

---

**From:** Cory Capoccia <cory@womply.com>
**Sent:** Monday, May 10, 2021 9:56 AM
**To:** David Rathmann <david@elev8withus.com>; Barry Calhoun <barry@blueacorn.co>; Lisa Mead <lisa.mead@everettadvisory.com>; Noah Spirakus <noah@blueacorn.co>
**Cc:** Mihir Sambhus <msambhus@womply.com>; Toby Scammell <toby@womply.com>; Shelly B. Whitt <shelly@teslarsoftware.com>
**Subject:** Teslar access for Blue Acorns team

Hi David, Barry, Noah, and Lisa. Your Teslar access has been setup. Please visit the URL below and log in using your email address. Once you log in you'll need to setup your cell phone for 2FA and then please also change your pw to something unique.

https://3eteslar.com/2095-CP

Username: email

Password: ███████████

If you run into any issues, Shelly (cc'd) will help out.

Cory Capoccia

On Mon, May 10, 2021 at 8:47 AM, David Rathmann <david@elev8withus.com> wrote:

Hi Toby,
I have not yet received an email invite to the platform.

@Cory Capoccia, @Mihir Sambhus,
Please let me know next steps.

David

---

**From:** Toby Scammell <toby@womply.com>
**Sent:** Monday, May 10, 2021 9:41 AM
**To:** Lisa Mead <lisa.mead@everettadvisory.com>; David Rathmann <david@elev8withus.com>
**Cc:** Mihir Sambhus <msambhus@womply.com>; Cory Capoccia <cory@womply.com>; Barry Calhoun <barry@blueacorn.co>; Noah Spirakus <noah@blueacorn.co>
**Subject:** 100 deals review

Hi Lisa & David,

You should have both received access to our tech platform and be able to see the 100 deals we sent over last night. Can you meet with Cory & Mihir this morning to make sure you know your way around and get passed any access issues?

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

This e-mail and any attachments may contain confidential and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

This e-mail and any attachments may contain confidential, proprietary and privileged information. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this e-mail and destroy any copies. Any dissemination or use of this information by a person other than the intended recipient is unauthorized and may be illegal.

## **EXHIBIT 5**

**To:**     Connie Spencer-Adams[connie@womply.com]; Matt Yahes[matt.yahes@blueacorn.co]
**Bcc:**    Shelly B. Whitt[shelly@teslarsoftware.com]
**From:**   Cory Capoccia[cory@womply.com]
**Sent:**    Wed 5/19/2021 9:26:33 AM (UTC-07:00)
**Subject:** Re: Teslar Overview, Daily Stand up and Lender Guide

Matt - I just sent a calendar invite over for 1230pm PT today in case that works with your schedule. Look forward to connecting then. Thanks

**Cory Capoccia**


On Wed, May 19, 2021 at 10:13 AM, Cory Capoccia <[cory@womply.com](mailto:cory@womply.com)> wrote:

  −Toby −Barry

  Matt, great to connect. Let's setup a quick call today to sync on the common FAQs that you're seeing re: this process. Are you available around 1230pm PT today?


  **Cory Capoccia**


  On Wed, May 19, 2021 at 9:57 AM, Connie Spencer-Adams <[connie@womply.com](mailto:connie@womply.com)> wrote:

    Matt and Barry,

    I have added Shelly from Teslar to this email so that we can coordinate times for an overview of the Teslar dashboard as well as a short daily call to address any questions or open items.  We have found that calls earlier in the day work well as that gives us time to address any issues/questions that might be blocking your team.

    Shelly and I will be your points of contact regarding the deal workflow and processes  My cell number is 801.573.0485.

    Attached is a Lender Guide with overviews and steps of the most common processes.  Please let me know if you have any questions once you have had a chance to review.

    Looking forward to working with you and the rest of the team.

    **Connie Spencer-Adams** | VP of Partnerships | [Womply](mailto:) |   [connie@womply.com](mailto:connie@womply.com)


  On Wed, May 19, 2021 at 9:41 AM, Toby Scammell <[toby@womply.com](mailto:toby@womply.com)> wrote:

    Adding Cory and Connie.

    Connie, can you setup a daily standup with Matt from Blueacorn/CapitalPlus? Also, share our standard instructions for lenders re where to direct people for support.

    Toby Scammell
    Founder & CEO at Womply
    415-246-3250
    [LinkedIn](mailto:)

    On Wed, May 19 2021 at 5:33 AM, Barry Calhoun <[barry@blueacorn.co](mailto:barry@blueacorn.co)> wrote:

    Toby,
    Who should we connect with to get a process in place to manage this stuff?

Thanks

Barry

Sent from my iPhone

On May 19, 2021, at 8:31 AM, Matt Yahes <matt.yahes@blueacorn.co> wrote:

do you want me to connect with someone at womply to get an overview of all the different processes?  I can probably get what Eric needs in a 20 min call.  if so, please give me a name to call.

---------- Forwarded message ---------
From: **Eric Donnelly** <edonnelly@capitalplusfin.com>
Date: Tue, May 18, 2021 at 8:07 AM
Subject: Fw: Please Withdraw/Void DocuSign
To: Barry Calhoun <barry@blueacorn.co>
Cc: Matt Yahes <matt.yahes@blueacorn.co>, Greg Jacobson <gjacobson@capitalplusfin.com>, Farzana Giga <fgiga@capitalplusfin.com>

A fairly benign request but since we don't have the equivalent of
bank@blueacorn for Womply yet, not sure where to send this?
Also, I'm sure you saw the $5B remaining funds email from SBA. Probably
light by a couple of billion in my opinion given the ones likely falling
out..

------ Forwarded Message ------
From: "Jade Hughes" <ms.jade87@icloud.com>
To: fgiga@capitalplusfin.com
Cc: edonnelly@capitalplusfin.com
Sent: 5/18/2021 6:02:30 AM
Subject: Please Withdraw/Void DocuSign

Good Morning,

This morning I was sent the Ppp loan application docusign from womply. However, I didn't realize it was for the first draw until I logged into my Womply portal. I've already been funded for my first draw. Could you please withdraw/void the DocuSign, as I do not want my chances of obtaining a second draw to be ruined, and I do not want to increase the chances of getting a secondary lender review hold either.

Thanks,

Jade Hughes

Sent from my iPhone

## EXHIBIT 6

**To:**    Farzana Giga[fgiga@capitalplusfin.com]
**Cc:**    Amber Aldrich[amber.aldrich@blueacorn.tech]; Noah Spirakus[noah@blueacorn.tech]; Justin
Crossman[justin.crossman@blueacorn.tech]; Eric Donnelly[edonnelly@capitalplusfin.com]; cory@womply.com[cory@womply.com]
**From:**    Connie Spencer-Adams[connie@womply.com]
**Sent:**    Fri 6/18/2021 7:16:05 AM (UTC-07:00)
**Subject:**    Re: Loan Funding

Hi Farzana,

Our team is sending reminders to the borrowers every day reminding them that they have outstanding documents to sign. We will continue our efforts to get these documents processed as soon as possible.

**Connie Spencer-Adams** | VP of Partnerships | Womply | connie@womply.com

On Fri, Jun 18, 2021 at 7:52 AM, Farzana Giga <fgiga@capitalplusfin.com> wrote:

Connie - I spoke with Shelly yesterday about the loan files we have not received back to prepare for funding. Given that we have to submit all these loans to the Fed, we've set a **DEADLINE of 6/23** to get all files/tapes to CPF so that we can prepare and fund all loans prior to 6/30. From speaking with Shelly, we currently have approximately 11K loans where we have not received documents back on. We need you to push the borrowers to get these back so we can get them funded. Any loans not sent to BA/CPF by 6/23 will not be able to get funds and none of us want to deal with that. Shelly - BA will be pulling down the 75,090 files today. Will you be adding a new file TODAY for all documents received since the last file was created? If so, we can get that submitted to the Fed also. Finally, please run the file each day so that we can move loans into funding as possible.

Please let me know if you have any questions.

Thanks,
Farzana

--
Farzana Giga
Chief Financial Officer
**Capital Plus Financial, LLC**
**Crossroads Systems, Inc.**
(p) 817-510-2235: ▋
(a) 2247 Central Dr. Bedford, TX 76021
(e) fgiga@capitalplusfin.com



## EXHIBIT 7

# Fwd: Womply Invoice INV07688

Begin forwarded message:

**From:** bill hutchinson <bill.hutchinson@blueacorn.co>
**Date:** July 1, 2021 at 9:06:55 PM EDT
**To:** Invoices <invoices@blueacorn.co>, Noah Spirakus <noah@blueacorn.co>, Barry Calhoun
<barry@blueacorn.co>, Erin Valdes <erin.valdes@blueacorn.co>
**Cc:** Amber Aldrich <amber.aldrich@blueacorn.co>
**Subject: Fwd: Womply Invoice INV07688**

──── Forwarded message ────
From: **Jessica Harris** <jharris@womply.com>
Date: Thu, Jul 1, 2021 at 3:48 PM
Subject: Womply Invoice INV07688
To: <bill.hutchinson@blueacorn.co>
Cc: Accounts Receivable <accountsreceivable@womply.com>, Partnerships Team
<partnerships@womply.com>

Bill,

Attached is today's invoice showing the total outstanding balance for loans funded through
6/28/2021. Please confirm receipt of this email. Thank you for your partnership, have a great
weekend!

--

**Regards,**

**Jessica Harris** | Accounts Receivable & Payable | **Womply** | (435) 363-5728 | jharris@womply.
com

—

William E. Hutchinson
Chief Financial Officer
704.441.3426

blueacorn

*"Doing the right things, for the right reasons, for the right people"*

—

Farzana Giga
Chief Financial Officer
**Capital Plus Financial, LLC**
**Crossroads Systems, Inc.**

(p) 817-510-2235 : 
(a) 2247 Central Dr. Bedford, TX 76021
(e) fgiga@capitalplusfin.com



From      **Toby Scammell** <toby@womply.com>

To        **Barry Calhoun** <barry@blueacorn.co>

Thursday, July 1 2021 at 10:23 PM PDT   ✕

Thanks for headsup

Toby Scammell
Founder & CEO at Womply
415-246-3250
LinkedIn

On Fri, Jul 2 2021 at 4:41 AM, Barry Calhoun <barry@blueacorn.co> wrote:

FYI
Sent from my iPhone

Begin forwarded message:

**From:** Farzana Giga <fgiga@capitalplusfin.com>
**Date:** July 1, 2021 at 9:31:33 PM EDT
**To:** Barry Calhoun <barry@blueacorn.co>
**Cc:** Erin Valdes <erin.valdes@blueacorn.co>, David Rathmann <david.rathmann@blueacorn.co>
**Subject: Re: Womply Invoice INV07688**

They've been billed as of Monday. I'll let you know once we start collecting.

On Thu, Jul 1, 2021 at 8:10 PM Barry Calhoun <barry@blueacorn.co> wrote:
I need to know when we start getting paid in these.

Thanks

BC

Sent from my iPhone

Begin forwarded message:

**From:** bill hutchinson <bill.hutchinson@blueacorn.co>
**Date:** July 1, 2021 at 9:06:55 PM EDT
**To:** Invoices <invoices@blueacorn.co>, Noah Spirakus <noah@blueacorn.co>, Barry
Calhoun <barry@blueacorn.co>, Erin Valdes <erin.valdes@blueacorn.co>
**Cc:** Amber Aldrich <amber.aldrich@blueacorn.co>
**Subject: Fwd: Womply Invoice INV07688**

———— Forwarded message ————
From: **Jessica Harris** <jharris@womply.com>
Date: Thu, Jul 1, 2021 at 3:48 PM
Subject: Womply Invoice INV07688
To: <bill.hutchinson@blueacorn.co>
Cc: Accounts Receivable <accountsreceivable@womply.com>, Partnerships Team
<partnerships@womply.com>

Bill,

Attached is today's invoice showing the total outstanding balance for loans funded through
6/28/2021. Please confirm receipt of this email. Thank you for your partnership, have a great
weekend!

–

**Regards.**

**Jessica Harris** | Accounts Receivable & Payable | **Womply** | (435) 363-5728 | jharris@womply.com

—

William E. Hutchinson
Chief Financial Officer
704.441.3426

## blueacorn

*"Doing the right things, for the right reasons, for the right people"*

—

Farzana Giga
Chief Financial Officer
**Capital Plus Financial, LLC**
**Crossroads Systems, Inc.**
(p) 817-510-2235: ███████
(a) 2247 Central Dr. Bedford, TX 76021
(e) fgiga@capitalplusfin.com

---

**Me**          Toby Scammell Founder & CEO at Womply 415-246-3250 LinkedIn          ⊝  JUL 1

**Cory**        Hey Toby - we still haven't received any payments from Blue Acorn. Are there diff...  JUL 22

**Me to Cory & Thom**                                                                    JUL 22

Please email Barry and ask him. Let him know that I shared his previous commitment to make a substantial payment by end of last week and ask him for an update on when they expect to make their first payment and how much it'll be for.

---

Opened by Thom and Cory



**EXHIBIT 8**

Date: 7/21/2021
Invoice No. INV07737

From: Oto Analytics, Inc. (dba Womply)
548 Market Street #737451
San Francisco, CA 84104

To: Blue Acorn LLC
30 N Gould St.
Ste 3297
Sheridan WY 82801

**New Invoice(s)**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date |
|---|---|---|---|---|---|---|---|---|
| 7/16/2021 | INV07737 | 36 | 385,525 00 | 3,855.25 | 26,575.42 | - | 30,430.67 | 8/5/2021 |

**Outstanding Invoices Awaiting Payment**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date |
|---|---|---|---|---|---|---|---|---|
| 6/21/2021 | INV07675 | 75,090 | 827,542,920 00 | 8,275,429.20 | 58,586,935.13 | - | 66,862,364.33 | 7/11/2021 |
| 6/25/2021 | INV07688 | 8,361 | 94,442,963 00 | 944,429.63 | 6,363,212 04 | - | 7,307,641.67 | 7/15/2021 |
| 7/9/2021 | INV07728 | 3,671 | 38,556,366 00 | 385,563.66 | 2,733,309 84 | - | 3,118,873.50 | 7/29/2021 |
| Unapplied payments | | | | | | - | 0.00 | |
| **Total** | | 87,158 | 960,927,774 | 9,609,278 | 67,710,032 | **0** | 77,319,310 | |

| | |
|---|---|
| Total Payment Outstanding based on Net 15 | 74,170,006.00 |
| Late fee on Outstanding Balance over Net 15 | 0.00 |

*Unpaid invoices are subject to a finance charge of **1.5%** per month or the maximum permitted by law, whichever is lower, plus all expenses of collection.*

*If you have any questions regarding this invoice, please contact AccountsReceivable@Womply.com. Wire/ACH information was communicated separtely. To prevent fraud or other potential funding problems, DO NOT accept changes to wiring instructions without verbal confirmation from an authorized representative from Womply. Supporting detail included as separate attachment.*

**EXHIBIT 9**

**To:**       Toby Scammell[toby@womply.com]
**From:**    Cory Capoccia[cory@womply.com]
**Sent:**    Wed 7/28/2021 8:40:10 AM (UTC-07:00)
**Subject:**  Fwd: Re: Payment status

Sounds like they are holding funds hostage
.


Cory Capoccia

---------- Forwarded message ----------
From: Barry Calhoun <barry@blueacorn.co>
Date: Wednesday, July 28 2021 at 9:31 AM MDT
Subject: Re: Payment status
To: Cory Capoccia <cory@womply.com>
Cc: Thom Keyes <tkeyes@womply.com>


Cory,
I think cap plus has been requesting information and a process for acces to files on their loans.

I think getting into a flow with them regarding info sharing will be really helpful in giving them confidence to start releasing funds.

How's that going?

Sent from my iPhone


> On Jul 28, 2021, at 10:07 AM, Cory Capoccia <cory@womply.com> wrote:


> Hi Barry - checking back in on this thread. Can you please advise so we can communicate and set appropriate expectations with all parties impacted by the delayed payment? Thanks

Cory Capoccia

> On Tue, Jul 27 2021 at 9:01 AM, Cory Capoccia <cory@womply.com> wrote:

> Hi Barry - hope your week is going well. Could you please let us know timing for when you expect to receive payment from Cap Plus?

> Thanks!

Cory Capoccia

> On Fri, Jul 23, 2021 at 12:09 PM, Cory Capoccia <cory@womply.com> wrote:

> Thanks, Barry. Do you have a sense for when you expect to receive payment from Cap Plus?

Cory Capoccia

> On Thu, Jul 22 2021 at 7:04 PM, Barry Calhoun <barry@blueacorn.co> wrote:

**APPX. 228**

We have not been paid by capital plus

Sent from my iPhone

On Jul 22, 2021, at 7:53 PM, Cory Capoccia <cory@womply.com> wrote:

Hi Barry, I hope you are doing well. I'm checking in with you re: the timing for payment to Womply. Toby shared your previous commitment to make a substantial payment by end of last week with us, but to date we have not received any payments from Blue Acorn.

Can you please provide an update on when you will make their first payment and what amount we should expect for that?

Thanks in advance!

**Cory Capoccia**

## EXHIBIT 10

**To:**       Barry Calhoun[barry@blueacorn.co]
**Cc:**       Greg Jacobson[gjacobson@capitalplusfin.com]
**From:**    Cory Capoccia[cory@womply.com]
**Sent:**    Tue 8/3/2021 5:38:26 AM (UTC-07:00)
**Subject:**  Re: Womply fee payments

Hi Barry, thanks. Can you please provide an update on the timing of receiving the overdue payment? Thanks

Cory Capoccia

On Sun, Aug 1 2021 at 5:17 PM, Barry Calhoun <barry@blueacorn.co> wrote:

  Cool!  I'll reach out and see what's going on.

  Sent from my iPhone


        On Aug 1, 2021, at 7:07 PM, Cory Capoccia <cory@womply.com> wrote:


        Yes

        Cory Capoccia

        On Sun, Aug 1 2021 at 4:01 PM, Barry Calhoun <barry@blueacorn.co> wrote:

        Hey Cory,
        Have you guys gotten everything over to cap plus that they were looking for?

        Sent from my iPhone


              On Aug 1, 2021, at 5:47 PM, Cory Capoccia <cory@womply.com> wrote:


              Hi guys, hope you are having a good weekend. I haven't heard back from either of you and so
              I'm following up. Can you please provide an update on this? Thanks

              Cory Capoccia

              On Thu, Jul 29 2021 at 7:18 AM, Cory Capoccia <cory@womply.com> wrote:

              Hi Greg and Barry, can you please let us know the status of receiving payment for the referral
              activity we sent through to Blue Acorn and Capital Plus? We were promised that we would
              receive
              payment weeks ago according to terms of our agreement and have yet to receive any payments.
              Please let me know if you need updated wire instructions from our team or if there is anything
              we need to discuss on a quick call today so that payment can be remitted before end of week.

              Thank you,
              Cory Capoccia

**EXHIBIT 11**

# ʬʬwomply

| | |
|---|---|
| Date: | 8/4/2021 |
| Invoice No. | INV07737 |

From:
Oto Analytics, Inc. (dba Womply)
548 Market Street #737451
San Francisco, CA 84104

To:
Blue Acorn LLC
30 N Gould St.
Ste 3297
Sheridan WY 82801

**New Invoice(s)**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date | Late Fees |
|---|---|---|---|---|---|---|---|---|---|
| 7/31/2021 | | 0 | 0.00 | 0.00 | 0.00 | - | 0.00 | | - |

**Outstanding Invoices Awaiting Payment**

| Funding Date | Invoice No. | Quantity | Total Loan Amt | Referral Fees | Technology & Developer Fee | Pymts Received | Outstanding Bal. | Due Date | Late Fees |
|---|---|---|---|---|---|---|---|---|---|
| 6/21/2021 | INV07675 | 74,312 | 838,095,697.00 | 8,163,761.95 | 57,972,654.34 | - | 66,136,416.29 | 7/11/2021 | 760,568.79 |
| 6/25/2021 | INV07688 | 8,359 | 94,476,795.00 | 944,091.31 | 6,361,550.36 | - | 7,305,641.67 | 7/15/2021 | 69,403.60 |
| 7/9/2021 | INV07728 | 3,671 | 38,556,366.00 | 385,563.66 | 2,733,309.84 | - | 3,118,873.50 | 7/29/2021 | 7,797.18 |
| 7/16/2021 | INV07737 | 36 | 385,525.00 | 3,855.25 | 26,575.42 | - | 30,430.67 | 8/5/2021 | - |
| Unapplied payments | | | | | | - | - | | |
| **Total** | | 86,378 | 971,514,383 | 9,497,272 | 67,094,090 | 0 | 76,591,362 | | |

Total Payment Outstanding based on Net 15   76,560,931.46
Late fee on Outstanding Balance over Net 15   837,769.57

*Unpaid invoices are subject to a finance charge of  **1.5%**  per month or the maximum permitted by law, whichever is lower, plus*

*If you have any questions regarding this invoice, please contact AccountsReceivable@Womply.com. Wire/ACH information was communicated separtely. To prevent fraud or other potential funding problems, DO NOT accept changes to wiring instructions without verbal confirmation from an authorized representative from Womply. Supporting detail included as separate attachment.*